T.C. Memo. 1999-101


UNITED STATES TAX COURT


JERRY AND PATRICIA A. DIXON, ET AL.,[1] Petitioners
v. COMMISSIONER OF INTERNAL REVENUE, Respondent[*]


Docket Nos. 9382-83, 17646-83,    Filed March 30, 1999.
            4201-84,  7323-84,
           15907-84, 20119-84,
           40159-84, 22783-85,
           30010-85, 30979-85,
           29643-86, 35608-86,
           19464-92,   621-94,
            7205-94,  9532-94,
           17992-95, 17993-95.

    [1] Cases of the following petitioners are consolidated
herewith:  Ronald L. Alverson and Mattie L. Alverson, docket No.
17646-83; Hoyt W. and Barbara D. Young, docket Nos. 4201-84,
22783-85, 30010-85; Anthony E. and Carol A. Eggers, docket No.
7323-84; Robert L. and Carolyn S. DuFresne, docket Nos. 15907-84,
30979-85; John L. and Terry E. Huber, docket No. 20119-84;
Terry D. and Gloria K. Owens, docket No. 40159-84; Richard and
Fidella Hongsermeier, docket No. 29643-86; Norman W. and
Barbara L. Adair, docket No. 35608-86; Willis F. McComas, II and
Marie D. McComas, docket No. 19464-92; Wesley Armand and Sherry
Lynn Cacia Baughman, docket No. 621-94; Joe A. and JoAnne
Rinaldi, docket No. 7205-94; Norman A. and Irene Cerasoli, docket
No. 9532-94; Stanley C. and Sharon A. Titcomb, docket No. 17992-
95; Richard B. and Donna G. Rogers, docket No. 17993-95.

    [*] This opinion supplements our previously filed Memorandum
Findings of Fact and Opinion in Dixon v. Commissioner, T.C. Memo.
1991-614, vacated and remanded per curiam sub nom. DuFresne v.
Commissioner, 26 F.3d 105 (9th Cir. 1994).

In Dixon v. Commissioner, T.C. Memo. 1991-614, vacated and remanded per curiam sub nom. DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), following a trial of 14 docketed test cases of eight Ps, the Court sustained R's disallowance of interest deductions claimed by Ps in various tax shelter programs promoted by K. After the Court entered decisions against the test case Ps in accordance with its opinion, R moved to vacate the decisions entered in three test cases (T, C, and X). R alleged that, before the trial of the test cases, R's trial attorney and District Counsel had entered into contingent settlement agreements with T and C that had not been disclosed to the Court or to the other test case Ps or their counsel. R asked the Court to conduct an evidentiary hearing to determine whether the undisclosed agreements with T and C had affected the trial of the test cases or the opinion of the Court.

The Court granted R's motions to vacate the decisions entered in the T and C cases, entered revised decisions in the T and C cases consistent with R's prior agreements with T and C, denied R's motion to vacate the decision in the X case, and denied R's request for an evidentiary hearing on the ground that the testimony, stipulated facts, and exhibits relating to the T and C cases had no material effect on the Court's opinion as it related to the remaining test case Ps.

On appeal, the Court of Appeals for the Ninth Circuit vacated the decisions in the remaining test cases and remanded them to this Court with directions "to conduct an evidentiary hearing to determine the full extent of the admitted wrong done by the government trial lawyers." DuFresne v. Commissioner, supra at 107. The Court of Appeals, citing Arizona v. Fulminante, 499 U.S. 279, 309 (1991), directed the Court to consider "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error." Id. Further, the Court of Appeals directed this Court to consider on the merits all motions of intervention filed by affected parties. See id. This Court ordered that the cases of 10 nontest case Ps, the majority of whom had previously signed piggyback agreements, be consolidated with the remaining test cases for purposes of the evidentiary hearing. Three groups of Ps participated in all subsequent phases of the evidentiary hearing.

Ps argue (under various theories) that the Court's decisions in the remaining test cases should not be reinstated, or, in the alternative, that the piggyback agreements are not enforceable. R counters that the decisions in the remaining test cases should be reinstated on the ground that Ps were not prejudiced by the Government misconduct in the trial of the test cases and that the piggyback agreements remain in force.

Held: The Government misconduct in the trial of the test cases did not result in a structural defect in the trial. Held further: The Government misconduct in the trial of the test cases resulted in harmless error. Held further: The Government misconduct in the trial of the test cases does not provide any other basis for invalidating the Court's decisions in the remaining test cases or for setting aside the piggyback agreements. Held further: As a sanction against R, program participants who have not been the subject of a final determination are not liable for time-sensitive additions to tax for negligence under secs. 6653(a)(2) and 6653(a)(1)(B), I.R.C., or increased interest under sec. 6621(c), I.R.C.

Joe Alfred Izen, Jr., counsel for petitioners in docket Nos. 9382-83, 4201-84, 15907-84, 40159-84, 22783-85, 30010-85, 30979-85, 29643-86, and 35608-86.

Robert Alan Jones, counsel for petitioners in docket Nos. 17646-83, 19464-92, 621-94, and 9532-94.

Robert Patrick Sticht, counsel for petitioners in docket Nos. 7323-84, 20119-84, 7205-94, 17992-95, and 17993-95.

Mary Elizabeth Wynne, Steven A. Wilson, Andrew J. Gottlieb, Milton J. Carter, Jr., Robert E. Casey, and Richard S. Goldstein, for respondent.

CONTENTS

Page

Introduction.................................................9

FINDINGS OF FACT...........................................15

I.   Kersting Tax Shelter Programs and Related Matters.......15
     A. The Pike Case......................................15
     B. Kersting Criminal Investigation...................16
     C. Assessments of Kersting Promoter Penalties.............18
     D. Kersting Notice of Deficiency.....................19

II.  Notices of Deficiency Issued to Kersting Program
     Participants .........................................20
     A. Form of Notices of Deficiency.....................20
     B. Thompson Notices of Deficiency....................21
     C. Cravens Notices of Deficiency.....................23
     D. Alexander Notices of Deficiency...................24
        1. 1974 and 1975.................................25
        2. 1976 and 1977.................................26
     E. Validity of Notices of Deficiency................27
     F. Errors in Notices of Deficiency..................27

III. Commencement of Kersting Project ....................28
     A. Tax Shelter Projects and Test Case Procedures.....28
        1. Overview......................................28
        2. National Office Tax Shelter Branch Functions.........30
     B. Petitions for Redetermination....................31
     C. Brian J. Seery...................................32
     D. Respondent's Counsel.............................33
        1. Kenneth W. McWade............................33
        2. William A. Sims..............................34
     E. Adoption of Test Case Procedures in Kersting Project.....34
        1. The Honolulu Session (June 1985).............34
        2. Test Case Procedure..........................35
        3. Test Case Array..............................38

IV.  The Maui Session (February 1987)......................42
     A. Trial Notices....................................42
     B. Piggyback Agreements.............................44
     C. Mr. Seery's Withdrawals as Counsel...............48
        1. The Thompsons................................49
        2. The Test Cases...............................50
     D. Entries of Appearance by Chicoine and Hallett.........51
     E. Evidentiary Issues...............................54
        1. The Maui Session.............................54
        2. Dixon I Opinion..............................55

V.   Kersting Disputes With Program Participants.............55
     A. The Thompsons....................................56

       1. The Bauspar Program...................................56
       2. Deterioration of Thompson/Kersting Relationship.......57
   B. The Alexander Dispute...................................67
   C. Collection Actions.....................................72
       1. Steve Hane.........................................72
       2. Carl Mott, George Vermef, and Robert Peterson........73

VI.   Settlements............................................74
   A. Internal Revenue Service Policy.........................74
       1. National Office Position............................74
       2. Regional Counsel...................................76
   B. Official Kersting Project Settlement Offer (7-Percent
      Reduction of Deficiency or Out-of-Pocket Expenses).......77
   C. Deviations From Official Project Settlement Offer.......78
       1. Modified 7-Percent Settlement Offer..................78
       2. 20-Percent Settlement Offer........................80
       3. Negotiations for 50-Percent Settlement Offer.........82
       4. Revival of 20-Percent Settlement Offer..............84
   D. The Thompson Settlement................................92
       1. Initial Thompson Settlement Agreement...............92
       2. First Revision of Thompson Settlement...............94
       3. Second Revision of Thompson Settlement..............98
   E. The Cravens Settlement................................100
   F. The Alexander Understanding...........................106
   G. The Kozak Decision...................................115

VII.  Pretrial Developments.................................116
   A. The Kersting Deposition--Postponed (January 1987).......116
   B. John Doe Summons/Assessments of Promoter Penalties.....118
   C. Chicoine and Hallett's Withdrawal as Counsel...........120
   D. Mr. Izen's Entry of Appearance........................120
   E. The Kersting Deposition (October 1988)................121

VIII. Trial of Test Cases (January 1989)....................123
   A. Mr. Cravens..........................................124
   B. Mr. Thompson.........................................126
   C. Mr. Kersting.........................................129
   D. Mr. Alexander........................................130
   E. Mr. DeCastro.........................................133
   F. Comfort Letters......................................133
   G. Mr. Izen's Introduction of Evidence of Collection
      Litigation.............................................135

IX.   Posttrial Developments................................137
   A. First Thompson Refund.................................137
   B. Mr. Izen's Motion To Reopen Record....................141
   C. Dixon II Opinion.....................................142
   D. Disclosure of Thompson Settlement.....................143
   E. Disclosure of Cravens Settlement......................152
   F. Respondent's Motions To Vacate........................155

    G. Attempted Discovery by Counsel for Nontest Case
       Petitioners.........................................................156
    H. Closing of Thompson Cases/Further Refunds..............156
    I. Closing of Cravens Cases.................................160

PROCEDURAL HISTORY OF EVIDENTIARY HEARING.....................162

I.     Developments Before Evidentiary Hearing.................162
    A. Referral of Thompson and Cravens Settlements to Office
       of Inspector General......................................162
    B. Revival of 7-Percent Settlement Offer...................165
    C. Disciplinary Actions.....................................165
    D. Indictment of Mr. Izen...................................166
    E. Pretrial Conference (July 1995).........................167
    F. Pretrial Conference (January 1996)......................168
    G. Denial of Respondent's Motion To Disqualify Mr. Izen....168
    H. Mr. DeCastro's Withdrawal................................170
    I. Discovery of Alexander Decisions and Referral to
       Office of Inspector General..............................170
    J. Mr. Izen's Motion To Compel Production of Documents
       and Issuance of Protective Orders........................171
    K. Burden of Proof and Rule 145 Order......................173

II.    The Evidentiary Hearing.................................175
    A. Testimony...............................................176
       1. Mr. Cravens......................................... 176
       2. Mr. Thompson........................................178
       3. Mr. Alexander.......................................179
       4. Mr. McWade..........................................180
       5. Mr. Sims............................................182
       6. Mr. DeCastro........................................183
       7. Mr. Izen............................................184
    B. Mr. Sticht's Allegations of Potential Witness
       Intimidation.............................................186
    C. Mr. Bradt's June 12, 1996, Letter to Mr. Kersting.......187
    D. Denial of Mr. Izen's Motion To Refer Thompson and
       Cravens Settlements and Alexander Agreement to
       Department of Justice (Public Integrity Section)........189

III.  Developments Following Initial Evidentiary Hearing......189
    A. Denial of Respondent's Motion for Further Hearing
       Regarding Potential Witness Intimidation................189
    B. Supplemental Evidentiary Hearing (August 18, 1997)......192
    C. Denial of Mr. Izen's Motion To Compel Production of
       Documents................................................194
    D. Denial of Mr. Sticht's Motion To Reopen Record.........195
    E. Denial of Mr. Izen's Motion To Take Judicial Notice.....196
    F. Denial of Mr. Sticht's Motions for Release From
       Piggyback Agreements.....................................198
    G. Reports Regarding the Court's Protective Orders.........199

ULTIMATE FINDINGS OF FACT.....................................200

OPINION.......................................................202

I.    Burden of Proof........................................203

II.   Structural Defect......................................211
      A. Case Law............................................211
      B. Arguments...........................................215
      C. Summary of Government Misconduct....................218
      D. Discussion..........................................225

III.  Harmless Error Analysis...............................233
      A. Review of Dixon II..................................236
         1. Mr. Kersting's Lack of Credibility..............237
         2. Sham Analysis...................................238
         3. Lack of Genuine Debt/Waltz of Funds.............240
            i.   Subscription Interest.......................241
            ii.  Primary Loans..............................242
            iii. Leverage Loans.............................244
         4. Collection Litigation...........................244
         5. CAT-FIT Plan....................................245
         6. Additions to Tax................................247
            i.   Negligence.................................247
            ii.  Late Filing................................247
            iii. Substantial Understatement.................247
            iv.  Increased Interest.........................248
      B. Discussion..........................................249
         1. Mr. Cravens.....................................249
            i.   Sham Analysis..............................251
            ii.  Lack of Genuine Debt/Waltz of Funds........254
         2. Mr. Thompson....................................255
            i.   Sham Analysis..............................257
            ii.  Lack of Genuine Debt/Waltz of Funds........258
            iii. Additions to Tax...........................262
         3. Mr. Alexander...................................264
         4. Summary.........................................266

IV.   Fraud, Misrepresentation, and Misconduct..............267

V.    Fraud on the Court....................................271
      A. Case Law Survey.....................................271
      B. Discussion..........................................281

VI.   Mr. Izen's Allegations That Mr. DeCastro Was a "Mole"...283

VII.  Enforceability of Piggyback Agreements.................284
      A. Principles of Contract Law.........................285
      B. Discussion..........................................290
         1. Benefit of the Bargain.........................290
         2. Mr. Seery's Purported Conflict of Interest......294

3. Rejection of Mr. Izen's Argument for Entry of
Decision On the Basis of Thompson Decisions..........296

VIII. Mary Carter Agreements.................................296

IX.    Mr. Sticht's Motion To Sever Case and for Entry of
Decision or Alternatively To Sever Case and Set for
Trial .................................................300

X.     Protective Orders...................................302

XI.    Sanctions...........................................305

Conclusion.................................................307

SUPPLEMENTAL MEMORANDUM FINDINGS OF FACT AND OPINION

BEGHE, Judge:  Eight of these consolidated cases--with five petitioners represented by Joe Alfred Izen, Jr. (Mr. Izen),--are test cases before the Court on remand from the Court of Appeals for the Ninth Circuit in DuFresne v. Commissioner, 26 F.3d 105 (9th Cir. 1994), vacating and remanding per curiam Dixon v. Commissioner, T.C. Memo. 1991-614.

The other 10 consolidated cases--with petitioners in one case represented by Mr. Izen and the other petitioners represented by Robert Alan Jones (Mr. Jones) and Robert Patrick Sticht (Mr. Sticht)--are nontest cases that have been added to the consolidated group in order to effectuate the direction of the Court of Appeals "to consider on the merits all motions of intervention filed by parties affected by this case."  Id. at 107.

Unless otherwise indicated, section references are to the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

Introduction

These consolidated cases are part of a group of more than 1,300 remaining cases--more than 500 cases have settled--arising from respondent's disallowance of interest deductions claimed by participants in various tax shelter programs promoted by Henry F.K. Kersting (Mr. Kersting).  The Kersting group of cases (hereinafter the Kersting project) was assigned to Judge William A. Goffe (Judge Goffe) for disposition.  By agreement of the parties and the Court, the merits of the Kersting programs were to be litigated in a consolidated trial of 14 docketed cases of eight petitioners that had been designated as "test cases". The vast majority of the remaining Kersting project petitioners signed stipulations to be bound (sometimes referred to herein as piggyback agreements) in which they agreed with respondent that their cases would be resolved in accordance with the Court's opinion in the test cases.

Before the trial of the test cases, some test case petitioners argued that a 1981 search of Mr. Kersting's office had been illegal, that materials seized during the search should be suppressed in the test case proceedings, and that the burden of proof and burden of going forward with evidence should be shifted to respondent.  In Dixon v. Commissioner, 90 T.C. 237 (1988) (Dixon I), the Court held, in an opinion by Judge Goffe, that the petitioners had failed to establish standing to contest the Kersting search and seizure.

Judge Goffe held the trial of the test cases in Honolulu, Hawaii, during January 1989. The majority of the test case petitioners were represented at trial by Mr. Izen. However, test case petitioners John R. and Maydee L. Thompson (docket Nos. 19321-83, 31236-84, and 30965-85) were represented at trial by Luis C. DeCastro (Mr. DeCastro), and test case petitioners John R. and E. Maria Cravens (docket Nos. 16900-83 and 15135-84) appeared pro sese.

Following the trial of the test cases, the Court issued its memorandum opinion in <u>Dixon v. Commissioner</u>, T.C. Memo. 1991-614, 62 T.C.M. (CCH) 1440, 1991 T.C.M. (RIA) par. 91,614 (Dixon II), sustaining virtually all of respondent's determinations in each of the test cases, and entered decisions against the test case petitioners in accordance with its opinion.

On March 13, 1992, the Court entered the following decisions in the Thompson and Cravens cases:

John R. and Maydee L. Thompson

|  |  | Additions to Tax | | | |
|  |  | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a) | 6653(a) | 6653(a)(1) | 6653(a)(2) |
| 1979 | $18,161.00 | --- | $908 | --- | --- |
| 1980 | 24,838.00 | --- | --- | --- | --- |
| 1981 | 36,294.52 | $4,934.32 | --- | $1,958.28 | 50 percent of the interest due on the deficiency |

John R. and E. Maria Cravens

|  |  | Additions to Tax |
| Year | Deficiency | Sec. 6653(a) |
| 1979 | $4,508.00 | $225.40 |
| 1980 | 5,893.45 | 294.67 |

On June 9, 1992, respondent filed motions for leave to file motions to vacate the decisions entered against the Thompsons, the Cravenses, and another test case petitioner, Ralph J. Rina (Mr. Rina), docket No. 17640-83. Respondent's motions to vacate alleged that, before the trial of the test cases, respondent's trial attorney, Kenneth W. McWade (Mr. McWade), and his supervisor, Honolulu District Counsel William A. Sims (Mr. Sims), had entered into contingent settlement agreements with the Thompsons and the Cravenses that had not been disclosed to the Court or to the other test case petitioners or their counsel. Respondent asked the Court to conduct an evidentiary hearing to determine whether the undisclosed agreements with the Thompsons and the Cravenses had affected the trial of the test cases or the opinion of the Court.

On June 22, 1992, Judge Goffe granted respondent's motions to vacate filed in the Thompson and Cravens cases, vacated the decisions entered in those cases, ordered the parties to file agreed decisions with the Court, or otherwise move as appropriate, and denied respondent's request for an evidentiary hearing. By order dated June 22, 1992, Judge Goffe also denied respondent's motion to vacate the decision entered against Mr. Rina, on the ground that the testimony, stipulated facts, and exhibits relating to the Thompson and Cravens cases had no material effect on the Court's Dixon II opinion as it related to Mr. Rina.

On July 22, 1992, the test case petitioners represented by Mr. Izen filed a motion for reconsideration of the Court's order denying respondent's motion to vacate the decision in the Rina case. By order dated August 4, 1992, Judge Goffe denied petitioners' motion for reconsideration.

In August 1992, the Court entered revised decisions in the Thompson and Cravens cases consistent with Mr. McWade's prior agreements with the taxpayers in those cases. Specifically, the Court entered the following decisions in the Thompson and Cravens cases:

John R. and Maydee L. Thompson

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | --- | --- |
| 1980 | $15,000 | --- |
| 1981 | 15,000 | --- |

John R. and E. Maria Cravens

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | $3,606.40 | --- |
| 1980 | 6,175.76 | --- |

The decisions entered in the Thompson and Cravens cases are now final.[2]

---

[2] Mr. Izen and Mr. Sticht filed separate motions with the Court to intervene in the Thompson and Cravens cases. The Court denied these motions to intervene. Although Mr. Izen and Mr. Sticht filed separate appeals in the Thompson and Cravens cases with various courts, including the Courts of Appeals for the Second, Ninth, and Tenth Circuits, all appeals in the Thompson and Cravens cases eventually were dismissed. In an unpublished opinion filed June 15, 1994, the Court of Appeals for the Ninth Circuit stated:

(continued...)

Because of Judge Goffe's termination, on September 30, 1992, of his recall status as a Senior Judge of the Court, all cases in the Kersting project group were reassigned to Judge Renato Beghe.

The other test case petitioners, including Mr. Rina, appealed the decisions entered in their cases to the Court of Appeals for the Ninth Circuit. On appeal, those petitioners argued that the trial of the test cases had been tainted by the Thompson and Cravens settlement agreements. The response of the Court of Appeals was to vacate the decisions in the remaining test cases and remand them to this Court with directions "to conduct an evidentiary hearing to determine the full extent of the admitted wrong done by the government trial lawyers." DuFresne v. Commissioner, 26 F.3d at 107. The Court of Appeals, citing Arizona v. Fulminante, 499 U.S. 279, 309 (1991), directed the Court to consider "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's misconduct, the judgment can be upheld as harmless error." DuFresne v. Commissioner, supra at 107. Further, the Court of

---

2(...continued)
The Tax Court's August 25 and 26, 1992 decisions entering settlement in the Cravens and Thompson cases, respectively, are final. 26 U.S.C. § 7481(a)(1); Fed. R. App. P. 13. The Tax Court lacks jurisdiction to vacate those decisions. Billingsley v. CIR, 868 F.2d 1081, 1084 (9th Cir. 1989). Because there is no case remaining in which the taxpayers can intervene, this appeal is moot. [Adair v. Commissioner, No. 92-70812, 26 F.3d 129 (9th Cir. 1994).]

Appeals directed this Court to consider on the merits all motions of intervention filed by parties affected by Dixon II.  See id.[3]

On February 2, 1995, respondent filed a Motion for an Evidentiary Hearing.  On September 14, 1995, the Court granted respondent's motion.  To effectuate the direction of the Court of Appeals regarding intervention, the Court ordered that the cases of 10 nontest case petitioners, the majority of whom had previously signed piggyback agreements, be consolidated with the remaining test cases for purposes of the evidentiary hearing.[4] As a result, three groups of petitioners have participated in all subsequent phases of the evidentiary hearing:  Test case and nontest case petitioners represented by Mr. Izen; nontest case petitioners represented by Mr. Jones; and nontest case petitioners represented by Mr. Sticht.[5]  The positions taken by

---

[3]  The appellate panel in DuFresne v. Commissioner, 26 F.3d 105, 107 (9th Cir. 1994), vacating and remanding per curiam Dixon v. Commissioner, T.C. Memo. 1991-614, 62 T.C.M. (CCH) 1440, 1991 T.C.M. (RIA) par. 91,614 (Dixon II), issued an order stating that the panel would retain jurisdiction over any subsequent appeal.

[4]  On June 13, 1995, test case petitioner Mr. Rina conceded his case in full, resulting in entry of a stipulated decision in docket No. 17640-83 that was identical with the decision originally entered in that case on the basis of the Court's opinion in Dixon II.

[5]  The group of cases that were consolidated for purposes of the evidentiary hearing initially included the case of William D. and Karen S. Booth, docket No. 28950-88, in which Declan J. O'Donnell (Mr. O'Donnell) had entered his appearance.  However, at the start of the evidentiary hearing, the Court granted Mr. O'Donnell's motion to sever the Booth case from the cases consolidated for the evidentiary hearing.  Mr. O'Donnell argued that, in light of the theory underlying a Motion for Summary Judgment that he had filed on behalf of the Booths, they had no

(continued...)

the various groups of petitioners during these proceedings have not been consistent in all respects and in some respects the positions of counsel--primarily Messrs. Izen and Sticht--have become adversarial.[6]

Following pretrial conferences on the record in Los Angeles on July 17, 1995, and January 16, 1996, the evidentiary hearing was held at special trial sessions of the Court conducted in Los Angeles on May 13 to 30 and June 10 to 26, 1996, and August 18, 1997.

In the interest of chronology and as an aid to understanding this opinion, the procedural history of the evidentiary hearing comes after the Court's detailed findings of fact and before the ultimate findings of fact.

FINDINGS OF FACT

I. Kersting Tax Shelter Programs and Related Matters

A. The Pike Case

Mr. Kersting began promoting tax shelter programs in Hawaii in the early 1970's. Mr. Kersting's early tax shelter programs included an "Auto-Leasing Plan" and an "Acceptance Corporation Plan." Those plans generally required participants to purchase

---

[5](...continued)
need to participate in the evidentiary hearing. In Gridley v. Commissioner, T.C. Memo. 1997-210, the Court rejected the argument, raised in the Booths' Motion for Summary Judgment, that Kersting petitioners who signed stipulations to be bound to Dixon II were entitled to entry of decisions in their cases consistent with the decision entered by the Court in the Thompson case at docket No. 19321-83.

[6] See infra pp. 168-169, 171-172, and 187-188.

stock in a subchapter S leasing corporation or an acceptance corporation and/or enter into a subscription agreement to purchase stock, all in connection with loans to the participants by various entities created by Mr. Kersting. The plans were primarily designed to generate income tax deductions for interest that the participants purportedly paid to the Kersting entities on the loans.

The Commissioner determined that participants in Mr. Kersting's auto-leasing and acceptance corporation plans were not entitled to deduct: (1) "Interest" that participants claimed to have paid on either the Auto-Leasing stock purchase or leverage loans; (2) the participants' pro rata shares of losses or investment credits from the auto leasing companies; and (3) "interest" that participants claimed to have paid either on the acceptance corporation stock purchase or stock subscription loans.

In Pike v. Commissioner, 78 T.C. 822 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984), this Court sustained the Commissioner's disallowances of all deductions for interest, losses, and credits claimed by participants in Mr. Kersting's early programs.

B. Kersting Criminal Investigation

While the Pike litigation was underway, Mr. Kersting continued to promote additional tax shelter programs, which came to be known as the stock purchase plan, the stock subscription plan, the leasing company plan, and the CAT-FIT plan. The

Court's opinion in Dixon II describes the mechanics of these programs in detail.[7]

On January 22, 1981, following an undercover criminal investigation, the Internal Revenue Service searched Mr. Kersting's offices in Hawaii pursuant to a search warrant issued by the U.S. District Court for the District of Hawaii. Seventy-seven boxes and two filing cabinets of records were seized from Mr. Kersting's office, including lists identifying, by name and address, approximately 1,800 participants in Mr. Kersting's programs, and schedules of the interest purportedly paid by each participant to one or more Kersting companies during the taxable years 1977, 1978, and 1979.

On January 24, 1981, Mr. Kersting wrote a form letter to the participants of his programs, one of his many "Dear Friend" letters, stating that he had been entrapped by an undercover Internal Revenue Service special agent into creating a backdated "tax deduction" of $21,600.[8]  By letter dated February 15, 1981, Mr. Kersting provided participants in his programs with "tax reporting notices", presumably for the 1980 tax year, and encouraged them to "take full advantage of the deductions

---

[7]  The Kersting programs involved a number of corporations (hereinafter Kersting corporations).  Mr. Kersting served as both a director and president of most of these corporations and also sometimes owned stock.  For those corporations in which he served as president during the years in issue, he had exclusive management authority.

[8]  The record in these cases contains no fewer than 38 "Dear Friend" letters.

reported to you."  Mr. Kersting further informed participants that the Internal Revenue Service had "accomplished only a temporary disruption of our operations" and that his office was "back to almost normal workings".  All records seized in the January 22, 1981, search were returned to Mr. Kersting by 1987.

In January 1983, Mr. Kersting filed suit in the U.S. District Court for the District of Hawaii (docket No. CV-83-0018-MP) against the United States, the Internal Revenue Service, and certain Internal Revenue Service agents alleging, inter alia, that the January 1981 search was illegal and that the defendants had abused the grand jury process by shopping for a favorable grand jury, by violating grand jury secrecy, and by using the grand jury as a civil investigation tool.  Through a number of unpublished orders, the District Court and the Court of Appeals for the Ninth Circuit rejected Mr. Kersting's claims.  See Kersting v. United States, 865 F. Supp. 669, 674-675 (D. Haw. 1994).

C.   Assessments of Kersting Promoter Penalties

Mr. Kersting's tax shelter activities did not lead to an indictment.  However, in October 1989, the Commissioner assessed promoter penalties of $1,545,201 and $2,330,000 against Mr. Kersting, pursuant to sections 6700 and 6701, respectively, for the years 1982 through 1988.[9]  The District Court for the

_____

[9]  Sec. 6700 provides for imposition of a penalty of a percentage of the gross income derived from promoting an abusive tax shelter, and sec. 6701 provides for imposition of a penalty
(continued...)

District of Hawaii sustained the Commissioner's assessments.  See
Kersting v. United States, Civil Nos. 90-00304, 91-00747, 92-
00593 (D. Haw., Sept. 30, 1994).  Mr. Kersting's appeal of that
decision to the Court of Appeals for the Ninth Circuit, docket
No. 94-16942, was argued and submitted on May 8, 1996, but
subsequently withdrawn from submission (with an opportunity for
supplemental briefing) until after this Court issues its opinion
in these consolidated cases.

D.    Kersting Notice of Deficiency

The Commissioner sent Mr. Kersting a notice of deficiency
determining deficiencies in and additions to his Federal income
taxes for the taxable years 1982 through 1988.  The deficiencies
were based upon the Commissioner's determination that cash
payments of so-called leverage loan interest received by Kersting
corporations, which were characterized by the District Court in
the promoter penalty cases as "alter egos" of Mr. Kersting, and
which the Court's Dixon II opinion characterized as fees paid to
Mr. Kersting by program participants in exchange for tax
deductions, were includable in Mr. Kersting's gross income.
Mr. Kersting filed a timely petition for redetermination with
this Court (assigned docket No. 7448-96), and the case was tried
at a Honolulu special trial session that commenced January 27,
1999.

---

[9](...continued)
of $1,000 (per incident) upon a person who knowingly aids or
assists another in understating his tax liability.

II.  Notices of Deficiency Issued to Kersting Program
     Participants

In 1982, respondent began to issue notices of deficiency to
Kersting program participants, disallowing interest deductions
claimed with respect to the stock purchase plan, the stock
subscription plan, the leasing company plan, and the CAT-FIT plan
for a number of taxable years.

A.  Form of Notices of Deficiency

The notices of deficiency issued by respondent to many
Kersting program participants used a common format, stating in
pertinent part as follows:

EXPLANATION OF ADJUSTMENTS

1. It is determined that the following amounts claimed
on your ____ income tax return as interest deductions
are not allowable:

| Amount | Purported Payee[10] |
|--------|---------------------|
| $--------- | Any entity owned, associated with, or controlled, either directly or indirectly, by Henry Kersting |

This disallowance is based on the determination that
the transactions giving rise to the claimed interest
deduction are shams.  This disallowance is further
based upon your failure to establish that the above
amounts were paid or properly accrued, or that the
transactions purportedly generating the claimed amounts
resulted either in any bona fide indebtedness or in any
enforceable and bona fide obligation to pay
compensation for use or forbearance of money on
indebtedness within the meaning of I.R.C. Section 163.

Furthermore, if it is established that any portion
of the above disallowed "interest" is a properly

---

[10]  In some instances, respondent's notices of deficiency
listed specific Kersting corporations under "Purported Payee".

allowable deduction, it is further determined that such interest constitutes interest in investment indebtedness and deduction of such amounts is limited under the provisions of I.R.C. 163(d).

Further, and in support of a portion of the determined deficiency, if you establish that you are entitled to the above-mentioned interest deduction, it is determined that you improperly failed to report the income resulting from the same transaction.

2. It is determined that part of the underpayment of tax for the taxable year ____ is due to your negligent of [sic] intentional disregard of the rules and regulations.  Consequently, the 5 percent addition to the tax is charged for ____ as provided by Section 6653(a) of the Internal Revenue Code.

B.  Thompson Notices of Deficiency

John R. Thompson (Mr. Thompson) was a pilot with Continental Airlines from 1946 until his retirement in October 1982. Mr. Thompson became aware of Mr. Kersting's programs through a conversation with another pilot, Michael Provan (Mr. Provan), who had solicited other pilots to participate in Mr. Kersting's programs.[11]  The Thompsons began participating in Mr. Kersting's programs in 1977.[12]  In addition to their participation in

---

[11]  Mr. Provan, who was at one time the president of one of the Kersting companies, eventually became an adversary of Mr. Kersting.  See <u>infra</u> p. 66.

[12]  Although the Thompsons participated in one of Mr. Kersting's programs during 1977, the Thompsons did not claim any Kersting-related interest deductions on their 1977 return because their accountant-return preparer refused to include them on the return.

The record suggests that the Thompsons' 1978 tax return was prepared by Phil Scheff (an accountant recommended by Mr. Kersting) and that the Thompsons claimed Kersting program interest deductions on their return for that year.  The Thompsons experienced audit problems with their 1978 tax return that were

(continued...)

certain programs that were the subject of this Court's opinion in Dixon II, the Thompsons, along with some 40 other investors, including Mr. Provan, participated in a transaction arranged by Mr. Kersting in early 1978 to acquire First Savings and Loan Association of Hawaii (First Savings).

The Thompsons filed joint Federal income tax returns for 1979, 1980, and 1981 in which they claimed interest deductions attributable to their participation in certain Kersting programs. On May 5, 1983, June 13, 1984, and May 31, 1985, respondent mailed notices of deficiency to the Thompsons determining deficiencies in and additions to their Federal income taxes for the taxable years 1979, 1980, and 1981, as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a) | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6653(a)(2) |
| 1979 | $18,161.00 | --- | $908 | --- | --- |
| 1980 | 24,838.00 | --- | --- | --- | --- |
| 1981 | 36,294.52 | $4,934.32 | --- | $1,958.28 | 50 percent of the interest due on the deficiency |

Respondent further determined that the Thompsons were liable for increased interest for 1981 pursuant to section 6621(d).[13] The

---

[12](...continued)
due, in part, to their failure to attach to the return a Form W-2 showing the amount of tax that Continental Airlines had withheld from Mr. Thompson's wages. In early to mid-1986, the Thompsons' counsel, Samuel M. Huestis, negotiated a settlement of their tax liability for 1978. The record does not disclose the terms of the settlement.

[13] Sec. 6621(d) was redesignated sec. 6621(c) by sec. 1511(c)(1)(A)-(C) of the Tax Reform Act of 1986 (TRA), Pub. L. 99-514, 100 Stat. 2744. We will hereinafter refer to the
(continued...)

Thompsons filed timely joint petitions for redetermination of the above-described deficiencies.

C.    Cravens Notices of Deficiency

John R. Cravens was a pilot with American Airlines during 1979 and 1980.  Mr. Cravens became aware of Mr. Kersting's programs through conversations with other pilots.

The Cravenses filed joint Federal income tax returns for 1979 and 1980 in which they claimed interest deductions attributable to their participation in certain Kersting programs. On April 15, 1983, and March 20, 1984, respondent mailed notices of deficiency to the Cravenses determining deficiencies in and additions to their Federal income taxes for the taxable years 1979 and 1980, as follows:

|  |  | Additions to Tax |
| Year | Deficiency | Sec. 6653(a) |
|  |  |  |
| 1979 | $4,508.00 | $225.40 |
| 1980 | 19,251.70 | 962.59 |

The notice of deficiency issued to the Cravenses for 1979, while disallowing interest deductions of $9,810, included a credit for personal exemptions of $4,000, resulting in a net adjustment of $5,810.  The notice of deficiency issued to the Cravenses for 1980 included disallowed interest deductions of $19,620 and, as an alternative to the disallowance of such interest, the inclusion of $18,000 in unreported dividend income from a Kersting controlled entity known as Candace Acceptance Corp.

_____

[13](...continued)
provision as sec. 6621(c).

(Candace). The notice of deficiency issued to the Cravenses for 1980 also included the disallowance of two personal exemptions claimed for the Cravenses' children. The Cravenses filed timely joint petitions for redetermination contesting the above-described notices of deficiency.

The Cravenses' reporting position was unique among the test case petitioners insofar as the Cravenses had adjusted (reduced) their tax basis in their Candace stock by the amount of a "non-taxable distribution" from Candace in 1980. Having reduced the basis of their Candace stock, the Cravenses reported a capital gain of $7,200 on their 1980 tax return after surrendering the stock to Mr. Kersting in exchange for cancellation and return of the note evidencing their primary loan.[14]

D.  Alexander Notices of Deficiency

Denis Alexander (Mr. Alexander) is a broker and investor who first met Mr. Kersting in Los Angeles in the early 1960's. Mr. Alexander lent money to Mr. Kersting's subchapter S leasing corporations in the 1970's, participated in the acquisition of First Savings, and participated in some of the Kersting programs at issue in Dixon II.

---

[14] Although the Cravenses' reporting position was unique insofar as they had reported a capital gain in a taxable year in dispute before the Court, we note that test case petitioners Robert L. and Carolyn S. DuFresne had also reported a capital gain (albeit in a year subsequent to the years in dispute) upon the surrender of stock in Charter Financial Corp. to Mr. Kersting. Like the Cravenses', the DuFresnes' capital gain was attributable to their reduction of the tax basis of their stock as opposed to an increase in its value.

1.   <u>1974 and 1975</u>

Mr. Alexander and his wife, Freida, filed joint Federal income tax returns for the taxable years 1974, 1975, 1976, and 1977.  Following an examination of their returns for 1974 and 1975, the Alexanders conceded certain adjustments proposed by respondent, resulting in agreed assessments of $2,133 and $811 for 1974 and 1975, respectively.[15]  However, because the Alexanders declined to agree to other proposed adjustments, respondent, on November 29, 1979, issued a notice of deficiency determining deficiencies of $4,891.83 and $40,760.38, respectively, in their Federal income taxes for 1974 and 1975.

Respondent's deficiency determinations against the Alexanders for 1974 and 1975 were based, in part, on disallowance of interest deductions of $2,917 and $46,500, respectively, attributable to their participation in Kersting programs for those taxable years.  Additional adjustments included disallowance of an $18,500 capital loss claimed by the Alexanders for 1974 on a sale of stock in Mendocino Financial Corp. and respondent's determination that they had failed to report a $59,080 capital gain for 1975 from a sale of real estate to the Cadillac Drive Apartments partnership.

---

[15]   The Alexanders were represented during the audit by their accountant, Gilbert Matsumoto (Mr. Matsumoto).  Mr. Matsumoto had served as the accountant for some of Mr. Kersting's subchapter S leasing corporations, and Mr. Kersting had recommended that program participants use Mr. Matsumoto, among others, to prepare their tax returns.

On February 28, 1980, the Alexanders filed a timely petition with the Court, assigned docket No. 2758-80, contesting the notice of deficiency for 1974 and 1975.

2.   1976 and 1977

Respondent also examined the Alexanders' joint income tax returns for 1976 and 1977.  On April 17, 1986, respondent issued the Alexanders a notice of deficiency determining deficiencies in and additions to their 1976 and 1977 Federal income taxes, as follows:

|         |            | Additions to Tax |
| Year    | Deficiency | Sec. 6653(a)     |
| ------- | ---------- | ---------------- |
| 1976    | $3,596     | $180             |
| 1977    | 876        | 44               |

Respondent also determined that the Alexanders were liable for increased interest for 1976 pursuant to section 6621(c).

The deficiencies that respondent determined against the Alexanders for 1976 and 1977 resulted, in part, from respondent's disallowance of interest deductions of $8,665 and $12,993, respectively, attributable to their participation in Kersting programs for those years.  Respondent also disallowed a $5,149 partnership loss claimed by the Alexanders for 1976 on their investment in the Avista Epsilon and Sarbonne partnership.

On July 21, 1986, the Alexanders filed a petition through Mr. Kersting's office, assigned docket No. 30413-86, contesting the notice of deficiency for 1976 and 1977.

E.    Validity of Notices of Deficiency

In Dixon II, the Court considered and rejected arguments by the test case petitioners represented by Mr. Izen that the notices of deficiency issued to them were invalid under Scar v. Commissioner, 814 F.2d 1363 (9th Cir. 1987), revg. 81 T.C. 855 (1983).  After the evidentiary hearing in these proceedings, the Court rejected the Scar argument advanced by Mr. Jones on behalf of a Kersting participant who had settled his case before the trial of the test cases in Dixon II.  See Richards v. Commissioner, T.C. Memo. 1997-149, supplemented by T.C. Memo. 1997-299, affd. without published opinion 165 F.3d 917 (9th Cir. 1998).[16]

F.    Errors in Notices of Deficiency

Although this Court rejected the argument that notices of deficiency issued to Kersting program participants were invalid, it is evident that some notices of deficiency issued to Kersting program participants did contain errors.  For instance, in Richards v. Commissioner, supra, it appears that respondent overstated the deficiency using an excessive tax rate of 70 percent.  In addition, the petition filed in the Richards case included an allegation that respondent disallowed interest

---

[16]    Although Luis C. DeCastro had negotiated the settlement on behalf of Mr. and Mrs. Richards, he did not participate in the filing or prosecution of Mr. Jones' motion to vacate the decision entered in their case.

deductions in excess of Kersting interest deductions that the Richardses actually claimed.[17]

Similarly, as observed in the Court's Dixon II opinion, respondent's alternative determinations in the notice of deficiency issued to the Cravenses overstated their deficiency for 1980. The Court ordered that the Cravenses' deficiency for 1980 be reduced to account for: (1) The elimination of respondent's alternative determination that the Cravenses failed to report $18,000 in dividends paid by Candace; and (2) respondent's failure to eliminate the capital gain of $7,200 reported by the Cravenses for 1980 on the disposition of their Candace stock.

III. Commencement of Kersting Project

A. Tax Shelter Projects and Test Case Procedures

   1. Overview

The large volume of cases generated by the Commissioner's disallowances of deductions claimed by taxpayers participating in large tax shelter programs during the late 1970's and early 1980's created the largest inventory of cases ever docketed in the Tax Court. Among the responses of the Internal Revenue Service and the Tax Court were the development of procedures that

---

[17] Test case petitioners Terry D. and Gloria K. Owens alleged in their petition that respondent disallowed legitimate interest deductions in their notice of deficiency. However, it appears that the allegation was not pursued by or on behalf of the Owenses, inasmuch as the decision entered by the Court in their case, following the issuance of the Court's opinion in Dixon II, was consistent with the deficiency determined by respondent.

were intended to streamline the litigation process, economize on the use of administrative and judicial resources, and reduce the costs incurred by taxpayers in resolving disputes over tax shelter adjustments.  The Internal Revenue Service, Office of Chief Counsel, created the Tax Shelter Branch in the National Office to oversee tax shelter litigation across the country and to organize individual tax shelter projects.  Concurrently, the Tax Court began working with the Internal Revenue Service and private parties in tax shelter cases to create what became known as the test case procedure; i.e., the selection of representative or test cases from a particular tax shelter project for a single trial on the merits.  See, e.g., Drobny v. Commissioner, T.C. Memo. 1995-209 (citing H. Conf. Rept. 98-861, at 985-986 (1984), 1984-3 C.B. (Vol. 2) 1, 239-240), affd. 113 F.3d 670 (7th Cir. 1997).

The test case procedure is intended to streamline the litigation process.  To this end, taxpayers who are not selected as test cases are encouraged to execute a piggyback agreement; i.e., a stipulation to be bound by the outcome of the test cases. As a practical matter, the effectiveness of the test case procedure depends in large part upon the agreement of the taxpayers not selected as test cases to be bound by the outcome of the test cases.  Normally, taxpayers in a tax shelter project who decline or otherwise fail to sign a piggyback agreement will either have their cases set for trial with the test cases or, after the trial of the test cases, will be ordered to show cause

why their case should not be decided the same way as the test cases. See, e.g., <u>Krause v. Commissioner</u>, 99 T.C. 132 (1992), affd. sub nom. <u>Hildebrand v. Commissioner</u>, 28 F.3d 1024 (10th Cir. 1994); <u>Acierno v. Commissioner</u>, T.C. Memo. 1997-441; <u>Karlsson v. Commissioner</u>, T.C. Memo. 1997-432. Using the order to show cause procedure to dispose of nontest cases in a tax shelter project is more cumbersome and consumes more time and judicial, administrative, and private party resources than using piggyback agreements. As discussed in greater detail below, the Court used the test case procedure in the Kersting project; the vast majority of the Kersting project participants signed piggyback agreements. See <u>infra</u> pp. 34-41.

2.  <u>National Office Tax Shelter Branch Functions</u>

The Tax Shelter Branch, established by the Office of Chief Counsel in the National Office, was given the responsibilities of coordinating the examination, appeals, and litigation functions and of overseeing tax shelter projects from the National Office perspective. The Tax Shelter Branch provided advice and prepared material for use by the field in tax shelter cases, reviewed legal briefs, monitored the status of tax shelter case inventory, and prepared reports for Internal Revenue Service executives.

The Tax Shelter Branch monitored tax shelter projects by reviewing and extracting information from quarterly tax shelter reports that were required to be submitted by the project attorney; i.e., the District Counsel trial attorney with primary responsibility for the project. Each project attorney was

required to submit a quarterly tax shelter report providing an update on the status of the project, including a summary of the current project settlement offer and any recent court action affecting the project.

One of the goals of the tax shelter program was consistent treatment of similarly situated taxpayers. The Tax Shelter Branch monitored settlement offers in similar tax shelter projects for disparities and tried to determine whether the project settlement offers should be similar. However, actual supervisory responsibility in a tax shelter project was left primarily in the Regional Counsel and District Counsel offices to which the project was assigned.

B. Petitions for Redetermination

In or around June 1982, Mr. Kersting facilitated the filing of petitions with the Tax Court by Kersting program participants. In letters issued in June and July 1982, Mr. Kersting informed Kersting program participants that a joint petition was being prepared on behalf of a large group of taxpayers. On July 12, 1982, Lu N. Nevels, Jr., filed a consolidated Tax Court petition, assigned docket No. 17445-82, on behalf of 60 Kersting program participants.[18]

---

[18] Lu N. Nevels, Jr., had represented the test case taxpayers in Pike v. Commissioner, 78 T.C. 822 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984). For an example of the problems created by using one petition on behalf of so many different petitioners, see Aaronson v. Commissioner, T.C. Memo. 1985-131, involving the Hongsermeier petitioners in what is now docket No. 29643-86. See infra p. 38.

C.    Brian J. Seery

In early 1982, Brian J. Seery (Mr. Seery) began assisting Kersting program participants with issues arising from the audit of their income tax returns.  On April 14, 1982, Mr. Kersting issued a letter to Kersting program participants informing them that they soon would receive a letter from the Commissioner proposing to disallow their Kersting program interest deductions.  Mr. Kersting advised program participants that they should not remit any amount to the Internal Revenue Service until their liability was determined in court.  On February 15, 1983, Mr. Kersting issued a letter to Kersting program participants stating in pertinent part:  "I trust that you have placed the tax retrievals which we have accomplished for you over the years into profitable investments and that you are receiving a reasonable rate of return.  You will not lose any ground if your funds earn at least a return equal to the interest charges imposed by the IRS from time to time."

On March 1, 1985, Mr. Kersting issued a letter to Kersting program participants stating that he had retained Mr. Seery to represent them in the Tax Court at no charge to the individual petitioners.[19]  The letter requested that each Kersting program participant provide written authorization for Mr. Seery's

_____

[19]    Initially, Mr. Kersting or the entities that he controlled paid the legal fees associated with the Tax Court litigation.  Later, however, some Kersting program participants began paying $100 per month to a legal defense fund managed by Mr. Kersting.

representation. In a letter to program participants dated August 11, 1986, Mr. Kersting recommended that program participants not attempt to resolve their cases on their own and instead rely on counsel that he had hired.

Mr. Seery subsequently entered his appearance in the Tax Court on behalf of several hundred Kersting petitioners, including the Thompsons and the Cravenses. Mr. Seery's compensation for legal services rendered to Kersting program participants was always paid by one of the corporations controlled by Mr. Kersting.

D. Respondent's Counsel

1. Kenneth W. McWade

In 1970, Mr. McWade began his career as a trial attorney with the Office of Chief Counsel. Mr. McWade's duties with the Office of Chief Counsel included litigating tax cases.

In January 1982, Mr. McWade transferred from respondent's District Counsel office in Seattle, Washington, to respondent's District Counsel office in Honolulu, Hawaii. Mr. McWade initially assisted with the Pike group of cases. On or about July 1, 1984, the Kersting project was officially established in the Honolulu Appeals Office, and Mr. McWade was appointed to serve as the project attorney. Wally Kobayashi was appointed to serve as the key Appeals officer for the Kersting project.

By late 1986, Mr. McWade had litigated 40 to 50 Tax Court cases. However, Mr. McWade had never litigated any cases that were part of a tax shelter project.

2.  William A. Sims

In 1972, Mr. Sims began his career with the Office of Chief Counsel, General Litigation Division, National Office. Except for a 6-month assignment doing Tax Court work, Mr. Sims handled general litigation matters concerning collection, bankruptcy, and tax liens. Mr. Sims eventually became Assistant Director of the General Litigation Division in the National Office.

In February 1986, Mr. Sims was appointed District Counsel for Honolulu, Hawaii. Before his appointment as District Counsel, Mr. Sims had never worked on a tax shelter project in any capacity.

E.  Adoption of Test Case Procedures in Kersting Project

1.  The Honolulu Session (June 1985)

The Court set for trial the cases of approximately 375 Kersting program participants at a Tax Court session scheduled to commence on June 10, 1985, in Honolulu, Hawaii (the June 1985 session).

Before the June 1985 session, Mr. McWade and Mr. Seery agreed to use the test case procedure in the Kersting project. During the June 1985 session, Mr. McWade and Mr. Seery discussed the use of the test case procedure with Judge Goffe during a chambers conference. During the conference, Mr. Seery informed Judge Goffe that, although he was representing petitioners who were Kersting program participants, he was being paid by Mr. Kersting. Judge Goffe indicated that he saw no conflict of interest as long as Mr. Seery had not participated in the

planning or promotion of the Kersting programs.  See Rule
24(f).[20]

Consistent with counsels' agreement to use the test case
procedure in the Kersting project, Judge Goffe granted the
parties' joint motions to continue the cases called at the June
1985 session.  At the same time, the parties began filing
piggyback agreements (discussed in greater detail below), which
they did in the vast majority of the Kersting project cases.

Mr. Seery reported the results of the June 1985 proceedings
to Mr. Kersting and kept him abreast of developments.  Mr. Seery
relied upon Mr. Kersting to distribute correspondence from
Mr. Seery to petitioners in the Kersting project.

2.  Test Case Procedure

Mr. McWade and Mr. Seery agreed to select test cases that
would be representative of all the Kersting programs for all
years in dispute, including the taxable years 1975 through 1983.
At the time that Mr. Seery selected his test cases, he assumed
that the test case petitioners would bear the burden of proof at
trial.

In selecting test cases, Mr. Seery was not concerned with
whether a case involved other tax issues.  Mr. Seery was simply
looking for cases "where someone did everything right."

---

[20] Rule 24(f), which became effective on July 1, 1990, see
93 T.C. 857, addresses conflicts of interest in Tax Court
litigation.  Rule 24(f) was redesignated Rule 24(g) effective
Aug. 1, 1998.  See 109 T.C. 542.

Mr. Seery selected two or three test cases, including the Cravenses and the Hongsermeiers.

In an effort to find the best cases for trial from petitioners' point of view, Mr. Seery selected test cases by reference to the manner in which the taxpayers had reported the transactions. Mr. Seery selected test cases that he thought he could win, but, as he testified at the evidentiary hearing, he had difficulty identifying such cases in addition to the Cravenses and the Hongsermeiers.[21]

Mr. Kersting and Mr. Cravens discussed having Mr. Cravens' case serve as a test case. Mr. Kersting told Mr. Cravens that Mr. Seery wanted to use him as a test case because, unlike other Kersting program participants, the Cravenses had reported a capital gain when they surrendered their stock in the Kersting holding company in conjunction with the annual termination of the Kersting program. The Cravenses' reporting position was consistent with Mr. Kersting's advice to program participants that distributions by Kersting holding companies used by program participants to pay the principal amount of leverage loans were tax-free returns of capital rather than taxable dividends. Mr. Seery viewed the Cravens cases as "unique" in this respect.

Mr. Cravens believed that he had a choice whether his case would serve as a test case. When Mr. Cravens agreed to have his

[21] Mr. Seery's testimony: "I was having trouble selecting cases beyond those two that I thought would be good vehicles for that."

case serve as a test case, he did so without condition.  He believed that he would win his case because he had correctly reported his tax liabilities, as reduced by reason of his participation in the Kersting programs.

Mr. Seery selected the Hongsermeier case because it was his impression that the Hongsermeiers had used their own funds to pay the principal of a Kersting leverage loan, rather than using a "nontaxable distribution" from a Kersting holding company.[22] Mr. Seery also selected the Hongsermeiers because they had participated in the CAT-FIT program, which Mr. Seery viewed as the strongest Kersting program from the standpoint of sustaining the interest deductions claimed.

Mr. McWade analyzed between 400 and 500 project cases; he selected test cases that he thought would be representative of all Kersting programs for all years in dispute.  Mr. McWade selected "clean" cases; i.e., cases that did not include issues other than Kersting interest deductions.  Mr. McWade tried to avoid cases that were unique or atypical of the Kersting programs.  Although Mr. McWade selected at least five of the test cases, he could not recall the specific cases that he selected.

In June 1986, Mr. McWade and Mr. Seery agreed on the dockets that were to serve as the test cases.  By letter dated June 10,

---

[22] Mr. Seery's impression was not quite right.  The Court found in Dixon II that the Hongsermeiers were unique insofar as they paid $250 per month out-of-pocket (rather than use the proceeds from a leverage loan) to satisfy the interest due on a CAT-FIT primary loan.  See Dixon II, 62 T.C.M. (CCH) at 1480, 1991 T.C.M. (RIA), at 91-3023.

1986, Mr. McWade notified Judge Goffe that he and Mr. Seery had selected the following 14 dockets to serve as test cases with respect to the Kersting project:

| Case Name | Docket No. |
|---|---|
| Dixon v. Commissioner | 9382-83 |
| Cravens v. Commissioner | 16900-83 |
| Rina v. Commissioner | 17640-83 |
| Thompson v. Commissioner | 19321-83 |
| Young v. Commissioner | 4201-84 |
| Cravens v. Commissioner | 15135-84 |
| DuFresne v. Commissioner | 15907-84 |
| Thompson v. Commissioner | 31236-84 |
| Owens v. Commissioner | 40159-84 |
| Young v. Commissioner | 22783-85 |
| Young v. Commissioner | 30010-85 |
| Thompson v. Commissioner | 30965-85 |
| DuFresne v. Commissioner | 30979-85 |
| Hongsermeier v. Commissioner | [1]29643-86 |

[1] By order dated Aug. 13, 1986, the Court severed the Hongsermeiers from docket No. 17445-82 (the Aaronson consolidated petition filed by Mr. Nevels) and assigned them new docket No. 29643-86.  See supra note 18 and accompanying text.

With the exception of the Cravens case assigned docket No. 16900-83, and the Hongsermeier case assigned docket No. 17445-82, each of the test case petitioners had filed pro se petitions.  By August 1986, Mr. Seery had entered his appearance in each of the test cases with the exception of the Young cases assigned docket Nos. 4201-84, 22783-85, and 30010-85, the DuFresne case assigned docket No. 30979-85, and the Thompson case assigned docket No. 30965-85.

3.  Test Case Array

The test case petitioners had participated in Kersting programs during the taxable years 1975 through 1983 as follows:

Taxable Year 1975

| Program | Petitioner(s) |
|---|---|
| CAT-FIT | Owens |
| MAURIER LEASING[1] | Owens |
| NORWICK 20/20 | Owens |

Taxable Year 1976

| Program | Petitioner(s) |
|---|---|
| UNIVERSAL LEASING | Owens |
| FORBES 30/30 | Owens |

Taxable Year 1977

| Program | Petitioner(s) |
|---|---|
| CAT-FIT | Dixon |
| ESCON LEASING | Dixon |
| FARGO 30/30 | Dixon |
| NORWICK 20/20 | Owens |

Taxable Year 1978

| Program | Petitioner(s) |
|---|---|
| CAT-FIT | Hongsermeier |
| CAT-FIT | Dixon |
| UNIVERSAL LEASING | Hongsermeier |
| ESCON LEASING | Dixon |
| ESCON LEASING | Hongsermeier |
| MAHALO 30/30 | Owens |
| MAHALO 60/60 | Dixon |

Taxable Year 1979

| Program | Petitioner(s) |
|---|---|
| CAT-FIT | Hongsermeier |
| CAT-FIT | Dixon |
| UNIVERSAL LEASING | Hongsermeier |
| ANSETH LEASING | Rina |
| ANSETH LEASING | Young |
| ESCON LEASING | Hongsermeier |
| ESCON LEASING | Dixon |
| ESCON LEASING | Thompson |
| CANDACE 60/60 | Dixon |
| CANDACE 60/60 | Cravens |
| CANDACE 60/60 | Rina |

| | |
|---|---|
| CANDACE 60/60 | Thompson |
| CANDACE 60/60 | Young |
| CHARTER 80,000 | Rina |
| CHARTER 120,000 | Young |
| INVESTORS 80,000 | Rina |
| INVESTORS 120,000 | Young |

Taxable Year 1980

| Program | Petitioner(s) |
|---|---|
| CAT-FIT | Dixon |
| CAT-FIT | DuFresne |
| CAT-FIT | Hongsermeier |
| ANSETH LEASING | Hongsermeier |
| ANSETH LEASING | Rina |
| ANSETH LEASING | Young |
| ESCON LEASING | Dixon |
| ESCON LEASING | Hongsermeier |
| ESCON LEASING | Thompson |
| CANDACE 60/60 | Cravens |
| CANDACE 60/60 | Rina |
| DELTA 40/40 | Hongsermeier |
| DELTA 60/60 | Cravens |
| DELTA 60/60 | Dixon |
| DELTA 60/60 | DuFresne |
| DELTA 60/60 | Rina |
| DELTA 60/60 | Thompson |
| DELTA 60/60 | Young |
| CHARTER 40,000 | Rina |
| CHARTER 80,000 | Rina |
| CHARTER 120,000 | Dixon |
| CHARTER 120,000 | DuFresne |
| CHARTER 120,000 | Thompson |
| CHARTER 120,000 | Young |
| INVESTORS 80,000 | DuFresne |
| INVESTORS 80,000 | Rina |
| INVESTORS 80,000 | Thompson |
| INVESTORS 120,000 | Dixon |
| INVESTORS 120,000 | Young |

Taxable Year 1981

| Program | Petitioner(s) |
|---|---|
| ANSETH LEASING | Young |
| ESCON LEASING | Dixon |
| DELTA 60/60 | Young |
| CHARTER 120,000 | Dixon |
| CHARTER 120,000 | DuFresne |
| CHARTER 120,000 | Young |

|            |         |          |
|------------|---------|----------|
| INVESTORS  | 80,000  | DuFresne |
| INVESTORS  | 120,000 | Dixon    |
| INVESTORS  | 120,000 | Young    |

Taxable Year 1982

| Program             | Petitioner(s) |
|---------------------|---------------|
| ANSETH LEASING      | Young         |
| CHARTER 120,000     | DuFresne      |
| CHARTER 120,000     | Young         |
| INVESTORS 80,000    | DuFresne      |
| INVESTORS 120,000   | Young         |

Taxable Year 1983

| Program             | Petitioner(s) |
|---------------------|---------------|
| ANSETH LEASING      | Young         |
| CHARTER 120,000     | DuFresne      |
| INVESTORS 80,000    | DuFresne      |

[1] Maurier Leasing, a subch. S leasing program, was considered by the Court in Pike v. Commissioner, 78 T.C. 822 (1982).

The notice of deficiency issued to the Thompsons for the taxable year 1981 states in pertinent part:  "Based on examination information from the 1978, 1979, and 1980 returns, the investment interest is generated from the interest deduction tax shelter.  The purported payees cannot be identified from the 1981 income tax return filed by the taxpayers."  Respondent has not been able to identify specifically the Kersting programs that the Thompsons participated in during 1981.  However, the record suggests that, in addition to the Kersting programs that the Thompsons participated in during 1979 and 1980, the Thompsons participated in the Anseth Leasing Program during 1981.

If the Thompson and Cravens cases had been removed from the test case array, there would have been no reduction in coverage

of the test cases. In other words, each program in which the Thompsons and Cravenses participated during the years in issue was also a program before the Court in which one or more of the other test case petitioners had participated.

## IV. The Maui Session (February 1987)

After Messrs. Seery and McWade had selected the test cases, they initiated settlement negotiations and began to prepare the test cases for trial.[23] Their trial preparations included work on a proposed stipulation of facts and an attempt to take Mr. Kersting's deposition. During this period (June 1986 or thereabout), Mr. Seery and Mr. Kersting's attorney, L.T. Bradt (Mr. Bradt), discussed using the 1981 search of Mr. Kersting's office as a basis for filing a motion to shift the burden of proof to respondent in the test cases.

## A. Trial Notices

By letter dated July 30, 1986, Judge Goffe informed Messrs. Seery and McWade that the test cases would be set for trial during a special session of the Court commencing on February 9, 1987, in Wailuku, Maui, Hawaii (the Maui session). Judge Goffe's letter also informed Messrs. Seery and McWade that he intended to notify each Kersting petitioner who had not filed a piggyback agreement that his or her case would be set for trial during the Maui session.

---

[23] Settlement negotiations between Mr. McWade and Mr. Seery are discussed in greater detail infra pp. 78-80.

In August 1986, the Court issued orders setting the 14 test cases for trial during the Maui session.  By letter dated August 5, 1986, Judge Goffe informed all Kersting petitioners who had not already executed piggyback agreements that their cases would be set for trial at the Maui session unless they executed piggyback agreements by September 29, 1986.  Judge Goffe's letter states as follows:

                                          August 5, 1986

                                          Dkt #
Dear _____:

     Your case involves matters concerning promotions
by Henry Kersting.  Cases with issues identical to the
issues in your case have been set for trial on
February 9, 1987, at the courtroom of the Circuit Court
for the Second Circuit in Wailuku, Maui, Hawaii.

     In order to conserve the time and expense of the
taxpayers, the government and the Court, all of the
cases with identical issues will be tried at one time
unless the parties agree in advance, in writing, to be
bound by the outcome of the cases set for trial.  In
most of the pending cases, the parties have so agreed
to be bound.

You should contact at your earliest convenience the
lawyer for the government in the Kersting cases if you
decide to agree to be bound.  He is Mr. Kenneth McWade,
PJKK Federal Building, Room 3304, Box 50089, 300 Ala
Moana Boulevard, Honolulu, Hawaii 96850.  His telephone
number is (808) 546-7333.  If, however, you do not wish
to be bound, you should advise my office promptly, in
writing at the above address, in order that your case
may be set for trial on February 9, 1987.  In either
event, you must advise Mr. McWade or me by
September 29, 1986.

     If you fail to advise Mr. McWade by September 29,
1986, that you wish to be bound and have executed a
stipulation to be bound by that time and if you fail to
advise me by September 29, 1986, that you wish to have
your case set for trial, it will automatically be set
for trial on February 9, 1987.  If your case is set for

trial and you do not appear for trial, your case will likely be dismissed and you will be required to pay all of the income tax which the government contends you owe, plus interest thereon as provided by law.

William A. Goffe
Judge

In November 1986, the Court issued orders notifying Kersting petitioners who had not filed piggyback agreements that their cases were set for trial at the Maui session. As additional Kersting project cases were docketed and identified, the Court issued orders setting them for trial at the Maui session, subject to being stricken if the parties executed a piggyback agreement.

B. Piggyback Agreements

As early as June 1985, Kersting program participants had begun executing piggyback agreements (1985 piggyback agreements),[24] drafted by Messrs. McWade and Seery, that stated as follows:

Stipulation of Settlement for Tax Shelter Adjustments

With respect to all adjustments in respondent's notice of deficiency relating to the Kersting interest deduction tax shelter(s), the parties stipulate to the following terms of settlement:

1. The term Kersting programs refers to interest expense deductions or other related deductions associated with various programs promoted by Henry Kersting.

2. The Kersting program deduction adjustments shall be redetermined on the same basis that the same program adjustments are resolved with respect to taxpayers trying the same program adjustments at the

---

[24] Before 1987, there was no uniform format for piggyback agreements. In 1987 or early 1988, respondent's Tax Shelter Branch issued a standard form of piggyback agreement.

June 10, 1985 session of the Court in Honolulu, Hawaii, or such session as these cases may be adjourned or continued to by the Court (hereinafter "TRIED CASE").

3.  All issues involving the Kersting programs shall be resolved as if the petitioner(s) in this case is the same as the taxpayers in the TRIED CASE;

4.  A decision shall be submitted in this case when the decision in the TRIED CASE is entered;

5.  Following entry of the decision in this case, petitioner(s) consents to the assessment and collection of the deficiencies, attributable to the adjustments formulated by reference to the Tax Court's opinion, notwithstanding the restrictions contained in I.R.C. § 6213(a);

6.  The petitioner(s) in this case will testify or provide information in any case involving the same tax shelter adjustments, if subpoenaed; and

7.  The petitioner(s) in this case consents to the disclosure of all tax returns and tax return information for the purpose of respondent's discovering or submitting evidence in any case involving the same Kersting shelter adjustments.

The parties agree to this stipulation of settlement.

Piggyback agreements executed by Kersting program participants after 1985 differed from those executed in 1985.  In particular, post-1985 piggyback agreements stated as follows:

Stipulation of Settlement for Tax Shelter Adjustments

With respect to all adjustments in respondent's notice of deficiency relating to the Kersting interest deduction tax shelter(s), the parties stipulate to the following terms of settlement:

1.  The Kersting interest deduction tax shelter adjustments shall be redetermined on the same basis that the same tax shelter adjustments are resolved with respect to taxpayers trying the same shelter adjustments at the February 9, 1987 session of the Court in Wailuku, Maui, Hawaii, or such session as

these cases may be adjourned or continued to by the Court (hereinafter "TRIED CASE").

2. All issues involving the Kersting interest deduction tax shelter(s) shall be resolved as if the petitioner(s) in this case is the same as the taxpayers in the TRIED CASE;

3. A decision shall be submitted in this case when the decision in the TRIED CASE becomes final under I.R.C. § 7481;

4. Following entry of the decision in this case, petitioner(s) consent to the assessment and collection of the deficiencies, attributable to the adjustments formulated by reference to the Tax Court's opinion, notwithstanding the restrictions contained in I.R.C. § 6213(a);

5. The petitioner(s) in this case will testify or provide information in any case involving the same tax shelter adjustments, if subpoenaed; and

6. The petitioner(s) in this case consents to the disclosure of all tax returns and tax return information for the purpose of respondent's discovering or submitting evidence in any case involving the same shelter adjustments.

7. If the Court determines the I.R.C. § 6621(d) penalties are applicable in the test case controlling petitioner's(s') case, then the petitioner(s) concedes that I.R.C. § 6621(d) is applicable to any underpayment of tax determined in their case(s) attributable to the Kersting interest deduction tax shelter(s), if such underpayment exceeds $1,000.00 in any one taxable year.

8. With respect to adjustments in respondent's notice of deficiency relating to additions to the tax under I.R.C. § 6653(a), the parties agree to the following:

(a) Respondent concedes that the petitioner(s) are not liable for additions to tax under I.R.C. § 6653(a) or § 6653(a)(1) or § 6653(a)(2) for any year prior to the taxable year 1982.

The parties agree to this stipulation of settlement.

In sum, whereas paragraph 4 of the 1985 piggyback agreements states that a decision will be entered in the piggyback case following entry of decision in the test cases, paragraph 3 of the post-1985 piggyback agreements states that a decision will be entered in the piggyback case once the decision in the test cases becomes final.[25]  See Gridley v. Commissioner, T.C. Memo. 1997-210.  Unlike 1985 piggyback agreements, post-1985 piggyback agreements state (at paragraph 7) that petitioners agree to be bound to the Court's holding in the test cases respecting the applicability of increased interest under section 6621(c) on any underpayment of tax of more than $1,000.  Further, while 1985 piggyback agreements make no reference to additions to tax, post-1985 piggyback agreements state (at paragraph 8) that petitioners are not liable for additions to tax for negligence for any year before the taxable year 1982.[26]

_____

[25]  Despite this distinction, respondent did not move for entry of decision--upon entry of decisions in the Kersting test cases in early 1992--in any of the cases in which Kersting petitioners had executed the 1985 version of the piggyback agreement.  Respondent has taken the position that no decisions should be entered in any of the piggyback cases until the decisions in the test cases become final.  Cf. Abatti v. Commissioner, 859 F.2d 115 (9th Cir. 1988), affg. 86 T.C. 1319 (1986).

[26]  Although the record does not reveal why post-1985 piggyback agreements limit respondent's concession of additions to tax for negligence to taxable years before 1982, a plausible explanation for selecting 1982 as the line of demarcation would be that the Tax Court had released its opinion in Pike v. Commissioner, 78 T.C. 822 (1982), in May 1982, putting taxpayers on notice for 1982 and later taxable years that Mr. Kersting's programs did not generate legitimate interest deductions.

When Messrs. McWade and Seery drafted the piggyback agreements, Mr. Seery did not consider the possibility that a test case might be settled.[27]

Nontest case petitioners Ronald L. and Mattie E. Alverson (docket No. 17646-83) executed their piggyback agreement in June 1985. Nontest case petitioners Anthony E. and Carol A. Eggers (docket No. 7323-84), John L. and Terry E. Huber (docket No. 20119-84), Stanley C. and Sharon A. Titcomb (docket No. 17992-95), and Richard B. and Donna G. Rogers (docket No. 17993-95) executed piggyback agreements in late November 1986. Nontest case petitioners Norman W. and Barbara L. Adair (docket No. 35608-86) executed their piggyback agreement in March 1987. Nontest case petitioners Willis F. McComas, II and Marie D. McComas (docket No. 19464-92), Wesley Armand and Sherry Lynn Cacia Baughman (docket No. 621-94), Joe A. and JoAnne Rinaldi (docket No. 7205-94), and Norman A. and Irene Cerasoli (docket No. 9532-94) did not execute piggyback agreements for their cases on these dockets.

C.   Mr. Seery's Withdrawals as Counsel

During late 1986 and early 1987, and shortly before the Maui session, Mr. Seery began to withdraw as counsel in the Kersting cases in the circumstances described below.

_____

[27]  A piggyback agreement that binds the piggyback case to the outcome of the test case, whether by litigation or settlement, is not unprecedented. See, e.g., Fisher v. Commissioner, T.C. Memo. 1994-434.

1.    The Thompsons

In 1985, the Thompsons had retained Samuel M. Huestis (Mr. Huestis) to prepare an estate plan for them.  Eventually, the scope of Mr. Huestis' representation was extended to include settlement of the Thompsons' 1978 tax liabilities and their dispute with Mr. Kersting, as described infra pp. 56-67.

One result of that dispute was Mr. Huestis' letter of September 10, 1986, to Mr. Seery, notifying him that the Thompsons were seeking substitute counsel and requesting the Thompson files.  On September 15, 1986, Mr. Seery sent the Thompson files to Mr. Huestis and informed him that the Thompsons were test case petitioners.  Mr. Seery indicated that he was withdrawing as the Thompsons' counsel in the Tax Court.

On October 28, 1986, Mr. Huestis wrote to Mr. Seery to express dissatisfaction with the sufficiency of the Thompsons' files and to warn Mr. Seery that his earlier representation of the Thompsons, while he was also apparently representing Mr. Kersting, could be viewed as a conflict of interest and lead to an action for "professional negligence".

On October 31, 1986, Mr. Seery filed motions to withdraw as counsel in the Thompsons' cases.[28]  The Court granted Mr. Seery's motions in November 1986.

---

[28]  Mr. Seery had entered his appearance only in the Thompson cases assigned docket Nos. 19321-83 and 31236-84, not docket No. 30965-85.

In the interim, Mr. Huestis assisted the Thompsons in locating and interviewing Mr. DeCastro to serve as their counsel in the Tax Court.[29]  On November 15, 1986, Mr. Thompson and Mr. DeCastro's associate, Phillip Hoskins, executed a retainer agreement under which Mr. Thompson agreed to pay Mr. DeCastro $5,000 for his effort to negotiate a settlement of the Thompson tax cases.  The agreement provided that the retainer fee was limited to settlement negotiations and did not include preparation for or representation at trial.  In early January 1987, Mr. DeCastro filed an entry of appearance in the Thompson cases.

2.    The Test Cases

On November 7, 1986, Mr. Seery filed a motion to change the place of trial of the test cases from Maui to Honolulu. Mr. Seery asserted that a trial in Maui would be inconvenient and a hardship to Mr. Kersting, who lived and operated a business in Honolulu.  Mr. Seery's motion included the statement that

> 4.  Mr. Kersting is providing the financial
> support for the litigation of this and the related
> cases and the additional expense involved in
> transporting witnesses and staff to Wailuku as well
> as paying for accommodations for the staff while in
> Wailuku is a great financial burden to him.

On November 14, 1986, the Court issued an order denying Mr. Seery's motion to change the place of trial.  In so doing,

---

[29]  Mr. Huestis had initially referred the Thompsons to a law firm, Loeb & Loeb, in Los Angeles, California.  The Loeb firm declined to represent the Thompsons because of the short time to prepare for the Maui session and the incompleteness of the Thompson files.

the Court noted that the motion "implies that * * * [Mr. Seery] represents not only petitioners but also Henry Kersting, the promoter of the tax shelters which are the subject of this litigation." The Court went on to observe that, if Mr. Seery were representing both Mr. Kersting and petitioners, the dual representation would constitute a conflict of interest. The Court attached to the order copies of several authorities concerning conflicts of interest, including Adams v. Commissioner, 85 T.C. 359 (1985). Mr. Seery subsequently filed motions to withdraw as counsel in the Kersting project cases (both test cases and nontest cases), citing concerns about a possible conflict of interest. The Court granted Mr. Seery's motions.

By letter dated December 12, 1986, Mr. Kersting informed Kersting program participants that Judge Goffe had "inferred" that Mr. Seery might have a conflict of interest. Although Mr. Kersting denied that he was represented by Mr. Seery, he stated that he and Mr. Seery had decided that it would be prudent for Mr. Seery to withdraw as counsel. Mr. Kersting further stated that substitute counsel had been retained to represent test case and nontest case petitioners alike.

D.    Entries of Appearance by Chicoine and Hallett

Following Mr. Seery's withdrawal, Mr. Bradt recommended that Mr. Kersting hire Mr. Izen to serve as counsel for the test

cases.[30]  However, Mr. Kersting, with his son-in-law, an attorney, Roger Moseley (Mr. Moseley), contacted Robert J. Chicoine (Mr. Chicoine) and Darrell D. Hallett (Mr. Hallett) (collectively Chicoine and Hallett), to determine whether they would represent the test case petitioners at the Maui session.

On November 22, 1986, Mr. Kersting sent Mr. Hallett a letter describing the Kersting programs.  Shortly thereafter, Mr. Kersting interviewed Mr. Hallett in Hawaii.  On December 9, 1986, Chicoine and Hallett reached an agreement with Mr. Kersting to represent the test case petitioners (other than the Thompsons).  On December 12, 1986, Mr. Kersting wrote to Kersting program participants informing them that Mr. Seery had withdrawn as counsel and that Chicoine and Hallett had been retained.  At the same time, either Mr. Kersting or Chicoine and Hallett informed the test case petitioners that they would have to provide Chicoine and Hallett with written authorization to enter appearances in their cases.

Although Mr. Seery sent Chicoine and Hallett his files for the test cases, most of the documents that Mr. Seery had intended to use at trial remained in Mr. Kersting's possession.  By letter dated December 19, 1986, Chicoine and Hallett reminded Mr. Kersting that they needed all documents in the possession of Mr. Kersting and Mr. Seery that pertained to the Kersting programs in dispute in the Tax Court.

---

[30]  Mr. Bradt and Mr. Izen had been law partners from 1978 to 1981.

By letter dated January 7, 1987, Chicoine and Hallett outlined the conditions underlying their agreement with Mr. Kersting to represent the test case petitioners in the Tax Court. Chicoine and Hallett's letter states in pertinent part:

> Our representation is conditioned upon the following however:
>
> 1. We will represent only the individuals selected as test cases and who request us to do so. We are not representing or acting on behalf of any other taxpayers or litigants who have invested in various companies in which you are affiliated and who have stipulated to be bound by the outcome of the litigation or desire legal advice with respect to whether they should accept the Internal Revenue Service's settlement proposal.
>
> 2. All parties understand and agree that under the circumstances, the Petitioners involved in the test cases who have expressly authorized us to represent them will be our clients and that we do not represent you individually, although you have agreed with those Petitioners that you will pay the legal fees to defer [sic] the costs of their defense. We will discuss the fee arrangement with each of the Petitioners in the test cases and their perception of any possible conflict of interest which we would require that they waive.
>
> 3. It is understood that there will be no restrictions on the advice which we may provide to our clients and after review of the relevant facts and documents, we are free to propose such settlements as we may deem appropriate. We need not proceed with trial in any situation if which we consider our position to be indefensible or frivolous.

In early January 1987, Messrs. Chicoine and Hallett filed entries of appearance as counsel in each of the test cases other than the Thompson and Cravens cases.

As discussed in greater detail <u>infra</u> pp. 100-106, at the time of Mr. Seery's withdrawal from the Cravens cases,

Mr. Cravens and Mr. McWade had agreed to a settlement of the Cravens cases. After reaching an agreement with Mr. McWade, Mr. Cravens did not authorize Chicoine and Hallett to enter an appearance in his cases.

E.    Evidentiary Issues

After undertaking to represent the test case petitioners, Chicoine and Hallett decided to challenge their deficiency notices on the ground that the search of Mr. Kersting's office in January 1981 had been illegal. Chicoine and Hallett thereupon filed motions for leave to file amendments to the petitions and lodged the amendments with the Court. The amendments included arguments that the materials seized by the Internal Revenue Service during the search of Mr. Kersting's office should be suppressed at trial of the test cases and that the burden of proof and burden of going forward with evidence should be shifted to respondent. On January 14, 1987, the Court granted Chicoine and Hallett's motions for leave to file amendments to the petitions and subsequently directed respondent to file answers to the petitions as amended.

1.    The Maui Session

Although the test cases were originally scheduled for trial at the Maui session, the trial was delayed by the need to use the Maui session to receive testimony and evidence on the evidentiary issues raised by Chicoine and Hallett.

Mr. McWade and Henry E. O'Neill (Mr. O'Neill), another trial attorney assigned to the Honolulu District Counsel Office,

appeared on behalf of respondent at the Maui session. Mr. DeCastro appeared at the Maui session on behalf of the Thompsons. The Cravenses did not appear at the Maui session.

Following the Maui session, the Court ordered respondent and petitioners, by May 18 and June 17, 1987, respectively, to file opening and reply briefs addressing the evidentiary issues raised by Chicoine and Hallett. On motions by the parties, the Court extended the dates for the filing of opening and reply briefs to June 8 and August 10, 1987, respectively.

2. Dixon I Opinion

On February 11, 1988, the Court issued its Dixon I opinion rejecting Chicoine and Hallett's evidentiary arguments. Specifically, the Court held that petitioners had failed to establish standing to contest the Kersting search. Dixon v. Commissioner, 90 T.C. 237 (1988).

By order dated July 1, 1988, the Court set the test cases for trial in San Diego, California, on January 9, 1989. By order dated October 24, 1988, the Court granted Mr. Izen's motion to reconsider and set the test cases for trial in Honolulu, Hawaii, on January 9, 1989.

V. Kersting Disputes With Program Participants

Before the trial of the test cases, Mr. Kersting had disputes, summarized below, with the Thompsons and the Alexanders.

A.    The Thompsons

    1.    The Bauspar Program

On August 13, 1979, the Thompsons purchased a condominium unit in Wahiawa, Hawaii (the Wahiawa property), from Pacific Universal Corp. (not a Kersting company).  On April 24, 1981, the Thompsons entered a Kersting program known as Bauspar--not one of the Kersting programs in dispute at the trial of the test cases-- to effect the payoff of seller-provided financing on the Wahiawa property.  The Thompsons executed a first mortgage and promissory note reflecting a loan from Bauspar, Inc. (Bauspar), in the principal amount of $80,000.  The Thompsons agreed to repay the $80,000 Bauspar loan, with interest at 7 percent per year, through monthly payments of principal and interest of $532.24 for a 10-year period, followed by a balloon payment of $69,182.47.[31] In conjunction with the Bauspar loan, the Thompsons agreed to purchase $80,000 worth of Bauspar stock.  The Thompsons borrowed $80,000 to purchase the Bauspar stock from another Kersting company, Paragon Investments, Inc. (Paragon), at an annual interest rate of 18 percent.  The Thompsons further agreed to participate in a "savings program" by depositing $1,200 per month into an account with Citizen's Financial, Inc. (Citizen's Financial), another Kersting company.

On August 12, 1982, the Thompsons agreed to sell the Wahiawa property to Kevin and Ada Shea for $122,500 by an "Agreement of

_____

    [31]  It appears that the Thompsons actually made monthly payments of $535 to Bauspar.

Sale" under which the Thompsons apparently took back a purchase money mortgage on the property. The Thompsons continued to participate in the Bauspar program until 1986 when the Sheas decided to sell the Wahiawa property to a third party.

On January 30, 1985, Mr. Kersting sent Mr. Thompson a schedule listing the interest payments that Mr. Thompson had made during 1984 as follows:

| Payee | Amount |
| --- | --- |
| Bauspar, Inc. | $6,420.00 |
| Paragon Investments, Inc. | 9,611.04 |
| Citizens Financial, Inc. | 14,400.00 |

Upon sale of the Wahiawa property by the Sheas in 1986, Bauspar received a check in the amount of $75,511.74 in satisfaction of the principal amount remaining due on the Thompsons' loan from Bauspar.

2. Deterioration of Thompson/Kersting Relationship

While working on the Thompsons' estate plan, Mr. Huestis asked Mr. Kersting for an accounting of the Thompsons' investments in Kersting programs. By letter dated March 3, 1986, Mr. Kersting responded by providing Mr. Huestis a summary list of the Kersting programs that the Thompsons had participated in during 1977, 1978, 1979, 1980, and 1981. By letter dated March 12, 1986, Mr. Huestis informed Mr. Kersting that the Thompsons wished to terminate their participation in all Kersting programs and obtain a complete accounting of their investments. Mr. Huestis also requested that all future communications

regarding the matter be directed to Mr. Huestis rather than to the Thompsons.

By letter dated March 17, 1986, Mr. Kersting complained to Mr. Huestis about his "assertive approach" and said he would continue to communicate directly with the Thompsons. By letter dated March 17, 1986, Mr. Kersting wrote to Mr. Thompson, confirmed that he would terminate Mr. Thompson's programs, and inquired whether Mr. Thompson still had any stock certificates issued in connection with his participation in Kersting programs. Mr. Kersting's letter also states that Mr. Thompson would incur tax liability for capital gains that would be realized upon the termination of his accounts in the Kersting programs.

On March 21, 1986, Mr. Huestis again wrote to Mr. Kersting, stating that the Thompsons were disappointed with Mr. Kersting's failure to respond to their requests or to assist them with the tax problems arising from their participation in his programs. By letter to the Thompsons dated March 25, 1986, Mr. Kersting confirmed that he would liquidate their investments, as discussed with Mr. Thompson in a recent telephone conversation. Mr. Kersting requested that Mr. Thompson endorse all relevant stock certificates and return them to Mr. Kersting so that the proceeds from the sale of stock represented by such certificates could be used to retire Mr. Thompson's debts to Kersting companies.

By letter dated March 31, 1986, Mr. Kersting wrote to Mr. Thompson and admitted that he was having difficulty

reconciling Mr. Thompson's Bauspar account because Earl LeMond, Mr. Kersting's son-in-law and the manager of the Bauspar program, did not keep reliable records. Nonetheless, Mr. Kersting prepared an accounting of Mr. Thompson's Bauspar account indicating that Mr. Thompson had paid $90,769.72 under the program and had received nontaxable dividends of $27,000 and Federal tax and State income tax savings (presumably from interest deductions) of $36,307.79 and $9,000, respectively. Mr. Kersting further indicated that, in light of Mr. Thompson's apparent dissatisfaction, he would waive the normal requirement that the Bauspar program run for a 10-year period, allow Mr. Thompson to terminate the program prematurely, and pay Mr. Thompson $27,000 reflecting 3 years of "equity build-up" in the program. On the basis of his accounting, Mr. Kersting concluded that Mr. Thompson would realize a net gain of $8,538.07 from the Bauspar program. Mr. Kersting advised Mr. Thompson to check his accounting carefully, and that, if necessary, Mr. Kersting would make adjustments in Mr. Thompson's favor to avoid a legal dispute.

On March 31, 1986, Mr. Kersting wrote a second letter to Mr. Thompson stating that the Thompsons owed a total of $11,844 to Avalon Acceptance Corp., Aztec Acceptance Corp., Mahalo Acceptance Corp., Lombard Acceptance Corp., and Candace, for interest due on leverage notes during 1983 and 1984. Mr. Kersting's letter states in pertinent part:

I will assume that you will take the position
that you should not be paying interest on notes which
produced deductions which you might not have used.
While this, of course, would not go well with a bank or
Credit Union (they would charge you interest whether
you use the deductions or not) I am willing to make
adjustments to your advantage.  To get that underway I
suggest that you tell us which of the deductions were
claimed by you in 1983 and 1984.

                    *   *   *   *   *   *   *

To keep the spirit of accommodation alive and to remove
all elements of dissatisfaction we are quite willing to
lean over into your direction.  It has troubled me
considerably that of all people you would be displeased
with our services.

On May 6, 1986, Mr. Thompson wrote to Mr. Kersting

requesting a full accounting for his participation in the Bauspar

program.  Mr. Thompson informed Mr. Kersting that the property

subject to the Bauspar mortgage had been sold.  Mr. Thompson also

said that he was reminding Mr. Kersting that, upon his retirement

in 1982, he had asked to terminate his participation in the

programs for which Mr. Kersting was now seeking interest payments

for leverage loans.

Beginning in June 1986, Mr. Thompson stopped making the

$1,200 monthly deposits to Citizens Financial as required under

the Bauspar program.  At the same time, Mr. Thompson ignored

Mr. Kersting's written requests to explain his failure to make

the deposits.  Further, on June 23, 1986, at the suggestion of

Mr. Huestis, the Thompsons retained John A. Chanin (Mr. Chanin),

an attorney practicing in Honolulu, to assist them in their

dispute with Mr. Kersting.  Mr. Chanin assigned the matter to his

associate, Keith Y. Yamada (Mr. Yamada).

On August 1, 1986, Mr. Yamada spoke with Mr. Kersting by telephone and requested a detailed accounting of the amounts that the Thompsons had paid to Bauspar and Citizen's Financial, as well as a status report on the promissory notes executed by the Thompsons in favor of Bauspar, Signet Financial, Inc., and Paragon.  Following the telephone call from Mr. Yamada, Mr. Kersting called Mr. Thompson.  During this conversation, Mr. Thompson reminded Mr. Kersting that the Wahiawa property had been sold.  Mr. Kersting stated that he would provide Mr. Chanin with copies of the documents relating to Mr. Thompson's participation in the Bauspar program as soon as Mr. Thompson provided Mr. Kersting with a written authorization to release them.

By letter dated August 23, 1986, Mr. Kersting notified the Thompsons that he had turned their file over to Mr. Moseley for collection and that he sensed that litigation was imminent. Mr. Kersting's letter states in pertinent part:

> Since the odds, however, are in favor of imminent litigation I consider it to be my obligation to point out to you the consequences:
>
> The day after you have allowed your attorneys to file suit I will declare all notes which you have executed to our companies in default and begin collection proceedings.  We will make an effort to collect from you not only the $11,844.00 of interest on promissory notes of which we have sent you billings several times we will also file suit to collect the principal of all notes which we hold.  The aggregate sum is well in excess of $250,000.00, as you know.
>
> I will also ask you to return to us the $40,000.00 we advanced to you after the First Savings debacle.  We will start collection proceedings on the $75,000.00

note which you executed in favor of FEDERATED FINANCE COMPANY to facilitate the acquisition of your stock in First Savings & Loan Ass. We will ask you to pay a pre-payment penalty on your mortgage on the house in Wahiawa.

We will NOT arrange for you a capital gain in your BAUSPAR HOLDINGS INC. stock which I had considered-- even though not due you because of premature withdrawal from the Plan--and we will NOT render assistance in saving you capital gains taxes on the re-capture of basis in your stock holdings.

We will NOT provide legal assistance free of cost to you any longer in US Tax Court proceedings. You will have to retain your own attorney to make an appearance for you on February 9/1987 in US Tax Court.

By letter dated August 24, 1986, Mr. Kersting notified Mr. Seery that he expected to be in litigation with the Thompsons and directed Mr. Seery not to "render any services, at our expense," to the Thompsons.

By letter dated August 28, 1986, Mr. Huestis notified Mr. Moseley that he represented the Thompsons in connection with their Kersting transactions and the pending Tax Court litigation. Mr. Huestis advised Mr. Moseley to direct all future communications regarding the Thompsons to Mr. Chanin.[32]

By letter dated September 5, 1986, Mr. Kersting again notified Mr. Seery of his dispute with the Thompsons and the likelihood of litigation. Mr. Kersting included a copy of Mr. Huestis' August 28, 1986, letter to Mr. Moseley.

---

[32] As previously mentioned, this was around the time that Mr. Seery began the process of withdrawing as counsel for the Thompsons, following Mr. Huestis' notification to Mr. Seery that the Thompsons were in the process of retaining substitute counsel.

Mr. Kersting told Mr. Seery that he considered it "mandatory" that the Thompsons be removed as test case petitioners. On September 24, 1986, Mr. Kersting again wrote to Mr. Seery, reminding him of the need to remove the Thompsons from the list of test cases. During this period, Mr. Thompson began talking with other Kersting program participants about filing a class action lawsuit against Mr. Kersting.

On January 1, 1987, Mr. Kersting wrote to Bill Witthorne, a Kersting program participant, requesting help in dealing with Mr. Thompson. Mr. Kersting's letter states in pertinent part:

> Yet, I consider it important that someone would bring home to Jack the dangers of the action he has in mind. He has been hoodwinked by the attorneys out in California and I think he is blind to the ramifications. Can you think of anyone in California who is close to Jack and willing to talk to him?

That same day Mr. Kersting wrote to Benness M. Richards, another Kersting program participant, stating in pertinent part:

> We have been unsuccessful over the last six months or so to convince Jack that he will be better off with the legal representation provided by us. Neither has anyone be [sic] able to bring home to him that the IRS does NOT make him a better deal than offered to all the other Petitioners.

On March 10, 1987, Mr. DeCastro and Mr. Huestis informed Mr. Thompson that Mr. Kersting would not return the Thompsons' promissory notes. Mr. DeCastro indicated that he wanted to discuss the possible involvement of his firm in bringing legal action against Mr. Kersting.

On April 10, 1987, Mr. Thompson wrote a letter to other Kersting program participants, saying that Mr. Kersting had

deceived him.  In his letter, Mr. Thompson said that he had gone to Mr. Kersting to reduce his tax liabilities but that he now believed the cost to him would be great because the Internal Revenue Service was challenging Mr. Kersting's programs. Mr. Thompson suggested that the biggest worry for Kersting program participants was Mr. Kersting's "ultimate weapon", the promissory notes.  Mr. Thompson enclosed a copy of a letter that he had received from Mr. Kersting as an example of what the others might face.[33]  Mr. Thompson informed the other participants that, although Mr. Kersting had promised to cancel all promissory notes in exchange for the surrender of the Kersting company stock that was purchased with the proceeds of the primary loan, Mr. Thompson had tried to surrender his Kersting company stock but Mr. Kersting had refused to cancel Mr. Thompson's promissory notes.  Mr. Thompson indicated that he no longer trusted Mr. Kersting, and that he had retained Mr. DeCastro.

By letter dated May 5, 1987, Mr. Yamada advised Mr. Thompson that a lawsuit against Mr. Kersting would have merit, and that a class action lawsuit should be considered.  Around this time, Mr. DeCastro had proposed to file suit on behalf of the Thompsons against Mr. Kersting in Federal District Court.

---

[33]  Although the Court's copy of Mr. Thompson's Apr. 10, 1987, letter does not include a copy of a letter from Mr. Kersting, we assume that Mr. Thompson circulated Mr. Kersting's letter of Aug. 23, 1986.

On May 26, 1987, Mr. Huestis called Mr. DeCastro and learned that, after Mr. Kersting had obtained a copy of Mr. Thompson's April 10, 1987 letter, Mr. Moseley had written to Mr. DeCastro on behalf of Mr. Kersting and proposed a settlement of the Kersting/Thompson dispute. During a later meeting that day with Mr. Thompson, Mr. Huestis agreed to contact another lawyer in Honolulu, Charles R. Kozak (Mr. Kozak), to discuss whether Mr. Kozak might represent the Thompsons in a lawsuit against Mr. Kersting.

On May 27, 1987, Mr. Huestis contacted Mr. Kozak on behalf of the Thompsons. Mr. Kozak informed Mr. Huestis that he had represented two other Kersting participants (David L. Bigelow[34]

---

[34] David L. Bigelow and Patricia L. Bigelow had participated in the CAT-FIT program during the taxable years 1975 and 1976. In Bigelow v. Commissioner, T.C. Summary 1983-6 (docket No. 3147-78S), the Court held that the Bigelows were entitled to interest deductions that they had claimed under the CAT-FIT program, partly on the basis of evidence that the Bigelows had successfully sued a related Kersting finance company in State court. Because the Bigelows' case was tried under the small tax case procedure, the case was not subject to appeal and is not treated as precedent for any other case. See sec. 7463(b).

Mr. Kozak had represented Mr. Bigelow in a lawsuit against Mr. Kersting for payment of the "equity build-up" in a mortgage funding program (presumably Bauspar) following Mr. Bigelow's termination of the program. Mr. Bigelow won the suit and collected damages. According to Mr. Kozak, Mr. Bigelow had prevailed by virtue of Mr. Kersting's promise not to enforce notes that Mr. Bigelow had signed in connection with his participation in other Kersting programs. Mr. Bigelow used Mr. Kersting's written promise that he would not enforce promissory notes to prevent Mr. Kersting from asserting the principal on the notes as a defense or offset to Mr. Bigelow's claim to the equity buildup in the mortgage funding program.

and Michael Provan[35]) and that he knew the Kersting programs and how to locate Mr. Kersting's assets.[36]  On June 2, 1987, Mr. Huestis agreed to send a copy of the Thompson file to Mr. Kozak.  On the same date, Mr. Huestis notified Mr. Yamada that the Thompsons did not plan to retain the Chanin firm to bring suit against Mr. Kersting.

Messrs. Bigelow, Provan, and Thompson all asked Mr. Kozak to investigate the filing of a lawsuit against Mr. Kersting.  On August 6, 1987, Mr. Kozak wrote to Mr. Thompson and suggested that there was a good chance of obtaining a large judgment against Mr. Kersting through a class action lawsuit, but that collection of any such judgment would be uncertain.  In addition, Mr. Kozak's letter states in pertinent part:

> As you know, Kersting is now embroiled with the IRS on behalf of his clients.  I recently had a conference with Ken McWade, local counsel for the IRS.  He tells me the trial of these cases will be no sooner than late Spring 1988.  I suspect 12-18 months is a more realistic date.  Also McWade stated he is 100% sure Kersting will be unable to show any "purposive" function of his corporations other than to avoid taxes.  Several witnesses including yourself are available to McWade to prove Kersting never had any intention of enforcing the notes he had his clients execute.  Also, I am suspicious that Kersting's representation that his

---

[35]  Mr. Kozak had represented Mr. Provan when he had been sued as a director of First Savings.  The representation ended with a settlement with the company that provided First Savings' officers and directors liability insurance.  Mr. Kozak did not represent Mr. Provan in any tax controversies with the Internal Revenue Service related to the Kersting programs.

[36]  As discussed in greater detail, infra pp. 115-116, Mr. Kozak and his wife, Susan K. Kozak, had participated in one or more of the Kersting programs that were the subject of this Court's opinion in Pike v. Commissioner, 78 T.C. 822 (1982).

companies are making loans, leasing cars and factoring accounts in any meaningful business sense is without any merit.

Further, I believe we will find that Kersting did not do many of the "house keeping" accounting and legal matters which needed to be done to qualify his schemes before the IRS, even if there was an arguable business purpose position for his schemes under the tax code.

In my estimation, those clients of Kersting who continue to be represented by Kersting's lawyers are headed towards a nightmare. Interest continues to mount on the taxes due. By the time the pilots finally get a decision from the tax court, they will be in terrible financial condition. Of course, they will still have to pay the tax since bankruptcy will not terminate their tax liability.

Those who are smart enough should disassociate themselves from Kersting's lawyers now, obtain their own counsel, offer their testimony as part of their negotiations with the IRS and buy out as cheap as they can now!

There is no evidence in the record that the Thompsons have ever filed a lawsuit against Mr. Kersting or that Mr. Kersting has ever filed a lawsuit against the Thompsons. There is no documentation in the record to support Mr. Thompson's statement to Mr. Kersting in 1986 that in 1982 he had asked Mr. Kersting to terminate Mr. Thompson's participation in the Kersting programs.

B.  The Alexander Dispute

As previously mentioned, Mr. Alexander first met Mr. Kersting in Los Angeles in the early 1960's. In the mid-1970's, Mr. Alexander lent over $100,000 to Mr. Kersting to assist him in the acquisition of Cosmopolitan Financial Corp. Mr. Alexander's creditor's interest in Cosmopolitan evolved into a stock interest in Charter Financial. Mr. Alexander also lent

$80,000 to Mr. Kersting's subchapter S leasing corporations in the 1970's.

In 1977, Mr. Alexander, a minority shareholder of First Savings, met with Mr. Kersting to discuss the possible acquisition of the company. Mr. Alexander participated in the acquisition of First Savings and added to his First Savings stock holdings in the process. Mr. Alexander participated in certain Kersting programs at issue in Dixon II during the taxable years 1974 through 1977.

In 1980, Mr. Alexander brought suit against Mr. Kersting in Hawaii State court seeking the repayment or return of approximately $450,000 that Mr. Alexander claimed he had lent to or invested with Mr. Kersting. Mr. Kozak initially represented Mr. Alexander in this litigation. Mr. Kersting and/or his companies eventually filed counterclaims in excess of $4 million against Mr. Alexander. Mr. Moseley represented Mr. Kersting in the Alexander litigation.

In March 1982, Mr. Alexander received a telephone call from Internal Revenue Service Special Agents George Scott and Mike Duncan, who were interested in questioning Mr. Alexander regarding Mr. Kersting's various programs. The record does not reflect whether Mr. Alexander ever agreed to be questioned by the agents.

The Alexander/Kersting litigation eventually was submitted to arbitration during a week-long proceeding in July 1987. During the arbitration proceeding, Mr. Kersting discovered that

Messrs. Alexander, Kozak, and Matsumoto had contacted Mr. McWade to discuss whether the Government would pay a finder's fee for information pertaining to Mr. Kersting's programs. Mr. Alexander's discussions with Mr. McWade on the subject of a finder's fee are discussed in greater detail, <u>infra</u> pp. 106-115.

In a letter dated July 24, 1987, Mr. Kersting brought his dispute with Alexander to the attention of Chicoine and Hallett, stating as follows:

Dear Darrell:

I have spent the better part of this week in arbitration hearings concerning a case whereby we are attempting to accomplish an offset of debt owed us by a Mr. Denis Alexander against certain obligations we have to him. The matter has been going on for more than six years and has become sheer agony.

During the course of the proceedings, however, certain matters came to the surface which will become apparent to you as you will read the enclosed material. The material will disclose a conspiracy between McWade, DEnis [sic] Alexander, an accountant by the name of Gilbert Matsumoto and an attorney by the name of Charles Kozak.

Here are some short facts to illuminate the case:

DEnis [sic] Alexander was a long-time friend going back more than 25 years, until we locked horns over the debt referred to above.

Gilbert Matsumoto is an accountant who was for years the tax preparer for our Finance Company in Aiea, Federated Finance Company, and for about 10 to 14 of our clients which we had referred to him. He had given me an opinion with respect to the viability of the SubChapter S concept which we employed in the mid-70s for our Leasing Companies. He, in fact, did the filing of SubChapter S qualification forms for us with the IRS in Fresno, Calif. and did some of the Tax Returns. I

adapted the SubChapter S principles on the strength of his advise [sic].

Charles Kozak is an attorney here in town who was at one time a shareholder in one of our SubChapter S Leasing Companies and also a participant in other programs. He did some legal work for us in the mid-70s in chasing a dead-beat by the name of Feliciano and he obtained judgement for us. He became an adversary after he had made no lease payments on a car which we had leased to him which compelled us to repossess the car. He was delinquent by more than one year. He has stirret [sic] up trouble for me ever since.

These three characters now conspired with McWade to initiate criminal proceedings again against me and, as you will read, already discussed among themselves how to divide the "finders fee" (more precisely the Judas ducats) which they expected to receive from IRS. As we took Alexanders [sic] testimony this week it became apparent to Kozak that he had acted unethically and he read a statement into the records that "he had advised his client (Alexander) not to engage in reporting me to the IRS in order to extract from me a settlement of his claims" which, of course, is self-defeating since he was an active participant in the scheme.

I have reason to believe that all of this led nowhere. If even entrapment and subsequent raid on our premises did not yield the evidence for the CID characters to take me out of circulation the Kozak / Alexander / Matsumoto / McWade conspiracy had no prospect of success. More than a year has gone by since these rats tried to make money by setting me up for execution.

I will assume that this incident will become a piece of the mosaic which should be made known to the US Tax Court Judge in support of my contention that IRS and it's [sic] representatives have conspired to ruin my business and inflict harm on me personally, one way or another.

Following the arbitration hearing, Mr. Moseley filed a complaint with the Supreme Court of the State of Hawaii, Office of Disciplinary Counsel (HODC), accusing Mr. Kozak of conflict of interest and of attempting to extort money from Mr. Kersting in a civil suit. On March 17, 1988, Mr. Kozak submitted a written

response to the HODC in response to Mr. Moseley's complaint. Mr. Kozak alleged that he had been offered inducements by the Internal Revenue Service in exchange for his cooperation in an Internal Revenue Service investigation of Mr. Kersting, suggested that HODC should contact Mr. McWade, denied that he used the threat of Internal Revenue Service litigation against Mr. Kersting, and denied any conflict of interest. On April 12, 1988, Mr. Kozak wrote another letter to HODC stating that the Internal Revenue Service had agreed to pay Mr. Kozak and Mr. Alexander for their cooperation in an Internal Revenue Service investigation of Mr. Kersting. At the evidentiary hearing in this proceeding, Mr. Kozak testified that his statements to HODC that the Internal Revenue Service had agreed to pay him for cooperation in an investigation of Mr. Kersting were false.

On July 12, 1988, the arbitrator released his Arbitration Decision and Award denying all claims and counterclaims between Messrs. Alexander and Kersting.[37] The arbitrator's decision

---

[37] Following the issuance of the arbitration decision, the Alexanders claimed a net operating loss (NOL) on their 1988 tax return in the amount of $321,000 identified as amounts "expended for the purpose of starting new businesses deemed to be unretrievable by the American Arbitration Association". The Alexanders later claimed an NOL in the amount of $360,260 on their 1990 tax return and an NOL carryforward of $201,955 and a loss "due to fraud" in the amount of $129,000 on their 1991 tax return. The Alexanders' 1991 tax return included the following statement:

The loss was $450,000. $321,000 was claimed on the 1988 returns. $129,000 was not claimed because

(continued...)

turned largely on the lack of credibility of both parties.

The record does not reflect the outcome of Mr. Kersting's complaint filed with HODC against Mr. Kozak.

## C.   Collection Actions

In Dixon II, the Court described Mr. Kersting's 1980 dunning letter to more than 30 program participants and several lawsuits brought during the period 1983-86 in the names of Kersting corporations against Kersting program participants to collect amounts purportedly due on promissory notes.  See Dixon II, 62 T.C.M. (CCH) at 1466-1467, 1505-1506, 1991 T.C.M. (RIA), at 91-3007 to 91-3008, 91-3048 to 91-3050.  Summarized below are the Court's findings and conclusions in Dixon II regarding the collection lawsuits.

### 1.  Steve Hane

In 1983, a Kersting company, Atlas Funding, commenced an action on a $30,000 renewal primary note for a stock subscription plan against Kersting program participant Steve Hane.  The Court noted that the Hane litigation was the only example in the record

---

[37](...continued)
recovery was expected in the future.  In 1991 the assets on which the recovery was anticipated disappeared because the corporation was absorbed and ceased to exist.

Upon examination of the Alexanders' returns for 1990 and 1991, the Commissioner disallowed the claimed NOL's and fraud loss.  After the Alexanders agreed to these adjustments, the Commissioner issued a notice of deficiency to the Alexanders determining accuracy-related penalties attributable in part to the disallowed losses.  In Alexander v. Commissioner, T.C. Summary 1997-80 (docket No. 8948-95S), the Court sustained the Commissioner's determinations.

of litigation on a primary note.  The Court concluded that the
evidence of the Hane litigation was inconsequential because of
the lack of any testimony about the matter and the fact that
Atlas Funding dismissed the action voluntarily after obtaining a
default judgment.

    2.  <u>Carl Mott, George Vermef, and Robert Peterson</u>

In Dixon II, the Court found that Kersting corporations
pursued collection lawsuits in 1985-86 on leverage loans against
Kersting program participants Carl Mott, George Vermef, and
Robert Peterson.  The Court noted that while Carl Mott had been
sued only for interest on leverage loans, Messrs. Vermef and
Peterson had been sued for both interest and principal on
leverage loans.  The Court found that there was no explanation in
the record how Messrs. Vermef and Peterson could have owed
principal on leverage loans that would be consistent with the way
the Kersting programs were intended to operate nor with the way
that they apparently actually operated.  Further, the Court found
that the judgments entered against Mr. Vermef were vacated after
the parties agreed to settle the cases and that a default
judgment entered against Mr. Peterson later was set aside on
Mr. Peterson's motion.  The Court summarized its conclusions
regarding collection activities and litigation as follows:

> Five Kersting corporations commenced actions
> against Carl Mott based upon a year of unpaid interest
> on 15 leverage notes, but the principal amounts of the
> notes were not in issue.  The record is replete with
> copies of checks, drawn on personal bank accounts other
> than Liberty Bank or Hawaii National Bank, that
> petitioners used to pay interest on leverage notes.

Respondent does not dispute that Kersting insisted on these interest payments, but maintains that to the extent they were made they must be characterized as fees to Kersting for providing tax deductions. Consequently, that Carl Mott allegedly failed to pay interest on leverage notes is of no significance to the substance of his or anybody else's leverage loans.

* * * * * * *

As illustrated by Kersting's pay-or-else letter to over 30 clients on September 25, 1980, and his 1986 correspondence with the Thompsons, his overriding concern was to be compensated by means of leverage loan interest. It was this amount that even he often referred to as a "fee" or a deductible "cost" of tax deductions. In encouraging clients by means of the September 25, 1980, letter to "discharge the debt to which you are a party," he sought only small amounts that could not have represented typical primary or leverage loans. His letters to the Thompsons indicate that he only threatened or pursued collection of principal obligations when the investor neglected or refused to pay leverage loan interest. This rare occurrence, which Kersting did not testify he either intended or expected, is not sufficient to transform any of petitioners' loans from Kersting corporations into genuine recourse indebtedness.

Dixon II, 62 T.C.M. (CCH) at 1505-1506, 1991 T.C.M. (RIA), at 91-3049 to 91-3050.

VI.  Settlements

A.  Internal Revenue Service Policy

1.  National Office Position

After a tax shelter project is created and a project attorney and a project Appeals officer are appointed, an official project settlement offer is determined by the project Appeals officer, the project attorney, and District Counsel. The project attorney and project Appeals officer review the strengths and weaknesses of the particular tax shelter and evaluate the hazards

of litigation to determine an appropriate project settlement offer. Upon determination of the project settlement offer, the terms of the offer are reported to the Tax Shelter Branch in the National Office for dissemination to Internal Revenue Service field offices (particularly the examination and appeals functions) throughout the country to ensure that similarly situated taxpayers are treated consistently.

Once a tax shelter project is assigned to a particular District Counsel office, that office has the authority to settle any individual case in the project. District Counsel generally is expected to adhere to the official project settlement offer. Nevertheless, District Counsel has the authority in special circumstances to settle individual tax shelter project cases on a basis different from the project settlement offer. For example, District Counsel could deny a project settlement offer to the shelter promoter or a participant who had helped to market the program. In addition, District Counsel might eliminate an addition to tax (such as negligence) because of the participant's lack of education or sophistication in financial matters.

District Counsel can alter or modify an official project settlement offer without prior approval of the National Office. However, District Counsel is required to notify the Tax Shelter Branch of any change or modification to the official project settlement offer in order to allow the Tax Shelter Branch to disseminate the revised offer to Internal Revenue Service offices throughout the country.

The National Office did not maintain a policy prohibiting the settlement of a test case. However, the Commissioner's practice of withdrawing project settlement offers once the project test cases have been set for trial would serve to bar settlements in test cases and nontest cases alike.[38]

2. Regional Counsel

Benjamin C. Sanchez (Mr. Sanchez) served as Regional Counsel for the Western Region during the period in question. His view of District Counsel's settlement authority in tax shelter cases differed from the National Office view. In Mr. Sanchez' view, District Counsel had authority to settle tax shelter project cases only on the basis of the official project settlement offer. Mr. Sanchez believed that District Counsel was obliged to adhere strictly to the official project settlement offer because of the overriding need to ensure consistent treatment of tax shelter project cases. Although Mr. Sanchez acknowledged that District Counsel technically had authority to settle a tax shelter project case on a basis different from the official project settlement offer, Mr. Sanchez believed that it would be improper to do so. In his view, disciplinary or other adverse career consequences might follow if District Counsel deviated from the official project settlement offer in settling a case.

---

[38] Of course, District Counsel might be reluctant to settle a test case at a time that removal of the case from the test case array would require delay in the trial to allow the parties to select a replacement case.

Mr. Sanchez expected that he would be informed by District Counsel of settlements in tax shelter project cases that deviated from the official project settlement offer.

B.    Official Kersting Project Settlement Offer (7-Percent Reduction of Deficiency or Out-of-Pocket Expenses)

Between January 1982 and mid-1986, the terms of the official Kersting project settlement offer were stated as follows:

> You will be allowed your actual out-of-pocket expenses, in essence, the interest you actually paid to Henry Kersting on the prepayment loan, or leverage loan, which amount equals approximately 7% of the determined deficiencies in most cases.  In addition, if you reported capital gain income from the Kersting transactions, or recaptured the difference between your adjusted basis in the stock and your outstanding indebtedness, then an appropriate adjustment will be made to reflect this fact.  In addition, if you are involved in a leasing plan, to the extent there are additional allowable I.R.C. Section 162 expenses which were not claimed on the return, an appropriate allowance will be made for settlement purposes.  If you were involved in the Uniform Gift to Minors Act program, referred to as KAT-FIT (sic), to the extent you can establish compliance with the Clifford Trust rules, then an appropriate allowance for the deductions will be made.  The government will concede the negligence penalties, I.R.C. Section 6653(1) and I.R.C. Section 6653(a)(2), as well as the I.R.C. Section 6621(c) interest.

The 7-percent reduction of the deficiency reflected a deduction equal to an average of the actual out-of-pocket expenses in approximately 25 Kersting project cases.  For this purpose, the Commissioner treated the "interest" paid on Kersting leverage loans as the out-of-pocket expense.  From respondent's

perspective, the 7-percent settlement offer was equivalent to allowing a deduction for a theft loss in the year of payment.[39]

Under the 7-percent settlement offer, the Commissioner would:  (1) Concede the negligence addition to tax and increased interest imposed on tax-motivated transactions pursuant to section 6621(c); (2) concede an annual deduction under section 162 or 212 to leasing program participants for expenses that exceeded the out-of-pocket adjustment; (3) concede the deficiency in full to participants in the CAT-FIT program who could provide information on how the funds paid to the minor child were used and establish that such use did not give rise to constructive receipt of income by the parents; and (4) make appropriate adjustments if the taxpayer had reported capital gains upon the surrender of stock certificates to Mr. Kersting.  The purpose of these concessions and adjustments was to provide similar treatment of all Kersting program participants who wished to settle their cases.

C.    Deviations From Official Project Settlement Offer

    1.    Modified 7-Percent Settlement Offer

Between April and September 1986, Mr. McWade and Mr. Seery conducted settlement negotiations that led Mr. McWade to offer a settlement that deviated from the official project settlement

---

[39]   Respondent's position represented a concession insofar as the allowance as a deduction of a theft loss of payments induced by misrepresentation is postponed until the year of discovery.  See sec. 165(e); Bellis v. Commissioner, 61 T.C. 354, 357 (1973), affd. 540 F.2d 448 (9th Cir. 1976).

offer in one significant respect. Specifically, by September 1986, Mr. McWade and Mr. Seery had agreed to modify the 7-percent settlement offer to incorporate a new feature they called the "shelter burnout" that would apply in cases involving more than 1 taxable year. The shelter burnout feature grew out of Mr. Seery's contention that Mr. Kersting's programs could be viewed as a tax deferral mechanism.[40] Mr. McWade agreed with Mr. Seery, for settlement purposes, to allow a shifting of the initial year's deficiency to a later year as a "shelter burnout". For example, in a case involving 2 taxable years, the taxpayer's liability for statutory interest under section 6601 was computed under the modified 7-percent settlement offer by treating the taxpayer's tax liability for the earlier of the 2 years as having been incurred on the due date for payment of tax for the later year. Under this approach, the total amount of the taxpayer's underlying tax deficiencies remained the same, but the taxpayer's liability for interest on the deficiencies was reduced by the amount of such interest that otherwise would have accrued on the deficiency for the earlier year of the 2-year period. Variations of this approach were used in cases involving more than 2 taxable years. The modified 7-percent settlement offer negotiated by

---

[40] In Dixon II, the Court considered and rejected the argument that Mr. Kersting's programs resulted in mere tax deferral. The Court arrived at this conclusion through a detailed analysis of the Cravenses' tax returns for 1979 and 1980. See Dixon II, 62 T.C.M. (CCH) at 1483-1484, 1991 T.C.M. (RIA), at 91-3026.

Mr. Seery and Mr. McWade provided that the Commissioner would settle any additions to tax for fraud on a case-by-case basis.

By letter dated September 29, 1986, Mr. Seery informed Kersting program participants of the terms of the modified 7-percent settlement offer and suggested that they give serious consideration to the proposal. Mr. McWade informed Mr. Seery that, because the trial of the test cases had been set for February 1987, the modified 7-percent settlement offer would be withdrawn on December 31, 1986, and that Kersting program participants interested in accepting the settlement should contact Mr. McWade by November 10, 1986, in order to allow time to complete the necessary computations before the withdrawal of the offer.

On October 10, 1986, Mr. Kersting issued a letter to Kersting program participants in which he characterized the modified 7-percent settlement offer as "grossly inadequate."

Messrs. Sims and McWade did not notify the National Office, Regional Counsel, or the Appeals Office that they had incorporated the burnout feature in their offer to settle Kersting project cases.

2.  20-Percent Settlement Offer

Between September and December 1986, Mr. McWade and Mr. Sims began to offer 20-percent settlements that were based on the same general approach as their modified 7-percent settlement offer that included the burnout feature. The 20-percent settlement approach originated in late 1986 in separate negotiations between

Mr. Sims and Mr. Chicoine and between Mr. McWade and Mr. DeCastro.  The enhanced 20-percent settlement offer reflected the perceptions of Messrs. Sims and McWade that the evidentiary issues raised by Chicoine and Hallett increased respondent's risks of litigation.

The 20-percent settlement offer was not disseminated in writing by either Mr. Sims or Mr. McWade.  The existence of the 20-percent settlement offer became known, if at all, through a combination of Mr. Kersting's letters to program participants and calls that Mr. McWade received from Kersting program participants.  Messrs. Sims and McWade did not request approval from or otherwise inform the National Office, Regional Counsel, or the Appeals Office before making the 20-percent settlement offer.

Following the February 1987 Maui session, the Honolulu Appeals Office once again began to offer Kersting program participants a deduction for their cash out-of-pocket expenses, or if substantiation was not available, a reduction of the deficiency by 7 percent, with a waiver of the additions under section 6653(a)(1) and (2).  The Honolulu Appeals Office did not learn that Mr. McWade had negotiated 20-percent settlement offers until mid-1988, following issuance of the Court's opinion in Dixon I.  At that time, the Honolulu Appeals Office determined not to extend such offers because it saw no reason to deviate from the official 7-percent project settlement offer.

3. <u>Negotiations for 50-Percent Settlement Offer</u>

In January 1987, Messrs. Sims and Chicoine continued their efforts to negotiate a settlement of the Kersting project cases. Initially, their discussions concerned a higher percentage settlement if Mr. Kersting would agree to quit the tax shelter business. They eventually abandoned their discussions to link the settlement offer with Mr. Kersting's future conduct.

By letter dated January 16, 1987, Mr. Chicoine notified Mr. Kersting that he believed he had arrived at an agreement with Mr. Sims to settle all the Kersting cases docketed in the Tax Court by allowing 50 percent of the claimed interest deductions. Mr. Chicoine's letter further states that Chicoine and Hallett would agree to represent Kersting program participants desiring to settle their cases on these terms for a flat fee of $550 per case.

On January 19, 1987, Mr. Kersting wrote a letter to program participants stating that a 50-percent settlement had been negotiated. Mr. Kersting recommended that the 50-percent settlement be accepted; he included with his letter a form for program participants to use to authorize Chicoine and Hallett to represent them for purposes of settlement. As a result of Mr. Kersting's letter, approximately 300 Kersting program participants contacted Chicoine and Hallett seeking representation.

In the meantime, Mr. Sims consulted Barbara Leonard, Deputy Regional Counsel for the Western Region. She directed him to terminate negotiations based upon a 50-percent settlement.

Upon learning of Mr. Kersting's letter, Mr. DeCastro called Mr. Chicoine to inquire about the terms of the purported 50-percent settlement. Mr. DeCastro stated that the terms of the purported settlement were better than the terms he had received for his clients and that he intended to attempt to obtain the same terms for his clients. During his conversation with Mr. Chicoine, Mr. DeCastro threatened to "make trouble" for Mr. Chicoine unless he referred clients residing in California to Mr. DeCastro for further representation. Mr. Chicoine flatly rejected Mr. DeCastro's proposal.

Following the release of Mr. Kersting's January 19, 1987, letter, Mr. Sims received numerous telephone calls from Kersting program participants and attorneys seeking to accept the 50-percent settlement. Following his conversation with Mr. Chicoine, Mr. DeCastro called Mr. Sims to express concern that Mr. Chicoine's clients might obtain more favorable settlements than the settlements offered to Mr. DeCastro's clients.

By letter to Mr. Chicoine dated February 4, 1987, during the week immediately preceding the Maui session, Mr. Sims denied that he had agreed to a 50-percent settlement of the Kersting project cases. Mr. Sims' letter states in pertinent part:

1.  <u>I have not settled any of the Kersting cases with you.</u>

2.  <u>The government has not made any new, blanket offer to settle these cases (other than our old 7% offer); nor has the government made any offer to wholly or partially concede any of the issues presented by these cases.  To the extent that you may disagree with this statement, any such offer of concession that you believe has been made by me or any other government official is hereby withdrawn.</u>

3.  <u>We do not have a workable basis for settlement of any case or any group of cases.  If you should attempt to represent to the Court that you have such a basis, either in order to obtain a continuance of the trials in this matter or to attempt to force the government into unagreed-to settlements or concessions, I will dispute this firmly.</u>

Before the start of the Maui session, Judge Goffe held a chambers conference with Messrs. Chicoine, Hallett, Sims, McWade, O'Neill, and DeCastro.  Although Mr. Chicoine told Judge Goffe that the parties had reached a basis of settlement, Mr. Sims denied that there was a settlement.  Mr. Sims said that he had "pulled the plug" on a proposed 50-percent settlement because Mr. Kersting had interfered with the negotiations.

4.  <u>Revival of 20-Percent Settlement Offer</u>

During spring 1987, Mr. Chicoine continued to explore with Mr. McWade the possibility of a global settlement.  By letter dated April 13, 1987, Mr. Chicoine provided Kersting program participants with a detailed status report addressing developments at the Maui session as well as settlement negotiations.  Mr. Chicoine's letter also stated that the firm's representation of nontest case taxpayers was not intended to extend to general representation in all matters but was limited

to the acceptance of an Internal Revenue Service settlement offer.

On April 16, 1987, Mr. Chicoine wrote to Mr. Kersting and confirmed that he would be meeting Mr. McWade in Hawaii the following week to discuss the possible settlement of six cases. Mr. Chicoine warned Mr. Kersting not to address the subject of the status of settlement negotiations in his letters to Kersting program participants, inasmuch as his comments could be detrimental to such negotiations. On or about April 27, 1987, Mr. Chicoine informed Mr. Kersting that he would recommend that Kersting program participants accept a 20-percent settlement offer.

By letter dated May 22, 1987, Mr. Kersting provided Mr. Hallett with information pertaining to a purported 30-percent settlement negotiated by Mr. DeCastro on behalf of Benness M. and Jane Richards.[41] Mr. Kersting stated that he was attempting to obtain information respecting additional settlements negotiated by Mr. DeCastro. Between May 1987 and February 1988, Mr. Kersting wrote no fewer than seven letters to Chicoine and Hallett strongly objecting to their communication of a 20-percent settlement offer to Kersting program participants. In his

---

[41] In Richards v. Commissioner, T.C. Memo. 1997-149, supplemented by T.C. Memo. 1997-299, affd. without published opinion 165 F.3d 917 (9th Cir. 1998), we observed that the settlement may have been detrimental to Mr. and Mrs. Richards insofar as the original deficiency had been computed using an excessive tax rate (70 percent) and may have been based in part upon the disallowance of legitimate non-Kersting interest deductions. See supra p. 27.

May 22, 1987 letter, Mr. Kersting objected to Chicoine and

Hallett's recommendation of a 20-percent settlement in pertinent

part as follows:

> As I have done several times now I ask you again NOT to
> communicate to anyone of my friends a prospect of a 20%
> settlement.  The 50% flop has left a $40,000.00 to
> $50,000.00 scar with us.  It was a lesson I will take
> with me to the other side.  I trust that you have
> reconsidered by now your position in the matter and
> that you will NOT go into an adverse stance to me and
> my enterprises.  I assure you that the jolt of April
> 27th has not worn off yet.

On June 10, 1987, Mr. Kersting forwarded to Mr. Chicoine a

letter that he had received from Mr. DeCastro pertaining to a

settlement that Mr. DeCastro purportedly negotiated on behalf of

Boyd S. and Jeannette F. Proctor.  By letter dated June 16, 1987,

Mr. Chicoine responded to Mr. Kersting, stating that he was

satisfied that the Proctors did not receive a settlement in

excess of 50 percent as Mr. Kersting had suggested because the

figures in question did not include the Proctors' liability for

statutory interest.  Mr. Chicoine concluded that the settlement

was in the range of a 14-percent reduction of the Proctors'

deficiency.

On November 4, 1987, Mr. Kersting sent Mr. Hallett a letter

which states in pertinent part:

> Here I asked you about a year ago to defend my
> friends, here I had high hopes and reasonable
> expectation that you would work with us, that we would
> work on consensus and to the common benefit of my
> friends and here I find that you not only do not care
> to do that, you are actually moving into an adversary
> position.  And this after I have paid you an enormous
> amount of legal fees and after I have disciplined
> myself over and over again to keep my temper as I

observe a widening rift between the attorneys who are supposed to work for us and who are, instead, looking after their strangly [sic] perceived protection from liability. My interest in these proceedings and what I consider to be the best interest of my friends is arrogantly overlooked and we are, if your scheme of things would prevail, relegated to onlookers to a spectacle for which we are compelled to pay but in which we are not allowed to take part. It is simply absurd.

On January 12, 1988, Mr. Kersting issued a letter encouraging nontest case Kersting program participants who had paid $550 to Chicoine and Hallett for representation in the settlement process to "recall your funds".

By letter dated January 20, 1988, Mr. Chicoine notified the test case petitioners represented by his firm that Mr. McWade was offering a 20-percent settlement. Mr. Chicoine's letter states in pertinent part:

> Mr. McWade has stated that you may settle your case along the grounds set forth above. Since you are a test case, however, you will not be permitted to withdraw if you wish to enter into the settlement proposed. Accordingly, we would enter into an agreement with Mr. McWade that regardless of the outcome of the trial, you would be allowed the settlement. Thus, if the case were lost in its entirety, your tax deficiency would be calculated in accordance with the settlement.

By letter dated January 22, 1988, Mr. Hallett informed Mr. Kersting that Chicoine and Hallett were seeking an opinion from an expert on legal ethics whether it would be appropriate for the firm to accept new clients seeking to settle Kersting project cases. However, Mr. Hallett stated that the firm would continue to inform its existing clients regarding the status of settlement discussions.

By letter dated January 29, 1988, Mr. Chicoine sent Mr. Kersting copies of proposed stipulated decisions reflecting settlements that Mr. Chicoine had negotiated with Mr. McWade in three Kersting cases.[42] Mr. Chicoine stated that Chicoine and Hallett were obliged to inform all Kersting program participants who had retained his firm that Mr. McWade was continuing to offer settlements despite Mr. Kersting's misrepresentations in his letters to Kersting program participants that no settlement was being offered.

By letter dated February 5, 1988, John A. Strait, Associate Professor of Law at the University of Puget Sound School of Law (Professor Strait), responded to Chicoine and Hallett's request for an expert opinion regarding their ethical obligations as counsel in the Kersting project. Professor Strait advised Chicoine and Hallett that the firm did not have an attorney/ client relationship with, or owe attorney/client duties to, Mr. Kersting, but that Chicoine and Hallett did have an attorney/client relationship with the test case petitioners as well as the nontest case Kersting program participants who had sent Chicoine and Hallett the $550 retainer and authorization forms. Concerning the nontest case clients, Professor Strait concluded that Chicoine and Hallett were obliged to "evaluate settlement proposals and to transmit to them your recommendation

_____

[42] Mr. Chicoine's letter identified the taxpayers as Muller, Lipsky, and Mellows. The record does not reflect the terms of the settlements in these cases.

with the explanation of what the options might be as to the desirability of accepting any settlement proposal."

On February 6, 1988, Mr. Kersting wrote to Mr. Hallett stating in pertinent part:

> I take it from our phone conversation yesterday that you are intent now to trigger the melt-down on me and our corporations with which you have threatened me now for months.  And if I have absorbed all this correctly, you will do this mainly out of concern that some of my friends might sue you at some time down the line if you do not advise them of a "settlement" which you perceive to be available.
>
> The bitter irony of all this is that there was only a remote possibility that anyone of my friends would sue you.  If you go through with your threat to cause a run on us you will have THE CERTAINTY that there will be litigation.  It will be hell after this.

On February 8, 1988, Mr. Kersting wrote a letter to Kersting program participants warning them that Chicoine and Hallett soon would circulate the details of a 20-percent settlement offer. Mr. Kersting urged Kersting program participants not to hire Chicoine and Hallett for purposes of settlement and instead to await the Court's decision regarding the evidentiary issues raised by Chicoine and Hallett on behalf of the test cases. During this period, Mr. Kersting threatened to sue Chicoine and Hallett if they reported the settlement offer.

On February 9, 1988, Mr. Chicoine issued two letters, one addressed to the firm's clients and one addressed to Kersting program participants who had contacted Chicoine and Hallett regarding representation.  These letters served as status reports on the Tax Court case and settlement negotiations.  Mr. Chicoine

reported that Mr. McWade had offered to settle docketed Tax Court cases in accordance with the previously described 20-percent settlement offer, recommended that program participants seriously consider the settlement, and suggested that those who desired to settle on these terms should contact Chicoine and Hallett.

On February 20, 1988, Mr. Kersting wrote to Chicoine and Hallett stating in pertinent part:  "I hereby revoke your appointment as counsel for the test cases".

On February 23, 1988, Mr. Chicoine wrote to Mr. McWade seeking a 20-percent settlement on behalf of test case petitioners Terry D. and Gloria K. Owens.  Mr. Chicoine's letter states in pertinent part:

> Mr. Owens understands that not all cases will settle and you wish to proceed to trial with some test cases. It is hoped that under the circumstances he may be withdrawn as a test case.  If this is not possible, he still wishes to settle the case and enter into an agreement which will permit him to settle the case regardless of the outcome of the trial.

Mr. and Mrs. Owens subsequently decided that they would not continue efforts to settle their case.

In early March 1988, Chicoine and Hallett began receiving requests from Kersting program participants for return of the $550 retainer fee.  Although Chicoine and Hallett returned the full amount of the fee to all those who requested it, they were informed that they might be billed for a "minimal amount" reflecting the firm's costs associated with the opening of files and issuance of status reports.

On March 9, 1988, Mr. Kersting issued a letter to program participants characterizing Chicoine and Hallett as "scoundrels", and stating that he had fired them and retained Mr. Izen to represent the test cases (excluding the Thompsons and the Cravenses).

By letter dated April 22, 1988, Mr. Chicoine notified Kersting program participants that the Court had ruled in the Government's favor in Dixon I; he restated his support for the 20-percent settlement offer described in his February 9, 1988, letter and revealed that, because of a disagreement with Mr. Kersting, Chicoine and Hallett would withdraw as counsel for the test cases.[43]

Mr. Kersting later carried out his threat to sue Chicoine and Hallett for legal malpractice.  Mr. Izen served as an expert witness for Mr. Kersting in his lawsuit against Chicoine and Hallett.

By letter dated April 8, 1988, Mr. McWade notified Mr. DeCastro that, after June 15, 1988, respondent would no

---

[43]  Coincidentally, on Apr. 20, 1988, Mr. DeCastro wrote a letter to a client, James Losey, expressing similar sentiments in favor of settlement of the Kersting cases.  After outlining the deadlines that Mr. McWade had set for the acceptance of outstanding settlement offers, Mr. DeCastro's letter states in pertinent part:

> There is now an urgent need for your friends and acquaintances to consult their legal counsel and seriously consider settling their case with the IRS. The evidence continues to build against the taxpayers in these cases and despite Mr. Kersting's assurances, we feel the trial will be won by the IRS.  The result would be very serious for the taxpayers.

longer consider settlements, other than on the basis of allowing
out-of-pocket expenses, and that out-of-pocket settlements would
no longer be available after October 3, 1988.  By memorandum
dated October 19, 1988, the Acting Chief of the Tax Shelter
Branch notified the Assistant Commissioner for Examination (with
copies to the Director of the Appeals Office, Mr. McWade, and
several National Office executives) that, because the Kersting
test cases had been set for trial in January 1989, the
Kersting project settlement offer would be withdrawn, effective
October 28, 1988.

D.    The Thompson Settlement

1.    Initial Thompson Settlement Agreement

In early December 1986, Mr. McWade and Mr. DeCastro
discussed settlement of the cases of a number of Mr. DeCastro's
clients, including the Thompsons.  Mr. Sims was aware of the
McWade-DeCastro discussions when he also met with Mr. DeCastro in
December 1986 at the Honolulu District Counsel Office and
generally discussed with Mr. DeCastro settlement arrangements for
the Thompson cases.

On December 23, 1986, Mr. McWade mailed a letter to
Mr. DeCastro enclosing proposed decision documents for the
Thompsons as well as several other taxpayers with cases before
the Court.  Mr. McWade's letter states in pertinent part:

Dear Mr. DeCastro:

Enclosed herewith are the Decision documents, as
per our conference, in the above-captioned cases.
Please sign the original and one copy of the Decision
document, in the space provided, and return them to

this office for signing and filing with the Court.  The remaining copy is for your records.

As previously indicated, the Decision documents in John R. and Maydee Thompson will not be filed with the Court until the Decision becomes final in the test cases.  In the interim, the Thompsons can make an advance payment, as discussed at our conference, and stop the accrual of any additional liability for interest.

In response, on December 30, 1986, Mr. DeCastro executed three separate decision documents on behalf of the Thompsons agreeing to the following deficiencies:

| Year | Deficiency | Additions to Tax |
|------|------------|------------------|
| 1979 | --- | --- |
| 1980 | $34,425 | --- |
| 1981 | 30,000 | --- |

The December 1986 settlements that Mr. McWade extended to Mr. DeCastro's clients differed from the 7-percent official Kersting project settlement offer used by respondent's Appeals Office.  In particular, the Thompson settlement included the burnout feature and was based on a reduction of the deficiencies that respondent had determined against the Thompsons of approximately 19 percent as follows:

| Year | Adjustment | Deficiency | Settlement | % Reduction |
|------|-----------|-----------|-----------|-------------|
| 1979 | $39,477 | $18,161 | --- | |
| 1980 | 72,840 | 24,838 | $34,425 | |
| | Total | 42,999 | 34,425 | 20% |
| 1981 | $80,782 | 36,295 | 30,000 | 17 |
| All years total | | 79,294 | 64,425 | 19 |

The adjustments for each year consisted solely of the disallowance of deductions that the Thompsons had claimed with respect to Kersting programs.

On December 30, 1986, Mr. Thompson sent a letter to Mr. McWade enclosing checks for $34,000 and $25,545 that were intended as payments of interest on the Thompsons' tax liabilities for the taxable years 1980 and 1981, respectively.[44]

2.    First Revision of Thompson Settlement

On January 27, 1987, Mr. Huestis sent a letter to Mr. DeCastro stating that Mr. Thompson did not understand the terms of his settlement.  On February 3, 1987, Mr. DeCastro responded to Mr. Huestis as follows:

Dear Sam:

Thanks for your letter of January 27, 1987 indicating questions which Jack Thompson has regarding the proposed settlement.  I will respond in the order of your questions:

1.    The only years in dispute are 1979, 1980 and 1981.

2.    For each year, the amounts claimed due by the I.R.S. by category are:

|  | 1979 | 1980 | 1981 | Total |
|---|---|---|---|---|
| Tax deficiency | $18,161 | $24,838 | $36,295 | $79,294 |
| Penalty | 908 | 1,242 | 19,757 | 21,907 |
| Interest | 19,977 | 24,838 | 27,976 | 72,791 |
|  | 39,046 | 50,918 | 84,028 | 173,992 |

3.    By the terms of the proposed settlement, the following amounts are due to be paid by Jack:

---

[44]  Many Kersting program participants, like the Thompsons, made interest payments on or immediately before Dec. 31, 1986, in order take advantage of the full deductibility of interest in 1986.  The deductibility of payments of personal interest was subject to phase-out for taxable years beginning after Dec. 31, 1986, pursuant to TRA sec. 511(b), 100 Stat. 2246.

|                | 1979 | 1980     | 1981     | Total     |
|----------------|------|----------|----------|-----------|
| Tax deficiency | 0    | $34,425  | $30,000  | $64,425   |
| Interest       | 0    | 35,275   | 24,270   | 59,545    |
|                | 0    | 69,700   | 54,270   | 123,970   |

As you can see, this amounts to a substantial reduction in tax liabilities.

4. Jack correctly understands that his recent payment of $59,545 was entirely applied to interest.

5. The IRS is willing to settle with Jack only on the basis that his test case remains active. The terms are not contingent upon any specific testimony or degree of cooperation and will be filed upon completion of the test case. Jack need only testify, at the trial and is only technically a defendant. Unless some dramatic changes in schedule occur, there will be no depositions. Essentially, Jack need only testify, be protected from Kersting, and does not need to prepare a full-blown defense.

6. As indicated, the IRS insists upon Jack continuing as a test case defendant for its own purposes. That is presently a condition of the settlement. In addition, we simply do not trust Kersting to act in accordance with his promises and staying in the case appears to be wise insurance to obtain cancellation of the notes, etc.

7. I enclose a copy of a letter we have sent to Kersting's attorney regarding the notes issue for your information.

8. If we are unable to obtain a cancellation of notes and recovery of funds invested for Jack through negotiation, we will certainly look to retain John Chanin or other local counsel for that purpose.

On February 6, 1987, Mr. Huestis reviewed Mr. DeCastro's letter with Mr. Thompson and was satisfied that Mr. Thompson understood the status of his case.

On March 13, 1987, following the Maui session, Mr. McWade sent Mr. DeCastro a revised decision for docket No. 31236-84 reducing the Thompsons' tax deficiency for 1980 from $34,425 to

$33,000. Mr. Sims reviewed and approved Mr. McWade's letter to Mr. DeCastro. Although the record contains no explanation for this revision of the Thompson settlement, the revision effectively increased the Thompson settlement from 19 percent to approximately 20 percent. On April 7, 1987, Mr. DeCastro sent Mr. Thompson a letter informing him that the Internal Revenue Service had reduced his tax liability for 1980 by approximately $1,000. Mr. DeCastro also informed Mr. Thompson that this reduction would also save him approximately $1,000 in interest.

On June 4, 1987, the Court granted respondent's Motion to Withdraw Stipulation of Settlement for Tax Shelter Adjustments in the Thompson cases at docket Nos. 19321-83 and 31236-84.[45] Mr. McWade filed the motions on the stated ground that, because the Thompsons had been designated as test cases, it was inappropriate for the Thompson piggyback agreements to remain in effect. Mr. McWade's motions stated that Mr. DeCastro did not object to the granting of the motions. Because Messrs. McWade and DeCastro had previously agreed to settle the Thompson cases, the above-referenced motion is the first instance in which the Court was misled by the failure of counsel who were in the know to disclose that the Thompson cases had been settled.

---

[45] The Thompsons had not signed a piggyback agreement for their case at docket No. 30965-85. The only other test case petitioners who had signed piggyback agreements were the Dixons, in their case at docket No. 9382-83, and Mr. Rina, in his case at docket No. 17640-83. All the piggyback agreements signed by test case petitioners had been signed in June 1985 and were in the form of the 1985 agreement set forth supra pp. 44-45.

On June 15, 1987, Mr. DeCastro sent a $63,000 cashier's check "in partial payment of the total amount due" to the Internal Revenue Service Center in Fresno, California, on behalf of the Thompsons. The remittance was made with respect to the Thompsons' three docketed cases and included a request that the matter be referred to a problems resolution officer "so that we can determine the balance due and conclude this matter." On June 17, 1987, the Commissioner "transferred" $775 of the $63,000 payment to the Thompsons' account for 1988 and applied the $62,225 balance to the Thompsons' account for 1979.[46] As of June 1987, the Thompsons had paid a total of $121,770 towards their tax liabilities (tax and interest) for the taxable years 1979, 1980, and 1981.

On July 10, 1987, Mr. DeCastro wrote to Mr. McWade transmitting a Notice of Overdue Tax received by the Thompsons with respect to their 1981 income tax liability. Mr. DeCastro asked Mr. McWade to contact him regarding the notice and to send him "copies of the decisions entered in this matter." On July 24, 1987, Mr. McWade sent Mr. DeCastro copies of proposed decision documents for the Thompson cases. Mr. McWade informed Mr. DeCastro that "per our understanding, since the Thompsons are

---

[46] The record does not reflect the basis for the Commissioner's transfer of $775 of the payment to the Thompsons' account for 1988. Because the 1988 tax year had not even started on the date of the transfer, there can be no reasonable explanation for the transfer; perhaps it was a typographical error and was intended to refer to the taxable year 1978, which Mr. Huestis had settled on the Thompsons' behalf.

involved as a test case, the documents are being held in our files, and will be signed and filed with the Court when the test case litigation has been completed."  The revised decision documents prepared by Mr. McWade set forth the Thompsons' tax liabilities as follows:

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | --- | --- |
| 1980 | $33,000 | --- |
| 1981 | 30,000 | --- |

On August 5, 1987, Mr. DeCastro sent copies of the proposed decision documents to the Thompsons.

### 3.   Second Revision of Thompson Settlement

Before the trial of the test cases, Mr. DeCastro informed Mr. McWade that the Thompsons were having financial difficulties and that he did not think that it was fair to require the Thompsons to remain as test case petitioners.  Mr. DeCastro expressed concern to Mr. McWade about the amount of legal fees the Thompsons would incur as test case petitioners and informed Mr. McWade that he would attempt to have the Thompsons removed from the list of test cases.  Mr. McWade told Mr. DeCastro that he did not want the Thompsons to be removed as test case petitioners because he did not want to change the test cases so close to trial.  Mr. DeCastro thought that Mr. McWade's desire to retain the Thompsons on the list of test cases was caused by administrative or technical concerns.

Mr. DeCastro and Mr. McWade resolved their respective concerns by further modifying the Thompson settlement.  In

particular, Mr. McWade agreed to reduce the Thompsons'
deficiencies in an amount sufficient to compensate them for the
cost of having an attorney represent them at the trial of the
test cases.  Mr. DeCastro estimated that his legal fees for
representing the Thompsons at the trial of the test cases would
be approximately $60,000.  Under the revised settlement
agreement, the Thompsons' tax deficiencies were reduced to the
following:

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | --- | --- |
| 1980 | $15,000 | --- |
| 1981 | 15,000 | --- |

By reason of the Thompsons' having previously remitted $121,770
to the Internal Revenue Service for the taxable years 1979, 1980,
and 1981, Mr. DeCastro and Mr. McWade calculated that the above-
described reductions of the Thompsons' deficiencies would
generate refunds of tax and interest to the Thompsons of
approximately $60,000.  Mr. DeCastro and Mr. McWade understood
that the refunds generated by the reduced deficiencies would be
used for the purpose of paying the Thompsons' attorney's fees to
Mr. DeCastro.

Although Mr. McWade and Mr. DeCastro agreed to revise the
Thompson settlement in this manner before the trial of the test
cases, the first written confirmation of their agreement appears
after the trial, in the form of an April 10, 1989, memorandum
from Mr. McWade to Tom Stevens (Mr. Stevens), Chief of Special
Procedures in the Collection Division of the Honolulu District

Director's Office, requesting that the latter process a refund to the Thompsons in the amount of $30,000.[47]

E.    The Cravens Settlement

By letter dated September 29, 1986, Mr. Seery informed Mr. Cravens of the terms of the modified 7-percent settlement offer.  On October 28, 1986, Mr. McWade disseminated the modified 7-percent settlement offer by form letter mailed to all known Kersting program participants, including the Cravenses.[48] Considering the nature and purpose of the form letter, it appears that issuance of the letter to the Cravenses, who had already been designated test case petitioners, was inadvertent.

On October 15, 1986, Mr. Cravens wrote to Mr. Seery asking him to explain how the proposed settlement offer affected him and to give him a recommendation.  By letter dated October 23, 1986, Mr. Seery advised Mr. Cravens to consult a tax preparer or accountant because the offer was complicated in its application to his case.  Mr. Seery also noted that Mr. Cravens could take advantage of the unlimited deduction for personal interest in effect for 1986 by paying the liability in full in 1986 whether or not he settled his case.[49]

---

[47]  The full text of Mr. McWade's memorandum is set forth infra p. 137.

[48]  Mr. McWade's letter included a statement that the modified 7-percent settlement offer would be withdrawn on Dec. 31, 1986.

[49]  See supra note 44 regarding the Thompsons' interest payment.

On October 31, 1986, Mr. Cravens again wrote to Mr. Seery with questions about the settlement offer. In the letter, Mr. Cravens informed Mr. Seery that he had paid a cash bond against the deficiency for 1979 and felt "in good shape for that year." Mr. Cravens then asked whether respondent's determination to include a dividend in his income for 1980 would be eliminated to reduce the deficiency for that year. If so, Mr. Cravens indicated that he would pay the amount that would be due, "and not take the gamble on the courts" since the amount due would be "catastrophic" if he lost. In closing, Mr. Cravens offered to pay Mr. Seery for the extra effort on his case, and reminded him that the deadline for accepting the settlement offer was drawing near.

As previously mentioned, Mr. Seery began to withdraw as counsel for test case petitioners following the Court's November 14, 1986, order indicating that Mr. Seery might have a conflict of interest.

Sometime after receiving Mr. McWade's October 28, 1986, letter, Mr. Cravens contacted Mr. McWade by telephone with the intent of settling his case. Mr. Cravens took notes of his conversation with Mr. McWade, which indicate that they discussed: (1) Eliminating the dividend adjustment for 1980; (2) eliminating all penalties for both 1979 and 1980; (3) backing out the tax already paid with respect to the capital gains that the Cravenses had reported for 1980; and (4) eliminating statutory interest for 1979. Mr. McWade told Mr. Cravens that he would call him back

with figures reflecting "the amount due for the settlement."

Mr. McWade called Mr. Cravens back on December 15, 1986.

On December 16, 1986, Mr. Cravens wrote to Mr. McWade confirming the terms of his settlement as follows:

> Dear Ken:
>
> As per our telephone conversation 12/15/86, I am enclosing a check for $10,678.67. According to the amount we agreed on via telephone, the figures break down like this:
>
> | | |
> |---|---|
> | Deficiency for 1979 and 1980 | $9,782.16 |
> | Less cash bond | 4,508.00 |
> | Total | 5,274.16 |
> | Plus 1.02474 interest | 5,404.51 |
> | Total due | 10,678.67 |
>
> I wish to thank you for being so agreeable and assisting me in settling this matter.

Mr. Cravens' payment of $10,678.67 on December 16, 1986, was processed on December 31, 1986, pursuant to a payment posting voucher bearing Mr. McWade's initials. The payment posting voucher provided for the application of the funds as follows:

| Year | Advance Payment | Designated Interest |
|---|---|---|
| 1979 | $3,000.00 | $3,000.00 |
| 1980 | 2,274.16 | 2,404.51 |
| Total | 5,274.16 | 5,404.51 |

Mr. Cravens believed his settlement assured that he could neither win nor lose at the trial of the test cases. At the time that he entered into his settlement, Mr. Cravens was not aware that Mr. McWade intended to allow the Cravenses the better of the above-described settlement or the outcome based upon the Court's opinion following the trial of the test cases.

Although Mr. Cravens intended to accept the modified 7-percent settlement offer, the Cravenses' settlement was less favorable to them than the modified 7-percent settlement offer. In particular, the Cravenses' correct tax liabilities for 1979 and 1980 were $4,508 and $5,893.45, respectively, for a total of $10,401.45.[50] Thus, the Cravens settlement in the amount of $9,782.16 represents a reduction of approximately 6 percent of the correct amount of the Cravenses' deficiencies. In addition, the Cravens settlement was not structured to include the burnout feature. At the time that Mr. Cravens settled his cases, Messrs. Sims and McWade were offering 20-percent settlements with the burnout feature to Mr. DeCastro's clients and Chicoine and Hallett's clients.

Mr. McWade was aware that Mr. Cravens was a test case when he spoke to Mr. Cravens about settling his cases. Mr. McWade told Mr. Cravens that the Cravenses would have to continue as test case petitioners as a condition of the settlement. Mr. McWade did not tell Mr. Cravens to cooperate with the Government in the trial of the test cases, or to keep his settlement a secret. Mr. McWade did not tell Mr. Cravens that he had to settle so-called open years, nor did Mr. McWade examine

---

[50] The $4,508 figure for 1979 is consistent with the deficiency notice issued to the Cravenses for that year. The $5,893.45 figure for 1980 represents the Cravenses' correct tax liability after eliminating the dividend adjustment set forth in the notice of deficiency for 1980 and backing out the tax on the capital gain that the Cravenses had reported on their 1980 tax return.

Mr. Cravens' returns for years still open under the applicable statute of limitations to determine whether he had claimed Kersting deductions for years not before the Tax Court.

Mr. McWade initially told Mr. Cravens that his settlement assured that the Cravenses could not win or lose in the trial of the test cases. Mr. McWade also told Mr. Cravens that, by reason of the settlement, the Cravenses did not need an attorney. Mr. Cravens therefore concluded that he no longer needed legal representation. When Mr. Cravens asked Mr. McWade why he had to remain a test case despite his settlement, Mr. McWade responded that to remove the Cravenses from the group of test cases would cause a delay in the trial of the test cases while a replacement test case was selected.

After Mr. Seery's withdrawal from their cases, the Cravenses did not retain new counsel. When Mr. Kersting asked Mr. Cravens why the Cravenses had failed to authorize Chicoine and Hallett to represent them, Mr. Cravens informed Mr. Kersting that he had settled his cases.

On December 13, 1988, within 1 month before the trial of the test cases, which began January 9, 1989, Mr. McWade forwarded to the Cravenses proposed decision documents fixing their tax liabilities for 1979 and 1980, to be signed and returned to Mr. McWade. The proposed decision documents provided as follows:

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | $3,606.40 | --- |
| 1980 | 6,175.76 | --- |

The $3,606.40 figure for 1979 represents a 20-percent reduction of the $4,508 deficiency that respondent determined against the Cravenses for that year.  However, the derivation of the $6,175.76 figure for 1980 is not known; it exceeded the correct deficiency of $5,893.45 for 1980, including adjustments eliminating both the capital gains that the Cravenses reported for that year and respondent's alternative determination that the Cravenses failed to report dividends paid to them by Candace. The sum of the two figures ($9,782.16) is equal to the total tax deficiency Messrs. Cravens and McWade had previously agreed to, as shown by Mr. Cravens' letter of December 16, 1986, to Mr. McWade.

Mr. Sims approved Mr. McWade's decision to forward decision documents to the Cravenses for their signature 1 month before trial of the test cases, believing that the Cravenses had accepted the 20-percent settlement offer.  When Mr. Cravens testified at the trial of the test cases, Mr. Sims continued to believe that Mr. Cravens was entitled to the 20-percent settlement.  On December 23, 1988, the Cravenses signed the decision documents and returned them to Mr. McWade.

When Mr. Cravens appeared at the trial of the test cases, he was surprised and suspicious when Mr. McWade informed him that he

would be entitled to the better of his settlement or the Tax Court's decision in the test cases.

F.    The Alexander Understanding

On June 3, 1986, Mr. Alexander wrote to Mr. Matsumoto, suggesting that they might "blow the whistle" on Mr. Kersting. Mr. Alexander's letter displays animosity and resentment against Mr. Kersting arising out of their unresolved dispute, which had not yet been submitted to arbitration. Shortly after writing to Mr. Matsumoto, Mr. Alexander listened in on a telephone conference call between Mr. McWade and Mr. Matsumoto as confirmed in a subsequent letter that Mr. Alexander wrote to Mr. Kozak. Mr. Alexander's letter to Mr. Kozak, dated July 16, 1986, states:

> Dear Chuck:
>
> I just had a long phone conversation with Gilbert Matsumoto relative to blowing the whistle on you know who. During this long phone call Gilbert "patched" me in to his phone while he called McWade, the attorney at the IRS. I must say Gilbert's phone mechanism works very well, I heard every word McWade said and he did not know I was on the line. Gilbert instructed me not to say anything.
>
> After the conversation with McWade Gilbert agreed to call you and fill you in on the latest information. McWade will be now talking to Myron Chang, the IRS attorney on the Criminal Investigation side of the IRS. McWade also said to go ahead with the Affidavits and then we can discuss with himself and with Myron Chang what the next step will be. In the conversation with McWade, Gilbert also discussed the amount of "finder's fee" and method of payment to the person(s) supplying the information. It was very clear to me that the fees are negotiable and that they could be on the amount assessed or the amount collected. This is also negotiable and from their eagerness to get you know who I believe the fees could be sizeable.

My suggestion to Gilbert was to go ahead with you and
draft the Affidavits, at least yours and mine and we
(you, Gilbert and me) would review the Affidavits
before sitting down with McWade and Myron Chang.  The
conversation with McWade ended with him saying he would
get back to Gilbert after another meeting with Chang,
however, we should go ahead with drafting the
Affidavits.

Chuck, as Gilbert may have told you, this means blowing
the whistle on 1400 of you know who's [sic] clients, 10
or 12 of which are Gilbert's clients.  As you and I
discussed, when the Nazi knows that 1400 of his
client's [sic] are going to be clobbered and that he
will have the Criminal Investigation Division of the
IRS coming down on him I think he will be inclined to
pay me my money.

In the weeks that followed, Messrs. Alexander and Kozak prepared

draft affidavits for submission to Mr. McWade.

On August 12, 1986, Mr. Alexander sent copies of his draft

affidavit to Messrs. Matsumoto and Kozak by overnight mail.  On

August 15, 1986, Messrs. Alexander, Matsumoto, and Kozak held a

conference call regarding the affidavits.  In a letter to Messrs.

Kozak and Matsumoto dated August 16, 1986, Mr. Alexander stated

as follows:

Dear Chuck & Gilbert:

Following our conference call of yesterday, August
15th, I am submitting the following for both of your
considerations:

1.  I suggest that we submit to the IRS AFFIDAVITS in
DRAFT FORM ONLY.

2.  It is against my better judgment to submit executed
and notarized affidavits without having some idea what
the IRS will do and what they will pay.

3.  They can make their determination (s) and eat up 30
days based on drafts or I should say final drafts.  We
can agree verbally to execute the final drafts when

they tell us exactly what else they want and what they will do for us.

4. With executed affidavits we would leave ourselves open to the following:

a. They could investigate and audit all our past tax returns.

b. They could refuse immunity.

c. They could claim Alexander was an associate/ conspirator with Kersting.

d. They could claim Alexander was in violation of IRS regulations by not turning Kersting in years ago.

e. They could claim Alexander knew the notes were a "sham" tax avoidance/evasion scheme early on and under IRS regulations Alexander was obligated to report this to IRS early on.

4. [sic] I understand that Gilbert is not expecting a large fee for his cooperation in this matter, however, I have told Gilbert that if the IRS payment to me for this testimony is a large amount that I will contribute something toward whatever amount Gilbert's 8 or 10 clients will be forced to pay as a result of my testimony.

5. What does Chuck expect for his role in this matter???

On August 20, 1986, Mr. Kozak sent a letter to Mr. McWade, enclosing draft affidavits from both himself and Mr. Alexander. Mr. Kozak's letter states: "We are willing to negotiate an arrangement with the IRS, wherein we would execute the affidavits enclosed and provide testimony consistent with the affidavits or in clarification thereof." The draft affidavits that Mr. Kozak sent to Mr. McWade contained information regarding the various Kersting programs in dispute in the test cases. Mr. Kozak's draft affidavit alleged that Mr. Kersting refused to pay David

Bigelow the "equity" in a mortgage funding program and that Mr. Provan knew other airline pilots who were "shocked and angry that Kersting would attempt to collect these notes after he had assured them the notes would not be collectable." Both draft affidavits alleged that Mr. Kersting had sued Mr. Alexander for over $500,000 on the basis of promissory notes with respect to which Mr. Alexander "never received any money whatsoever or anything of value in exchange for the promissory notes." Mr. Alexander's draft affidavit alleged that: (1) Mr. Alexander was in litigation with Mr. Kersting "over funds Kersting supposedly was to invest in auto leasing and factoring at Universal Leasing and Federal Finance & Mortgage", and that "Kersting refused to pay the yield or return the funds"; (2) "no client of Kersting's has ever repaid a promissory note * * * with funds other than provided by Kersting through his closed circulation of funds from one Kersting controlled entity to another"; and (3) Mr. Alexander believed that Mr. Kersting's only legitimate business was the purchase of First Savings, in which Mr. Alexander was a shareholder.

Mr. Alexander's affidavit reveals that Mr. Alexander expected a "quid pro quo" for his testimony, as follows: "9. Affiant is ready and willing to testify to the above facts or any others within his knowledge concerning Kersting provided an agreement quid pro quo can be worked out through affiant's representatives, Charles R. Kozak and Gilbert Matsumoto."

Mr. Kozak submitted his draft affidavit to Mr. McWade in August 1986 in an effort to have Mr. McWade eliminate the deficiencies in Mr. Kozak's case, assigned docket No. 25812-81, concerning the Kozaks' tax liabilities for 1973, 1974, and 1975, arising from their participation in Pike programs.

Messrs. Alexander, Kozak, and Matsumoto met Mr. McWade in Hawaii in early September 1986. During the meeting, Mr. McWade informed Mr. Alexander that his authority was limited and that there were a number of prerequisites to payment of an informant's award or "finder's fee". The prerequisites that Mr. McWade mentioned included the submission of an affidavit, an Internal Revenue Service investigation, and an assessment resulting from the information provided. The amount of an award was not discussed during the meeting. Mr. McWade suggested that Mr. Alexander should see Myron Chang, head of the Internal Revenue Service Criminal Investigation Division in Honolulu, to determine whether the Criminal Investigation Division was interested in Mr. Alexander's affidavit. Mr. McWade told Mr. Kozak that he could do nothing to reduce the Kozaks' tax deficiencies.

Mr. Alexander's efforts to cooperate with the Internal Revenue Service remained dormant until Mr. Alexander again met with Mr. McWade in late 1988 to discuss his tax liabilities for the years 1974, 1975, 1976, and 1977. During this meeting, Mr. McWade told Mr. Alexander to search his records for

documentation to support the Alexanders' reporting position for the years 1974 through 1977.

On October 20, 1988, Mr. Alexander sent a letter to Mr. McWade enclosing copies of several documents purporting to substantiate the Alexanders' position that they realized a loss of $55,152.04 in 1975 on a sale of real estate to the Cadillac Drive Apartments partnership, as opposed to the $59,080 capital gain determined in the notice of deficiency.

On December 8, 1988, Jean Samuels (Ms. Samuels), an Appeals auditor in the Honolulu Appeals Office, sent a two-page memorandum to Mr. McWade addressing Mr. Alexander's October 20, 1988, letter. Ms. Samuels recommended one adjustment to the notice of deficiency for 1975 in the Alexanders' favor. Specifically, Ms. Samuels concluded that the Alexanders had substantiated a higher cost basis in the property that they sold to the Cadillac Drive Apartments partnership than had been used in the notice of deficiency. Giving effect to this higher basis would have reduced the Alexanders' capital gain on the sale by $23,084. Taking into account the corresponding adjustment to the section 1202 deduction previously allowed in the notice of deficiency, Ms. Samuels recommended a net decrease of $11,542 to the Alexanders' taxable income as determined in the notice of deficiency. However, Ms. Samuels referred to certain covenants in an agreement of sale in the file before her, and cautioned Mr. McWade that the consideration paid to the Alexanders on the

sale may actually have been higher than the amount used in the notice of deficiency.

If Ms. Samuels' recommended adjustment to the notice of deficiency issued to the Alexanders for 1974 and 1975 had been accepted, the total adjustments for 1975 would have been reduced from $127,562 to $116,020, but the deficiency would not have been eliminated.

Mr. McWade believed that Mr. Alexander was familiar with the operation of Mr. Kersting's various programs. Before the trial of the test cases, Mr. McWade arrived at a general understanding with Mr. Alexander that the Alexanders' tax liabilities for the taxable years 1974, 1975, 1976, and 1977 would be reduced in exchange for Mr. Alexander's agreement to serve as an undeclared consultant or assistant to Mr. McWade during the trial of the test cases. Mr. McWade's understanding with Mr. Alexander is reflected in decision documents that were executed by Mr. McWade on April 6, 1989, and approved by Mr. Sims. In particular, Mr. McWade executed a stipulated decision in docket No. 2758-80 conceding the deficiencies determined against the Alexanders for the taxable years 1974 and 1975 and allowing the Alexanders overpayments for the taxable years 1974 and 1975 in the amounts of $2,133 and $811, respectively. In sum, Mr. McWade completely eliminated all deficiencies determined against the Alexanders for the taxable years 1974 and 1975 and relieved the Alexanders of the concessions that they had made before the issuance of the notice of deficiency for those years. The stipulation

accompanying the decision document submitted to the Court in

docket No. 2758-80 states as follows:

<u>STIPULATION</u>

It is hereby stipulated that the following statement shows the petitioners' income tax liabilities for the taxable years 1974 and 1975:

<u>1974</u>

NET TAX ASSESSED AND PAID . . . . . . . . . . $3,646.00

    Payments: April 15, 1975     $1,513.00
            December 15, 1984    <u>2,133.00</u>

        Total payments    $3,646.00

TAX LIABILITY . . . . . . . . . . . . . . . . $<u>1,513.00</u>

OVERPAYMENT . . . . . . . . . . . . . . . . . $2,133.00

    I.R.C. §§ 6512(b)(2)(B) and 6511(b)(2)(B)
    Return filed April 15, 1975
    No claim filed
    No agreement executed
    Deficiency notice mailed November 29, 1979

<u>1975</u>

NET TAX ASSESSED AND PAID . . . . . . . . . . $1,114.00

    Payments: April 15, 1976     $303.00
            December 15, 1984    <u>811.00</u>

        Total payments    $1,114.00

TAX LIABILITY . . . . . . . . . . . . . . . . $<u>303.00</u>

OVERPAYMENT . . . . . . . . . . . . . . . . . $811.00

    I.R.C. §§ 6512(b)(2)(B) and 6511(b)(2)(B)
    Return filed April 15, 1976
    No claim filed
    No agreement executed
    Deficiency notice mailed November 29, 1979

At the time that Mr. McWade submitted the above-described decision document to the Court, respondent's legal file did not include any explanation of the elimination of the Alexanders' deficiencies for the taxable years 1974 and 1975. The Court entered the parties' stipulated decision in docket No. 2758-80 on April 13, 1989.

On April 6, 1989, Mr. McWade also executed a stipulated decision in docket No. 30413-86, approved by Mr. Sims, conceding in full the deficiencies determined against the Alexanders for the taxable years 1976 and 1977 as follows:

> ORDERED AND DECIDED: That there are no deficiencies in income taxes due from, or overpayments due to, the petitioners for the taxable years 1976 and 1977;
>
> That there are no additions to the taxes due from the petitioners for the taxable years 1976 and 1977, under the provisions of I.R.C. § 6653(a); and
>
> That there are no additions to the taxes due from the petitioners for the taxable years 1976 and 1977, under the provisions of I.R.C. § 6621(c).

On April 6, 1989, Messrs. Sims and McWade signed a Counsel Settlement Memorandum relating to the Alexanders' case at docket No. 30413-86, which states as follows:

> The above-entitled case is being settled on the basis that there are no deficiencies in income taxes due from, nor overpayments due to, the petitioners for the taxable years 1976 and 1977.
>
> Discussion: The above-entitled case is part of the Kersting interest deduction tax shelter program. The basis for settlement represents allowance of petitioners' out-of-pocket expense, approximately 7% of the deficiency, and concession of penalties for settlement purposes.

If more than one year is involved, the settlement reflects a shelter burn-out for the first half of petitioners' participation, and a disallowed deduction for the later years.

Non-Kersting Issues:  None.

The Counsel Settlement Memorandum signed by Messrs. Sims and McWade contains two false statements:  (1) That the basis for settlement represents the Alexanders' out-of-pocket expenses; and (2) that the case did not include any non-Kersting issues. The Court entered the parties' stipulated decision in docket No. 30413-86 on April 13, 1989.

The stipulated decisions described above reflect Mr. McWade's general understanding with Mr. Alexander, made before the trial of the test cases, to reduce the Alexanders' tax liabilities, in exchange for Mr. Alexander's cooperation and assistance at the trial of the test cases.

G.   The Kozak Decision

On July 23, 1981, the Commissioner issued a joint notice of deficiency to Mr. Kozak and his wife, Susan K. Kozak, disallowing subchapter S losses and interest deductions that the Kozaks claimed on their tax returns for 1973, 1974, and 1975 with respect to their participation in Kersting programs that were the subject of Pike v. Commissioner, 78 T.C. 822 (1982).  The Kozaks filed a petition with the Court, assigned docket No. 25812-81, contesting the notice of deficiency.

On May 12, 1986, Mr. McWade filed a motion for order to show cause why a decision should not be entered in the Kozaks' case

consistent with the Court's opinion in the <u>Pike</u> case, less out-of-pocket expenditures.  The Kozaks did not respond to the Court's order, and on September 30, 1986, the Court entered an Order and Decision against the Kozaks for deficiencies in tax in the amounts of $1,641, $1,844, and $902 for the taxable years 1973, 1974, and 1975, respectively, reflecting approximately a 7-percent reduction of the deficiencies that respondent had determined against the Kozaks.

VII.  <u>Pretrial Developments</u>

A.    <u>The Kersting Deposition--Postponed (January 1987)</u>

On November 17, 1986, Mr. Seery and Mr. McWade signed a stipulation to take Mr. Kersting's deposition in Honolulu.  On January 7, 1987, the day to which the deposition had been adjourned, Mr. Bradt and Mr. Moseley filed a motion for protective order with the Court on behalf of Mr. Kersting.  Judge Goffe denied the motion in a telephone conference call with the parties on the morning of January 7, 1987.

Mr. Seery did not appear at the deposition because he had withdrawn or was in the process of withdrawing from the Kersting project test cases.  Mr. Moseley appeared at the deposition and stated that Mr. Kersting would not be deposed until Mr. Kersting was provided with copies of any prior statements he had made to the Internal Revenue Service.  Although Mr. Kersting was not deposed on January 7, 1987, Messrs. McWade, Moseley, and Chicoine agreed on a procedure for respondent to review a large number of documents produced by Mr. Kersting at that time.

The following colloquy ensued upon Mr. DeCastro's appearance at the deposition, at a time when Mr. DeCastro had already executed and delivered the initial Thompson settlement agreement to Mr. McWade:

MR. McWADE:  Let the record show that Mr. Luis DeCastro from Los Angeles, who represents Mr. Thompson, has arrived.

(Off the record.)

MR. MOSELEY:  Not to stray from the subject, but I could, for the record, find out, you represent Mr. --

MR. DeCASTRO:  Thompson.

MR. MOSELEY:  Thompson.  He's one of the test cases that were designated?

MR. McWADE:  Yes.

MR. MOSELEY:  I would just like for the record to object to Mr. DeCastro's appearance here.  And the objection is on the basis that I have been informed that Mr. DeCastro has informed at least some of the petitioners' counsel that in fact they are planning to settle Mr. Thompson's case, and if they are planning to settle Mr. Thompson's case, then essentially his appearance at a deposition of my client would not be appropriate.  I just want to enter that for the record. And I'm going to go on, then, with the description of what I was talking about in terms of the other documents.

MR. McWADE:  If we can take a break here, just so I can advise Mr. DeCastro of where we are at this point.

There is no further mention of the possible settlement of the Thompson cases appearing in the transcript of the January 7, 1987, proceedings.  As discussed below, Mr. Kersting eventually was deposed in October 1988.

B.    John Doe Summons/Assessments of Promoter Penalties

In early 1987, Mr. O'Neill, on behalf of the Honolulu District Examination Division, requested the Justice Department to initiate legal proceedings to serve Mr. Kersting with a John Doe Summons (summons).[51]  The purpose of the summons was to compel Mr. Kersting to identify the participants in Mr. Kersting's programs during the taxable years 1984, 1985, and 1986, and to aid the Internal Revenue Service in developing a case against Mr. Kersting for so-called promoter penalties under sections 6700 and 6701.

On May 15, 1987, the U.S. Attorney's Office filed a petition in the Federal District Court for Hawaii to serve Mr. Kersting with the summons.  The summons requested production of all books and records in Mr. Kersting's custody and control relating to participants in Mr. Kersting's programs for 1984, 1985, and 1986. The summons specifically requested production of customer lists and similar documents containing the names, addresses, and other identifying information of the participants.  Mr. Kersting moved to quash the summons.

---

[51]  Sec. 7609(f) provides that the Secretary may issue a John Doe summons, i.e., a summons that does not identify the person with respect to whose liability the summons is issued, only with court approval after the Secretary establishes that: (1) The summons relates to the investigation of a particular person or ascertainable group or class of persons; (2) there is a reasonable basis for believing that such person or group or class of persons may fail or may have failed to comply with any provision of any internal revenue law; and (3) the information sought to be obtained and the identity of the person or persons with respect to whose liability the summons is issued are not readily available from other sources.

On July 1, 1987, the District Court granted the Government's petition to serve Mr. Kersting with the summons. Mr. Kersting produced some documents to Revenue Agent Larry Tahara in response to the summons but did not fully comply with the summons. Mr. Kersting challenged the summons during protracted summons enforcement proceedings that followed.

Following an August 1987 hearing, the District Court ordered Mr. Kersting to produce the summoned documents by February 1988. After another hearing in March 1988, the District Court, in May 1988, held Mr. Kersting in contempt and threatened him with fines if the summoned documents were not produced. During this period, Mr. Izen filed a motion to intervene in the summons proceedings on behalf of his test case petitioners. The District Court denied Mr. Izen's motion.

Both Mr. Kersting and Mr. Izen appealed the District Court's decision enforcing the summons to the Court of Appeals for the Ninth Circuit. The Court of Appeals remanded the case to the District Court to determine whether Mr. Kersting had substantially complied with the summons so as to moot the appeals. See United States v. Kersting, 891 F.2d 1407, 1410-1411 (9th Cir. 1989). Despite its remand, the Court of Appeals considered and rejected Mr. Kersting's arguments that the District Court erred in concluding that the Internal Revenue Service acted in good faith in issuing the summons. See id. at 1411-1413. Mr. Kersting eventually produced the summoned documents.

As previously mentioned <u>supra</u> pp. 18-19, in October 1989, the Commissioner assessed promoter penalties of $1,545,201 and $2,330,000 against Mr. Kersting pursuant to sections 6700 and 6701, respectively, for the years 1982 through 1988.

C.   <u>Chicoine and Hallett's Withdrawal as Counsel</u>

By February 1988, Mr. Kersting's dissatisfaction with Chicoine and Hallett over evaporation of the 50-percent settlement and their promotion and reporting of 20-percent settlements led him to terminate their employment as counsel for the test cases and to encourage their other Kersting program clients to recall their settlement retainers.  In April 1988, the Court granted Chicoine and Hallett's motions to withdraw their appearances as counsel for test case petitioners.

D.   <u>Mr. Izen's Entry of Appearance</u>

In February 1988, Mr. Kersting retained Mr. Izen to represent the test case petitioners, other than the Thompsons and the Cravenses.  At the time, Mr. Izen had no experience representing test case taxpayers in the Tax Court, although he did have experience representing taxpayers who had signed piggyback agreements to be bound by the outcome of test cases in a tax shelter project.

Mr. Izen filed entries of appearance as counsel for test case petitioners during February 1988 through January 1989. Mr. Izen examined the deductions claimed by the test case petitioners he represented to determine whether they were representative of the Kersting programs.  Mr. Izen analyzed the

various Kersting programs and documents regarding each of the test case petitioners that he represented.  On the basis of his analysis, Mr. Izen determined that the test case petitioners that he represented would be representative of the nontest cases.

On April 29, 1988, Mr. Izen filed a motion to compel Chicoine and Hallett to provide him with the client files and papers of certain test case petitioners he represented.  On June 6, 1988, Mr. Chicoine filed an objection to Mr. Izen's motion, asserting that Chicoine and Hallett had returned to Mr. Izen's clients all original documents that had been provided to Chicoine and Hallett.  By order dated July 11, 1988, the Court denied Mr. Izen's motion as moot.

From the beginning of his representation of the test case petitioners until late 1995, Mr. Izen's fees were paid by check signed by Mr. Kersting and written on bank accounts of corporations controlled by Mr. Kersting.  Commencing December 1995, Mr. Izen's fees have been paid from a "pool" or "fund" contributed by a group of test and nontest case petitioners.

E.   The Kersting Deposition (October 1988)

On July 8, 1988, respondent served Mr. Kersting and the test case petitioners with a notice of deposition pursuant to Rule 75. On July 25, 1988, Mr. Kersting served Mr. McWade with an objection stating, inter alia, that Mr. Kersting should not be deposed because he had reason to believe that he was under criminal investigation.  Mr. Kersting's objection included

allegations that Mr. Alexander was assisting the Government in the criminal investigation.

On August 25, 1988, Mr. McWade filed a motion to take Mr. Kersting's deposition in the test cases. Mr. McWade attached a number of documents to his motion for the purpose of refuting Mr. Kersting's allegations that he was under criminal investigation. In particular, Mr. McWade attached copies of the affidavits that Messrs. Alexander and Kozak had submitted to Mr. McWade in August 1986, as well as copies of the various documents and letters circulated between Messrs. Alexander, Matsumoto, and Kozak during that same period. See supra pp. 106-111. By order dated August 30, 1988, the Court granted Mr. McWade's motion to depose Mr. Kersting.

During October 24 through 27, 1988, Mr. Kersting was deposed in Honolulu. Mr. Bradt represented Mr. Kersting at the deposition. Mr. McWade, along with Jeffrey A. Hatfield (Mr. Hatfield), and Thomas A. Dombrowski (Mr. Dombrowski), questioned Mr. Kersting on behalf of respondent.[52] Mr. Izen and Mr. DeCastro questioned Mr. Kersting on behalf of their clients. Mr. Cravens did not participate in the deposition.

Mr. Kersting did not bring any documents to the deposition; he claimed that the documents had already been produced in

---

[52] Messrs. Dombrowski and Hatfield were both trial attorneys with the Office of Chief Counsel assigned to the San Diego District Counsel Office. In September 1988, Messrs. Dombrowski and Hatfield were assigned to assist Mr. McWade in the trial of the Kersting test cases.

response to respondent's summons. During the deposition, the parties conducted a telephone conference call with Judge Goffe regarding Mr. Kersting's failure to produce the requested documents. As a result of the conference call, the parties agreed that Mr. McWade could inspect documents that Mr. Kersting had produced in response to the summons. Mr. McWade's review of these documents was intended to satisfy Mr. Kersting's obligation to produce documents at his deposition. Mr. Kersting and Mr. Bradt agreed to this procedure.

VIII. Trial of Test Cases (January 1989)

The trial of the test cases was conducted before Judge Goffe during January 9 through 27, 1989, at Honolulu, Hawaii. Respondent was represented at the trial by Messrs. McWade, Dombrowski, and Hatfield. Mr. Sims attended the trial but did not enter an appearance for respondent. Mr. Sims and Mr. McWade did not inform Judge Goffe, the National Office, the Regional Office, or Mr. Izen of the Thompson and Cravens settlements or the Alexander understanding before or during the January 1989 trial of the test cases.

Respondent issued subpoenas duces tecum to all test case petitioners, directing them to appear, testify, and produce documents at the trial of the test cases. Each of the eight test case petitioners testified during the trial of the test cases. Mr. Hatfield conducted the cross-examination of test case petitioners Dixon, Owens, Young, DuFresne, Rina, and Hongsermeier. Mr. McWade conducted the cross-examination of

Messrs. Cravens, Thompson, Moseley, and Kersting, and the direct examination of Messrs. Kersting, Toyota, Ing, and Alexander. Mr. Dombrowski conducted the direct examination of Alice Combs and Margo Akamine, Mr. Kersting's bookkeepers.

A.    Mr. Cravens

Following Mr. Seery's withdrawal from the Cravens cases in early 1987, Mr. Cravens did not retain substitute counsel because he regarded his cases as settled.  Mr. Cravens arrived in Hawaii 1 day before he was scheduled to testify at the trial of the test cases.  The Government paid Mr. Cravens' travel, food, and lodging expenses while he was in Hawaii.[53]

Mr. McWade prepared and submitted to the Court requested findings of fact respecting Mr. Cravens' participation in the disputed Kersting programs.  When Mr. Cravens testified during the trial of the test cases, he made a brief statement to the Court about his participation in the Kersting programs, told the Court and the parties that he had absolutely nothing to hide, and said that he would answer any questions to the best of his ability.

Mr. McWade cross-examined Mr. Cravens at the trial and elicited testimony to support respondent's proposed finding of fact that Mr. Cravens' primary reason for participating in the Kersting programs was to obtain tax benefits.  Mr. Cravens

---

[53]    Inasmuch as respondent subpoenaed all the test case petitioners, it is assumed that they were all reimbursed for their expenses.  See sec. 7610.

testified that he participated in Stock Subscription Plans in 1979 (Candace) and 1980 (Delta), and that he closed out his participation in the Kersting programs by endorsing his stock certificates and returning them to Mr. Kersting in exchange for the return of his promissory notes.

Mr. McWade introduced exhibits at the trial pertaining to Mr. Cravens' participation in Kersting programs that were referred to in the stipulation of facts that had been signed by Mr. McWade and Mr. Cravens. Mr. Izen briefly cross-examined Mr. Cravens after Judge Goffe asked what right Mr. Izen had to question a test case petitioner who was not his client. In the absence of an objection from Mr. Cravens, and in light of Mr. McWade's assent to a brief cross-examination, Judge Goffe stated: "I'll permit a certain amount of questioning, but we'll just see where it goes." Mr. DeCastro did not question Mr. Cravens, nor did the Court.

Mr. Cravens never informed the Court that he had settled his case because he believed the matter was common knowledge. Mr. Cravens had no intention of having a secret settlement. Following the trial, the Cravenses did not file any briefs with the Court.

B.   <u>Mr. Thompson</u>

Mr. Thompson appeared at the trial of the test cases and produced eight pages of documents in response to the subpoena duces tecum issued by Mr. McWade.[54]  The Government paid Mr. Thompson's travel, food, and lodging expenses.

Mr. DeCastro conducted direct and redirect examinations of Mr. Thompson.  Mr. DeCastro questioned Mr. Thompson about his participation in the acquisition of First Savings as well as the Bauspar program to show that the Thompsons had financial dealings with Mr. Kersting other than through the programs at issue in the trial.  Mr. Thompson testified that, following a forced merger between First Savings and First Federal Savings of Honolulu, Mr. Kersting returned the Thompsons' $20,000 initial investment in First Savings.  Mr. Thompson further testified that he lost $80,000 in the Bauspar program.

Mr. McWade cross-examined Mr. Thompson.  Mr. Thompson had never met Mr. McWade until he was scheduled to testify.  Pursuant

---

[54]  When Mr. McWade moved to have the Thompson documents admitted as evidence during Mr. Thompson's testimony, Mr. Izen objected on the grounds that he had not had an opportunity to review them.  Although Judge Goffe initially questioned whether Mr. Izen should be permitted to object to the admission of the Thompson documents, Mr. DeCastro indicated that he had no objection.  Judge Goffe then called a brief recess to allow Mr. Izen to review the documents and indicated that he would allow Mr. Izen to subject Mr. Thompson to a voir dire examination.  Following the recess, Mr. Izen raised a limited objection to the admissibility of the documents insofar as they contained statements of Mr. Kersting's opinion of the tax laws.  Judge Goffe overruled Mr. Izen's objection and admitted the documents in evidence as respondent's exhibit SL.  Mr. Izen was allowed to cross-examine Mr. Thompson without limitation.

to a stipulation of facts, Mr. McWade introduced exhibits at the

trial of the test cases pertaining to the Thompsons'

participation in the disputed Kersting programs.  During

Mr. McWade's cross-examination, Mr. Thompson made the following

statement:

> Mr. McWade:  When did you terminate your
> participation in these plans, Mr. Thompson?

> Mr. Thompson:  In--let's see--1984.  No, wait a
> minute; 1982.  I retired, and I went to my retirement
> party, came home, and I had notice from the Internal
> Revenue Service regarding my 1978 taxes.  And I went up
> to the house, called him up, and said, "Henry, I've got
> a problem."  And he said to just send it to him and
> he'd take care of it.

> Two and half years later he was still taking care
> of it.  I still didn't know what was wrong.  And I was
> becoming very disenchanted with his taking care of it.
> To be quite honest with you, I went to an attorney over
> it.

> And an agent actually came to our house and was
> interested in my paying him $23,346, as I remember, on
> the spot.

> In the interim period I had received no notice
> that our house had a lien slapped on it from the
> Internal Revenue Service, but I didn't know about this.

> But anyway, this was all the thing that brought
> all my investments with Mr. Kersting to a head.  I got
> absolutely no support that was effective from him.  I
> wanted to know what the problem was so that I could
> address it--not in a manner of putting a band-aid on
> it; I wanted it settled.  I was retired.  I couldn't go
> on with this business that, "Oh, we'll go to court and
> they'll never get us," and all of this business that we
> had.  I was out money, lots of it:  $80,000, on the one
> hand.  And $23,000 goes over 100--pretty easy, right
> then.

> I was in the process of doing a trust.  I went to
> the attorney that was running that for me, and he wrote
> a letter to Kersting wanting to know what he had done,
> and got a rotten letter back from him.  I tried to get

him to do something for me on the 1978 situation, and
there wasn't anything happening.

The procedure went through a tax firm in Los
Angeles known as Loeb & Loeb, and I wound up with the
DeCastro Law Corporation by way of their direction, and
made several discoveries that were startling to me.
And of course, I settled.  To be quite honest, I had to
get out of this.  I was not going to spend my life--

Mr. McWade:  Well, let me--

Mr. Thompson:  --doing all this.

Mr. McWade:  Let me stop you here for a moment.

Mr. Thompson:  Okay.  I'm sorry.  I beg your
pardon.

Mr. McWade:  Mr. Thompson, can you tell me:  have
we been successful in getting the lien removed from
your house?

The subject of the Thompson settlement did not arise again during

Mr. Thompson's testimony at the trial of the test cases.[55]

Mr. McWade followed the colloquy quoted above by asking

Mr. Thompson whether he had ever tendered stock certificates to

Mr. Kersting.  Mr. Thompson responded that, contrary to

Mr. Kersting's promises, he tried twice (through Mr. DeCastro and

Mr. Chanin) to tender his stock certificates to Mr. Kersting in

exchange for the cancellation of his promissory notes but had

been refused.

---

[55]  In Dixon II, Judge Goffe interpreted Mr. Thompson's
remarks concerning settlement as pertaining to the resolution
of Mr. Thompson's tax liability for 1978--a year for which the
Thompsons had not been issued a notice of deficiency.  See Dixon
II, 62 T.C.M. (CCH) at 1472-1473, 1991 T.C.M. (RIA), at 91-3014
to 91-3015.  In retrospect, and in the light of what has come
out, it is more likely that Mr. Thompson in his above-quoted
testimony was referring to the settlement on his behalf that
Mr. DeCastro had negotiated with Mr. McWade.

Mr. McWade prepared and submitted to the Court requested findings of fact respecting the Thompsons' participation in the disputed Kersting programs. Mr. McWade relied upon Mr. Thompson's testimony at trial to support respondent's proposed findings of fact that Mr. Thompson "lost $80,000 maintained in the savings program with the Kersting company."

Mr. Izen was permitted to cross-examine Mr. Thompson. Mr. Izen questioned Mr. Thompson about his purported $80,000 loss from the Bauspar program, Mr. Thompson's dispute with Mr. Kersting, and Mr. Kersting's threats to bring a lawsuit against the Thompsons.[56]

C. Mr. Kersting

Mr. McWade subpoenaed Mr. Kersting to testify at the trial of the test cases. Mr. Kersting testified extensively at the trial of the test cases regarding the Kersting programs in dispute. As discussed in greater detail below, Judge Goffe concluded in Dixon II that Mr. Kersting's testimony lacked credibility.

Mr. Kersting testified about the First Savings acquisition. In particular, Mr. Kersting testified that the acquiring group of approximately 40 investors (including Mr. Thompson) had been

---

[56] Mr. Thompson testified that the $80,000 loss arose from Mr. Kersting's failure to remit to the Thompsons the buildup in the forced savings leg of the Bauspar transaction under which the Thompsons had paid $1,200 per month to Citizen's Financial, Inc. Mr. Thompson testified that Mr. Kersting treated the $1,200 payments as interest payments, rather than as contributions to a savings plan.

required to pledge their First Savings stock to secure a loan from First Hawaiian Bank to provide partial financing for the acquisition. Mr. Kersting further testified that, following the initial acquisition, he arranged for the acquiring group to relinquish their interest in First Savings and become shareholders of a newly organized Kersting holding company known as Investors Financial Corp. (Investors Financial), which was to be a holding company for First Savings. Mr. Kersting testified that initially he had been erroneously informed that regulatory approval was not required for Investors Financial to serve as a holding company for First Savings. Mr. Kersting testified that the Federal Home Loan Bank Board eventually approved Investors Financial as a holding company for First Savings.

D.  Mr. Alexander

Mr. McWade subpoenaed Mr. Alexander to testify at the trial of the test cases. The Government paid Mr. Alexander's travel, food, and lodging expenses while he was in Hawaii. Unlike most witnesses, Mr. Alexander remained in Hawaii during the entire trial; this was pursuant to arrangement with Mr. McWade so that, as previously described, Mr. Alexander could serve as an undeclared consultant or assistant to Mr. McWade. The record does not reflect the extent to which Mr. McWade actually relied upon Mr. Alexander as an assistant or consultant during the trial of the test cases.

Mr. McWade's direct examination of Mr. Alexander focused largely on the details of the First Savings acquisition.

Mr. Alexander's testimony regarding the transaction differed from Mr. Kersting's testimony in one material respect.  Specifically, contrary to Mr. Kersting's testimony, Mr. Alexander testified that the Federal Home Loan Bank Board denied Mr. Kersting's application for Investors Financial to serve as a holding company for First Savings.[57]  Mr. Alexander further testified that Mr. Kersting "watered down" the First Savings shares by issuing additional Investors Financial shares to individuals other than the original acquiring group.  Mr. Alexander testified that when he questioned Mr. Kersting about the matter, Mr. Kersting stated that there was no problem with issuing additional Investors Financial shares because Mr. Kersting could have the shares returned at any time.

Mr. Alexander testified that in February 1980, Federal banking authorities forced First Savings to merge with First Federal Savings of Honolulu.  Mr. Alexander testified that, following the forced merger, Mr. Kersting returned the initial investments of some members of the original acquiring group but that Mr. Kersting did not return Mr. Alexander's investment of approximately $125,000.

Under direct examination by Mr. McWade, Mr. Alexander admitted that he had filed a lawsuit against Mr. Kersting, which resulted in the arbitration proceeding in July 1987, and that he

_____

[57]  In Dixon II, the Court found that Investors Financial was not approved as a holding company for First Savings and that Investors Financial had no other assets.  See Dixon II, 62 T.C.M. (CCH) at 1447, 1991 T.C.M. (RIA), at 91-2987.

was not on good terms with Mr. Kersting.  Under cross-examination by Mr. Izen, Mr. Alexander admitted that he had talked with Mr. McWade about submitting an affidavit concerning Mr. Kersting's programs.  When asked by Mr. Izen whether he and Mr. McWade had discussed a reduction of Mr. Alexander's tax liability in exchange for the affidavit, Mr. Alexander responded, "Specifically, no."[58]  Mr. Izen's cross-examination of Mr. Alexander included questions concerning Mr. Alexander's various dealings with Mr. Kersting, including First Savings and Mr. Alexander's participation in the Kersting programs at issue in the trial.

After Mr. Izen had questioned Mr. Alexander about his participation in the Kersting programs at issue in the trial, Mr. McWade elicited testimony from Mr. Alexander (on redirect examination) that Mr. Kersting had represented to Mr. Alexander and others that the promissory notes underlying the interest expense deductions would not be called for payment.

---

[58]  Mr. Izen questioned Mr. Alexander as follows:

Mr. Izen:  Have you ever offered * * * Mr. McWade, or any other person connected with the Internal Revenue Service, an affidavit concerning your testimony concerning these tax shelters?

Mr. Alexander:  We talked about it.

Mr. Izen:  Did you ever offer to them to testify in return for reducing your own personal taxes?  The amount of.

Mr. Alexander:  Specifically, no.

E.   Mr. DeCastro

Mr. DeCastro attended the trial of the test cases and conducted Mr. Thompson's direct examination.  Following the trial, Mr. DeCastro filed an eight-page brief with the Court on behalf of the Thompsons.  Mr. DeCastro's brief included an argument that the Thompsons entered into the Kersting programs in dispute with the intention of making a profit.  This argument was based upon the Thompsons' prior investment experience with Mr. Kersting, including their participation in the First Savings acquisition.  Mr. DeCastro's brief also acknowledged that "one of the primary motives for the stock purchase was to realize the substantial tax savings promised by the Kersting plan".  Mr. DeCastro also argued, contrary to Mr. Thompson's testimony, that the promissory notes signed by the Thompsons "are valid and enforceable."  Mr. DeCastro filed no reply brief on behalf of the Thompsons.

F.   Comfort Letters

The record in the trial of the test cases included evidence that Mr. Kersting had assured certain Kersting program participants, whom Mr. Kersting referred to as "nervous Nellies", that their primary loan obligations could be satisfied in full at any time by mere surrender of the associated stock certificates.  In Dixon II, the Court summarized the evidence as follows:

> [Mr. Kersting] testified that he provided so-called "comfort letters" only to those "nervous Nellies" who insisted on having them, which did not include any of petitioners.

We do not doubt that Kersting only provided these personalized comfort letters to investors who insisted and that petitioners were not among that group. It does not necessarily follow, however, that the policy embodied in the letters was unknown or unavailable to petitioners or other investors. In fact, the record contains several indications, covering a span of several years, that Kersting applied this policy to everyone whether they requested personalized comfort letters or not:

(1) Thompson testified that Kersting assured him of the policy at the outset, and no other petitioner testified that he tendered stock to Kersting and was refused. Kersting's refusal to accommodate Thompson is reasonably attributed to the serious falling out that occurred previously and to Thompson's apparent refusal to pay leverage loan interest.

(2) Kersting described a 1976 Forbes Acceptance Stock Subscription Plan to Mil Harr this way: "The deal is self-liquidating as you can retire all of your debt by simple surrender of the stock certificate issued to you."

(3) Gabriele Kersting sent a form letter to Owens also relating to the 1976 Forbes Acceptance Stock Subscription Plan, in which she advised him to "Keep the [stock] certificate in a safe place as you will need it later to retire the $30,000.00 note."

(4) In a form letter transmitting initiating documents for the Leasing Corporation Plan of Universal Leasing, Kersting stated: "All of your debt, except your monthly payment obligation, can be discharged at any time at your option by surrender of the stock certificate which will be issued to you after we have received the executed documents from you."

(5) In a form letter marking the first anniversary of a Leasing Corporation Plan for Anseth Leasing, Kersting noted that "you do have the continuing option to retire the existing notes by a sale to your corporation of the stock which you have acquired."

(6) Although in the form of a personalized comfort letter, Kersting wrote expansively in 1977: "there is, of course, no problem to reassure you of the self-sustaining and self-liquidating aspects of the transaction. We would, in fact, issue a letter to every participant in the deal outlining that

understanding if it would not weaken YOUR position with the IRS."

(7)  In another personalized comfort letter, this time from 1978, Kersting again wrote broadly:  "As to the obligation under the promissory notes and subscription agreements there is no ongoing obligation as far as we are concerned.  We will always repurchase the stock issued at a price sufficient to allow a borrower to discharge all of his debt."

(8)  In a 1980 credit-reference letter to a third party, Kersting wrote that the investor's "liabilities at * * * [the time of his stock purchases] and from there on would be equal to the assets acquired.  His debt can be canceled at any time of his choice by the sale of the assets in his possession."

(9)  Dixon received a 1985 form letter that told him how to terminate his participation in his Charter Financial stock purchase plan by returning an endorsed stock certificate, after which his notes and stock certificate would be canceled and notes marked "paid" would be returned to him.  The letter contained similar unused "cancellation" lines for leasing corporation stock certificates and acceptance corporation stock certificates.

Dixon II, 62 T.C.M. (CCH) at 1499-1500, 1991 T.C.M. (RIA), at 91-3043 to 3044-91.

G.  Mr. Izen's Introduction of Evidence of Collection Litigation

During the trial of the test cases, Mr. Moseley testified (on direct examination by Mr. Izen) that he had represented several Kersting companies in collection litigation against several Kersting program participants.[59]  When Mr. Izen attempted

_____

[59]  Before the trial of the test cases, Mr. McWade became aware of the Kersting collection cases through settlement discussions with Kersting program participant Lou Galli.  Mr. McWade subsequently discovered that certain corporations controlled by Mr. Kersting had obtained collection judgments against no fewer that 10 Kersting program participants.  In addition, Mr. McWade issued a subpoena to Mr. Kersting requesting

(continued...)

to offer collection litigation records into evidence through Mr. Moseley, Judge Goffe initially questioned why Mr. Izen had not obtained the documents before trial so that the documents could have been subjected to the stipulation process. Mr. Izen responded that, although he had requested the documents from Mr. Kersting earlier, ultimately he had relied upon the subpoena that respondent had served on Mr. Kersting, and he had only recently received the documents.

During Mr. Moseley's testimony, Mr. Izen offered into evidence records from the bankruptcy case of Mr. Provan indicating that certain corporations controlled by Mr. Kersting were creditors of Mr. Provan. The Court sustained Mr. McWade's objections to admission of these records on grounds of relevance and incompleteness.[60] The Court also sustained Mr. McWade's objections to the admission of several documents pertaining to collection litigation against George Vermef, although these documents were later admitted into evidence through Mr. Kersting's testimony.[61]

---

[59](...continued)
the production of records of any other collection actions against Kersting program participants.

[60] The documents in question did not reveal the particular debts that the Kersting corporations had apparently asserted against Mr. Provan.

[61] Judge Goffe's treatment of the collection litigation evidence is summarized supra pp. 72-74. Mr. Izen's bringing up the collection litigation again, following the evidentiary hearing, is described infra pp. 196-197.

IX.   Posttrial Developments

A.   First Thompson Refund

Around the time of the Dixon II trial, Mr. DeCastro asked Mr. McWade to arrange for the Thompsons to receive a refund of $30,000 of their advance payments, in accordance with the second revision of the Thompson settlement.  In a memorandum dated April 10, 1989, Mr. McWade requested Mr. Stevens to process a $30,000 refund to the Thompsons.  Mr. McWade's April 10, 1989, memorandum states:

> The above-named taxpayers are part of the Kersting Interest Deduction Project.  Because their case was designated as one of the "test cases", the basis for settlement agreed to prior to trial cannot be finalized until after the Court enters its decision, projected to be after mid-year 1990.
>
> The basis for settlement will result in approximate deficiencies, as follows:

| Tax Year | Deficiencies | Interest | Total |
| --- | --- | --- | --- |
| 1980 | $15,000.00 | $19,241.66 | $34,241.66 |
| 1981 | $15,000.00 | $15,191.44 | $30,191.44 |

> Based upon the enclosed transcript, the taxpayers have made advance payments as follows:

| Tax Year | Advance Payment |
| --- | --- |
| 1979 | $63,000.00 |
| 1980 | $35,373.09 |
| 1981 | $145.88 |

> In an effort to minimize the interest expense to the government, it is requested that $30,000.00 of advance payment be refunded to the taxpayers, the allocations and/or inter-year adjustments being made, as necessary.
>
> Following the refund, there will be sufficient advance payments to full pay the agreed deficiencies, plus accrued interest, with a $4,085.87 reserve.

Mr. McWade's memorandum apparently did not raise any concerns in the Special Procedures office.[62]  On July 11, 1989, the Government issued a refund check to the Thompsons in the amount of $30,000.  The Thompsons endorsed the check to DeCastro Law Corp. without depositing it in their own checking account.

On August 3, 1989, Mr. DeCastro wrote a letter to Mr. McWade confirming the revision of the Thompson settlement that had been agreed to before the trial of the test cases.  Mr. DeCastro's letter states in pertinent part as follows:

Re: Jack and Maydee Thompson

Dear Ken:

Please confirm following is our agreement with respect to settlement of above taxpayer's cases for open years:

We have agreed that the total taxes due for all the open years are $15,000 for 1980 and $15,000 for 1981.

Further, in the event a final decision in this case is more favorable they are to receive the benefit of such decision.

Please sign below so I can have for my files.

Mr. McWade signed the letter and returned it to Mr. DeCastro.

On August 24, 1989, Mr. DeCastro wrote to Mr. McWade requesting that Mr. McWade arrange for the Thompsons to receive the balance of their refund.  Mr. DeCastro's letter states in pertinent part:

_____

[62]  Mr. Stevens was not called to testify at the evidentiary hearing.

Dear Ken:

    The following are my calculations of the refund
due the Thompsons:

| | | |
|---|---|---|
| 1980 Deficiency: | $15,000 | |
| Interest on Deficiency: | 15,300 | $30,300 |
| (To 12-31-86) | | |
| | | |
| 1981 Deficiency: | $15,000 | |
| Interest on Deficiency | 12,150 | 27,150 |
| | | |
| Total Tax and Interest due to 12-31-86 | | $57,150 |
| | | |
| Amount Paid 12-31-86 ($25,545 plus $34,269) | | $59,814 |
| | | |
| Overpayment as of 12-31-86 | | 2,664 |
| | | |
| Additional amount paid | | |
| on account 6-11-87 | | 63,000 |
| | | |
| TOTAL OVERPAYMENT DUE TAXPAYER | | $65,664 |

    Please calculate the interest due on the
overpayment and arrange to refund the balance due them
(less the $30,000 recently received).

    Thanks for your cooperation.

On October 3, 1989, Mr. DeCastro sent the Thompsons a letter
reporting that Mr. McWade had confirmed that they were due a
large refund, plus interest, which would not be refunded until
the Court issued its opinion in the test cases.  Mr. DeCastro
advised the Thompsons that, because the Internal Revenue Service
would be paying interest, he believed it was fair to add interest
to the Thompsons' bill.

On or about November 6, 1989, Mr. McWade received an undated
letter from Mr. Thompson which stated in pertinent part as
follows:

Dear Mr. McWade:

There are some questions in mind that I feel you can help me answer.

Owing to the fact that the Kersting hearing is behind and my testimony is complete I ask; have I completed my portion of this case?  If in fact my portion is complete I question the requirement for counsel any longer.

Secondly--I received a check from IRS in the amount of thirty thousand dollars--($30,000).  I endorsed this over to DeCastro Law Corp; this did not retire the billed amount.  I am completely amazed at the billings we are receiving.  I am now in receipt of additional billings that exceed realistic amounts.  In fact the total comes to sixty six thousand two hundred forty three and 66/100 dollars ($66,243.66).  At some point I know a reconciliation will come.  Luis says don't be concerned.  I am very concerned, I am the one being billed.

Thirdly--it was Maydee and me who stood up to be counted at the hearing.  In crossing paths with former friends I know not whether they will be friendly or not.  The percentage is still in my favor.  And soon now I feel that all will have to come to grips with reality in this matter.  So be it, it is a factor in our lives.

Fourth--I came forward to help bring about justice for Henry Kersting.  While it is true that I was aware that a measure of direct animosity would result, and I accepted this.  Maydee has experienced additional illness this I am very sorry about.

Most emphatically I did not expect to be a channel through which IRS funneled funds to any law firm. Certainly not in this magnitude.  I have the feeling at this point that I am correct in this--the bill is to [sic] much.  I want to know the exact legal position I occupy.  We have been frustrated long enough.  We wish to close this chapter.

Ken we spent little time with you, however Maydee and I both agree, we like you.  I hope as Maydee does that you are on your way out of the smoking habit.  I truly hope that this will be accepted in the context I feel. I guess I am tired of this matter.  All the broken

dreams the Kersting fraud has shattered are everywhere
I look.  I only know a few by comparison.

Best regards,      Jack

The payment of Mr. DeCastro's legal fees is also discussed in a

letter dated November 17, 1989, from Mr. DeCastro to Mr. Huestis

which states in pertinent part:

> Thank you for your letter regarding the matter of
> the Thompsons' fees.  As I have told Jack, we are
> looking for payment of his fees to the IRS, not him.  I
> am enclosing a copy of my letter to him in this regard
> for your information.
>
> I am not sure how there got to be any confusion on
> this score, but hope this lays that to rest.  We have
> been told by the IRS that they will not release any
> additional funds until after the judgment and in the
> meantime we give Jack and Maydee our statements to keep
> them informed of the balances.
>
> Just to make it all very clear, we are looking
> only to the payments from the IRS for our fees and do
> not expect Jack and Maydee to come up with money on
> that score.

Mr. DeCastro sent a similar letter to the Thompsons on the same

date.

B.   Mr. Izen's Motion To Reopen Record

On January 23, 1991, Mr. Izen filed a motion to reopen the

record in the trial of the test cases to receive newly discovered

evidence.  In particular, Mr. Izen sought to introduce evidence

that certain Kersting program participants had reported a capital

gain upon the termination of their participation in a particular

Kersting program and later filed a claim for refund based upon

the Commissioner's determination that the transaction was a sham.

Mr. Izen argued that the Commissioner's denial of the taxpayers'

refund claims constituted an admission against interest.
Respondent opposed Mr. Izen's motion on the grounds that the
taxpayers in question had claimed Kersting interest deductions
for the 3 taxable years before the year that they reported a
capital gain, and that the Commissioner had accepted those tax
returns as filed.  Respondent asserted that under the
circumstances it was not inequitable for the Commissioner to deny
the taxpayers the claimed refunds.  On February 26, 1991, the
Court denied Mr. Izen's motion.

C.  Dixon II Opinion

Messrs. Sims and McWade did not inform Judge Goffe, the
National Office, Regional Counsel, or Mr. Izen of the Thompson
and Cravens settlements or the Alexander understanding before the
issuance of the Court's Dixon II opinion.

On December 11, 1991, the Court filed its Dixon II opinion.
In particular, the Court rejected Mr. Izen's contention that the
cases should be dismissed for lack of jurisdiction on the ground
that the notices of deficiency issued to his clients were
invalid.  The Court also sustained respondent's disallowance of
the interest deductions claimed with respect to the Kersting
stock purchase, stock subscription, leasing corporation, and CAT-
FIT plans.  The Court determined that the loans were sham
transactions lacking economic substance and that the loans did
not constitute genuine indebtedness.  Finally, the Court
sustained respondent's determinations against test case
petitioners who had been charged with additions to tax for

negligence, failure to file a timely return, and the increased rate of interest for substantial understatement of income tax attributable to tax-motivated transactions.

D.   Disclosure of Thompson Settlement

On March 13, 1992, the Court entered decisions pursuant to its Dixon II opinion in each of the test cases.  The Court entered decisions in the Thompson cases consistent with the notices of deficiency issued to the Thompsons as follows:

| Year | Deficiency | Additions to Tax | | |
| | | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6651(a)(1) |
| 1979 | $18,161.00 | $908 | --- | --- |
| 1980 | 24,838.00 | --- | --- | --- |
| 1981 | 36,294.52 | --- | $1,958.28 | $4,934.32 |

The decisions provided that the Thompsons were liable for 50 percent of the interest due on the deficiency for 1981 pursuant to section 6653(a)(2) as well as increased interest pursuant to section 6621(c).

By letter dated April 23, 1992, Mr. McWade forwarded to Mr. DeCastro waiver agreements which, if executed by Mr. DeCastro, would authorize the Internal Revenue Service to enter assessments against the Thompsons before expiration of the 90-day appeal period prescribed by section 7481.  Mr. McWade's letter stated that, on the basis of the Thompsons' earlier payments, there would be due a refund of approximately $56,873.03

for 1979, 1980, and 1981.  Finally, the letter stated that the Thompsons' refund was attributable to the resolution of Kersting interest deduction programs, including the Bauspar program.  Mr. DeCastro signed the waivers and returned them to Mr. McWade on April 27, 1992.  Mr. Sims and Mr. McWade initialed the waivers on May 1, 1992.  By letter dated May 8, 1992, Mr. DeCastro wrote to Mr. Thompson stating in pertinent part:  "Finally I have been advised that the Infernal [sic] Revenue Service is processing a refund to you.  I expect to be in excess of $55,000 [sic] so as I mentioned it will finally take care of my bill and leave some left over for you."

During this same period, Mr. Sims informed Larry Martucci (Mr. Martucci), an Associate Chief of Appeals in the San Francisco Appeals Office,[63] that a Kersting test case petitioner had accepted the project settlement offer made to all Kersting petitioners, but, because the petitioner was one of the test cases, he had tried his case.  Mr. Sims told Mr. Martucci that the Court had entered a decision in the case in accordance with its opinion.  Mr. Martucci told Mr. Sims that he did not know what could be done.  Mr. Martucci told Mr. Sims that, at a minimum, Mr. Sims should contact Mr. Sanchez, Regional Counsel for the Western Region, Office of Chief Counsel.

---

[63] From November 1988 through March 1992, Mr. Martucci supervised the Appeals officers assigned to the Honolulu Appeals Office, including Gary Lipetzky and Mel Iwane.  Mr. Martucci first became aware of the Kersting tax shelter project in 1988 or 1989 when the project was in District Counsel jurisdiction and no longer with the Appeals Office.

During the week of April 13, 1992, Mr. Sims contacted Jerry Li (Mr. Li), another Associate Chief of Appeals in San Francisco, about the need to assess amounts in the Thompson cases that were less than the amounts set forth in the Tax Court's decisions. Mr. Sims did not mention the Thompsons' participation in the Bauspar program in his conversation with Mr. Li. Mr. Li told Mr. Sims that he would have to check with his superiors before processing the case. Mr. Li asked Mr. Sims for a memorandum explaining the situation.

Mr. Sims and Mr. McWade sent Mr. Li a memorandum dated May 8, 1992, which states:

> Forwarded herewith are the administrative files for the above-entitled cases, which were part of the test cases in the Kersting Interest Deduction Program. As per our discussion, the petitioners indicated a desire to settle their cases, based upon the then outstanding settlement offer, prior to the trial of the test cases. Because of the stipulations of settlement of tax shelter issues filed in the remaining non-test cases, we felt settlement with petitioners, as test cases, without trial was inappropriate. In lieu of a stipulated settlement, we agreed to allow petitioners the better of the settlement or trial results, once the litigation was completed. Petitioners also established their entitlement to additional actual losses associated with another of Mr. Kersting's programs, Balspar [sic]. We agreed to reflect the tax consequences of such transactions in the final determination of their tax liability for the respective years.
>
> The Court has now rendered its opinion in the Kersting test case litigation and entered its decision. In accordance with our agreement with petitioners, the tax liabilities to be assessed in these cases, the decision notwithstanding, are as follows:

|      |            | I.R.C. Sections | | | |
| Year | Deficiency | 6651(a)(1) | 6653(a)(1) | 6653(a)(2) | 6621(c) |
|------|------------|------------|------------|------------|---------|
| 1979 | -0-        | N/A        | -0-        | N/A        | -0-     |
| 1980 | $15,000.00 | N/A        | N/A        | N/A        | -0-     |
| 1981 | $15,000.00 | -0-        | -0-        | -0-        | -0-     |

In order to expedite the closing of these cases, petitioners, through counsel, have executed waivers of the limitations contained in I.R.C. § 6213(a), copies of which are included in the files.  Immediate processing of the assessments are [sic] therefore appropriate.

If you have any questions regarding the processing of this matter, pleased contact me at (808) 541-3350.

Shortly after receiving this memorandum, Mr. Li called Gary Lipetzky (Mr. Lipetzky), an Appeals officer in Honolulu, who had begun to gather information about the Bauspar program. Mr. Lipetzky informed Mr. Li that he was the key Appeals officer on the Bauspar program and that he had not formulated any settlement offer for that program.

Mr. Li subsequently contacted his supervisor, Ron Wise (Mr. Wise), Assistant Chief of Appeals in San Francisco, about Mr. Sims' request.  On May 22, 1992, Mr. Wise talked to Mr. Sims about the Thompson cases.  Mr. Sims told Mr. Wise that the Thompsons had been selected as Kersting test cases, the Thompsons had their own attorney, Mr. Kersting had threatened to sue the Thompsons, Mr. Kersting had denied the Thompsons the return on one of their investments, and Mr. Kersting considered Mr. Thompson to be a renegade.  Mr. Sims told Mr. Wise that he and Mr. Thompson had worked out an informal arrangement that the Thompsons would receive the better of the Tax Court decision or the best settlement allowed to other Kersting program

participants before the trial. Mr. Sims told Mr. Wise that he was concerned about the piggyback cases because the Thompsons would be getting a better settlement and the Government had won all the test cases.

Mr. Wise believed that Mr. Sims' request to make an assessment that differed from a Tax Court decision required higher level approval. On May 15, 1992, Mr. Wise forwarded Mr. Sims' May 8, 1992, memorandum to his supervisor, Christian G. Beck, Chief of the San Francisco Appeals Office. Mr. Wise told Mr. Sims that he did not have authority to process his request and indicated he was going to seek approval from Danny Cantalupo (Mr. Cantalupo), Regional Director of Appeals for the Western Region. On May 22, 1992, Mr. Cantalupo informed Peter D. Bakutes (Mr. Bakutes) Deputy Regional Counsel (Tax Litigation) for the Western Region, that the Appeals Office had received a request from Mr. Sims to make an assessment in a Kersting test case on a basis that differed from the Tax Court's decisions.

Under the management structure of the Western Regional Counsel's Office, Mr. Bakutes reported directly to Mr. Sanchez. As Deputy Regional Counsel, Mr. Bakutes was responsible for general oversight of tax litigation in the Western Region, including tax shelter cases, and for evaluating how such cases should be handled. Mr. Bakutes had experience with tax shelter procedures before becoming Deputy Regional Counsel. Mr. Bakutes expected that, in the Western Region, a project attorney and the attorney's manager would contact the Regional Office if they

wished to settle a project case on grounds different from the official project settlement offer. Mr. Sanchez considered Mr. Bakutes his key executive staff person and had directed all District Counsel, including Mr. Sims, to discuss any unusual or novel matters with Mr. Bakutes.

Mr. Bakutes and Mr. Cantalupo immediately informed Mr. Sanchez about the Thompson settlement. This was the first time Mr. Sanchez heard of the Thompson settlement. No one in the Western Regional Counsel's Office knew of the unusual settlement of Kersting cases before May 22, 1992. No one in the Western Regional Office had approved the settlements.

Mr. Sanchez immediately called Mr. Sims, who admitted the basic facts regarding the Thompson settlement arrangement. Mr. Sims stated that his motivation for the settlement was to prevent Mr. Kersting from perpetrating a fraud on the Court. Mr. Sims stated that the best way to do this was to have at least one attorney not paid by Mr. Kersting participate in litigating the test cases.

After discussing the matter with Mr. Sims, Mr. Sanchez contacted Mr. DeCastro and learned more of the details surrounding the settlement. Mr. DeCastro informed Mr. Sanchez that Mr. Sims and Mr. McWade had agreed to a proposal to keep the Thompsons in the litigation by rebating to the Thompsons an amount sufficient to pay their legal fees. Mr. Sanchez told

Mr. DeCastro that Mr. Sims had no authority to enter into such a settlement.[64]

Mr. Sanchez promptly notified David Jordan (Mr. Jordan), Acting Chief Counsel (National Office) of the basic facts surrounding the Thompson settlement. Mr. Jordan told Mr. Sanchez that Chief Counsel attorneys in the Tax Litigation Division in the National Office would be brought into the matter for two reasons: The gravity of the situation and the role of the Tax Litigation Division in the National Office as the prime liaison of the Internal Revenue Service with the Tax Court. Mr. Jordan and Mr. Sanchez agreed that the Tax Court had to be notified immediately.

Mr. Sanchez assigned Mr. Bakutes to investigate the matter on behalf of Regional Counsel. Mr. Bakutes spent several weeks gathering facts, so that the matter could be reported to the Tax Court. Mr. Bakutes recognized that he needed to move quickly because the period for appealing the decisions entered in the Thompson cases would expire on June 11, 1992.

---

[64] Mr. Sanchez believed that Mr. Sims was acting outside the scope of his employment and authority when he deviated from the terms of the official project settlement offer in the Thompson cases, and when he purportedly used as a basis for settlement a transaction (Bauspar) that had occurred in a tax year over which he, as District Counsel, had no jurisdiction. We observe that the Thompsons' participation in the Bauspar program apparently originated in 1981--one of the years that the Thompsons had pending before the Court--although the record does not detail the deductions, if any, claimed by the Thompsons with respect to the Bauspar program on their 1981 return.

On May 29, 1992, Mr. Sims sent a letter to Mr. DeCastro informing him that the Thompson settlement had been rejected by Regional Counsel, stating in pertinent part as follows:

> As I'm sure you recall, on or about October, 1986, you approached Ken McWade of this office with an offer to settle * * * [the Thompson] cases based on the Government's then outstanding settlement position for the Kersting project. At that time, I informed you that, since the Thompsons' cases had been designated as test cases in the Kersting project litigation, I would not approve of any settlement of these cases prior to trial. Nonetheless, I represented to you that I would exert my personal best efforts to see that the Thompsons were not disadvantaged by my decision not to settle. I also advised you that I was not in a position to guarantee success inasmuch as approval of a higher authority might be required. Finally, I advised you that if the test case petitioners won, we would allow you to enjoy that result. I am certain that both you and I left with the clear understanding as a result of what I had said, the [sic] we remained adversaries with respect to the litigation.

Mr. Sims' letter further states that, absent an appeal, the Internal Revenue Service would assess the full deficiencies in the Thompson cases, consistent with the Court's Dixon II opinion, plus all applicable statutory additions to tax. The total assessment, including interest, would have been $302,396.12.

On June 1, 1992, Mr. Sims sent Mr. Sanchez a copy of Mr. DeCastro's August 3, 1989 letter, signed by Mr. McWade, acknowledging the second revision to the Thompson settlement. On June 2, 1992, Mr. Sanchez and Mr. Bakutes had a conference call with Messrs. Sims, McWade, and DeCastro. During the call, Mr. DeCastro claimed that Mr. Thompson had a profit motive and that Mr. Thompson's testimony was stronger on this point than that of any of the other test case petitioners. Mr. DeCastro

also denied that the Thompson settlement was attributable in any way to the Thompsons' participation in the Bauspar program.

On June 2, 1992, Mr. Bakutes directed Mr. Sims to send him immediately the files in the Kersting test cases.

Mr. Bakutes assigned Mr. Dombrowski to assist him in formulating respondent's position with respect to the settlement arrangement. On June 3, 1992, Mr. Bakutes directed Mr. Dombrowski to prepare motions to vacate the decisions in the Thompson cases.

On June 3, 1992, Mr. Li prepared a memorandum summarizing his earlier conversations with Mr. Sims, stating in pertinent part as follows:

> Per Bill Sims, the main reason for the lower deficiency to be assessed was that the Thompsons wanted to settle their case, based upon the then outstanding settlement offer prior to the trial of the test cases. Sims stated that because of the stipulations of settlement of tax shelter issues filed in the remaining non-test cases, Honolulu District Counsel felt settlement with the petitioners, as test cases, without trial was inappropriate.

> Bill then stated to me that also Mr. Thompson was taken by Mr. Kersting and that Mr. Thompson was considered a traitor by all of the other Kersting's investors. Mr. Thompson helped the government's case against Mr. Kersting promotion with his testimony about the Kersting promotion. Mr. Thompson was cooperative with District Counsel and therefore District Counsel will reduce the tax deficiency for all three years.

On June 4, 1992, Mr. Sims informed Mr. Bakutes that "Except for the Thompson and Cravens cases, neither Ken nor I entered into any 'best of both worlds' settlements, agreements, or understandings, oral or written, formal or informal, with any

taxpayer or taxpayer's representative in any Kersting project case."

On or about June 11, 1992, Mr. Sanchez decided that Messrs. Sims and McWade should no longer have any authority over the Kersting cases. At that time, Mr. Bakutes reassigned all 14 test case dockets to Mr. Dombrowski, and all the nontest cases in the Kersting project to Mr. O'Neill. On June 12, 1992, Mr. Sanchez informed Mr. Sims that he had withdrawn Mr. Sims' delegation of authority to settle any matters relating to the Kersting project, and that management of the Kersting project was reassigned to Mr. Bakutes.

While Mr. Bakutes was carrying out his orders from Mr. Sanchez, Mr. Jordan directed two senior attorneys in the Tax Litigation Division in the National Office, Thomas J. Kane (Mr. Kane), and Steven M. Miller (Mr. Miller), to investigate the Thompson settlement on behalf of the National Office.

Messrs. Kane and Miller conducted in-house depositions and interviewed various individuals who had participated in the test case trial and the Thompson settlement. Mr. Bakutes directed Mr. Dombrowski to provide information to aid Messrs. Kane and Miller in their investigation.

E.  Disclosure of Cravens Settlement

The Cravens case for the 1980 taxable year was the only test case that required a computation for entry of decision under Rule 155. The computation was required in order to account for the capital gain that the Cravenses had reported for 1980 on their

surrender of their shares in Candace.  An adjustment was also required in order to eliminate respondent's alternative determination that the Cravenses had unreported dividend income for 1980.  The Cravens case was the only test case presenting these two issues.

On January 14, 1992, Mr. McWade forwarded a decision document for the 1980 tax year to the Cravenses for their signature.  The decision was formulated by reference to the Tax Court's December 11, 1991, opinion, as well as respondent's computation for entry of decision, together with a computation statement explaining how the decision was reached.  Mr. O'Neill prepared the aforementioned computations.  Mr. O'Neill was not aware at the time that Mr. McWade had entered into an agreement to settle the Cravens cases before trial.  The computation statement accompanying respondent's computation for entry of decision indicates that the proposed decision was based upon a complete disallowance of the interest deductions listed in the notice of deficiency issued to the Cravenses for 1980.

On January 30, 1992, the Cravenses signed the decision documents and returned them to Mr. McWade.  On February 4, 1992, Mr. McWade signed the same documents and submitted them to the Court.  On March 13, 1992, the Court entered decisions in the Cravens cases as follows:

|  |  | Additions to Tax | | |
| Year | Deficiency | Sec. 6653(a) | Sec. 6653(a)(1) | Sec. 6651(a)(1) |
| 1979 | $4,508.00 | $225.40 | --- | --- |
| 1980 | 5,893.45 | 294.67 | --- | --- |

The decisions entered in the Cravens cases did not give effect to the settlement between Mr. Cravens and Mr. McWade. Mr. Sims testified that he allowed the Court to enter decisions in the Cravens cases for the full amount of the deficiencies as computed by reference to the Court's opinion after the trial of the test cases because he intended to honor his agreement with the Cravenses by ensuring that a lower assessment would be processed by the Appeals Office.

Mr. Sims spoke to Mr. Cravens about the difference between the numbers in his settlement agreement and the larger numbers in the Rule 155 computation and the decision documents. Mr. Sims believed that Mr. Cravens understood that an assessment consistent with his settlement would be made administratively. However, when Messrs. Sims and McWade sent the Cravens cases to the San Francisco Appeals Office for closing and assessment, they did not request or instruct the Appeals Office to assess amounts in accordance with the arrangement reached with Mr. Cravens in December 1986.

Shortly after Messrs. Sanchez and Bakutes discovered the Thompson settlement, Messrs. Sims and McWade disclosed the Cravens settlement to them.

F.    Respondent's Motions To Vacate

On June 9, 1992, respondent filed motions for leave to file motion to vacate the decisions that the Court had entered against the Thompsons, the Cravenses, and Mr. Rina.  Respondent's motions included allegations that, before the trial of the test cases, Messrs. McWade and Sims had entered into contingent settlement agreements with the Thompsons and the Cravenses that were not disclosed to the Court or to the other test case petitioners or their counsel.  Respondent requested the Court to conduct an evidentiary hearing to determine whether the agreements with the Thompsons and Cravenses had affected the trial of the test cases or the opinion of the Court.

On June 22, 1992, the Court granted respondent's motions to vacate filed in the Thompson and Cravens cases, vacated the decisions entered in those cases, and ordered the parties to file agreed decisions with the Court, or otherwise move as appropriate.  The Court denied respondent's request for an evidentiary hearing.  Also on June 22, 1992, the Court denied respondent's motion to vacate the decision entered against Mr. Rina, stating:

> The Court has reviewed the testimony of Cravens, the testimony of Thompson, the stipulated facts and stipulated exhibits relating to the Cravenses and the Thompsons, and the exhibits offered through Thompson as a witness.  The Court finds that these reviewed items had no material effect on the opinion which the Court filed on December 11, 1991, as that opinion relates to petitioner Rina.  If the reviewed items were stricken from the record, the Court would file an opinion in all material respects like the opinion it filed on December 11, 1991 (with the exception of certain

portions relating specifically and expressly to the Cravenses or the Thompsons), and the Court's findings, analyses, and conclusions relating to petitioner Rina would remain the same.  * * *

G.  Attempted Discovery by Counsel for Nontest Case Petitioners

By letters dated June 24 and August 12, 1992, Messrs. Jones and O'Donnell jointly requested that Mr. Dombrowski provide informal discovery regarding the Thompson and Cravens settlements.  The earlier of the two letters included allegations that Mr. Kersting withheld documents from the test case petitioners that would have described "an underlying business of great substance" because Mr. Kersting feared that the information would increase his personal tax liability.  Respondent declined to respond to the informal discovery requests and did not allow Messrs. Jones and O'Donnell to participate in any of the in-house investigations conducted by Messrs. Bakutes, Dombrowski, Kane, and Miller.

H.  Closing of Thompson Cases/Further Refunds

In July 1992, Mr. DeCastro filed a motion for entry of decision in accordance with the terms of the Thompson settlement set forth in Mr. DeCastro's letter to Mr. McWade dated August 3, 1989; i.e., deficiencies of zero, $15,000, and $15,000 for the taxable years 1979, 1980, and 1981, respectively.  On August 20, 1992, respondent filed objections, with respondent's Motions for Entry of Decision and respondent's Memoranda of Points and Authorities, to Mr. DeCastro's motion for entry of decision. Respondent's Motions for Entry of Decision described the facts

discovered by Messrs. Miller, Kane, and Dombrowski in their investigation of the Thompson settlement. Respondent alleged that, sometime before the test case trial, Messrs. Sims and McWade had agreed to settle the Thompson cases by reducing the Thompsons' deficiencies in amounts sufficient to compensate the Thompsons for their projected attorney's fees. Respondent alleged that this "New Agreement" was designed--and constituted an agreement by Messrs. Sims and McWade--to pay Mr. DeCastro's legal fees. Respondent alleged that the "New Agreement" was unauthorized and had no legal basis. Consequently, respondent asked the Court to enter decisions in the Thompson cases consistent with the initial McWade-DeCastro agreement of December 1986, which had allowed the Thompsons a reduction of approximately 19 percent of their deficiencies with the burnout feature; i.e., deficiencies of zero, $34,425, and $30,000 for the taxable years 1979, 1980, and 1981, respectively.

On August 26, 1992, the Court granted Mr. DeCastro's motions for entry of decision and entered decisions in the Thompson cases as follows:

| Year | Deficiency | Additions to Tax |
|------|-----------|------------------|
| 1979 | --- | --- |
| 1980 | $15,000 | --- |
| 1981 | 15,000 | --- |

In January 1993, respondent entered assessments against the Thompsons for the taxable years 1979, 1980, and 1981 based upon the decisions entered by the Court in August 1992. Shortly thereafter, the Thompsons received a refund check for $32,225,

dated February 19, 1993, which the Thompsons endorsed to DeCastro Law Corp.

The refund of $32,225 to the Thompsons was based upon the conclusion that, as of December 30, 1986, when the Thompsons first remitted a total of $59,545 as interest payments for the years 1979, 1980, and 1981, the Thompsons' total tax liability for those years, as reflected in the Court's decisions entered on August 26, 1992, was approximately $57,500--comprising $30,000 in tax and $27,500 in interest. Accordingly, the Thompsons' December 1986 remittance of $59,545 resulted in an overpayment of approximately $2,045. In addition to this overpayment, on June 17, 1987, the Thompsons had made an additional payment of $62,225 towards their tax liability for 1979. The $32,225 refund paid to the Thompsons on February 19, 1993, represents the difference between the Thompsons' $62,225 payment and the $30,000 refund that the Thompsons had previously received in July 1989.

Following the receipt of the $32,225 refund, Mr. DeCastro wrote to Mr. Dombrowski to complain that respondent had erred in computing the amount of the Thompsons' overpayment. After review of the matter, Mr. Dombrowski prepared a memorandum to Mr. Bakutes dated September 17, 1993, requesting approval to process an additional refund to the Thompsons of approximately $32,000. Mr. Dombrowski stated that, in calculating the prior refund of $32,225, respondent had erroneously treated the $62,225 payment that the Thompsons made in June 1987 as a cash bond rather than an advance payment of tax. Viewing the $62,225

payment as an advance payment of tax, Mr. Dombrowski concluded that the Thompsons were entitled to interest on the resulting overpayment.

Mr. Bakutes approved Mr. Dombrowski's request. Shortly thereafter, Mr. Dombrowski requested the Fresno Appeals Office to adjust the Thompsons' account, resulting in the Thompsons' receipt of a third refund check, dated October 22, 1993, for $32,116.68.

In November 1993, the Thompsons received a fourth refund check for $4,107.93 with respect to their overpayment for the taxable years 1979, 1980, and 1981. Presumably this check reflected a refund of the overpayment of approximately $2,045 (with interest) that arose from the Thompsons' December 1986 payment of $59,545.

In sum, the Thompsons were refunded $98,449.61 of the $121,770 that they paid for the taxable years 1979, 1980, and 1981. Of the $98,449.61 in refunds, the Thompsons assigned $62,225 to DeCastro Law Corp.

As mentioned supra note 2, the Court of Appeals for the Ninth Circuit held that the Thompson decisions became final pursuant to section 7481(a)(1), despite the attempts by Messrs. Sticht and Izen to appeal those decisions on behalf of nontest case petitioners who sought to intervene.

I.    Closing of Cravens Cases

On July 1, 1992, Mr. Dombrowski wrote to the Cravenses enclosing documents that were intended to enable them to determine the proper decisions to be entered in their cases. Mr. Dombrowski stated that, upon receipt of the Cravenses' response, he would coordinate the matter with Mr. Bakutes to determine the terms of agreed decisions that respondent would be willing to submit to the Tax Court.  On July 3, 1992, Mr. Cravens responded to Mr. Dombrowski's letter with a written chronology of the events leading to the settlement of his cases in December 1986.

On August 25, 1992, the Court entered agreed decisions in the Cravens cases consistent with the proposed decisions that Mr. McWade forwarded to the Cravenses in December 1988.  The decisions provide that the Cravenses are liable for deficiencies for the taxable years 1979 and 1980 in the amounts of $3,606.40 and $6,175.76, respectively, and that the Cravenses are not liable for any additions to tax.  The decision for 1979 includes a stipulation that the agreed deficiency does not take into account advance payments in the amounts of $4,508 and $6,000 that the Cravenses made in May 1983 and December 1986, respectively. The decision for 1980 includes a stipulation that the agreed deficiency does not take into account an advance payment in the amount of $4,678.67 that the Cravenses made in December 1986.

On October 26, 1992, the Regional Director of Appeals for the Western Region wrote a memorandum to the San Francisco

Appeals Office requesting that the Cravens cases be closed in accordance with special closing instructions. The intent of these instructions as stated in the memorandum was "to cause the taxpayers' 1979 and 1980 accounts to zero out with no further amounts due." This was to be accomplished by adjusting the interest that would otherwise have become due on the assessments made in accordance with the stipulated decision previously entered by the Tax Court on August 25, 1992. The memorandum explained the proposed interest adjustment as follows:

> The amount of interest being assessed has been adjusted because the decision document tendered to petitioners and subsequently filed with the Court in settlement of this case did not comport with District Counsel's 1986 settlement offer. The settlement offer provided that the first year deficiency would be shifted to the second year. Accordingly, there would have been no deficiency for 1979 and the deficiency for 1980 would have been increased to $9,782 ($3,606 + $6,176). The amount of interest being assessed has been adjusted because this provision was not included in the decision documents and because the decision documents in this case were not promptly prepared and filed with the Tax Court in December 1986 when the case was settled. The balance of the adjustment relates to computational errors in District Counsel's original computation of the amounts due.

The authority stated in the memorandum for reducing the amounts due from the Cravenses was section 6404(a)(1), relating to excessive assessments, and section 6404(e)(1), relating to abatement of interest.

As mentioned supra note 2, the Court of Appeals for the Ninth Circuit held that the Cravens decisions became final pursuant to section 7481(a)(1), despite the attempts by Messrs.

Sticht and Izen to appeal those decisions on behalf of Kersting

project nontest case petitioners who sought to intervene.

PROCEDURAL HISTORY OF EVIDENTIARY HEARING

I.    Developments Before Evidentiary Hearing

A.    Referral of Thompson and Cravens Settlements to Office of
      Inspector General

When Mr. Sanchez learned of the Thompson and Cravens

settlements, he decided to refer the matters to the Department

of the Treasury, Office of the Inspector General (the OIG).[65]  On

June 30, 1992, Robert J. Wilson (Mr. Wilson), Special Litigation

Assistant, General Legal Services, Western Region, made a written

referral to the OIG.  In the referral, Mr. Wilson alleged that

Messrs. Sims and McWade had entered into undisclosed, contingent

settlements with the Thompsons and the Cravenses.  The referral

further alleged that the Thompsons' deficiencies had been reduced

to pay their attorney's fees.  Mr. Wilson's referral further

alleged that Messrs. Sims and McWade had grossly violated

procedures, and that Mr. McWade might have made false statements.

Mr. Wilson served as the liaison between the Western

Regional Counsel's Office and the OIG.  Mr. Sanchez believed that

the Region's referral to the OIG ended his investigatory

---

[65]  The Office of the Inspector General (Dept. of the
Treasury) was established under the Inspector General Act
Amendments of 1988, Pub. L. 100-504, 102 Stat. 2515, codified as
amended at 5 U.S.C. app. at 1381 (1994).  The Inspector General's
duties include the conduct, supervision, and coordination of
audits and investigations to prevent and/or detect fraud and
abuse in the Treasury Department and the reporting of possible
criminal violations to the Attorney General.

authority over the matter and that his only remaining responsibility was to assist the OIG with its investigation.

Upon receipt of the referral, OIG assigned Senior Special Agent Leland D. Halleck (Mr. Halleck) to investigate the matter. Mr. Sanchez directed Mr. Dombrowski to provide Mr. Halleck with all documents in respondent's possession that Mr. Halleck might request and to answer Mr. Halleck's questions. As part of his investigation, Mr. Halleck considered whether there had been any bribery in violation of 18 U.S.C. section 201. A violation of this section had not been included in the Internal Revenue Service referral but was added by the OIG. Mr. Halleck was not restricted from investigating any other possible violations relating to the Thompson and Cravens settlements.

Mr. Halleck interviewed Messrs. Sims and McWade in October 1992. Messrs. Sims and McWade told Mr. Halleck that they would not allow any of the Kersting test case petitioners to settle because: (1) They did not want the test case litigation delayed;[66] (2) they would have had to find replacement cases with

---

[66] As indicated supra pp. 41-42, removal of the Thompson and Cravens cases from the test case array in January 1987 would not necessarily have caused a delay in the trial of the test cases insofar as the Kersting programs in which the Thompsons and Cravenses had participated during the years in issue were before the Court in other test cases. On the other hand, removal of the Cravens cases might have caused the remaining test case petitioners to argue that the Cravens cases should be replaced because Mr. Cravens was the only test case petitioner to report capital gains upon the termination of his Kersting program. In any event, the nearly 2-year delay in the trial of the test cases after Chicoine and Hallett were allowed to file amendments to petitions raising evidentiary issues provided ample time for

(continued...)

similar characteristics; and (3) they were concerned about the possible effect on the other Kersting project cases. The OIG report includes Mr. Sims' affidavit, executed October 29, 1992, which states that it was his recollection that the final version of the Thompson settlement agreement was agreed to before the trial of the test cases. Mr. Sims' affidavit also includes the following statement: "I can recall numerous discussions with McWade concerning our own trial strategy as well as discussions concerning the anticipated strategies of both Izen and DeCastro, but no discussions whatsoever concerning any 'settlement'."

On December 9, 1992, the OIG report prepared by Mr. Halleck was completed. The OIG report concluded that Messrs. Sims and McWade had: (1) Agreed to special arrangements with the Thompsons and the Cravenses; and (2) provided a special arrangement for the Thompsons designed to compensate them for their attorney's fees. Mr. Halleck concluded that Messrs. Sims and McWade had not benefited financially or otherwise by agreeing to the special arrangements.

In Mr. Halleck's opinion, Messrs. Sims' and McWade's agreement to arrange a refund to be used to pay the Thompsons' legal fees violated 31 C.F.R. section 0.735.30(a)(5) (making a decision outside of official channels).

_____

[66](...continued)
Messrs. Sims and McWade to disclose the Thompson and Cravens settlements to the Court and to reach agreement with test case petitioners' counsel for selection of replacement cases.

B.    Revival of 7-Percent Settlement Offer

In January 1993, Mr. O'Neill notified all known Kersting nontest case petitioners that the Commissioner would settle their cases on a basis "consistent with the original project settlement offer that was extended to Kersting investors before the trial of the test cases":  A 7-percent reduction of the deficiency, elimination of all additions to tax, and interest imposed at the normal rate prescribed in section 6621; the burnout feature was not provided for.  The settlement offer, which was extended for only 60 days, was accepted by a few Kersting petitioners.

C.    Disciplinary Actions

On July 29, 1993, Mr. Sanchez sent Notices of Proposed Disciplinary Action to Messrs. Sims and McWade.  The notices asserted that Messrs. Sims and McWade had violated: (1) Department of the Treasury Minimum Standards of Conduct, section 0.735-30(a)(2) (an employee shall avoid any action which might result in or create the appearance of giving preferential treatment to any person); (2) Department of the Treasury Minimum Standards of Conduct, section 0.735-30(a)(6) (an employee shall avoid any action that might adversely affect the confidence of the public in the integrity of the Government); and (3) Internal Revenue Service Rule of Conduct 214.5 (an employee will not intentionally make false or misleading verbal or written statements in matters of official interest).  The notices proposed to suspend both Messrs. Sims and McWade for 14 calendar days without pay.

Mr. Sanchez' Notices of Proposed Disciplinary Action to Messrs. Sims and McWade listed the following reasons for the proposed disciplinary actions: (1) Negotiating an unauthorized settlement agreement with the Thompsons; (2) basing the Thompson settlement on unaudited and insufficiently documented losses from an unrelated shelter; (3) allowing the Thompsons a settlement that provided them more favorable treatment than other taxpayers; (4) compensating the Thompsons for their attorney's fees; and (5) not informing the Tax Court of the Thompson settlement arrangements.

Mr. Sims responded in writing to Mr. Sanchez on September 14, 1993. Nonetheless, Mr. Sanchez sustained the Notice of Proposed Disciplinary Action issued to Mr. Sims.

Mr. McWade retired from the Internal Revenue Service effective October 2, 1993, rather than accept a transfer to the Los Angeles District Counsel Office. On November 2, 1993, Mr. Jordan approved Mr. Sanchez' proposed disciplinary action. Mr. Sims was suspended from duty without pay for 14 days and was transferred to the San Francisco Regional Counsel Office, where he was assigned nonsupervisory duties as a Special Litigation Assistant in the General Litigation area.

D. Indictment of Mr. Izen

On May 3, 1995, following an investigation by the Criminal Investigation Division of the Internal Revenue Service, a Federal grand jury indicted Mr. Izen on four counts of conspiracy and money laundering under 18 U.S.C. sections 371 and 1956(a)(3)(A)

and (B).  Approximately 1 year later, in May 1996, shortly before commencement of the evidentiary hearing, the indictment was dismissed.  Mr. Izen testified at the commencement of the evidentiary hearing that the indictment had been a distraction that made it difficult for him to prepare for the evidentiary hearing, but that he had participated in discovery and was ready to go forward and participate in the evidentiary hearing on behalf of the test case petitioners.

E.    Pretrial Conference (July 1995)

On July 17, 1995, the Court held a pretrial conference on the record for the purpose of addressing various issues, including the scheduling of the evidentiary hearing, identification of the parties who would participate in the evidentiary hearing, and scheduling of discovery.  The Court also commented at the conference that the Thompson and Cravens settlements appeared to share some characteristics with so-called Mary Carter agreements.

Respondent was represented at the conference by Mr. O'Neill and Mr. Dombrowski.  During the conference, Mr. O'Neill questioned whether Mr. Izen should be disqualified as counsel because he would probably be called as a witness at the evidentiary hearing.  During the conference, the Court questioned whether Mr. Dombrowski should represent respondent at the

evidentiary hearing, in view of his participation as counsel in the trial of the test cases.[67]

F.    Pretrial Conference (January 1996)

On January 16, 1996, the Court held a second pretrial conference on the record to obtain oral status reports from the parties respecting discovery and the stipulation process, to establish the format for the evidentiary hearing, and to discuss possible conflicts of interest affecting counsel.[68] Specifically, the Court and the parties discussed possible conflicts of interest of Mr. Izen and Mr. DeCastro.

G.    Denial of Respondent's Motion To Disqualify Mr. Izen

On February 12, 1996, respondent filed a motion to disqualify Mr. Izen as counsel on the ground that he would be a necessary witness at the evidentiary hearing.[69] By order dated April 1, 1996, the Court noted that, because Mr. Izen was likely to testify at the evidentiary hearing, Mr. Izen's testimony might in some sense prove to be adverse to the interests of his clients.  With these concerns in mind, and relying on ABA Model

_____

[67]   While both Messrs. Dombrowski and O'Neill testified at the evidentiary hearing, neither of them served as respondent's counsel at the evidentiary hearing.

[68]   By order dated May 2, 1996, the Court indicated that it would defer ruling on the assignment of the burden of proof and the standard of proof to be applied in these cases. Nevertheless, the Court established a procedure for the orderly presentation of evidence at the evidentiary hearing.

[69]   On Oct. 4, 1995, respondent had filed a motion to disqualify Mr. Izen as counsel on similar grounds.  By order dated Oct. 17, 1995, the Court had denied respondent's motion without prejudice to renew pending the completion of discovery.

Rules of Professional Conduct rules 1.7(b) and 3.7(a), the Court directed Mr. Izen to contact each of his clients in writing and to inform them of the potential for a conflict of interest and to file a report with the Court revealing whether his clients consented to his remaining as counsel.[70]  On April 22, 1996, Mr. Izen filed a report with the Court, attaching thereto a copy of a letter that he had written to each of his clients describing the possible conflict of interest along with executed waivers signed by his clients consenting to his continued representation of them at the evidentiary hearing.  By order dated April 23, 1996, the Court denied respondent's motion to disqualify Mr. Izen, citing the consents of his clients to his continued representation of them and the financial hardship that his disqualification would impose on them.  In so doing, the Court rejected the suggestions of Messrs. Sticht and Jones that Mr. Izen should associate himself with additional counsel for the conduct of the evidentiary hearing.

---

[70]  ABA Model Rules of Professional Conduct rule 1.7(b) states in pertinent part that a lawyer shall not represent a client if the representation may be materially limited by the lawyer's own interests unless that lawyer reasonably believes the representation will not be adversely affected and the client consents after consultation.  ABA Model Rules of Professional Conduct rule 3.7(a) states in pertinent part that a lawyer generally shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness.  See Ewing v. Commissioner, 91 T.C. 396, 397 n.2 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991); Para Techs. Trust v. Commissioner, T.C. Memo. 1992-575.

H.   Mr. DeCastro's Withdrawal

By order dated April 3, 1996, the Court directed Mr. DeCastro to show cause why he should not be disqualified from serving as counsel or otherwise representing the Thompsons at the evidentiary hearing.[71]  On April 10, 1996, the Court received a letter from Mr. DeCastro stating that he had withdrawn his representation of the Thompsons and that they would retain substitute counsel to represent them at the evidentiary hearing. By order dated April 11, 1996, the Court discharged as moot its order to show cause dated April 3, 1996.  Mr. Huestis entered his appearance on behalf of the Thompsons at the evidentiary hearing.

I.   Discovery of Alexander Decisions and Referral to Office of Inspector General

Shortly before commencement of the evidentiary hearing, the parties discovered that decisions had been entered in the Alexander cases eliminating their deficiencies for 1974, 1975, 1976, and 1977.[72]  On May 10, 1996, Martha Sullivan (Ms. Sullivan), successor to Mr. Sanchez as Regional Counsel, Western Region, referred the matter to the OIG.  The referral questioned whether the Alexanders had received a beneficial

---

[71]  Again, the Court relied primarily upon ABA Model Rules of Professional Conduct rules 1.7(b) and 3.7(a) as the bases for its order.

[72]  It appears that the Alexander correspondence that had been attached to Mr. McWade's motion to take Mr. Kersting's deposition, filed in the test cases on Aug. 25, 1988, piqued Mr. Sticht's curiosity and led him to request discovery of the Alexander files of the Internal Revenue Service for the taxable years 1974-77.

resolution of their tax cases that was inconsistent with the settlements offered to other Kersting program participants.

Ms. Sullivan's referral to the OIG was assigned to Mr. Halleck.  On July 29, 1996, the OIG informed Ms. Sullivan that the OIG would take no further action.  The stated grounds were the expiration of the period of limitations for criminal prosecution of any acts of wrongdoing by Messrs. Sims and McWade and the OIG's prior investigation and report.

J.   Mr. Izen's Motion To Compel Production of Documents and Issuance of Protective Orders

On April 26, 1996, the Court granted Mr. Izen leave to file a Motion to Compel Answers to Deposition Questions and Production of Documents.[73]  Mr. Izen argued that the Court should rule that the crime-fraud exception to the attorney-client privilege applies to these cases and that various witnesses, including Messrs. Thompson, DeCastro, Sims, McWade, and a number of additional Government attorneys, were barred from asserting the attorney-client privilege in response to outstanding discovery requests.[74]  The Court initially ordered respondent, Mr. Thompson, and Mr. DeCastro to file responses to Mr. Izen's

[73]  Leave to file the motion to compel was necessary insofar as the motion was filed beyond the Mar. 29, 1996, deadline for completing discovery as set forth in the Court's order dated Sept. 14, 1995, as amended by order dated Dec. 28, 1995.

[74]  The documents that the Government declined to produce were listed in a privilege log and supplemental privilege log that were attached to Mr. Sticht's Supplement to Petitioners' Motion for Court Order Permitting Department of Treasury to Disclose Information Pursuant to Privacy Act and Response to Objections to Notice of Deposition filed Apr. 8, 1996.

motion attaching thereto any documents alleged to be privileged for in camera inspection.  However, on May 6, 1996, Mr. Sticht filed an objection to Mr. Izen's motion, arguing that it would be inappropriate and potentially harmful to petitioners' cases for the Court to review respondent's documents before the evidentiary hearing, and that Mr. Izen's motion violated a private agreement between Messrs. Izen and Sticht concerning discovery matters. Mr. Sticht further stated that he could not support Mr. Izen's motion insofar as it pertained to Messrs. Thompson, DeCastro, and Huestis, without a privilege log describing the documents in dispute.

On May 6, 1996, the Court issued an order amending its prior order directing respondent, Mr. Thompson, and Mr. DeCastro to submit documents to the Court for in camera inspection.  On May 9, 1996, the Court issued an order directing Messrs. DeCastro and Huestis to appear at the call of the calendar at the commencement of the evidentiary hearing and file with the Court written responses to Mr. Izen's motion to compel and privilege logs describing any disputed documents.  Messrs. DeCastro and Huestis complied with the Court's order.  In addition, Mr. Huestis filed motions to quash trial subpoenas duces tecum that Mr. Sticht had served on Messrs. Thompson and Huestis.

On May 15, 1996, pursuant to the Court's directive and in response to trial subpoenas duces tecum that Mr. Sticht had served on Mr. Huestis and Mr. Thompson, Mr. Huestis filed a response, attaching thereto a privilege log.  On May 17, 1996,

Mr. Huestis filed a supplemental privilege log.  On May 24, 1996, following an in camera review of the documents that Mr. Huestis claimed were privileged, the Court ruled that the majority of the documents in question were not protected from disclosure.  In response to the Court's ruling, Mr. Huestis made an oral motion for a protective order on behalf of Mr. Thompson requesting that the parties maintain the confidentiality of all documents identified in Mr. Huestis' privilege logs.  On June 10, 1996, the Court issued an order granting Mr. Huestis' oral motion for protective order.  In particular, the Court placed under seal Exhibits 943-AMD through 975-ANJ, 978-ANM, and 979-ANN, and directed the parties to maintain the confidentiality of the documents.  By order dated June 26, 1996, the Court placed additional exhibits under seal, including Exhibits 995-ANO through 1015-AOI and 1018.  The Court's order also placed under seal a relevance memorandum filed by Mr. Sticht on June 24, 1996. The Court indicated that the affected parties would be given notice and an opportunity to respond before the Court lifted its protective orders with respect to these documents.[75]

K.    Burden of Proof and Rule 145 Order

By order dated May 2, 1996, the Court announced that it would defer ruling on assignment of the burden of proof and

---

[75]  By order dated Aug. 27, 1998, the Court directed the parties to file reports with the Court stating in detail any objection to the lifting of the Court's protective orders.  As discussed in greater detail below, the Court will lift its protective orders dated June 10 and 26, 1996.

standard of proof to be applied with respect to the evidentiary hearing. Nevertheless, the Court prescribed a structure for the orderly presentation of witnesses at the evidentiary hearing. In particular, consistent with the Court's view that respondent was in the best position in the first instance to present the Court with the facts critical to an understanding of the misconduct of respondent's attorneys in the trial of the test cases, the Court directed that respondent's case would be put on first. Respondent's witnesses were to be called to testify in turn, subjected to direct examination by respondent, and then passed to Mr. Sticht, Mr. Izen, and Mr. Jones, respectively, for additional direct or cross-examination.[76] Following the examination of respondent's witnesses, Mr. Sticht's remaining witnesses would be called to testify in turn, subjected to direct examination by Mr. Sticht, and then passed to respondent, Mr. Izen, and Mr. Jones, respectively, for additional direct or cross-examination. This process would be repeated for Mr. Izen's and Mr. Jones' witnesses.

In the same order, the Court invoked Rule 145, which provides that, on the Court's own motion, the Court may order witnesses excluded from the courtroom so that they cannot hear

---

[76] Because each of the parties listed many of the same witnesses in their trial memoranda, the Court ruled that those witnesses would be subjected to direct examination by each party's counsel who had listed the witness in his trial memorandum, regardless of the order in which the witness was passed to the party.

the testimony of other witnesses.[77]  The Court further directed that any witness testifying at the evidentiary hearing would be precluded from discussing his or her testimony with any other witness or providing any other witness with a transcript of his testimony.

II.  The Evidentiary Hearing

The evidentiary hearing in these cases was conducted in Los Angeles on May 13 to 30, 1996, June 10 to 26, 1996, and August 18, 1997.  The Court heard testimony from 29 witnesses during the evidentiary hearing and received approximately 500 exhibits.  The transcripts of the proceedings consist of more than 6,700 pages.  In addition, between May 13, 1996, and October 6, 1997, the parties filed with the Court a stipulation of facts and first through sixth supplemental stipulations of facts.

---

[77]  Rule 145(a) is designed to prevent witnesses from tailoring their testimony to that of prior witnesses and to minimize altered testimony.  See Thompson v. Commissioner, 92 T.C. 486, 494 (1989).

A.    Testimony[78]

    1.    Mr. Cravens

Mr. Cravens appeared at the evidentiary hearing and confirmed and expressly adopted every aspect of his prior testimony at the Dixon II trial.  Mr. Cravens testified that he did not intend to have a secret settlement, that he did not change his testimony at the original trial even though he had settled his case, that he would not have "sold out" the other pilots for money or a greater settlement offer, and that he had no disputes with Mr. Kersting when he testified at the original trial.  Mr. Cravens testified that his testimony at the trial of the test cases was incomplete insofar as he had failed to testify that he believed that the promissory notes that he had signed were valid and enforceable.

Mr. Cravens testified that he did not keep the fact that he had settled his case a secret before the trial of the test cases. He discussed his settlement with Mr. Kersting several times

_____

[78]  The following summaries of the testimony of various witnesses at the evidentiary hearing are provided for the sake of convenience and are not part of the Court's findings of fact. Also, these summaries do not cover the testimony of all witnesses who testified at the evidentiary hearing.

On the basis of our observations at trial and our review of the record, we conclude that the testimony of Messrs. Sims and McWade lacks credibility, particularly their testimony regarding the reasons for and circumstances surrounding the Thompson and Cravens settlements and the Alexander understanding. Mr. Alexander's testimony lacks credibility because of its evasiveness, particularly his misleading response at the original trial concerning his understanding with Mr. McWade regarding reduction of the Alexanders' tax liabilities.  See supra note 58.

before the trial. Mr. Kersting was concerned that Mr. Cravens' settlement would affect his testimony. Mr. Cravens told Mr. DeCastro that he was representing himself at the trial because he had settled and did not need to incur the legal expense. Mr. Cravens was uncertain whether he informed Mr. Izen of his settlement.

Mr. Cravens understood that he would testify at the trial of the test cases "that I sold the stock and received a profit off the stock, and * * * that I paid taxes on the sale of the stock." These are the two reasons he recalls being selected as a test case by Mr. Seery. Mr. Cravens assured Mr. Kersting that he was going to testify truthfully regardless of his settlement.

Between the time of his December 1986 settlement and the trial of the test cases in January 1989, Mr. Cravens received "reams of documents" relating to the trial that he paid no attention to and did not question. Before the trial of the test cases, Mr. Cravens did not know the identities of the remaining test case petitioners. Mr. Cravens had never met any of the other test case petitioners, and he never participated in any joint strategy sessions to prepare for trial. Mr. Cravens did not understand the difference between being a witness and allowing his case to serve as a test case.

Upon his arrival in Hawaii, Mr. Cravens met Mr. McWade in person for the first time. Until Mr. Cravens arrived at the trial, he was not sure of his exact role in the process, although he believed that his testimony would be very important to the

outcome.  Mr. Cravens became surprised and suspicious when Mr. McWade told him that he would receive a refund of the money he had paid pursuant to his settlement if the petitioners in test cases prevailed at trial.  Mr. Cravens was not prepared for this "change" in his settlement.  Mr. Cravens asked Mr. McWade about the change, but did not get a satisfactory answer.  Mr. Cravens had the impression that Mr. McWade did not want to discuss the subject.  Mr. Cravens denied that he had an added incentive to testify at the trial because he was told he could get his money back if the taxpayers won.  He thought that all he could do was testify truthfully to the matters that had caused his case to be selected as a test case.

Mr. Cravens recalled that Mr. DeCastro's demeanor outside the courtroom was "very anti-taxpayer * * * at least Kersting taxpayers."  Mr. Cravens had lunch with Mr. McWade and a group of other persons before testifying at the trial of the test cases. The group did not discuss Mr. Cravens' testimony during lunch. After lunch, Mr. McWade informed Mr. Cravens that he would have to make a statement to the Court because he was not represented by an attorney who could ask him questions.  Mr. McWade did not tell Mr. Cravens what to say in his statement to the Court, or how to respond to Mr. McWade's questions.

2.  Mr. Thompson

Mr. Thompson appeared at the evidentiary hearing and testified that he retained Mr. DeCastro to negotiate a settlement in his tax cases and that it was his understanding in December

1986 that his cases were settled for a fixed amount although he would receive a refund if the test case petitioners prevailed at trial. Mr. Thompson further testified that, by virtue of his settlement, he had informed Mr. DeCastro that he would not pay attorney's fees for representation at the trial of the test cases.

Mr. Thompson testified that the testimony that he provided at the trial of the test cases was completely truthful, that his testimony was not coached by either Mr. DeCastro or Mr. McWade, and that he wanted to testify in part to influence Mr. Kersting to withdraw his threats. Mr. Thompson testified that the $80,000 Bauspar loss that he mentioned in his testimony at the trial of the test cases was not an out-of-pocket loss but the loss of the returns he expected as a result of his participation in the Bauspar program.

### 3. Mr. Alexander

Mr. Alexander appeared at the evidentiary hearing only after Mr. Sticht made several unsuccessful attempts to serve him with a subpoena. Mr. Alexander's credibility as a witness at the evidentiary hearing was severely impaired by his evasive testimony and total lack of recall of the circumstances that led to the decisions eliminating his tax liabilities for 1974, 1975, 1976, and 1977. Mr. Alexander testified that he did not receive a "finder's fee" for the information or assistance that he provided to Mr. McWade during the trial of the test cases, nor would he admit that he had arrived at an understanding with

Mr. McWade for any reduction of the tax liabilities on his joint returns for the years 1974, 1975, 1976, and 1977.

4.  Mr. McWade

Mr. McWade appeared at the evidentiary hearing and testified that, when settlement discussions first arose in the Thompson and Cravens cases, he believed he had a problem with conflicting Government policies. In particular, Mr. McWade testified that while he was obliged by Internal Revenue Service policy to treat similarly situated taxpayers alike, the Internal Revenue Service also had a policy against settling test cases.[79] Mr. McWade did not confer with anyone in the National Office or the Regional Counsel's office regarding resolution of the conflict that he perceived; Mr. Sims was the only person with whom Mr. McWade discussed the alleged conflicting policies. Mr. McWade did not feel any obligation to coordinate the Thompson settlement arrangement with the National Office or Regional Counsel because he had discussed the arrangements with Mr. Sims.

Mr. McWade testified that the Thompson settlement was revised in the summer of 1989 in order to dispose of the Bauspar issue. Mr. McWade denied that the Thompson settlement was revised to provide a means for the Thompsons to pay Mr. DeCastro's attorney's fees.

---

[79] Contrary to Mr. McWade's testimony, we found that the Internal Revenue Service did not maintain a policy prohibiting the settlement of a test case. See supra p. 76.

Mr. McWade initially testified that he informed Messrs. Dombrowski and Hatfield about the Thompson and Cravens settlement agreements before the trial of the test cases. However, Mr. McWade later testified that he may have not informed Messrs. Dombrowski and Hatfield of the agreements. Mr. McWade testified that he had no recollection that he had informed Mr. O'Neill about the Thompson and Cravens settlement agreements.[80]

Mr. McWade denied offering Mr. Alexander any inducements to either cooperate with the Government or testify at the trial of the test cases. Mr. McWade acknowledged that Mr. Alexander provided assistance to him in understanding certain aspects of the Kersting programs during the trial of the test cases. Mr. McWade did not provide the Court with any credible explanation or justification of the decisions entered in the Alexander cases for the taxable years 1974 through 1977, which completely wiped out the deficiencies previously determined on the statutory notices.[81]

Mr. McWade denied that Mr. DeCastro passed information to him regarding Mr. Izen's trial strategy or that Mr. DeCastro

---

[80] Messrs. Dombrowski, Hatfield, and O'Neill denied having any knowledge of the Thompson and Cravens settlements before their discovery in 1992.

[81] Contrary to the Court's Dixon II opinion, the decisions in the Alexander cases for 1974 and 1975 reflected overpayments of $2,133 and $811, respectively, while the decisions in the Alexander cases for 1976 and 1977 reflected no deficiencies. See supra pp. 112-115.

otherwise acted as a "mole" or "plant" for respondent with respect to the Kersting test cases.

5.   Mr. Sims

Mr. Sims testified that he approved the Thompson and Cravens settlements with the understanding that he would do his best to process the proposed decisions but that he did not guarantee the outcome.  Mr. Sims testified that Mr. McWade's letters to Mr. DeCastro stating that the decisions would be filed with the Court later indicate that Mr. McWade misunderstood Mr. Sims' intentions.  Mr. Sims further testified that decisions could not be entered in the Thompson and Cravens cases before the trial of the test cases out of concern that taxpayers who had signed piggyback agreements would argue that they were entitled to similar settlements.  Mr. Sims characterized as an oversight his approval of Mr. McWade's decision to forward decision documents to the Cravenses for their signature 1 month before trial of the test cases.

With regard to the Thompson settlement, Mr. Sims testified that he felt it was important to keep Mr. DeCastro in the case because, unlike Mr. Izen, Mr. DeCastro was not being paid by Mr. Kersting.  However, Mr. Sims testified that he was aware, as early as December 1986, that Mr. DeCastro did not believe that Kersting interest deductions could be defended in court. Mr. Sims further testified that he felt sympathy for Mr. Thompson because of Mr. Kersting's threats and that he suggested that Mr. Thompson's participation in the Bauspar program could be used

to offset or reduce the Thompsons' tax liability. Mr. Sims was unable to confirm that he reviewed Mr. Thompson's Bauspar records as a basis for revising the Thompson settlement agreement. Mr. Sims testified that he and Mr. McWade had reached an agreement in principle with Mr. DeCastro before the trial of the test cases to further reduce the Thompsons' tax liabilities.

Mr. Sims testified that he did not know the basis upon which the Alexander cases were settled and that he never discussed the settlements with either Mr. McWade or Mr. Alexander.

Mr. Sims denied that Mr. DeCastro passed information to the Government regarding Mr. Izen's trial strategy or that Mr. DeCastro otherwise acted as a "mole" or "plant" for respondent with respect to the Kersting test cases.

6. Mr. DeCastro

Mr. DeCastro testified that the settlement agreement that he negotiated with Mr. McWade assured the Thompsons of the better of the pretrial settlement or the outcome in the trial of the test cases and that the agreement was not contingent on Mr. Sims' best efforts.

Mr. DeCastro testified that the final revision to the Thompson settlement was agreed to before the trial of the test cases, that the revision was made to account for the attorney's fees that Mr. Thompson would incur in the trial of the test cases, and that Mr. Thompson's participation in the Bauspar program was not the basis for the revision.

Mr. DeCastro testified that Mr. McWade considered various elements in negotiating settlements in Kersting cases, including the level of the taxpayer's participation in the Kersting programs and whether the taxpayer had escaped liability in other years by virtue of the expiration of the period of limitations.

Mr. DeCastro denied passing any information to Messrs. McWade or Sims regarding Mr. Izen's trial strategy or that he otherwise acted as a "mole" or "plant" for respondent with respect to the Kersting test cases.

7. Mr. Izen

Mr. Izen was the first witness to testify at the evidentiary hearing.

Mr. Izen testified that he had several discussions with Mr. DeCastro, beginning with Mr. Kersting's deposition in October 1988 through the eve of the trial of the test cases, during which he revealed his trial strategy to Mr. DeCastro. Mr. Izen testified that he attempted to "enlighten" Mr. DeCastro, who was openly pessimistic regarding the chances for success in the trial of the test cases.

Mr. Izen testified that Mr. DeCastro was upset on the eve of trial of the test cases that all documentation needed to support the test case petitioners' position had not been made available to petitioners. Mr. Izen testified that he did not serve a subpoena on Mr. Kersting before the trial of the test cases because he had relied upon the subpoena that Mr. McWade had served on Mr. Kersting.

Mr. Izen testified that he met Mr. DeCastro, with Mr. Hongsermeier and Mr. Bradt, in a hotel room on the eve of trial of the test cases. Mr. Izen testified that he discussed confidential matters with Mr. Hongsermeier in Mr. DeCastro's presence that he would not have revealed to Mr. DeCastro had he known of the settlement that Mr. DeCastro had negotiated on behalf of the Thompsons. Mr. Izen testified that he was aware that respondent planned to rely on the so-called comfort letters at the trial of the test cases, inasmuch as some of the letters were included in stipulations of fact filed with the Court, and that he informed Mr. DeCastro that he would offer evidence of collection actions brought by various Kersting companies against Kersting program participants to counter the comfort letters.

Mr. Izen testified that Mr. DeCastro grabbed notes out of his hand during the trial of the test cases, that Mr. DeCastro was in a position to overhear Mr. Izen's conversations with his witnesses during the trial of the test cases, and that Mr. Izen observed Mr. DeCastro conducting a "private" conversation with Mr. McWade during the trial of the test cases. Mr. Izen testified that his allegations in oral argument before the Court of Appeals for the Ninth Circuit in the DuFresne appeal that Mr. DeCastro was a "mole" or "plant" for respondent during the trial of the test cases were not based upon personal knowledge but that Mr. Izen only wanted the opportunity to prove the point. Mr. Izen did not provide any further evidence that Mr. DeCastro

was a mole or plant who passed Mr. Izen's trial strategy to Messrs. Sims or McWade.

Mr. Izen denied having personal knowledge, at the time that Messrs. Thompson and Cravens testified at the trial of the test cases, that Messrs. Thompson and Cravens had entered into settlement agreements with Mr. McWade.

B.    Mr. Sticht's Allegations of Potential Witness Intimidation

During the evidentiary hearing, following the testimony of Lois Fisher (Ms. Fisher) on June 12, 1996, Mr. Sticht made the following statement to the Court:

> But if there's any intention to obstruct or interfere with the presentation of any of my clients' cases in this trial, in this courtroom, or even to interfere with their presentation by outside harassment, intimidation or other means that are normally used to influence or attempt to influence the independent presentation of the case in any trial, and I want to go on record today, stating that I reserve the right to revisit this day in much the same way that has been alleged in the past with respect to the 1989 trial.

> *    *    *    *    *    *    *

> So, I will also state to the Court, along these lines, and I use Ms. Fisher as the segue to this final point, that at least two, possibly three of my clients, have received what I believe are properly characterized as potential intimidation for their presentation of this case.  Now, that is something I'm going to leave at that point, without specifics and details, today.

Following Mr. Sticht's remarks, the Court stated that, while the Court would respect Mr. Sticht's request not to pursue the matter immediately, Mr. Sticht was "obligated to put it to rest or to present it in a way that will enable it to be resolved".

Mr. Sticht did not return to the subject of potential witness

intimidation during the remainder of the evidentiary hearing, which, as described below, eventually led to a further evidentiary hearing held on August 18, 1997.

C.   Mr. Bradt's June 12, 1996, Letter to Mr. Kersting

Mr. Bradt first testified at the evidentiary hearing on June 10, 1996.  Mr. Bradt testified that he had no direct knowledge that Mr. DeCastro passed Mr. Izen's trial strategy to Mr. McWade, but that he suspected the same by virtue of Mr. McWade's opposition to Mr. Izen's efforts to introduce evidence concerning collection litigation through Mr. Moseley. See supra pp. 135-136.

Mr. Jones recalled Mr. Bradt to testify on June 14, 1996, for the purpose of rebutting testimony by Mr. O'Neill on the propriety of the summons issued by respondent to Mr. Kersting in 1987.  During Mr. Sticht's examination of Mr. Bradt, Mr. Sticht offered into evidence a one-page facsimile of a letter that Mr. Bradt had sent Mr. Kersting in Hawaii at 10:15 a.m. on June 12, 1996, which apparently was then inadvertently forwarded by Mr. Kersting's secretary to Mr. Sticht's office in Los Angeles at 10:52 a.m. on the same day.  Mr. Bradt's letter includes a discussion of testimony presented by Mr. Sticht's witness, Ms. Fisher, on June 10 and 11, 1996, and testimony presented by Mr. O'Neill.  Mr. Bradt's letter refers to a letter that Mr. Sticht wrote to Ms. Fisher.  Mr. Bradt's letter also includes disparaging remarks regarding Mr. Sticht's trial strategy and tactics.

Mr. Bradt asserted that his letter to Mr. Kersting was subject to the attorney-client privilege.  Mr. Bradt declined to disclose how he had obtained a copy of Mr. Sticht's letter to Ms. Fisher.

Pursuant to the Court's order excluding witnesses from the courtroom, Mr. Bradt had not been in the courtroom when either Ms. Fisher or Mr. O'Neill had testified.[82] Mr. Izen admitted that he had disclosed Ms. Fisher's testimony to Mr. Bradt so that he could prepare Mr. Kersting to testify in rebuttal of Ms. Fisher's testimony.  Similarly, Mr. Jones admitted that he had disclosed Mr. O'Neill's testimony to Mr. Bradt in order to prepare Mr. Bradt to testify in rebuttal.  Mr. Sticht suggested that Mr. Bradt's letter would tend to inflame Mr. Kersting against Ms. Fisher.[83]

---

[82]  The Court had ruled that Mr. Bradt would not be allowed in the courtroom until Mr. Kersting had testified.

[83]  Mr. Sticht's receipt and disclosure to the Court of Mr. Bradt's letter to Mr. Kersting raise interesting questions concerning the professional responsibilities of attorneys. Compare Committee on Professional Responsibility, Ethical Obligations Arising Out of an Attorney's Receipt of Inadvertently Disclosed Information, 50 The Record of the Association of the Bar of the City of New York 660 (1995), with Committee on Professional Responsibility, The Attorney's Duties to Report the Misconduct of Other Attorneys and to Report Fraud on a Tribunal, 47 The Record of the Association of the Bar of the City of New York 905 (1992).  The disclosures by Messrs. Izen and Jones that were prompted by the introduction of Mr. Bradt's letter also raise questions of possible conflict between the operation of Rule 145 and the need to prepare a witness to testify and bring documents in response to a subpoena duces tecum.  Compare Berry Petroleum Co. v. Commissioner, 104 T.C. 584, 609-611 (1995), affd. on other issues without published opinion 142 F.3d 442 (9th Cir. 1998), with Smith v. Commissioner, 92 T.C. 1349 (1989), and
(continued...)

D.    Denial of Mr. Izen's Motion To Refer Thompson and Cravens
      Settlements and Alexander Agreement to Department of Justice
      (Public Integrity Section)

On June 26, 1996, Mr. Izen filed a Motion to Refer the

Thompson and Cravens Settlements and the Alexander Agreement to

the Department of Justice (Public Integrity Section) for

prosecution.  Mr. Izen identified approximately 17 alleged crimes

associated with the Thompson and Cravens settlements and the

Alexander understanding and asked the Court to refer those

matters to the Department of Justice for prosecution.  By order

dated June 26, 1996, the Court denied Mr. Izen's motion.

III. Developments Following Initial Evidentiary Hearing

A.    Denial of Respondent's Motion for Further Hearing Regarding
      Potential Witness Intimidation

On October 28, 1996, after completion of the bulk of the

evidentiary hearing, respondent filed a motion to take additional

evidence concerning Mr. Sticht's unresolved allegations at the

evidentiary hearing of potential witness intimidation.  During

this same period, the parties filed with the Court third, fourth,

and fifth supplemental stipulations of facts that did not comply

with the Court's Rules concerning stipulations and amounted to

little more than a proffer of documents subject to an extensive

list of objections.

---

[83](...continued)
Thompson v. Commissioner, 92 T.C. 486 (1989).  None of these
questions have been resolved; they became moot with respect to
Mr. Kersting and Mr. Bradt by reason of Mr. Kersting's failure to
testify at the evidentiary hearing.

In a response to respondent's motion, Mr. Sticht alleged (and the record now shows) that Mr. Sticht's clients received unsolicited phone calls and written communications from Mr. Kersting and from Joseph A. Peterman (Mr. Peterman), a Kersting program participant and nontest case petitioner,[84] throughout these proceedings encouraging them to ask Mr. Sticht to cooperate and otherwise present a unified case with the test case and nontest case petitioners represented by Messrs. Izen and Jones, promising financial assistance in the form of disbursements from a "legal defense fund" in exchange for such cooperation, and ridiculing Mr. Sticht's representation of his clients.[85]

On January 30, 1997, the Court issued an order denying respondent's motion.  Although the Court expressed concern over Mr. Sticht's allegations, the Court was not persuaded that the activities in question satisfied the legal definition of witness intimidation.  See, e.g., <u>Griffith v. Commissioner</u>, T.C. Memo.

---

[84]  Mr. Peterman currently has eight cases docketed with the Court all of which appear to involve Kersting adjustments: docket Nos. 1676-84, 36324-85, 19467-86, 23493-90, 12628-91, 7155-92, 15005-93, and 3029-94.  Mr. Peterman executed piggyback agreements in the first five dockets listed above.

[85]  Mr. Kersting's various letters to Mr. Sticht's clients are included within the exhibits associated with the parties' fourth supplemental stipulations of facts, filed Nov. 27, 1996.

On Aug. 11 and Aug. 18, 1997, Mr. Sticht filed a  Status Report and a First Supplemental Status Report, respectively, attaching thereto copies of letters, some of which contain obscene and inflammatory statements, that Mr. Peterman had sent to Mr. Sticht and his clients.

1988-123; see also United States v. Thompson, 76 F.3d 442, 452-453 (2d Cir. 1996); United States v. Elwell, 984 F.2d 1289, 1293-1294 (1st Cir. 1993). Nevertheless, the Court directed Mr. Sticht to file a report with the Court identifying any of his witnesses who may have declined to testify at the evidentiary hearing, including a brief summary of the testimony that such witnesses were expected to provide, with a view to arriving at an agreement among the parties to stipulate such testimony or, if that should not be possible, to having a further hearing to receive such testimony. The Court further directed the parties to cooperate in the elimination of the various objections associated with the fourth and fifth supplemental stipulations of facts.

Mr. Sticht subsequently filed a report with the Court identifying Mr. Kersting, Richard B. Rogers (Mr. Rogers), and JoAnne Rinaldi (Ms. Rinaldi) as persons who were scheduled to, but did not, testify at the evidentiary hearing and providing a summary of the testimony expected from each witness. At approximately the same time, respondent filed a response with the Court stating that the parties were unable to eliminate many of the objections raised with respect to the documents attached to the parties' fourth and fifth supplemental stipulations of facts.

With a view to completing the record in these cases, the Court ordered a further evidentiary hearing for the purpose of receiving the testimony of Mr. Kersting and Ms. Rinaldi. It was hoped that Mr. Kersting's testimony would eliminate some or all

of the parties' objections to the documents attached to the parties' fourth and fifth stipulations of fact, and that having Ms. Rinaldi testify would complete the record insofar as she might have declined to testify at the initial evidentiary hearing because of perceived intimidation.  However, the Court rejected Mr. Sticht's request to call Mr. Rogers to testify on the grounds that:  (1) Mr. Rogers' testimony was not related to the documents attached to the parties' fourth and fifth stipulations of fact; (2) there was no indication that Mr. Rogers had declined to testify during the initial evidentiary hearing because of perceived intimidation;[86] and (3) Mr. Sticht's proffer of Mr. Rogers' testimony revealed that the testimony, which primarily concerned the First Savings acquisition, would amount to an attempt to retry the Dixon test cases on the merits or would concern a transaction that was not in issue in the trial of the test cases.

B.    Supplemental Evidentiary Hearing (August 18, 1997)

On July 24, 1997, Mr. Kersting filed a Motion for Protection or to Quash asserting that the supplemental evidentiary hearing and production of the documents identified in the subpoena that Mr. Sticht had served on him in May 1996 (before the initial evidentiary hearing) would amount to an attempt to retry the

_____

[86]   On June 17, 1997, at the initial evidentiary hearing, Mr. Sticht stated on the record that he was reconsidering whether Mr. Rogers' testimony was necessary in light of other evidence already in the record.

test cases.  By order dated July 25, 1997, the Court denied Mr. Kersting's motion as moot on the ground that Mr. Sticht's subpoena had expired on June 26, 1996--the date of adjournment of the original evidentiary hearing.

Mr. Sticht was unable to locate Mr. Kersting for purposes of service of a new subpoena directing him to appear and testify at the evidentiary hearing.  Nevertheless, on August 7, 1997, Mr. Kersting filed a Second Motion for Protection or to Quash Subpoena asserting that he was too ill to travel from Hawaii to Los Angeles for the evidentiary hearing because of recent cancer surgery.  Because Mr. Kersting did not appear at the supplemental evidentiary hearing, the Court later denied Mr. Kersting's motion as moot.

On August 18, 1997, the Court conducted a supplemental evidentiary hearing in these cases in Los Angeles.  Ms. Rinaldi was the sole witness at the supplemental evidentiary hearing. Ms. Rinaldi testified that she participated in the Kersting programs during the taxable years 1980 and 1983-91 with her husband, a flight engineer for American Airlines, with a view towards profiting as a stock holder and for the tax benefits.[87] Ms. Rinaldi testified that she believed that Kersting promissory notes were enforceable against her.  Ms. Rinaldi testified that she relied upon and was assured by the various "Dear Friend" letters that Mr. Kersting sent to her during the period 1981 to

_____

[87]  Ms. Rinaldi testified that she legally separated from her husband in 1994.

1992.  Ms. Rinaldi did not consult with a certified public accountant regarding her tax liability until after the Court released its opinion in Dixon II.

C.   Denial of Mr. Izen's Motion To Compel Production of Documents

On August 29, 1997, Mr. Izen submitted to the Court a document that the Court filed as a supplement to Mr. Izen's motion to compel filed April 26, 1996.  Relying on a recent case, In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910 (8th Cir. 1997), Mr. Izen argued that respondent could not rely upon the attorney-client privilege, executive privilege, or the attorney work product doctrine in these cases as bases for refusing to disclose documents.

By order dated September 4, 1997, the Court denied Mr. Izen's motion to compel.  The Court denied Mr. Izen's motion as moot insofar as Mr. Izen sought to compel the testimony of Messrs. Thompson, DeCastro, Sims, and McWade, and to compel Messrs. Thompson and DeCastro to produce documents.  In so ruling, the Court noted that Mr. Thompson had waived the attorney-client privilege, produced the documents requested in discovery, and testified at the evidentiary hearing.   In addition, the Court had heard testimony from Messrs. DeCastro, Sims, McWade, and additional Government witnesses.  Further, the Court denied Mr. Izen's motion insofar as Mr. Izen moved to compel respondent to produce documents.  Specifically, although the Court declined to decide whether the admitted Government

misconduct in the presentation and trial of the test cases in Dixon v. Commissioner, docket No. 9382-83, et al., amounted to fraudulent or criminal conduct, the Court did conclude that the disputed documents did not contain material subject to the crime-fraud exception, i.e., legal advice obtained in the furtherance or in aid of a future fraudulent scheme or criminal activity. Moreover, the Court rejected Mr. Izen's contention that respondent's activities since May 1992 amounted to an effort to "cover up" what Mr. Izen alleged to be fraudulent or criminal conduct. On the basis of a review of respondent's privilege log and supplemental privilege log, the Court held that the documents described therein qualified for protection from disclosure pursuant to the corresponding privilege(s) relied upon by respondent.

D.  Denial of Mr. Sticht's Motion To Reopen Record

On October 10, 1997, Mr. Sticht filed a Motion to Reopen the Record seeking to submit to the Court a written offer of proof comprising a written declaration by Mr. Rogers, a nontest case petitioner, along with numerous documents that purport to describe some connection or link between the series of transactions underlying Mr. Rogers' participation in the First Savings acquisition and his related participation in the Investors Financial stock purchase plan. Mr. Sticht's motion included allegations that Messrs. Thompson, Alexander, DeCastro, Kozak, and McWade compromised the trial of the test cases "by

making an incomplete an inaccurate presentation" of the First
Savings acquisition.[88]

By order dated November 24, 1997, the Court denied
Mr. Sticht's motion on the ground that the materials that
Mr. Sticht was seeking to submit to the Court should have been
offered into evidence during the initial evidentiary hearing in
May and June 1996, where all of the implicated parties had been
called to testify.  Insofar as Mr. Sticht was arguing that there
was a meaningful link or connection between the First Savings
acquisition and the Investors Financial stock purchase plan, the
Court further observed that the First Savings acquisition was not
among the Kersting programs at issue in the trial of the test
cases, and that petitioners' theory of a link between the two
transactions would be ripe for consideration only if respondent
were to move for entry of decision based in part on adjustments
attributable to the First Savings acquisition.

E.   Denial of Mr. Izen's Motion To Take Judicial Notice

On April 9, 1998, Mr. Izen filed a Motion to Take Judicial
Notice, asserting that the Court is obliged by rule 201 of the
Federal Rules of Evidence to take notice that the Hawaii District

---

[88]   The bulk of the testimony presented at the trial of the
test cases concerning the First Savings acquisition was offered
by Messrs. Kersting and Alexander.  Although their testimony
concerning the transaction generally was consistent, the Court in
Dixon II apparently accepted Mr. Alexander's testimony that
Federal regulators rejected Investors Financial as a holding
company for First Savings despite Mr. Kersting's testimony to the
contrary.  See Dixon II, 62 T.C.M. (CCH) at 1447, 1991 T.C.M.
(RIA), at 91-2987.

Court held that "the note indebtedness involved in the present case (tried previously before Judge Goffe) is legally viable and collectible under Hawaii state law." By order dated April 14, 1998, the Court indicated that Mr. Izen's motion would be decided in the Court's opinion in these cases.

On November 2, 1998, Mr. Izen filed a Petition for Mandamus with the Court of Appeals for the Ninth Circuit for a writ of mandamus directing this Court to grant Mr. Izen's Motion to Take Judicial Notice. By order filed December 16, 1998, the Court of Appeals denied Mr. Izen's petition.

All materials attached to Mr. Izen's motion, which concern Kersting program participant Carl Mott,[89] were received in evidence at the trial of the test cases and considered by Judge Goffe in Dixon II. See discussion of collection cases supra pp. 72-74. Mr. Izen's motion, which amounts to another attempt to retry matters previously decided in Dixon II, goes beyond the scope of the mandate of the Court of Appeals in its remand of these cases and will be denied.

---

[89] Mr. Izen's continued reliance on the collection litigation concerning Carl Mott indicates that Mr. Izen regards the collection litigation as a complete rebuttal to all evidence in the record that Mr. Kersting and program participants did not intend or expect that promissory notes would be enforced in accordance with their purported terms. In so doing, Mr. Izen ignores the Court's conclusion in Dixon II, 62 T.C.M. (CCH) at 1505-1506, 1991 T.C.M. (RIA), at 91-3048 to 91-3050, that, even if an obligation to pay leverage loan "interest" were enforceable, it would properly be characterized as a nondeductible "fee" for creating tax deductions rather than as "interest".

F.   Denial of Mr. Sticht's Motions for Release From Piggyback Agreements

On June 9, 1998, Mr. Sticht filed Motions for Release from Piggyback Agreement on behalf of nontest case petitioners Richard B. and Donna G. Rogers, Anthony E. and Carol A. Eggers, and John L. and Terry E. Huber.  Mr. Sticht contends that Mr. Seery's apparent conflict of interest, at a time when Mr. Seery represented the Rogerses, the Eggerses, and the Hubers, provides an independent basis for releasing nontest case petitioners from their piggyback agreements.  In the alternative, Mr. Sticht contends, in light of respondent's misconduct in the trial of the test cases, that the Court should conclude that respondent did not comply with the terms of the piggyback agreements.

On June 9, 1998, Mr. Sticht filed a Motion to Sever Case and for Entry of Decision; Or Alternatively to Sever Case and Set for Trial on behalf of Joe A. and JoAnne Rinaldi in docket No. 7205-94.  The Rinaldis' case at docket No. 7205-94 concerns the Rinaldis' tax liabilities for 1990 and 1991 and is based upon a notice of deficiency issued after the disclosure of the misconduct in the trial of the test cases.  Because the Rinaldis did not sign a piggyback agreement in docket No. 7205-94, Mr. Sticht contends that the Court's opinion in Dixon II does not bind the Rinaldis.  Mr. Sticht contends, relying upon the misconduct of respondent's attorneys in the trial of the test cases, that the Court should either enter a decision in the

Rinaldis' favor or sever the Rinaldis' case from the consolidated cases and set the case for trial.

On July 7, 1998, respondent filed objections to Mr. Sticht's motions. Respondent contends that the validity of the piggyback agreements in dispute is not affected by either events occurring during the trial of the test cases or Mr. Seery's alleged conflict of interest.

On July 10, 1998, Mr. Jones filed an opposition to Mr. Sticht's motions asserting that it would be premature to grant the motions.[90]

As discussed in greater detail <u>infra</u> pp. 284-295 and pp. 300-302, we will deny Mr. Sticht's motions.

G.    <u>Reports Regarding the Court's Protective Orders</u>

By order dated August 27, 1998, the Court directed Messrs. Huestis and Sticht to file reports with the Court detailing any objection to the lifting of the Court's protective orders dated June 10 and 26, 1996. Mr. Huestis filed a report with the Court objecting to the lifting of the Court's protective orders on the ground that Mr. Kersting might attempt to use the records in question to harass the Thompsons. Mr. Sticht and respondent filed separate reports with the Court indicating no objection to the lifting of the protective orders. As discussed

---

[90] On July 20, 1998, Mr. Sticht filed a Motion to Strike allegedly scandalous and impertinent matters from Mr. Jones' opposition. On Aug. 6, 1998, the Court denied Mr. Sticht's motion to strike.

in greater detail <u>infra</u> pp. 302-305, we will lift the protective orders.

## ULTIMATE FINDINGS OF FACT

Messrs. Sims and McWade negotiated a series of contingent settlement agreements with Mr. DeCastro in respect of the Thompsons' tax liabilities in advance of the trial of the test cases. The final Thompson settlement agreement provided for a reduction in the Thompsons' tax liabilities for 1979, 1980, and 1981 for the purpose of generating refunds of tax and interest that were used to pay Mr. DeCastro's attorney's fees. The refunds actually made were more than sufficient for this purpose; the excess was received and retained by the Thompsons. The Thompson settlement was not based upon or influenced by the Thompsons' participation in the Bauspar program.

Messrs. Sims and McWade negotiated a contingent settlement agreement with Mr. Cravens in respect of the Cravenses' tax liabilities for 1979 and 1980 in advance of the trial of the test cases. Messrs. Sims and McWade misled Mr. Cravens as to the nature and legal effect of his settlement and the need for counsel at the trial of the test cases. In so doing, they foreclosed the possibility that the Cravenses would become clients of Chicoine and Hallett, and later, of Mr. Izen. They thereby reduced the effectiveness of Mr. Cravens' presentations to the Court from the point of view of all petitioners; the likelihood that Mr. Cravens would have informed counsel for test

case petitioners that his cases had been settled was also reduced.

Messrs. Sims and McWade were the only persons in the Honolulu District Counsel Office with knowledge of the Thompson and Cravens settlements before and during the trial of the test cases. Other than Mr. Stevens, no one else within the Internal Revenue Service was aware of the Thompson and Cravens settlements before or during the trial of the test cases through the times that the Court issued its Dixon II opinion and entered the initial decisions in the test cases.

Before the trial of the test cases, Mr. McWade intentionally misled the Court, with the complicity of Mr. DeCastro, by not disclosing the settlement of the Thompson cases when he moved to set aside the Thompson piggyback agreements. At the trial of the test cases, Messrs. Sims, McWade, and DeCastro intentionally misled the Court regarding the status of the Thompson cases by not disclosing the settlement of the Thompson cases. At the trial of the test cases, Messrs. Sims and McWade intentionally misled the Court in similar fashion regarding the settlement of the Cravens cases.

Mr. McWade allowed Mr. Alexander to offer misleading testimony to the Court during the trial of the test cases regarding his understanding that his tax liabilities would be reduced in exchange for providing assistance to Mr. McWade.

Mr. DeCastro did not act as a Government "mole" during the trial of the test cases or convey any of Mr. Izen's trial

strategies or confidential information to the Government.  Cf. Kersting v. United States, 865 F. Supp. at 671-674.

Mr. Izen had no knowledge, before and at the trial of the test cases through the times that the Court issued the Dixon II opinion and entered the initial decisions in the test cases, that Messrs. Thompson and Cravens had entered into settlement agreements with Mr. McWade.

OPINION

The Court of Appeals for the Ninth Circuit vacated this Court's decisions in Dixon II and remanded the test cases for an evidentiary hearing "to determine the full extent of the admitted wrong done by the government trial lawyers."  DuFresne v. Commissioner, 26 F.3d at 107.  The Court of Appeals, citing Arizona v. Fulminante, 499 U.S. at 309, directed the Court to consider "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the Government's misconduct, the judgment can be upheld as harmless error."  Id.  Further, the Court of Appeals directed the Court to consider on the merits all motions of intervention filed by parties affected by Dixon II.  See id. Pursuant to this last direction, the Court consolidated the cases of three groups of petitioners to allow them to participate in the evidentiary hearing:  Test case and nontest case petitioners represented by Mr. Izen, nontest case petitioners represented by Mr. Jones, and nontest case petitioners represented by Mr. Sticht.

While the parties have primarily addressed the specific issues posed by the mandate of the Court of Appeals, whether the Government misconduct constitutes a structural defect or harmless error, our analysis is not limited to these issues. At the inception of this proceeding, the Court raised the issue whether the Thompson and Cravens settlements share significant characteristics with improper "Mary Carter" agreements; Mr. Izen has consistently maintained throughout this proceeding that the Government misconduct amounted to fraud on the Court; and Mr. Sticht has asserted that nontest case petitioners were not only harmed by the Government misconduct, but also by Mr. Kersting's interference in the attorney-client relationships between test case petitioners and their counsel. In an effort to spread the blame, respondent has asked the Court to find that Mr. Izen, as well as Mr. Kersting, was aware of the Thompson and Cravens settlements at or before the trial of the test cases.

Before turning to our analysis of the foregoing issues, we will address the burden of proof in this proceeding.

I.    Burden of Proof

The Court deferred ruling on the parties' requests for assignment of the burden of proof and the fixing of the standard of proof for purposes of the evidentiary hearing. The Court nevertheless placed on respondent the initial burden of coming forward with evidence and prescribed a structure for the orderly presentation of witnesses at the evidentiary hearing.

The burden of proof consists of two burdens--the burden of production of evidence and the burden of persuasion. See Wigmore, Evidence in Trials at Common Law, secs. 2485 to 2488 (Chadbourn rev. 1981). Assignment of the burden of proof and fixing the standard of proof serve a procedural function by delineating the parties' obligations respecting the presentation of evidence at trial.

Although assignment of the burden of proof was not resolved before the evidentiary hearing, the Court is satisfied that the evidentiary hearing has produced a record that contains all relevant facts necessary for the Court to discharge its obligations under the mandate. The parties' versions of the facts as set forth in their respective proposed findings of fact generally are in accord,[91] with one immaterial exception discussed infra pp. 209-211. Consequently, from a purely procedural standpoint, assignment of the burden of proof and fixing the standard of proof are not necessary.

We likewise are convinced that assignment of the burden of proof is not necessary for the Court to decide whether the Sims-McWade misconduct resulted in a structural defect in the trial of the test cases. The structural defect question raises a legal

---

[91] In those instances where the parties have not agreed with respect to a particular fact, or the record does not clearly reflect the date of a particular event, the Court generally has adopted the finding of fact proposed by the test case and nontest case petitioners.

issue requiring the Court to apply a settled body of case law to essentially agreed facts.

In contrast, assignment of the burden of proof and fixing the standard of proof have greater substantive significance with respect to harmless error analysis.  As discussed in greater detail infra pp. 233-236, harmless error analysis ultimately requires the Court to consider whether the Sims-McWade misconduct affected the outcome in the trial of the test cases.  Because the assignment of the burden of proof, and particularly the standard of proof, could influence the outcome of the Court's harmless error analysis, we will decide the issue.

Proper placement of the burden of proof in these cases for purposes of the evidentiary hearing is not easily resolved and raises some perplexing questions.  Rule 142(a) provides the general rule that the burden of proof (or burden of persuasion) will be upon the taxpayer, except as otherwise provided by statute or determined by the Court.[92]  See Welch v. Helvering, 290 U.S. 111 (1933).  Normally, the taxpayer bears the initial burden of producing enough evidence to make a prima facie case; i.e., evidence to support a finding contrary to the Commissioner's determination.  See Rockwell v. Commissioner, 512

---

[92]  Under sec. 3001 of the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, 112 Stat. 726, Congress enacted new sec. 7491, which provides, effective with respect to examinations commenced after July 22, 1998, that the burden of proof shifts to the Commissioner when the taxpayer produces credible evidence in opposition to the Commissioner's determination of a deficiency and satisfies other requirements.

F.2d 882, 885 (9th Cir. 1975), affg. T.C. Memo. 1972-133.  Where the taxpayer succeeds in producing evidence supporting a finding contrary to the Commissioner's determination, the burden of production or burden of going forward with evidence shifts to the Commissioner.  See Bernuth v. Commissioner, 470 F.2d 710, 714 (2d Cir. 1972), affg. 57 T.C. 225 (1971).  The taxpayer nonetheless continues to bear the ultimate burden of persuasion.

There is a well-recognized exception to the normal placement of the burden of proof in cases where the Commissioner determines that the taxpayer is liable for an addition to tax for fraud.  In such cases, the Commissioner bears the burden of proving fraud by clear and convincing evidence.  See sec. 7454(a); Smith v. Commissioner, 91 T.C. 1049, 1053 n.3 (1988), affd. 926 F.2d 1470 (6th Cir. 1991).

The Court has also recognized an exception to the normal rule respecting the placement of the burden of proof in motions practice.  For example, in Pietanza v. Commissioner, 92 T.C. 729 (1989), supplemented by T.C. Memo. 1990-524, affd. without published opinion 935 F.2d 1282 (3d Cir. 1991), the parties filed cross-motions to dismiss for lack of jurisdiction.  The taxpayers moved to dismiss on the ground that the Commissioner had failed to issue a valid notice of deficiency; the Commissioner moved to dismiss on the ground that the taxpayers had failed to file a timely petition.  Because the very existence of the notice of deficiency was in dispute, the Court held that the Commissioner should bear the burden of proof on the point because it would be

unfair to require the taxpayer to prove "the nonexistence of a notice which they swear they have never seen and which respondent is unable to provide." Pietanza v. Commissioner, supra at 736-737.

Because these cases are not now before the Court in the normal posture of a deficiency case, the parties agree that the Court should disregard Rule 142(a). The parties also agree that the Court should instead look to rule 60(b) of the Federal Rules of Civil Procedure to determine the proper assignment of the burden of proof, notwithstanding that the decisions in the test cases have not become final.[93] Under that rule a party may move to be relieved from a final judgment, order, or proceeding, in the case of fraud, misrepresentation, or other misconduct of an adverse party. Normally, the moving party bears the burden of producing clear and convincing evidence that relief should be granted under that rule. See Anderson v. Cryovac, Inc., 862 F.2d 910 (1st Cir. 1988). Predictably, respondent and petitioners each argue that the burden of proof should be imposed on the other side.

Respondent contends that, because petitioners "now seek to affirmatively invalidate the Court's Dixon II opinion", petitioners bear the burden of proof as the moving parties.

---

[93] Rule 1(a) states that, where there is no applicable rule of procedure, "the Court or the Judge before whom the matter is pending may prescribe the procedure, giving particular weight to the Federal Rules of Civil Procedure to the extent that they are suitably adaptable to govern the matter at hand."

Further, relying on cases such as <u>Jones v. Aero/Chem Corp.</u>, 921 F.2d 875, 878-879 (9th Cir. 1990), <u>Drobny v. Commissioner</u>, 113 F.3d 670, 678 (7th Cir. 1997), and <u>England v. Doyle</u>, 281 F.2d 304, 309 (9th Cir. 1960), respondent maintains that the proper standard of proof is clear and convincing evidence irrespective of whether the theory of relief is structural defect, reversible error, fraud on the Court, or attorney misconduct under rule 60(b)(3) of the Federal Rules of Civil Procedure.

Relying on virtually the same authorities, petitioners counter that respondent should bear the burden of proof and that the standard of proof is clear and convincing evidence. Petitioners reason that respondent should bear the burden of proof insofar as it was respondent who moved for an evidentiary hearing before the appeal of the test cases and again after the Court of Appeals remanded the test cases to the Court for an evidentiary hearing on the significance of the misconduct of respondent's attorneys.

We note that the decisions entered by the Court in the test cases have not become final. Timely appeals were taken and the test cases are before the Court pursuant to the mandate of the Court of Appeals, which vacated the decisions for further proceedings.

We disagree with petitioners' contention that respondent should bear the burden of proof on the technical ground that respondent is the moving party. Nonetheless, the unusual aspects of these cases persuade us that it would be inappropriate to

place the burden of proof on petitioners.  First, we observe that in Arizona v. Fulminante, 499 U.S. at 295-296, the Supreme Court ruled that the State had the burden of proving that the erroneous admission of the defendant's confession was harmless beyond a reasonable doubt.  By analogy, respondent should bear the burden of proving that the admitted misconduct of his attorneys was harmless and had no material effect on the outcome of the trial.  In addition, we note that respondent has had direct and immediate access to the critical witnesses and most of the relevant documents since May 1992, when respondent first discovered the misconduct in question.  Further, respondent conducted an initial investigation of the misconduct, to the exclusion of all private parties, shortly after discovering the misconduct.  Finally, respondent, by asserting various privileges in response to Mr. Izen's motion to compel production of documents, succeeded in protecting from discovery various documents generated during respondent's investigation.  Taken together, these factors persuade us that the interests of justice are better served by placing the burden of proof on respondent, and we so hold.  Because these cases concern attorney misconduct in the civil context, the standard of proof and persuasion that we apply is clear and convincing evidence.  See, e.g., Bunch v. United States, 680 F.2d 1271, 1283 (9th Cir. 1982) (attorney misconduct).

For purposes of completeness, we briefly address the immaterial exception alluded to above.  That exception arises

from respondent's requests for findings of fact and argument that

Mr. Izen was aware of the Cravens and Thompson settlements at the

time of the trial before Judge Goffe.[94]  Placing the burden of

proof on respondent--for reasons discussed above--we have found

that Mr. Izen was not aware of the settlements.  However, the

record contains evidence, such as Mr. Kersting's, Mr. Moseley's,

and Mr. Bradt's knowledge of the settlements, Mr. Bradt's prior

partnership with Mr. Izen and their cooperation and sharing of

information during the evidentiary hearing, and statements by Mr.

Cravens--which he ultimately recanted on grounds of uncertainty

and lack of clear recollection--from which it could be inferred

that Mr. Izen had been informed or had become aware of the

settlements at or before the trial of the test cases.[95]  Although

such evidence does not suffice to require a finding to that

effect, we might have found, if petitioners had to bear the

---

[94]  Respondent has not carried through and addressed the
significance for these cases of Mr. Izen's awareness or lack of
awareness of the settlements.  We do not believe that Mr. Izen's
awareness of the settlements would have any bearing on our
conclusion that the Court's decisions on the tax deficiencies of
the test case petitioners should be reinstated.  Although
nondisclosure of the settlements by Mr. Izen--if he had been
aware of them--would have amounted to misconduct on his part, we
would not regard such misconduct as having any bearing on the
reinstatement of the decisions in the test cases.  See discussion
infra pp. 230-232 of Mr. Kersting's misconduct.

[95]  We recognize that there is circumstantial evidence that
Mr. Izen was not aware of the Thompson and Cravens settlements.
If Mr. Izen had been aware of the Thompson settlement, it does
not seem likely that he would have allowed Mr. DeCastro to attend
the meeting that he held with Mr. Hongsermeier on the eve of the
trial of the test cases or shared other information with Mr.
DeCastro.  It is also likely that Mr. Izen would have brought the
settlements to the Court's attention before respondent did.

burden of proof on that question, that petitioners had not carried that burden.[96]

We regard the exception as immaterial because we are satisfied that our conclusions and the outcome would remain the same, even if we were to conclude that Mr. Izen had been aware of the settlements. We would so conclude on essentially the same grounds on which we reject Mr. Sticht's argument over Mr. Kersting's interferences with the attorney-client relationships of the attorneys whom he employed to represent the test case petitioners. See infra pp. 230-232.

II. Structural Defect

A. Case Law

The Court of Appeals for the Ninth Circuit vacated this Court's decisions in the test cases and remanded the cases with directions "to conduct an evidentiary hearing to determine the full extent of the admitted wrong done by the government trial lawyers" and to consider "whether the extent of misconduct rises to the level of a structural defect voiding the judgment as fundamentally unfair, or whether, despite the government's

---

[96] This would have been made even more likely by Mr. Kersting's failure to appear and testify at the evidentiary hearing, which might have brought into play the doctrine of Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. on other grounds 162 F.2d 513 (10th Cir. 1947), that the failure of a party to introduce evidence within his possession or control which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Mr. Kersting's assertions in his motion to quash subpoena that he was too sick to attend the evidentiary hearing might have been well taken, but consideration could have been given to alternative means of obtaining his testimony.

misconduct, the judgment can be upheld as harmless error."
DuFresne v. Commissioner, 26 F.3d at 107.

The term "structural defect" normally refers to the violation of a fundamental constitutional right occurring during a criminal trial that affects the very framework within which the trial proceeds, so that the trial cannot reliably serve its function as a vehicle for determination of guilt or innocence. See Arizona v. Fulminante, supra at 309-310. The presence of a structural defect in a criminal trial requires automatic reversal of the conviction and a new trial. See, e.g., id.; Chapman v. California, 386 U.S. 18 (1967).

Significantly, not all constitutional errors occurring during a trial result in a structural defect in the proceedings. To the contrary, there are a number of constitutional errors, characterized as lesser "trial errors", that are susceptible to harmless error analysis.

In Arizona v. Fulminante, 499 U.S. 279 (1991), a plurality opinion, the Supreme Court discussed the distinction between a constitutional violation that causes a structural defect in a trial and a constitutional violation that is subject to harmless error analysis. A majority of the Justices concluded that the admission of the defendant's coerced confession at his murder trial did not constitute a structural defect requiring automatic reversal of the defendant's conviction. However, a separate majority further concluded that the defendant was entitled to a new trial because the State of Arizona had failed to meet its

burden of establishing beyond a reasonable doubt that the

admission of the confession was harmless error.  See id. at 295-

296.

The Supreme Court described the distinction between a

constitutional violation that may be characterized as a trial

error as opposed to a structural defect as follows:

> Since this Court's landmark decision in Chapman v.
> California, 386 U.S. 18 (1967), in which we adopted the
> general rule that a constitutional error does not
> automatically require reversal of a conviction, the
> Court has applied harmless-error analysis to a wide
> range of errors and has recognized that most
> constitutional errors can be harmless.  See, e.g.,
> Clemons v. Mississippi, 494 U.S. 738, 752-754
> (1990)(unconstitutionally overbroad jury instructions
> at the sentencing stage of a capital case); Satterwhite
> v. Texas, 486 U.S. 249 (1988)(admission of evidence at
> the sentencing stage of a capital case in violation of
> the Sixth Amendment Counsel Clause); Carella v.
> California, 491 U.S. 263, 266 (1989)(jury instruction
> containing an erroneous conclusive presumption); Pope
> v. Illinois, 481 U.S. 497, 501-504 (1987)(jury
> instruction misstating an element of the offense); Rose
> v. Clark, 478 U.S. 570 (1986)(jury instruction
> containing an erroneous rebuttable presumption); Crane
> v. Kentucky, 476 U.S. 683, 691 (1986)(erroneous
> exclusion of defendant's testimony regarding the
> circumstances of his confession); Delaware v. Van
> Arsdall, 475 U.S. 673 (1986)(restriction on a
> defendant's right to cross-examine a witness for bias
> in violation of the Sixth Amendment Confrontation
> Clause); Rushen v. Spain, 464 U.S. 114, 117-118, and
> n.2 (1983)(denial of a defendant's right to be present
> at trial); United States v. Hasting, 461 U.S. 499
> (1983)(improper comment on defendant's silence at
> trial, in violation of the Fifth Amendment Self-
> Incrimination Clause); Hopper v. Evans, 456 U.S. 605
> (1982)(statute improperly forbidding trial court's
> giving a jury instruction on a lesser included offense
> in a capital case in violation of the Due Process
> Clause); Kentucky v. Whorton, 441 U.S. 786
> (1979)(failure to instruct the jury on the presumption
> of innocence); Moore v. Illinois, 434 U.S. 220, 232
> (1977)(admission of identification evidence in
> violation of the Sixth Amendment Confrontation Clause);

Brown v. United States, 411 U.S. 223, 231-232
(1973)(admission of the out-of-court statement of a
nontestifying codefendant in violation of the Sixth
Amendment Confrontation Clause); Milton v. Wainwright,
407 U.S. 371 (1972)(confession obtained in violation of
Massiah v. United States, 377 U.S. 201 (1964));
Chambers v. Maroney, 399 U.S. 42, 52-53
(1970)(admission of evidence obtained in violation of
the Fourth Amendment); Coleman v. Alabama, 399 U.S. 1,
10-11 (1970)(denial of counsel at a preliminary hearing
in violation of the Sixth Amendment Counsel Clause).

The common thread connecting these cases is that
each involved "trial error"--error which occurred
during the presentation of the case to the jury, and
which may therefore be quantitatively assessed in the
context of other evidence presented in order to
determine whether its admission was harmless beyond a
reasonable doubt. In applying harmless-error analysis
to these many different constitutional violations, the
Court has been faithful to the belief that the
harmless-error doctrine is essential to preserve the
"principle that the central purpose of a criminal trial
is to decide the factual question of the defendant's
guilt or innocence, and promotes public respect for the
criminal process by focusing on the underlying fairness
of the trial rather than on the virtually inevitable
presence of immaterial error." Van Arsdall, supra, at
681 (citations omitted).

* * * * * * *

The admission of an involuntary confession--a
classic "trial error"--is markedly different from the
other two constitutional violations referred to in the
Chapman footnote [Chapman v. California, 386 U.S. 18,
23 n.8 (1967)] as not being subject to harmless-error
analysis. One of these violations, involved in Gideon
v. Wainwright, 372 U.S. 335 (1963), was the total
deprivation of the right to counsel at trial. The
other violation, involved in Tumey v. Ohio, 273 U.S.
510 (1927), was a judge who was not impartial. These
are structural defects in the constitution of the trial
mechanism, which defy analysis by "harmless-error"
standards. The entire conduct of the trial from
beginning to end is obviously affected by the absence
of counsel for a criminal defendant, just as it is by
the presence on the bench of a judge who is not
impartial. Since our decision in Chapman, other cases
have added to the category of constitutional errors
which are not subject to harmless error the following:

unlawful exclusion of members of the defendant's race from a grand jury, <u>Vasquez v. Hillery</u>, 474 U.S. 254 (1986); the right to self-representation at trial, <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 177-178 n.8 (1984); and the right to public trial, <u>Waller v. Georgia</u>, 467 U.S. 39, 49, n.9 (1984). Each of these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself. "Without these basic protections, a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." <u>Rose v. Clark</u>, 478 U.S., at 577-578 (citation omitted).

<u>Id.</u> at 306-310.

The Court of Appeals for the Ninth Circuit recently relied upon the Supreme Court's opinion in <u>Arizona v. Fulminante</u>, <u>supra</u>, to support its holding that a defendant's absence from the courtroom when the jury returned the death sentence did not result in a structural defect in the proceedings. See <u>Rice v. Wood</u>, 77 F.3d 1138, 1144 (9th Cir. 1996). The Court of Appeals further concluded that the error was harmless because the defendant's absence from the courtroom did not have a "substantial and injurious effect or influence" in determining the jury's verdict. <u>Id.</u> at 1144 (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946))).

B. <u>Arguments</u>

Messrs. Izen and Jones argue that the Government misconduct in these cases resulted in a structural defect on the ground that their clients, both test case and nontest case petitioners, were deprived of a fair trial. Messrs. Izen and Jones argue that

the Government misconduct included the illegal search of Mr. Kersting's office, the issuance of erroneous notices of deficiency intended to pressure taxpayers, secret settlements with the Thompsons, Cravenses, and Alexanders, the use of Mr. Thompson as a conduit for the payment of Mr. DeCastro's attorney's fees, Mr. McWade's misrepresentations to Mr. Cravens regarding the terms and effect of his settlement, and respondent's denial of Mr. Jones' request to participate in the discovery/investigation process that respondent undertook in 1992. Messrs. Izen and Jones contend that the confluence of all of these factors amounted to Government misconduct so egregious as to prevent the test case petitioners from fully developing their positions at trial.

In the alternative, but in reliance upon the same factors, Messrs. Izen and Jones contend that the Government misconduct resulted in reversible error in the trial of the test cases. Mr. Izen further asserts that: (1) The Government misconduct resulted in a fraud upon the Court; and (2) respondent's use of Mr. DeCastro to "infiltrate" petitioners' camp requires a new trial. We will address separately the latter two contentions.

Mr. Izen contends that the proper remedy in these cases is entry of decision in favor of all petitioners. In the alternative, Mr. Izen contends that all petitioners should be awarded a new trial. Mr. Jones contends that the Court should order respondent to show cause why respondent should not be

barred from further proceedings against all Kersting petitioners.[97]

Mr. Sticht also contends that the Government's misconduct resulted in a structural defect in the trial of the test cases, but he characterizes the defect differently. Mr. Sticht asserts that the Court effectively was precluded from supervising the trial process because Judge Goffe was not informed of the Thompson and Cravens settlement agreements. In conjunction with this argument, Mr. Sticht maintains that nontest case petitioners were deprived of procedural due process insofar as their decisions to execute piggyback agreements, as opposed to accepting one of the Government's settlement offers before the trial, were made without knowledge that two test case petitioners had decided to settle their cases. Mr. Sticht relies on United States v. Noushfar, 78 F.3d 1442 (9th Cir. 1996), and Riley v. Deeds, 56 F.3d 1117, 1121 (9th Cir. 1995), for the proposition that an "abdication of judicial control over" a trial constitutes a structural defect. Citing United States v. Annigoni, 96 F.3d 1132, 1143-1147 (9th Cir. 1996), Mr. Sticht argues in the alternative that, even if the Government misconduct did not cause a structural defect in the trial of the test cases, these cases are not amenable to harmless error analysis because the impact of

_____

[97] Our research does not disclose any case in which this Court has invoked such an extraordinary remedy, and petitioners have brought no such case to our attention. A new trial normally is the proper remedy in the case of a structural defect or reversible error in a trial. See Arizona v. Fulminante, 499 U.S. 279 (1991).

the misconduct "cannot be fairly assessed without engaging in sheer speculation".  In short, taking a different route from Mr. Izen and Mr. Jones, Mr. Sticht would bring his clients to the same destination:  that nontest case petitioners are entitled to entry of decisions that no deficiencies are due in their cases.

In response to respondent's contention that the Government misconduct did not result in a structural defect because Mr. Izen was not inhibited in fully and fairly presenting his clients' cases, Mr. Sticht asserts that nontest case petitioners nevertheless were harmed by Mr. Kersting's firing of Chicoine and Hallett at a time when they were attempting to settle the Kersting project cases.  Mr. Sticht further suggests (in very general terms) that Mr. Izen's performance at the trial of the test cases was deficient and that the trial of the test cases should have included an attorney who was not being paid by Mr. Kersting.

C.  Summary of Government Misconduct

Our first step in deciding whether the Government misconduct resulted in a structural defect in the trial of the test cases is to describe and characterize the Government misconduct.

Messrs. Sims and McWade negotiated a series of contingent settlement agreements in the Thompson and Cravens cases in advance of the trial of the test cases under which the Thompson and Cravens would receive the more favorable of:  (1) The Tax Court's decision if the test case petitioners should prevail in

the Tax Court; or (2) the agreed decisions based on the settlements of their test cases.

Messrs. Sims and McWade were the only persons in the Honolulu District Counsel Office with knowledge of the Thompson and Cravens settlements before and during the trial of the test cases. Other than Mr. Stevens no one else within the Internal Revenue Service was aware of the Thompson and Cravens settlements before or during the trial of the test cases up to the times that the Court issued its Dixon II opinion and entered the initial decisions in the test cases.

Before the trial of the test cases, Mr. McWade intentionally misled the Court, with the complicity of Mr. DeCastro, by not disclosing the settlement of the Thompson cases when he moved to set aside the Thompson piggyback agreements. Messrs. Sims, McWade, and DeCastro intentionally misled the Court regarding the status of the Thompson cases at the trial of the test cases. When Mr. Thompson alluded to his settlement during his testimony at the trial of the test cases, Mr. McWade interrupted Mr. Thompson in order to divert him from the subject and thus intentionally prevented Judge Goffe from learning about the Thompson settlement. Messrs. Sims and McWade also intentionally misled the Court regarding the status of the Cravens cases at the trial of the test cases.

The decisions entered in the Thompson cases provided for agreed reductions in the Thompsons' tax liabilities for 1979, 1980, and 1981 that generated refunds of tax and interest that in

turn were used to pay Mr. DeCastro's attorney's fees. The refunds actually made were more than sufficient for this purpose; the excess was received and retained by the Thompsons. Contrary to McWade's testimony at the evidentiary hearing, the Thompson settlement was not based upon or influenced by the Thompsons' participation in the Bauspar program.

Although the contingent aspect of the secret settlement agreements provided an ostensible incentive for Messrs. Thompson and Cravens to defend vigorously the Kersting interest deductions that they had reported on their tax returns, the record shows that the secret settlements had the effect of diluting the adversarial character of the Thompsons' and Cravenses' presentations of their cases to the Court.

Mr. Thompson's testimony at the trial of the test cases reveals that he strongly defended the position that he had participated in the Kersting programs with the objective of making a profit. However, Mr. Thompson was the only test case petitioner to testify that Mr. Kersting had assured him that his promissory notes would not be enforced. Although Mr. Thompson's testimony on this point merely served to corroborate Mr. Kersting's statements to other Kersting program participants in the comfort letters, the circumstances indicate that Mr. Thompson participated in the trial of the test cases in part to lay the groundwork for a defense against Mr. Kersting's earlier threats

to collect on Mr. Thompson's promissory notes.[98]  Considering Mr. Thompson's mixed motivations, Mr. Thompson was not fully representative of the class of Kersting program participants interested in contesting the Commissioner's determinations disallowing Kersting interest deductions.

Mr. Thompson's testimony aside, Mr. Thompson's settlement agreement placed his counsel, Mr. DeCastro, in a conflict of interest.  In particular, Mr. Thompson's settlement agreement was altered so that Mr. DeCastro's attorney's fees in effect would be paid out of tax refunds that were guaranteed to be paid to the Thompsons.  In short, with Mr. Thompson serving as a conduit, Messrs. Sims and McWade arranged for the Government to pay Mr. DeCastro's attorney's fees to ensure that Mr. Thompson would ostensibly remain a test case petitioner.  As observed by the Court of Appeals, Mr. DeCastro "was the main beneficiary of the [Thompson] settlement".  DuFresne v. Commissioner, 26 F.3d at 107.  Mr. DeCastro's additional legal fee paid from the refunds generated by the final Thompson settlement--$62,225--was disproportionately high in relation to the amount remaining in issue for the Thompsons--$30,000 plus interest.

The record indicates that Mr. DeCastro had concluded before the trial of the test cases that Kersting program participants

---

[98]  Although Judge Goffe was not informed of Mr. Thompson's settlement, Mr. Thompson's dispute with Mr. Kersting was disclosed to Judge Goffe through Mr. Thompson's testimony. Consequently, Judge Goffe was able to weigh Mr. Thompson's credibility on this point.

did not have a viable case. He candidly admitted as much to Mr. Izen on the eve of the trial. Consistent with this view, Mr. DeCastro had advised his clients, including the Thompsons, to try to obtain the best settlements they could get and not abide the outcome of the trial of the test cases. Before the final sweetening of the Thompson settlement, Mr. DeCastro had effectively represented his clients, including the Thompsons, in obtaining a number of settlements (with the burnout feature) on the order of 20 percent.

Against this background, Mr. DeCastro's conflict in the Thompson cases became acute when he agreed, in the context of the final sweetening of the Thompson settlement to provide the wherewithal to pay his legal fees, to continue to participate in Messrs. Sims' and McWade's scheme to keep the Thompsons among the test cases petitioners and to provide the masquerade of trial representation for the Thompsons as one of the test cases. Before the trial of the test cases, Mr. DeCastro had written to Mr. Huestis that Mr. Thompson's participation in the trial "appears to be wise insurance to obtain cancellation of the notes".

Mr. McWade, with the knowledge of Mr. Sims, negotiated a contingent settlement agreement with Mr. Cravens in advance of the trial of the test cases. However, Mr. McWade intentionally misled Mr. Cravens as to the nature and legal effect of his settlement and the need for counsel at the trial of the test cases. Mr. McWade improperly advised Mr. Cravens that, by virtue

of his settlement, Mr. Cravens could not win or lose and would not need an attorney to represent him at the trial of the test cases. In so doing, Mr. McWade foreclosed the possibility that the Cravenses would become clients of Chicoine and Hallett, and later, of Mr. Izen, and thereby reduced the effectiveness of Mr. Cravens' presentations to the Court from the point of view of all petitioners. The likelihood that Mr. Cravens would have informed counsel for test case petitioners that his cases had been settled was also thereby reduced.

Mr. Cravens relied upon Mr. McWade's advice and appeared at the trial of the test cases without counsel, whereupon he was informed by Mr. McWade that he would enjoy the better of the Tax Court decision in the trial of the test cases or the previously arranged settlement agreement. We have no doubt that Mr. Cravens would have been better prepared and would have offered a more complete case had he been represented by counsel at the trial of the test cases. At a minimum, counsel could have assisted Mr. Cravens in completing his testimony regarding his motivations for participating in Kersting programs and his belief that his promissory notes were valid.

During the trial of the test cases and thereafter, Messrs. Sims and McWade intentionally misled the Court and the remaining test case petitioners regarding the status of the Thompson and Cravens cases. Messrs. Sims and McWade consciously continued their efforts to mislead the Court during the evidentiary hearing by denying that the Thompson settlement was a vehicle for paying

Mr. DeCastro's legal fees for representing the Thompsons at the trial of the test cases, by testifying that the Thompson settlement was attributable to the Thompsons' participation in the Bauspar program, and by trying to cover up the bases for the stipulated decisions that were entered by the Court in the Alexander cases.

Mr. McWade also failed to disclose to the Court his understanding with Mr. Alexander and allowed Mr. Alexander to offer misleading testimony to the Court during the trial of the test cases. Although we are unable to find that Mr. McWade and Mr. Alexander agreed before the trial to a specific reduction of the Alexanders' tax liabilities in exchange for Mr. Alexander's assistance to Mr. McWade during the trial of the test cases, we are convinced that Mr. McWade and Mr. Alexander had a general understanding that the Alexanders' tax liabilities would be reduced. In this regard, Mr. Alexander misled the Court when he ambiguously answered "Specifically, no." to Mr. Izen's question at trial whether Mr. Alexander had an agreement with Mr. McWade to reduce his tax liabilities.[99]

---

[99] Mr. Alexander's response could be understood as a statement (consistent with the Court's finding in these cases) that, although Mr. Alexander did not reach an agreement with Mr. McWade for a specific reduction in the amount of his tax deficiencies, he and Mr. McWade had a general understanding that Mr. Alexander's tax liabilities would be reduced. Considering the ambiguity in Mr. Alexander's response, it seems surprising that Mr. Izen did not pursue the matter further. In any event, by virtue of Mr. McWade's duty of candor toward the Court, see ABA Model Rules of Professional Conduct rule 3.3, Mr. McWade was obliged to disclose his understanding with Mr. Alexander to the Court.

In sum, the record in these cases reveals a scheme by Messrs. Sims and McWade to mislead the Court and manipulate the test case procedure in a misplaced effort to enhance the already overwhelming likelihood that respondent would prevail on the merits of the Kersting adjustments and their continuing efforts at the evidentiary hearing to cover up what they had done.

D.   Discussion

Petitioners unanimously advance the view that the Government misconduct should be considered a structural defect.  We are convinced that Messrs. Sims' and McWade's misconduct diluted the adversarial character of the presentation of what the Court and the other petitioners were led to believe were the Thompson and Cravens test cases.  To conclude, however, that the Government misconduct resulted in a structural defect in the trial of the test cases, one also must accept the proposition that the harm caused by the Government misconduct pervaded and altered the basic constitution of the trial mechanism in all the test cases.

As previously indicated, Messrs. Izen and Jones contend that the Government misconduct in these cases includes the alleged illegal search of Mr. Kersting's office and the issuance of erroneous notices of deficiency.  However, Messrs. Izen and Jones disregard the fact that every court considering the matter has rejected the contention that the search of Mr. Kersting's office was illegal.  See Kersting v. United States, 865 F. Supp. at 674-675.  In addition, the Court held in Dixon I that petitioners

lack standing to contest the alleged violation of Mr. Kersting's Fourth Amendment rights. Further, there is no credible evidence in the record that respondent issued notices of deficiency to Kersting program participants that were so erroneous as to render them invalid.[100] Consequently, we will limit our consideration to the misconduct associated with the secret settlements that Messrs. Sims and McWade entered with Messrs. Thompson and Cravens and Mr. McWade's understanding with Mr. Alexander.

The impact of the Government misconduct in these cases must be evaluated in the context in which it occurred. Specifically, whereas the typical structural defect case arises in a trial of a single criminal defendant, the test case procedures employed in these cases concern the tax liabilities of more than 1,300 Kersting program participants who agreed to be bound by the outcome in a trial of eight test case petitioners, six of whom were represented by Mr. Izen.

Although we are convinced that the Thompson and Cravens settlements had the effect of diluting or diminishing the adversarial character of the presentation of their cases, we are

---

[100] There is no evidence in the record that such errors as have been discovered in Kersting project statutory notices were attributable to an improper intention of pressuring taxpayers. However, the existence of such errors, see, e.g., Richards v. Commissioner, T.C. Memo. 1997-149, supplemented by T.C. Memo. 1997-299, affd. without published opinion 165 F.3d 917 (9th Cir. 1998), should alert nontest case petitioners and their counsel in nontest cases not yet disposed of to review their notices and carefully compare them with their return positions for the taxable years in question.

equally convinced that the Thompson and Cravens settlements neither prevented Mr. Izen from fully and fairly presenting his clients' cases to the Court nor resulted in any reduction in the effectiveness of his presentation on their behalves. There is no indication in the record that the Thompson and Cravens settlements affected Mr. Izen's trial preparation or trial strategy, or his trial tactics or presentation. Although Mr. Thompson's testimony at the trial of the test cases that Mr. Kersting had orally assured him that his promissory notes would be canceled in exchange for the return of Kersting stock may have surprised Mr. Izen, the record reveals that Mr. Izen was well aware that respondent intended to rely on the so-called comfort letters to establish the same point. Mr. Izen's strategy-- conceived before the trial of the test cases and continuing through the evidentiary hearing--was to rebut the comfort letters with evidence that Kersting corporations had initiated collection litigation against Kersting program participants who failed to make loan payments. In addition to developing the testimony of the test case petitioners that he represented, Mr. Izen cross- examined Messrs. Thompson, Cravens, and Alexander during the trial of the test cases. Considering all the facts and circumstances, we are convinced that the misconduct of Messrs. Sims and McWade in connection with the Thompson and Cravens settlements and the Alexander understanding did not alter the basic framework within which the trial of the test cases was conducted. We are convinced that the trial of the test cases

served its fundamental function as the vehicle for redetermining the tax liabilities of the broad array of test case petitioners represented by Mr. Izen.

We are not persuaded by Mr. Sticht's argument that the Court effectively was precluded from supervising the trial of the test cases because Judge Goffe was not informed of the Thompson and Cravens settlement agreements. Judge Goffe was aware that Messrs. Thompson and Alexander were hostile towards Mr. Kersting. Although a disclosure of the Thompson and Cravens settlements and the Alexander understanding would have given Judge Goffe a more comprehensive basis for weighing their credibility, we do not equate Judge Goffe's lack of knowledge of the settlements with the proposition that he was precluded from supervising the trial of the test cases. To the contrary, the record in the trial of the test cases and the evidentiary hearing shows that Judge Goffe accurately assessed the credibility of Messrs. Thompson, Cravens, Alexander, and Kersting and maintained firm control of the proceedings.

The Ninth Circuit cases that Mr. Sticht relies upon for the proposition that the nondisclosures to the Court precluded Judge Goffe from supervising the trial of the test cases are readily distinguishable from the facts at hand. In <u>United States v. Noushfar</u>, 78 F.3d at 1144-1145, the Court of Appeals held that there was a structural defect in a criminal trial in which the trial judge abdicated control of the presentation of evidence by allowing the jury to take into the jury room tapes of the

defendants' conversations that had never been played in open court. In <u>Riley v. Deeds</u>, 56 F.3d at 1119, the Court of Appeals held that there was a structural defect in a criminal trial in which, in the trial judge's absence, the trial judge's law clerk convened the court and permitted the court reporter to read back part of the victim's testimony to the jury. Considering the obvious distinctions between the errors of omission of the trial judges in the jury trial cases relied upon by Mr. Sticht, and Judge Goffe's role in the trial of the test cases, we reject Mr. Sticht's structural defect argument.

We likewise reject Mr. Sticht's argument that a structural defect occurred by reason of respondent's failure to inform nontest case petitioners who signed piggyback agreements that two test case petitioners had received contingent settlements. Although Mr. Sticht characterizes this failure as a structural defect, Mr. Sticht's argument amounts to little more than a breach of contract theory--a matter we address more fully below. In any event, we restate our earlier conclusion that the trial of the test cases served its fundamental function as the vehicle for redetermining the tax liabilities of Mr. Izen's test case petitioners to embrace the broader proposition that the nontest case petitioners who signed piggyback agreements received what they bargained for, an opinion and a series of decisions on the merits in Dixon II that covers a broad array of Kersting programs for the taxable years 1975 through 1983.

Mr. Sticht contends that Mr. Izen's representation of test case petitioners does not provide a sound basis for concluding that the Government misconduct did not cause a structural defect in the trial of the test cases. In particular, Mr. Sticht points to Mr. Kersting's interference in the Chicoine and Hallett settlement negotiations and his eventual firing of Chicoine and Hallett, and Mr. Izen's alleged lack of preparation for the trial, as evidence that nontest case petitioners were not afforded due process.

Mr. Kersting, the shelter promoter, had the incentive and initially the resources to finance the test case litigation. By so doing, Mr. Kersting positioned himself to influence or determine the choice of counsel hired to represent the test case petitioners, creating the potential for conflicts of interest. Mr. Kersting repeatedly used his control of the purse strings to interfere in the attorney-client relationships of participants in his programs, as evidenced by his attempts to initiate Mr. Seery's withdrawal as test case counsel for the Thompsons and his efforts to forestall dissemination to Kersting program participants of Internal Revenue Service settlement offers solicited by Mr. Seery and by Chicoine and Hallett. The pattern of interference continued in Mr. Kersting's firing of Chicoine and Hallett as counsel for test case petitioners and encouraging nontest case petitioners to recall their settlement retainers

from Chicoine and Hallett.[101] The record of the evidentiary hearing contains evidence that Mr. Kersting participated in and perhaps orchestrated efforts to create disaffection among Mr. Sticht's clients.

It is also ironic--if true--that Mr. Kersting did not inform Mr. Izen of the Thompson and Cravens settlements at or before the trial of the test cases. If Mr. Kersting had informed Mr. Izen and Mr. Izen had informed Judge Goffe, the trial might have been somewhat delayed, but the tax liabilities of the nonsettling Kersting test case and nontest case petitioners would have been finally resolved long ago, with attendant avoidance or reduction

---

[101] A lawyer who planned or helped to promote a tax shelter or is otherwise under the control of a tax shelter promoter has a conflict of interest in representing participants in the tax shelter because he will not (or may not) give disinterested advice regarding settlement offers that may conflict with his original advice or the interests of the promoter. See Ewing v. Commissioner, 91 T.C. at 397 n.2; Para Techs. Trust v. Commissioner, T.C. Memo. 1992-575.

Chicoine and Hallett, in their retainer agreements with the test case petitioners and by their actions, made clear that although they were not averse to obtaining additional business, they had no conflict of interest and that their primary loyalty was to their clients. Mr. Kersting fired Chicoine and Hallett when, on the basis of their independent appraisal of the weakness of the Kersting programs, they tried to obtain the most favorable settlements available on behalf of as many participants, test case and nontest case petitioners, as possible. Because of his potential personal liability for both promoter penalties and Federal income taxes, and his financial interest in trying to vindicate himself and his programs, Mr. Kersting scuttled the settlements, fired Chicoine and Hallett, and found another attorney to represent the test case petitioners in the trial of the test cases. Mr. Kersting's lack of sensitivity to the conflict issue and counsel's obligation to issue disinterested advice to clients is exemplified by his misplaced emphasis in mischaracterizing Chicoine and Hallett's actions as primarily stemming from fear of suit by their clients.

of interest costs, legal fees, and expenditure of private party, administrative, attorney, and judicial resources.

Nevertheless, Mr. Kersting's misconduct does not somehow tip the scale in favor of finding a structural defect in the trial of the test cases.  While Mr. Kersting endeavored to keep all the nontest case petitioners under his wing through his numerous "Dear Friend" letters and through the hiring and firing of counsel for test case petitioners, nontest case petitioners should have been alerted to the potential for and presence of conflicts between their interests and those of Mr. Kersting by Mr. Seery's withdrawal as counsel, as well as by the firing of Chicoine and Hallett.  However, neither Mr. Kersting's payment of Mr. Izen's fees, nor our review of the record in Dixon II, suggests that Mr. Izen's representation of the test case petitioners was inadequate, in the sense that there is anything more that he or any other attorney could have done that would have led to a different outcome.

At the end of the day, the Government misconduct in these cases is not readily comparable to any of the fundamental constitutional violations that the Supreme Court has identified as a structural defect, e.g., denial of the right to counsel or the right to self-representation, the right to an impartial judge, or the right to a public trial.  In this regard, we are mindful of the Supreme Court's statement in Arizona v. Fulminante, 499 U.S. 279 (1991), that most constitutional errors are amenable to harmless-error analysis.  Considering all the

facts and circumstances, including the unique nature of the test
case procedure, the specific configuration adopted for the trial
of the Kersting test cases, and Mr. Izen's ability fully and
fairly to present his clients' cases during the trial, we find
that the Government misconduct did not result in a trial that was
fundamentally unfair.  See id. at 308; see also Greer v. Miller,
483 U.S. 756, 768 (1987) (Stevens, J., concurring).  Stated
differently, although we disapprove Messrs. Sims' and McWade's
misconduct, as well as the misconduct of Mr. Kersting and
Mr. DeCastro, we do not conclude that their misconduct resulted
in a structural defect in the trial of the test cases mandating
either a new trial or entry of decisions in petitioners' favor.

III. Harmless Error Analysis

Although we have concluded that the Sims-McWade misconduct
did not result in a structural defect in the trial of the test
cases, we must consider whether petitioners are entitled to a new
trial on the ground that the misconduct resulted in reversible
error as opposed to harmless error.  See Arizona v. Fulminante,
supra at 307-308.  Although structural defect inquiries have
generally been limited to criminal cases, reversible versus
harmless error analysis appears in civil as well as criminal
cases.[102]

The Court's Rules of Practice and Procedure set forth the
principle of harmless error as follows:

---

[102]   See generally Traynor, "The Riddle of Harmless Error"
(1970).

Rule 160. HARMLESS ERROR

No error in either the admission or exclusion of evidence, and no error or defect in any ruling or order or in anything done or omitted by the Court or by any of the parties, is ground for granting a new trial or for vacating, modifying, or otherwise disturbing a decision or order, unless refusal to take such action appears to the Court inconsistent with substantial justice. The Court at every stage of a case will disregard any error or defect which does not affect the substantial rights of the parties.

Rule 160 is "substantially the same as" rule 61 of the Federal Rules of Civil Procedure. See 60 T.C. 1144; see also Fed. R. Crim. P. 52(a).

In civil cases, an error related to admission of evidence or attorney misconduct is considered harmless if there is no prejudicial effect and/or the error did not affect the judgment. See Chalmers v. City of Los Angeles, 762 F.2d 753, 761-762 (9th Cir. 1985); see also Mateyko v. Felix, 924 F.2d 824, 827-828 (9th Cir. 1991) (new trial is warranted only if misconduct affected the verdict). The standard of proof in such cases is normally clear and convincing evidence. See, e.g., Bunch v. United States, 680 F.2d at 1283.

The Supreme Court has adopted a similar standard for reviewing errors associated with prosecutorial misconduct in criminal cases. See United States v. Bagley, 473 U.S. 667 (1985); Smith v. Phillips, 455 U.S. 209 (1982); United States v. Agurs, 427 U.S. 97 (1976); Giglio v. United States, 405 U.S. 150 (1972); Brady v. Maryland, 373 U.S. 83 (1963); Napue v. Illinois,

360 U.S. 264 (1959).[103]  In criminal cases, the Government
generally is obliged to show beyond a reasonable doubt that the
alleged error did not affect the verdict.  See Arizona v.
Fulminante, supra at 295-296; Chapman v. California, 386 U.S. at
24.

Consistent with the approach of the cases on harmless error
in both the civil and criminal contexts, our inquiry is not
focused on the merits of the matter or the correctness of the
result in Dixon II, as such, but on what Justice Roger Traynor,
in his seminal essay, "The Riddle of Harmless Error" (1970),
called the "effect on the judgment" test of harmless error.  Id.
at 22.[104]  We therefore will assess the effects of the Sims-McWade
misconduct in the cases at hand in the light of evidence
presented at the trial of the test cases and the evidentiary
hearing in order to determine whether the Government misconduct
was material to the outcome of the trial of the test cases.
Arizona v. Fulminante, supra at 307-308; United States v. Bagley,
supra at 679-680 n.9.

_____

[103]  Although these criminal cases concern the prosecutor's
use of false testimony, as well as the prosecutor's suppression
of exculpatory and impeachment evidence, we believe they are
sufficiently analogous to the cases at hand where, at a minimum,
the Thompson and Cravens secret settlements and the Alexander
understanding could be viewed either as evidence that was
improperly admitted or impeachment evidence that was improperly
excluded.

[104]  For a more recent espousal of the same test in a
discussion limited to criminal cases see Edwards, "To Err Is
Human, But Not Always Harmless:  When Should Legal Error Be
Tolerated?", 70 N.Y.U.L. Rev. 1167 (1995).

Although our task has been made onerous by the magnitude of the record of the original trial and the evidentiary hearing, the task has been facilitated by the Court's detailed and discriminating findings of fact and discussion of law in Dixon II, as required by section 7459(a). We are not confronted by the opacity of a jury general verdict or cursory findings by a trial judge sitting without a jury. See Traynor, supra at 22-25. We reject Mr. Sticht's assertions that we are engaging in sheer speculation or embarking on uncharted waters in proceeding with the reversible error versus harmless error analysis mandated by the Court of Appeals. The road map provided by the Court's findings and opinion in Dixon II could not be more detailed and specific in relation to the record of the trial and the evidentiary hearing.

We therefore will first review the Court's Dixon II opinion and then consider the relative importance of the testimony and evidence of Messrs. Thompson, Cravens, and Alexander to the Court's holdings in Dixon II.

A.  Review of Dixon II

The Court's opinion in Dixon II contains a detailed description of the various Kersting programs and a comprehensive analysis in support of the Court's determination to sustain respondent's disallowances of Kersting interest deductions. In Dixon II, the Court held that the Kersting loans were sham transactions lacking economic substance, that the loans did not

constitute genuine debt, and that interest was not "paid" on Kersting loans within the meaning of section 163.

1.   Mr. Kersting's Lack of Credibility

In Dixon II, the test case petitioners bore the burden of proof and were required to show by a preponderance of the evidence that respondent's determinations disallowing Kersting interest deductions were erroneous.  See Rule 142(a).  As discussed below, it is evident the test case petitioners' efforts to satisfy their burden of proof were frustrated by the lack of credibility of their principal witness, Mr. Kersting.

Judge Goffe made it abundantly clear in Dixon II, on the bases of both his observations of Mr. Kersting at trial and his review of the record, that Mr. Kersting lacked credibility, particularly his testimony having a bearing on the tax viability of his programs.  Examples cited by Judge Goffe as evidence of Mr. Kersting's lack of credibility included his false testimony regarding:  (1) The filing of tax returns for Kersting corporations; (2) the reasons behind the closing of Kersting accounts at Hawaii National Bank; (3) the level of Gabriele Kersting's participation in daily corporate operations; (4) the reasons for the frequent creation of new acceptance corporations; and (5) the methods used to value Kersting stock.  See Dixon II, 62 T.C.M. (CCH) at 1482, 1484, 1487, 1991 T.C.M. (RIA), at 91-3024 to 91-3025, 91-3026 to 91-3027, 91-3029 to 91-3031.

2.   <u>Sham Analysis</u>

The Dixon II opinion reveals that Judge Goffe relied upon evidence that was both qualitatively and quantitatively substantial in support of the conclusion that the Kersting stock transactions in dispute were shams.  Although acknowledging that some Kersting corporations engaged in businesses unrelated to the disputed Kersting programs, Judge Goffe concluded that the viability and activities of the various Kersting corporations were not determinative of whether the specific Kersting transactions in dispute were shams.  See <u>id.</u> at 1485-1486, 1991 T.C.M. (RIA), at 91-3028; see also <u>ACM Partnership v. Commissioner</u>, T.C. Memo. 1997-115, affd. on this issue 157 F.3d 231, 260 (3d Cir. 1998).

Judge Goffe reviewed the relevant testimony and particular circumstances of each test case petitioner and concluded that the presence of several factors common to all of them invariably required the finding that petitioners had no subjective business purpose for engaging in the Kersting programs other than tax avoidance.  In particular, Judge Goffe found that the test case petitioners entered into the Kersting programs without specific knowledge about the Kersting corporations involved, the industries in which they operated, and the impact of prevailing economic conditions on their investment decisions, and without obtaining the assistance of an independent adviser.  Judge Goffe further found that the test case petitioners entered into the Kersting programs without regard to whether the purchase price

for the stock that they purported to purchase was reasonable and appropriate. See Dixon II, 62 T.C.M. (CCH) at 1486-1491, 1991 T.C.M. (RIA), at 91-3027 to 91-3034. Indeed, Judge Goffe found that Mr. Kersting had failed to explain clearly, consistently, or credibly how he had determined the value of Kersting stock upon both its sale and reacquisition from test case petitioners and other Kersting program participants. See id. at 1487, 1991 T.C.M. (RIA), at 91-3030.

Judge Goffe noted that Mr. Cravens had testified that his purpose for entering into the Kersting programs was "mainly" for tax shelter, that Mr. Cravens had failed to offer any other reason for his participation in the Kersting programs, and that Mr. Cravens had opened and closed two Kersting programs (stock subscription plans) during a 2-year period (1979 and 1980) without any economic profit or loss other than being out-of-pocket the cash payments on his leverage notes. See id. at 1488, 1991 T.C.M. (RIA), at 91-3031.

As with several other test case petitioners, Judge Goffe disregarded Mr. Thompson's testimony that he expected to profit from his participation in the Kersting programs on the ground that Mr. Thompson's testimony was vague and not supported by the record. Judge Goffe rejected Mr. Thompson's argument that his participation in the First Savings acquisition contributed to his profit motive for participating in the Kersting programs at issue. See id. at 1489-1490, 1991 T.C.M. (RIA), at 91-3032 to 91-3033.

Judge Goffe further concluded that the test case petitioners failed to show that the Kersting programs had economic substance beyond the creation of tax benefits. Relying primarily upon the manner in which Mr. Kersting actually operated the programs, Judge Goffe found that there was little if any likelihood of either corporate profitability or shareholder profitability. Even assuming some level of corporate profitability and a related increase in the value of Kersting stock, Judge Goffe found it significant that no evidence was offered either through Mr. Kersting or the test case petitioners that Kersting program participants were ever in a position to sell their stock at an increased value relative to the purchase price of the stock. Finally, Judge Goffe found that Mr. Kersting routinely disregarded standard corporate practices. See id. at 1491-1494, 1991 T.C.M. (RIA), at 91-3034 to 91-3038.

Consistent with his findings that the test case petitioners had no business purpose for entering into the Kersting programs other than tax avoidance and that the transactions lacked economic substance, Judge Goffe held that the stock transactions were shams.

3. Lack of Genuine Debt/Waltz of Funds

After concluding that the stock transactions were shams, Judge Goffe went on to consider whether the primary and leverage loans constituted genuine debt that qualified for deduction under section 163(a). Judge Goffe independently examined each of the Kersting programs and loans in dispute.

### i.   Subscription Interest

Relying upon the specific language in the stock subscription agreements underlying the stock subscription plan and the leasing corporation plan, Judge Goffe held that the agreements, standing alone, did not create an unconditional debt obligation.  See id. at 1494-1496, 1991 T.C.M. (RIA), at 91-3038 to 91-3040.

Judge Goffe further denied deductions for subscription interest under the Stock Subscription and Leasing Corporation Plans on the ground that such interest was not "paid" within the meaning of section 163(a).  In so holding, Judge Goffe focused on Mr. Kersting's practice of carrying out a circular flow of checks among Kersting corporations and investors at the same bank on the same day--the so-called waltz of funds.  See, e.g., Davison v. Commissioner, 107 T.C. 35 (1996), affd. per curiam 141 F.3d 403 (2d Cir. 1998).  In particular, Judge Goffe identified two specific instances in which Mr. Kersting waltzed funds affecting Stock Subscription Plans.  In one instance, Mr. Kersting waltzed primary loan funds; in the other instance, he waltzed leverage loan funds.  Relying upon evidence that there were several other potential waltz situations across the board with respect to the stock purchase plan, the stock subscription plan, and the leasing corporation plan, Judge Goffe found that waltzes were essential elements of all the Kersting stock transactions.  See Dixon II, 62 T.C.M. (CCH) at 1496-1499, 1991 T.C.M. (RIA), at 91-3040 to 91-3043.

ii.  Primary Loans

Judge Goffe determined that several features of the primary loans prevented them from being genuine debt in substance. First, Judge Goffe found that Mr. Kersting and program participants had an understanding at the commencement of a program, as reflected in a number of so-called comfort letters, that a primary loan obligation could be satisfied in full at any time by a mere surrender of the associated stock certificate.  In so finding, Judge Goffe rejected Mr. Kersting's testimony that he did not represent to program participants that they could exchange their stock for cancellation of a primary note at any time.  To the contrary, Judge Goffe listed the following nine items in support of his conclusion that Mr. Kersting applied the policy outlined in his so-called comfort letters to all program participants:  (1) Mr. Thompson's testimony that Mr. Kersting assured him of the exchange policy; (2) Mr. Kersting's description of a stock subscription plan to Mil Harr; (3) Gabriele Kersting's form letter to test case petitioner Terry D. Owens describing a stock subscription plan; (4) Mr. Kersting's form letter describing a leasing corporation plan; (5) Mr. Kersting's form letter issued on the first anniversary of a leasing corporation plan; (6) Mr. Kersting's acknowledgment in a comfort letter that such a letter would be issued to "every participant * * * if it would not weaken YOUR position with the IRS"; (7) Mr. Kersting's broad statement in a later comfort letter that "We will always repurchase the stock issued at a

price sufficient to allow a borrower to discharge all of his debt"; (8) Mr. Kersting's statements in a credit-reference letter written on behalf of a program participant; and (9) a form letter issued to test case petitioner Jerry R. Dixon describing the process for the termination of his participation in a stock purchase plan. See id. at 1499-1500, 1991 T.C.M. (RIA), at 91-3043 to 91-3044.

Continuing his analysis, Judge Goffe concluded that, even assuming that there was no prearranged understanding between Mr. Kersting and program participants, neither Mr. Kersting nor the program participants ever contemplated that the principal obligation on a primary loan would be paid except by a surrender of the underlying stock. Judge Goffe reached this conclusion after finding that: (1) No evidence was produced of a primary note ending up in the hands of anyone not associated with Mr. Kersting; (2) primary loans issued during later years included an express notation that they were nonnegotiable and nonassignable; and (3) primary loans were unsecured, with the primary notes failing to list even the purchased stock as collateral. See id. at 1500, 1991 T.C.M. (RIA), at 91-3044. Judge Goffe further concluded that program participants would not have assumed liability for the high level of debt that the primary loans represented, considering their lack of understanding of the Kersting corporations in which they were purportedly investing, "unless they had no expectation or intention of ever paying off those loans with cash". Id.

Judge Goffe found additional support for his conclusion that the primary loans did not constitute genuine debt in Mr. Kersting's backdating of documents relevant to the loan transactions and the apparent waltz of primary loan funds under the stock purchase plan and the leasing corporation plan. See id. at 1500-1502, 1991 T.C.M. (RIA), at 91-3044 to 91-3046.

Judge Goffe held in the alternative that, even assuming that the primary loans represented genuine debt, the test case petitioners had failed to show that they actually "paid" interest on the primary loans within the meaning of section 163(a) inasmuch as Mr. Kersting apparently waltzed leverage loan funds that were used to pay interest on primary loans. See id. at 1502, 1991 T.C.M. (RIA), at 91-3046.

### iii. Leverage Loans

Judge Goffe determined that leverage loans did not represent genuine debt because of several factors, including the waltzing of funds, backdating of documents, substance not following form, and mutual expectations that program participants would not incur personal liability for the principal amounts of the leverage loans. See id. at 1502-1503, 1991 T.C.M. (RIA), at 91-3046 to 91-3047.

### 4. Collection Litigation

As previously discussed, Mr. Izen offered evidence on behalf of test case petitioners that various Kersting corporations initiated collection actions against Kersting program participants in an attempt to rebut respondent's evidence that

there was a mutual understanding between Mr. Kersting and his program participants that primary and leverage loans would not be enforced. Judge Goffe rejected the collection litigation evidence as a basis for sustaining the validity of the Kersting loans as follows:

> As illustrated by Kersting's pay-or-else letter to over 30 clients on September 25, 1980, and his 1986 correspondence with the Thompsons, his overriding concern was to be compensated by means of leverage loan interest. It was this amount that even he often referred to as a "fee" or a deductible "cost" of tax deductions. In encouraging clients by means of the September 25, 1980, letter to "discharge the debt to which you are a party," he sought only small amounts that could not have represented typical primary or leverage loans. His letters to the Thompsons indicate that he only threatened or pursued collection of principal obligations when the investor neglected or refused to pay leverage loan interest. This rare occurrence, which Kersting did not testify he either intended or expected, is not sufficient to transform any of petitioners' loans from Kersting corporations into genuine recourse indebtedness.

Id. at 1506, 1991 T.C.M. (RIA), at 91-3049 to 91-3050.

5. CAT-FIT Plan

Judge Goffe found that the record in the trial of the test cases did not provide a basis for the Court to understand fully how the CAT-FIT program operated or how Mr. Kersting intended the program to operate.[105] In any event, Judge Goffe concluded that: (1) The CAT-FIT program was a sham transaction that provided no economic benefit other than the creation of tax losses; (2) the

---

[105] The test case petitioners who participated in the CAT-FIT program included the Dixons, DuFresnes, Owenses, and Hongsermeiers. See Dixon II, 62 T.C.M. (CCH) at 1507, 1991 T.C.M. (RIA), at 91-3050 to 91-3051.

CAT-FIT primary loan did not constitute genuine debt because the parties never contemplated that such loans would be paid except by means of a redemption of the investment certificate;[106] (3) CAT-FIT participants did not pay interest on primary loans insofar as Mr. Kersting waltzed leverage loan funds; (4) the CAT-FIT leverage loan did not constitute genuine debt inasmuch as (a) Kersting program participants failed to demonstrate how the leverage loan principal obligations were satisfied or intended to be satisfied;[107] and (b) Mr. Kersting waltzed leverage loan funds; and (5) the CAT-FIT primary and leverage loans did not result in allowable interest deductions under the rationale of Goldstein v. Commissioner, 364 F.2d 734 (2d Cir. 1966) (form of transaction will not be exalted over substance when sole objective of transaction is an interest deduction, even if transaction has some minimal economic gain potential), affg. 44 T.C. 284 (1965). See Dixon II, 62 T.C.M. (CCH) at 1508-1509, 1991 T.C.M. (RIA), at 91-3051 to 91-3053.

---

[106] Judge Goffe further concluded that the CAT-FIT primary loan did not constitute genuine debt insofar as the record indicated that Mr. Kersting had waltzed primary loan funds. See Dixon II, 62 T.C.M. (CCH) at 1508, 1991 T.C.M. (RIA), at 91-3052.

[107] In this regard, Judge Goffe rejected the test case petitioners' attempt to show that CAT-FIT leverage loans were genuine recourse debt through evidence of collection litigation brought against George Vermef. See Dixon II, 62 T.C.M. (CCH) at 1509, 1991 T.C.M. (RIA), at 91-3053.

6. <u>Additions to Tax</u>

i. <u>Negligence</u>

Judge Goffe sustained respondent's determinations that the test case petitioners were liable for additions to tax for negligence. In particular, Judge Goffe found that the test case petitioners failed to show that they were unsophisticated taxpayers, that they relied upon independent return preparers or tax advisers, the nature of any professional advice that they may have received, or that any such professional advice was based upon a disclosure of all of the relevant facts. See <u>id.</u> at 1512-1513, 1991 T.C.M. (RIA), at 91-3056 to 91-3057.[108]

ii. <u>Late Filing</u>

Judge Goffe sustained respondent's determination that the Thompsons were liable for the addition to tax for late filing under section 6651(a)(1) for 1981 on the ground that they did not contest the matter and were deemed to have conceded the point.[109] See <u>id.</u> at 1513, 1991 T.C.M. (RIA), at 91-3057.

iii. <u>Substantial Understatement</u>

Judge Goffe sustained respondent's determination that the Youngs and the DuFresnes were liable for additions to tax for

_____

[108] Although Judge Goffe sustained respondent's determinations that the test case petitioners were liable for additions to tax for negligence, nontest case petitioners who signed post-1985 piggyback agreements were to be relieved of liability for such additions to tax for tax years before 1982. See <u>supra</u> pp. 43-45.

[109] We note that the Thompsons had no need to contest this addition to tax by virtue of their settlement agreement.

substantial understatements of their income tax liabilities for the taxable years 1982 and 1983 at a rate equal to 10 percent of the underpayment. In short, the Youngs and the DuFresnes had contested the addition to tax only insofar as their liabilities depended upon respondent's prevailing on their deficiencies to a sufficient extent to exceed the substantial understatement threshold of section 6661(b)(1)(A) (deficiency must exceed greater of 10 percent of the tax required to be shown on the return, or $5,000). See id. at 1513-1514, 1991 T.C.M. (RIA), at 91-3058.

### iv. Increased Interest

Judge Goffe sustained respondent's determinations that the Thompsons were liable for interest computed at the increased rate prescribed in section 6621(c) for 1981, that the Youngs were liable for such increased interest for the taxable year 1982, and that the DuFresnes were liable for such increased interest for the taxable years 1982 and 1983.[110] In short, Judge Goffe sustained these determinations on the ground that the Court had already determined that the test case petitioners' underpayments were attributable to "tax motivated transactions"; viz, sham transactions, as provided in section 6621(c)(3)(A)(v). See id. at 1514, 1991 T.C.M. (RIA), at 91-3058.

---

[110] Nontest case petitioners who signed post-1985 piggyback agreements agreed to be bound by the Court's determination in the test cases regarding the applicability of sec. 6621(c).

B.    Discussion

Whether the Government misconduct in these cases constitutes reversible error as opposed to harmless error does not turn on the "culpability of the prosecutor" but on whether nondisclosure of the Thompson and Cravens settlements and the Alexander understanding was material to the outcome in Dixon II.  See Smith v. Philips, 455 U.S. at 219; Brady v. Maryland, 373 U.S. at 87; Mateyko v. Felix, 924 F.2d at 827-828; Chalmers v. City of Los Angeles, 762 F.2d at 761-762.  We evaluate the impact of the Government misconduct on the outcome in Dixon II on the basis of the entire record.

1.    Mr. Cravens

Mr. McWade's settlement agreement with Mr. Cravens placed a cap on the Cravenses' tax liabilities for 1979 and 1980. However, we have found that Mr. McWade deliberately misled Mr. Cravens regarding the nature and effect of his settlement. In particular, Mr. McWade initially misinformed Mr. Cravens that he could neither win nor lose at the trial of the test cases as the basis for advising him that he need not retain counsel. Relying on this misinformation and bad advice, Mr. Cravens appeared at the trial of the test cases without counsel.  Mr. Cravens was surprised when Mr. McWade informed him immediately before his testimony at the trial of the test cases that he would receive the better of his earlier settlement or a Tax Court decision in favor of the test case petitioners.

Mr. Cravens' testimony at the trial of the test cases was brief. Mr. Cravens testified that he participated in stock subscription programs in 1979 (Candace) and 1980 (Delta). Mr. Cravens testified that he participated in the Kersting programs mainly for the tax benefits; he did not offer any other motivation for his participation. Mr. Cravens did not testify regarding the validity of his promissory notes or his level of sophistication as an investor. Mr. Cravens testified that he closed out his participation in the Kersting programs by endorsing his stock certificates and returning them to Mr. Kersting in exchange for his promissory notes.

Although we believe that Mr. Cravens' testimony at the trial of the test cases was truthful in all material respects, we do believe that counsel could have assisted Mr. Cravens in presenting a more detailed and better organized case, particularly with regard to Mr. Cravens' motivation for participating in Mr. Kersting's programs and Mr. Cravens' view of the validity of his promissory notes.

We have also found that Messrs. Sims and McWade misled the Court and the remaining parties to these cases by not disclosing the Cravens settlement before the trial of the test cases. We recognize that Judge Goffe might have removed the Cravens cases from the test case array had he been informed of their settlement before the trial. Indeed, an argument can be made that Judge Goffe would have removed the Cravens cases from the test case

array, inasmuch as the remaining test cases provided full coverage of the Kersting programs and taxable years in dispute.

Under the circumstances, we must weigh the impact of the Government misconduct in the Cravens cases on two levels. First, because Mr. McWade led Mr. Cravens to believe that he did not need counsel at the trial of the test cases, we must consider whether Mr. Cravens' pro se status (and attendant lack of preparation and organization) was material to the outcome in the trial of the test cases. Second, because Judge Goffe might have removed the Cravens cases from the test case array if he had known that they had been settled, we must consider whether Mr. Cravens' testimony was material to the outcome in Dixon II. As discussed in greater detail below, we are convinced that the outcome in Dixon II would not have been different irrespective of whether Mr. Cravens had been represented at trial by competent counsel or whether Judge Goffe would have excluded Mr. Cravens' testimony in its entirety.

i.    Sham Analysis

We will assume that, but for Mr. McWade's interference, Mr. Cravens would have appeared at the trial of the test cases with counsel and testified (consistent with the testimony of the other test case petitioners) that he participated in the Kersting programs with a view towards making a profit and that his promissory notes constituted genuine indebtedness. Nevertheless, on the basis of our review of Dixon II, we are convinced that

Mr. Cravens' testimony would not have changed Judge Goffe's conclusion that the test case petitioners had no business purpose for participating in the Kersting programs. Judge Goffe relied upon factors common to all test case petitioners in rejecting their testimony that they had entered into the Kersting transactions with a view towards making a profit on stock appreciation. Specifically, Judge Goffe found that the test case petitioners participated in the Kersting programs without regard to whether the purchase price for the stock that they purported to purchase was reasonable and appropriate, and without specific knowledge about the Kersting corporations involved, the industries in which they operated, or the impact of prevailing economic conditions on their investment decisions. Under the circumstances, we are convinced that Mr. Cravens' pro se status was not material to Judge Goffe's holding that the test case petitioners had no business purpose for participating in the Kersting transactions.

We are also convinced that Mr. Cravens' testimony was not material to Judge Goffe's holding that the test case petitioners lacked a business purpose for participating in the Kersting programs. In particular, although Mr. Cravens testified that he participated in the Kersting programs mainly for the tax benefits, we are convinced, upon the basis of Judge Goffe's comprehensive analysis of the test case petitioners' lack of business purpose, that Mr. Cravens' testimony on this point was

cumulative of other evidence in the record and was not material to Judge Goffe's holding.

Judge Goffe also concluded that the test case petitioners failed to prove that the Kersting programs had economic substance beyond the creation of tax benefits. Relying primarily upon the manner in which Mr. Kersting actually operated the programs, Judge Goffe found that there was little if any likelihood of either corporate profitability or shareholder profitability, that there was no evidence that Kersting program participants were in a position to sell their stock at an increased value relative to the purchase price of the stock, and that Mr. Kersting routinely disregarded standard corporate practices. Because Judge Goffe focused on the manner in which Mr. Kersting actually operated the programs, we are convinced that Mr. Cravens' pro se status was not material to Judge Goffe's holding that the Kersting programs lacked economic substance.

Similarly, we are convinced that Mr. Cravens' testimony was not material to Judge Goffe's holding on this point. Although Mr. Cravens had terminated his participation in consecutive stock subscription plans in 1979 and 1980 without any economic benefit, we note that none of the test case petitioners presented any evidence that they enjoyed any economic benefit from their participation in the Kersting programs in dispute. In this light, we are convinced that Mr. Cravens' testimony was cumulative of other evidence and was not material to Judge Goffe's holding that the test case petitioners failed to prove

that the Kersting programs had economic substance beyond the creation of tax benefits.

###    ii.   Lack of Genuine Debt/Waltz of Funds

Judge Goffe also concluded that the test case petitioners failed to show that Kersting promissory notes constituted genuine debt or that interest was actually "paid" on the loans within the meaning of section 163(a).  As previously mentioned, Mr. Cravens participated in consecutive stock subscription plans in 1979 and 1980.  Relying upon the specific language used in stock subscription agreements underlying the stock subscription plan and the leasing corporation plan, Judge Goffe held that the agreements, standing alone, did not create an unconditional debt obligation.  Judge Goffe further denied deductions for subscription interest under the Stock Subscription Plan and the leasing corporation plan on the ground that such interest was not "paid" within the meaning of section 163(a) by virtue of Mr. Kersting's waltz of funds.  In particular, Judge Goffe identified two specific instances in which Mr. Kersting waltzed funds affecting stock subscription plans.  In one instance, the waltz concerned primary loan funds, while in the other the waltz concerned leverage loan funds.  Considering the bases for Judge Goffe's analyses on these points, we are convinced that neither Mr. Cravens' pro se status nor his testimony was material to Judge Goffe's holdings that the test case petitioners failed to show that Kersting promissory notes constituted genuine debt or

that interest was actually "paid" on Kersting loans within the meaning of section 163(a).

In sum, we conclude that the Government misconduct relating to the Cravens cases constituted harmless error with respect to Judge Goffe's holdings that the Kersting transactions were shams, that the loans underlying the various Kersting programs did not constitute genuine indebtedness, and that interest was not paid on Kersting loans within the meaning of section 163(a).

2. <u>Mr. Thompson</u>

Mr. McWade's settlement agreement with Mr. Thompson placed a cap on the Thompsons' tax liabilities for the taxable years 1979, 1980, and 1981, and ensured that the Thompsons would receive refunds of tax and interest previously remitted to respondent for those years. The Thompson settlement was amended shortly before the trial of the test cases to assure that the refunds that the Thompsons would receive would be more than sufficient to pay Mr. DeCastro's attorney's fees. The Thompson settlement created conflicts of interest for Mr. Thompson and Mr. DeCastro.[111]

By virtue of his settlement, Mr. Thompson was in a position to use the trial of the test cases as a forum either to attempt to further reduce his personal tax liabilities by contesting

---

[111] Mr. DeCastro's conflict in the Thompson cases became acute when he agreed, in the context of the final revision to the Thompson settlement, to participate in Messrs. Sims and McWade's scheme to keep the Thompsons among the test cases petitioners and to provide the masquerade of trial representation for the Thompsons as one of the test cases.

respondent's deficiency determinations or to air his grievances against Mr. Kersting and possibly achieve some advantage against Mr. Kersting's threats to collect on Mr. Thompson's promissory notes. Our review of Mr. Thompson's testimony at the trial of test cases, which testimony was both favorable and detrimental to the cause of the test case petitioners, suggests that Mr. Thompson may have viewed the trial of the test cases as an opportunity to attempt to attain both objectives. On the one hand, Mr. Thompson sought to prove that, because of his prior involvement in the First Savings acquisition, he had a legitimate business purpose; i.e., a profit motive, for participating in Mr. Kersting's programs. On the other hand, Mr. Thompson was the only test case petitioner to testify that Mr. Kersting had orally assured him that promissory notes would not be enforced.

Despite Mr. Thompson's apparently conflicting objectives, we are convinced that Mr. Thompson's testimony at the trial of the test cases was truthful. Although Mr. Thompson testified that Mr. Kersting had assured him that promissory notes would not be enforced, Mr. Thompson's testimony merely corroborated Mr. Kersting's written assurances or comfort letters to so-called "nervous Nellies". Moreover, in a March 1986 letter, Mr. Kersting had confirmed to Mr. Thompson that his promissory notes would be canceled if Mr. Thompson would surrender all relevant stock certificates to Mr. Kersting. It appears that Mr. Kersting later reneged on this confirmation by requiring that Mr. Thompson

also pay $11,844 to Mr. Kersting for interest purportedly due on certain leverage loans; i.e., Mr. Kersting's fees.[112]

We have found that Messrs. Sims and McWade misled the Court and the remaining parties to these cases by not disclosing the Thompson settlement before the trial of the test cases. As with Mr. Cravens, an argument can be made that Judge Goffe would have removed the Thompson cases from the test case array, inasmuch as the remaining test cases provided full coverage of the Kersting programs and taxable years in dispute. Proceeding on the assumption that Judge Goffe would have precluded Mr. Thompson from testifying at the trial of the test cases, we consider whether Mr. Thompson's testimony was material to the outcome in Dixon II.

### i. Sham Analysis

Judge Goffe relied upon factors common to all the test case petitioners in rejecting their testimony that they had entered into the Kersting transactions with a business purpose. Those factors included the test case petitioners' participation in the Kersting programs without regard to whether the purchase price for the stock they purported to purchase was reasonable and appropriate, and without specific knowledge about the Kersting corporations involved, the industries in which they operated, or the impact of prevailing economic conditions on their investment

---

[112] In Dixon II, Judge Goffe concluded that interest payments on leverage loans reflected Mr. Kersting's fee for generating interest deductions. Dixon II, 62 T.C.M. (CCH) at 1506, 1991 T.C.M. (RIA), at 91-3050.

decisions.  Although Mr. Thompson's testimony regarding profit motive was favorable to the test case petitioners' cause, Judge Goffe rejected his testimony as vague and unsupported by the record.  Because Judge Goffe rejected the testimony of all the test case petitioners in holding that they had not entered into the Kersting transactions with a business purpose, we are convinced that Mr. Thompson's testimony was not material to Judge Goffe's holding on the point.

Judge Goffe also held that the test case petitioners had failed to prove that the Kersting transactions had economic substance beyond the creation of tax benefits.  In particular, Judge Goffe focused on the manner in which Mr. Kersting actually operated the programs, the lack of corporate profitability or shareholder profitability, the absence of any evidence or likelihood that Kersting program participants were or would ever be in a position to sell their stock at an increased value relative to the purchase price of the stock, and Mr. Kersting's routine disregard of standard corporate practices.  Because Judge Goffe focused on the manner in which Mr. Kersting actually operated the programs, we are convinced that Mr. Thompson's testimony was not material to Judge Goffe's holding that the programs lacked economic substance.

### ii. Lack of Genuine Debt/Waltz of Funds

Judge Goffe relied upon the specific language of the stock subscription agreements underlying the Stock Subscription Plan and the Leasing Corporation Plan to conclude that the agreements,

standing alone, did not create unconditional debt obligations. Considering the narrow basis for Judge Goffe's holding, we are convinced that Mr. Thompson's testimony was not material to this holding.

Judge Goffe sustained respondent's disallowance of deductions for subscription interest under the stock subscription plan and the leasing corporation plan on the ground that such interest was not "paid" within the meaning of section 163(a) by virtue of Mr. Kersting's practice of waltzing loan funds. Judge Goffe identified two specific instances in which Mr. Kersting waltzed funds affecting both primary and leverage loans underlying the stock subscription plan. Mr. Thompson's testimony was not material to Judge Goffe's finding that Mr. Kersting made a practice of waltzing loan funds.

Judge Goffe held that primary loans, although recourse in form, did not represent genuine debt in substance because of several factors. First, Judge Goffe found that Mr. Kersting and program participants had an understanding at the commencement of a program that a primary loan obligation could be satisfied in full at any time by a mere surrender of the associated stock certificate. In so holding, Judge Goffe rejected Mr. Kersting's testimony that he did not represent to program participants that they could exchange their stock for cancellation of a primary note at any time. To the contrary, Judge Goffe listed nine items, including Mr. Thompson's testimony on the subject, in support of his finding of a pervasive stock surrender policy.

Although Judge Goffe listed Mr. Thompson's testimony first among the nine items identified in support of the Court's holding on the point, we are convinced for the reasons set forth below that Mr. Thompson's testimony was cumulative of other evidence and was not material to this holding.

Although Mr. Thompson was the only test case petitioner to testify that Mr. Kersting had assured him that promissory notes would not be enforced, Judge Goffe listed eight additional items, including a number of comfort letters, in support of his holding that there was a pervasive stock surrender policy. In short, there is ample evidence in the record, independent of Mr. Thompson's testimony, to support Judge Goffe's holding on the point. Along the same lines, we observe that the record in the trial of the test cases reveals that, at one time or another, each of the test case petitioners had terminated various Kersting programs by endorsing their stock certificates and returning them to Mr. Kersting in exchange for the return of their promissory notes marked "paid".

Even assuming for the sake of argument that Mr. Thompson's testimony was material to Judge Goffe's finding that there was a pervasive stock surrender policy, we are convinced that Mr. Thompson's testimony was not material to the final outcome in Dixon II. In particular, Judge Goffe's analysis of the validity of primary loans was not limited to his holding that Mr. Kersting and program participants had an understanding regarding the stock surrender policy. To the contrary, Judge Goffe also found that,

regardless of whether there was a prearranged understanding, Mr. Kersting and program participants never contemplated that the principal obligation on a primary loan would be paid except by a surrender of the stock. In so holding, Judge Goffe found it significant that: (1) No evidence was produced of a primary note ending up in the hands of anyone not associated with Mr. Kersting; (2) primary loans issued during later years included an express notation that they were nonnegotiable and nonassignable; and (3) primary loans were unsecured, with the primary notes failing to list even the purchased stock as collateral.

In completing his analysis, Judge Goffe found further support for his holding that the primary loans did not constitute genuine debt by virtue of Mr. Kersting's waltz of primary loan funds underlying the stock subscription plan, the apparent waltz of funds under the stock purchase plan and the leasing corporation plan, and Mr. Kersting's practice of backdating documents relating to the loans.

In the alternative, Judge Goffe found that, even assuming that the test case petitioners had established that the primary loans represented genuine debt, the test case petitioners had nevertheless failed to show that they actually paid primary loan interest within the meaning of section 163(a). Specifically, Judge Goffe concluded that the test case petitioners had not paid primary loan interest by virtue of Mr. Kersting's waltz of leverage loan funds (the funds used to pay primary loan interest)

underlying the stock subscription plan, and the apparent waltz of (1) first-year subscription interest under the leasing corporation plan, (2) distribution checks under the leasing corporation plan, and (3) leverage loan funds in each of the stock subscription, stock purchase, and leasing corporation plans.

In sum, considering Judge Goffe's copious list of factors in support of his conclusion that Mr. Kersting and program participants had an understanding regarding the stock surrender policy, as well as Judge Goffe's alternative analyses in support of his holding that primary loans did not constitute genuine debt and that interest on primary loans was not paid within the meaning of section 163, we are convinced that Mr. Thompson's testimony was not material to the outcome in Dixon II.

Judge Goffe also determined that leverage loans did not represent genuine debt because of several factors, including the waltzing of funds, backdating of documents, substance not following form, and mutual expectations of no personal liability. Again, given the variety of the factors cited by Judge Goffe, we are convinced that Mr. Thompson's testimony was not material to Judge Goffe's holding that leverage loans did not represent genuine debt.

### iii. Additions to Tax

Judge Goffe sustained respondent's determinations that the Thompsons were liable for interest computed at the increased rate prescribed in section 6621(c) for 1981, and that the Youngs and

the DuFresnes were liable for such increased interest for the taxable years 1982 and 1983.  In short, Judge Goffe sustained these determinations on the ground that the Court had already determined that the test case petitioners' underpayments were attributable to sham transactions.  Consistent with our finding that Mr. Thompson's testimony was not material to Judge Goffe's conclusion that the Kersting transactions were shams, we are convinced that Mr. Thompson's testimony was not material to Judge Goffe's decision to sustain respondent's determinations respecting increased interest.

Although Judge Goffe also sustained respondent's determinations that the Thompsons were liable for an addition to tax for late filing under section 6651(a)(1) for 1981 and additions to tax for negligence for the taxable years 1979 and 1981, these holdings have no bearing on nontest case petitioners. In particular, nontest case petitioners who signed 1985 piggyback agreements did not agree to be bound by the Court's holdings regarding additions to tax.  Further, while nontest case petitioners who signed post-1985 piggyback agreements agreed to be bound by the Court's holding regarding test case petitioners' liability for increased interest under section 6621(c), they did not agree to be bound by the Court's holding regarding test case petitioners' liability for additions to tax under section 6651(a) and they were to be relieved of liability for additions to tax for negligence for years before 1982.

3. <u>Mr. Alexander</u>

We have found that Mr. McWade and Mr. Alexander had an understanding before the trial of the test cases that the Alexanders' tax liabilities would be reduced in exchange for Mr. Alexander's informal assistance to Mr. McWade during the trial. We have also found that Mr. McWade allowed Mr. Alexander to present misleading testimony to the Court during the trial of the test cases in response to Mr. Izen's question whether Mr. Alexander had an agreement with Mr. McWade for the reduction of his tax liabilities. Although Judge Goffe was aware that Mr. Alexander was hostile towards Mr. Kersting and that Mr. Alexander had offered an affidavit to Mr. McWade regarding the Kersting programs, Judge Goffe, had he been informed of Mr. Alexander's understanding with Mr. McWade, might have precluded Mr. Alexander from testifying at the trial of the test cases or at least taken that understanding into account in weighing Mr. Alexander's credibility. Consequently, we must consider whether Mr. Alexander's testimony was material to the outcome in Dixon II.

Mr. Alexander was called to testify in part to rebut Mr. Kersting's testimony regarding the First Savings transaction. Indeed, Mr. Alexander directly contradicted Mr. Kersting as to whether Federal regulators ever approved Investors Financial as a holding company for First Savings. While Judge Goffe concluded that Mr. Kersting was not a credible witness, our review of Dixon II convinces us that Mr. Kersting's lack of credibility was by

and large attributable to Mr. Kersting's lack of candor as demonstrated by both inherent contradictions and inconsistencies with the written record. We are convinced that Mr. Alexander's testimony was not material to Judge Goffe's findings respecting Mr. Kersting's lack of credibility.

Like Mr. Thompson, Mr. Alexander testified that Mr. Kersting had represented to him that stock subscription plan promissory notes would not be enforced and would be returned or destroyed upon the termination of the plan. Although Judge Goffe concluded that there was a pervasive stock surrender policy in the Kersting programs, we note that Judge Goffe did not list Mr. Alexander's testimony among the nine items listed in support of his conclusion on the point. In any event, assuming that Judge Goffe took Mr. Alexander's testimony into account, we are satisfied that Mr. Alexander's testimony was not material to Judge Goffe's holdings that there was a pervasive stock surrender policy within the Kersting programs or that Kersting promissory notes did not constitute genuine debt. As previously discussed in our analysis of the lack of materiality of Mr. Thompson's testimony on this same subject, Judge Goffe relied upon a long list of items in support of these holdings. Considering all the evidence in support of Judge Goffe's holdings, we are convinced that Judge Goffe would have reached the same conclusions without Mr. Alexander's testimony on the subject. Moreover, even assuming for the sake of argument that Mr. Alexander's testimony was material to Judge Goffe's holding respecting a pervasive stock

surrender policy, Judge Goffe's reliance upon alternative bases to support the conclusion that Kersting promissory notes did not constitute genuine debt convinces us that Mr. Alexander's testimony was not material to the outcome in Dixon II.

4.   Summary

We hold that the Government misconduct in the trial of the test cases in Dixon II resulted in harmless error in the trial of the test cases insofar as the Court concluded that:  (1) The Kersting transactions were shams; (2) the Kersting promissory notes did not constitute genuine debt; and (3) interest on Kersting loans was not paid within the meaning of section 163(a).

In so holding, we reject Messrs. Izen's and Jones' contention that, by virtue of the totality of the Government's misconduct, their clients were denied due process.

We likewise reject Mr. Sticht's contention that his clients--nontest case petitioners--were denied due process on the ground that Judge Goffe effectively was precluded from supervising the trial of the test cases.  Although Judge Goffe might have removed the Thompson and Cravens cases from the test case array and struck Mr. Alexander's testimony if he had been informed of the Thompson and Cravens settlements and the Alexander understanding, we are convinced that the outcome in the trial of the test cases would not have changed.

Consistent with the preceding discussion, we are convinced that the test case and nontest case petitioners enjoyed a fair trial, encompassing "not only fair notice and an adequate

opportunity to be heard before the appropriate tribunal, but also an orderly presentation of evidence and a rational application of the law thereto".  Traynor, "The Riddle of Harmless Error", at 80 (1970).  Having placed the burden of proof by clear and convincing evidence on respondent, we are left with the definite and firm conviction that the Government misconduct had no effect on the decisions in the test cases whose petitioners were represented by Mr. Izen.

IV.  Fraud, Misrepresentation, and Misconduct

Mr. Izen contends that the Court should not reinstate its decisions in Dixon II on the ground that the Government misconduct in the trial of the test cases amounted to fraud, misrepresentation, or misconduct under rule 60(b)(3) of the Federal Rules of Civil Procedure.  Mr. Izen's contention is akin to a motion for reconsideration of the Court's Dixon II opinion under Rule 161 or a motion to vacate a decision under Rule 162. Relief under either of these Rules may be granted in the Court's discretion to prevent injustice.  See Chao v. Commissioner, 92 T.C. 1141, 1144-1145 (1989); see also Adams v. Commissioner, 85 T.C. at 375.

Rule 60(b)(3) of the Federal Rules of Civil Procedure states in pertinent part:

> On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: * * * (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party * * *.

In sum, District Courts are vested with discretion to relieve a party from a final judgment where the adverse party has committed a fraud, misrepresentation, or other misconduct.  See Atchison, Topeka & Santa Fe R.R. Co. v. Barrett, 246 F.2d 846, 849 (9th Cir. 1957).

Although the decisions in these cases are not final, the parties seem to agree that these proceedings may be analogized to proceedings under rule 60(b)(3) of the Federal Rules of Civil Procedure.  We will assume for present purposes that the analogy is valid in light of the apparent agreement of the parties.

A judgment may be set aside under rule 60(b)(3) of the Federal Rules of Civil Procedure where fraud, misrepresentation, or misconduct prevents a party from fully and fairly presenting his or her case at trial.  See In re M/V Peacock, 809 F.2d 1403, 1405 (9th Cir. 1987); Simons v. Gorsuch, 715 F.2d 1248, 1253 (7th Cir. 1983); Bunch v. United States, 680 F.2d at 1283; Atchison, Topeka & Santa Fe Ry. Co. v. Barrett, supra at 849.  Relief does not depend on whether the judgment is incorrect, only on whether the judgment was obtained unfairly.  See Lonsdorf v. Seefeldt, 47 F.3d 893, 897 (7th Cir. 1995); Anderson v. Cryovac, Inc., 862 F.2d at 924 n.10.

Some courts have held that the willful presentation of perjured testimony is grounds for granting the innocent party a new trial pursuant to rule 60(b)(3) of the Federal Rules of Civil Procedure.  See Diaz v. Methodist Hosp., 46 F.3d 492, 497 (5th Cir. 1995).  However, it has been said that

> The very purpose of a trial is to test the truthfulness of testimony and other evidence proffered by the parties. Examining the possibility that testimony is perjurious is one of the principal functions of cross-examination. * * * Rule 60(b) should not reward the lazy litigant who did not adequately investigate his or her case, or who did not vigorously cross-examine a witness. [Fn. refs. omitted.]

12 Moore, Moore's Federal Practice, sec. 60.43[1][c], at 60-131 to 60-132 (3d ed. 1998). In this regard, courts have denied relief under rule 60(b)(3) of the Federal Rules of Civil Procedure where the moving party had a full and fair opportunity to uncover the alleged fraud or perjury at trial. See Bunch v. United States, supra at 1283.

We have already described the Government misconduct in these cases supra pp. 218-225. Arguably, Messrs. McWade's and Sims' failure to disclose the Thompson and Cravens settlements and the Alexander understanding to the Court constitute fraud, misrepresentation, or misconduct within the meaning of rule 60(b)(3) of the Federal Rules of Civil Procedure. However, as discussed above, fraud, misrepresentation, or misconduct alone is not sufficient to require or justify relief under rule 60(b) of the Federal Rules of Civil Procedure. To the contrary, relief under rule 60(b) of the Federal Rules of Civil Procedure is warranted only where the fraud, misrepresentation, or misconduct has prevented the adversely affected party from fully and fairly presenting his or her case at trial. In re M/V Peacock, supra.

We are convinced that the Government misconduct did not prevent the remaining test case petitioners from fully and fairly

presenting their cases at trial.  In particular, our review of the record convinces us that Mr. Izen, who represented petitioners in six of the eight test cases, was not impeded in any sense by the Government misconduct in presenting his cases to the Court.  Because Mr. Izen was aware before the trial that the Government intended to rely on the so-called comfort letters at the trial of the test cases, we are satisfied that Mr. Izen was not unduly surprised by Messrs. Thompson's and Alexander's testimony that Mr. Kersting had assured them that they could exchange their Kersting corporation stock certificates for the cancellation of their promissory notes.[113]  Further, Mr. Izen was prepared and permitted to cross-examine Messrs. Thompson, Cravens, and Alexander and to probe and expose the bases of Messrs. Thompson's and Alexander's hostility towards Mr. Kersting.  Considering all the facts and circumstances, we conclude that petitioners are not entitled to relief under rule 60(b) of the Federal Rules of Civil Procedure or Rule 161 or 162.

---

[113]  Mr. Izen testified at the evidentiary hearing that he was aware of the comfort letters because some of them were part of the stipulated record.  Further, Mr. Izen informed Mr. DeCastro before the trial of the test cases that he would offer evidence of collection actions brought by various Kersting companies against Kersting program participants to counter respondent's reliance on the comfort letters.  However, Mr. McWade was aware of collection litigation before the trial because Mr. Kersting had encouraged certain program participants to raise the point with Mr. McWade during pretrial settlement discussions.

V.    Fraud on the Court

Although rule 60(b) of the Federal Rules of Civil Procedure provides a list of the grounds upon which a court may relieve a party or a party's legal representative from a final judgment, the rule also includes a so-called saving clause which states: "This rule does not limit the power of a court * * * to set aside a judgment for fraud upon the court."  It is well settled that the Tax Court may reopen and set aside a decision on the basis of fraud on the Court.  See Toscano v. Commissioner, 441 F.2d 930 (9th Cir. 1971) (fraud on the court properly raised where the taxpayer asserted that the Court's decision sustaining the Commissioner's determination of joint deficiencies was based on tax returns on which the taxpayer's signature was either forged or made under duress), vacating 52 T.C. 295 (1969).

A.    Case Law Survey

Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238 (1944), overruled on other grounds Standard Oil v. United States, 429 U.S. 17, 18 (1976), is the leading case considering fraud on the court.  In Hazel-Atlas Glass, certain officials and attorneys representing Hartford Empire Co. (Hartford) fraudulently prepared and published an article in a trade publication that Hartford subsequently used to support its pending application for a patent before the Patent Office.  After obtaining the patent, Hartford sued Hazel-Atlas Glass Co. (Hazel) for infringement in a District Court.  The District Court dismissed the case on the ground that no infringement had been

proved. In response, Hartford filed an appeal with the Court of Appeals for the Third Circuit and specifically directed the court's attention to the fraudulent article. Relying in part on the fraudulent article, the Court of Appeals for Third Circuit reversed the District Court and held that the patent had been infringed. Nine years later, Hazel returned to the Court of Appeals seeking relief on the ground that the Hartford article was fraudulent. However, the Court of Appeals declined to set aside the District Court decree on the grounds that: (1) the fraud was not newly discovered; (2) the fraudulent article was not the primary basis for its earlier decision, and (3) the Court of Appeals lacked the power to set aside the District Court decree because of the expiration of the term during which its decision had been rendered.

Upon review of the matter, the Supreme Court held that the Court of Appeals had equitable power to set aside the District Court decree despite the fact that the decree was otherwise final. See id. at 244-245. The Supreme Court explained its holding as follows:

> Every element of the fraud here disclosed demands the exercise of the historic power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals. Cf. Marshall v. Holmes, [141 U.S. 589 (1891]. Proof of the scheme, and of its complete success up to date, is conclusive. * * *

Id. at 245-246.

The Supreme Court further rejected the argument that alleged lack of diligence by Hazel in discovering the fraud should serve to bar relief. Observing that the fraud in question did not concern only private parties or a single litigant, the Supreme Court stated:

> There are issues of great moment to the public in a patent suit. Mercoid Corporation v. Mid-Continent Investment Co., 320 U.S. 661 * * *; Morton Salt Co. v. G.S. Suppiger Co., 314 U.S. 488 * * *. Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. * * *

Id. at 246.

Finally, the Supreme Court rejected the assertion that relief should be denied on the ground that the fraudulent article was not "basic" to the Court of Appeals' decision. In short, the Supreme Court held that an appraisal of the influence of the fraudulent article on the Court of Appeals' decision was not necessary insofar as Hartford had considered the article material and relied upon the article in obtaining a decision in its favor from the Court of Appeals. See id. at 246-247.

Some courts hold that the term "fraud on the court" should be construed consistently with the policy of preserving the finality of judgments. See Drobny v. Commissioner, 113 F.3d at

677-678;[114] <u>Broyhill Furniture Indus., Inc. v. Craftmaster
Furniture Corp.</u>, 12 F.3d 1080, 1085 (Fed. Cir. 1993); <u>Toscano v.
Commissioner</u>, <u>supra</u> at 934.  In this regard, not all fraudulent
or deceptive acts constitute fraud on the Court.  It has been
said that fraud on the court concerns egregious conduct affecting
the ability of the court to function impartially.  See <u>Broyhill
Furniture Indus., Inc. v. Craftmaster Furniture Corp.</u>, <u>supra</u> at
1085-1086, and cases cited therein.

Since the Supreme Court's decision in <u>Hazel-Atlas Glass Co.
v. Hartford-Empire Co.</u>, <u>supra</u>, a number of courts, including the
Court of Appeals for the Ninth Circuit, have relied upon or
adopted the definition of fraud on the court set forth in
12 Moore, Moore's Federal Practice, par. 60.21[4][a], at 60-52
(3d ed. 1998), which states:

> "Fraud on the court" is defined in terms of its
> effect on the judicial process, not in terms of the
> content of a particular misrepresentation or
> concealment.  <u>Fraud on the court</u> must involve more than
> injury to a single litigant; it is limited to fraud
> that "seriously" affects the integrity of the normal
> process of adjudication.  Fraud on the court is limited
> to fraud that does, or at least attempts to, "defile
> the court itself" or that is perpetrated by officers of
> the court "so that the judicial machinery can not
> perform in the usual manner its impartial task of
> adjudging cases".  [Fn. refs. omitted.]

---

[114] In <u>Drobny v. Commissioner</u>, 113 F.3d 670, 678 (7th Cir.
1997), affg. T.C. Memo. 1995-209, the Court of Appeals for the
Seventh Circuit held that the taxpayers were required to
demonstrate "not only that the respondent engaged in conduct that
was <u>intended</u> to mislead the court, but--of paramount importance--
that the actual conduct affected the outcome of their case."

See Drobny v. Commissioner, supra at 677-678 (citing Kenner v. Commissioner, 387 F.2d 689 (7th Cir. 1968)); Broyhill Furniture Indus., Inc. v. Craftmaster Furniture Corp., supra at 1085; In re Intermagnetics Am., Inc., 926 F.2d 912, 916 (9th Cir. 1991) (citing Alexander v. Robertson, 882 F.2d 421, 424 (9th Cir. 1989)); Senate Realty Corp. v. Commissioner, 511 F.2d 929, 931 (2d Cir. 1975).

The Court of Appeals for the Ninth Circuit has addressed the issue of fraud on the court in a number of cases. Before proceeding with our analysis, we will glean these cases for the insights they yield on the views of the Court of Appeals.

In Toscano v. Commissioner, 441 F.2d 930 (9th Cir. 1971), the taxpayer, Josephine Zelasko (Zelasko), asserted that the Tax Court had erred in failing to vacate a decision entered against Zelasko and her purported husband, John Toscano. Zelasko argued that the decision should be vacated on the ground of fraud on the Court because she was never married to Toscano, her signatures were placed on joint tax returns with Toscano either by forgery or under duress, and she was completely unaware that Toscano had filed a joint petition for redetermination with the Tax Court. After concluding that the Tax Court had the authority to set aside a final decision on the ground of fraud on the court, the Court of Appeals vacated this Court's decision against Zelasko after finding that she had alleged sufficient facts in support of her claim of fraud on the court to justify an evidentiary hearing

in the Tax Court.  More specifically, the Court of Appeals

concluded:

> When a deficiency was assessed, and Toscano
> petitioned the Tax Court for redetermination, he
> carried the fraud into the Tax Court.  Thus he was
> continuing to defraud the Commissioner, and he was
> continuing to attempt to subject Miss Zelasko to a
> liability that was not hers.  But he was doing more; he
> was also perpetrating a fraud upon the Tax Court, which
> culminated in a determination of joint deficiencies
> against Miss Zelasko as well as himself.  This, we
> think, was as much a fraud on the court as was the use
> of the spurious article in the Court of Appeals in
> Hazel-Atlas.

Id. at 935.

In Abatti v. Commissioner, 859 F.2d 115 (9th Cir. 1988),

affg. 86 T.C. 1319 (1986), the taxpayers argued that the Tax

Court had erred in failing to vacate final decisions against them

that were consistent with their agreements to be bound by certain

test cases.  In particular, after the Tax Court had granted

summary judgment in favor of the Commissioner in the test cases,

decisions were entered against the taxpayers in both the test

cases and the piggyback cases.  Although two test case taxpayers

and a number of the taxpayers who had signed piggyback agreements

filed timely appeals and persuaded the Court of Appeals to

reverse the Tax Court's decisions, the remaining taxpayers in the

test cases and piggyback cases did not file appeals.  Following

the remand of the appealed cases to the Tax Court for further

proceedings, the taxpayers who had not filed appeals argued

unsuccessfully in the Tax Court that the otherwise final

decisions entered against them should be vacated pursuant to

their piggyback agreements, which provided that all taxpayers would be afforded the outcome of the test cases.

The Court of Appeals rejected the taxpayers' contention that the Commissioner's position regarding entry of decision under the piggyback agreements constituted fraud on the court. Specifically, the Court of Appeals observed that, while fraud on the court may occur when the acts of a party prevent his adversary from fully and fairly presenting his case or defense, it was the taxpayers' misunderstanding of the piggyback agreements, rather than the Commissioner's fraud, that had caused their misfortune. See id. at 118-119.

In Alexander v. Robertson, supra, the Court of Appeals considered whether the entry of appearance at trial by counsel who was not a licensed attorney in the jurisdiction constituted fraud on the court in the following circumstances. Alexander sued Robertson in the District Court for the Northern District of California for failing to make required payments under a contract to purchase a boat. Robertson in turn cross-claimed against Fraser, Inc. (Fraser), the broker who had arranged for the sale of the boat.

Following a trial, the District Court sustained Alexander's claim against Robertson and rejected Robertson's cross-claims against Fraser. However, Robertson subsequently learned that David Warren (Warren), counsel for Fraser, had not been licensed to practice law in the State of California at the time of the trial. Robertson thereupon moved the District Court to vacate

the judgment, relying on Warren's alleged fraud on the Court. The District Court denied Robertson's motion.

On appeal, the Court of Appeals, citing Moore's definition of fraud on the court, observed that relief from a judgment for fraud on the court does not necessarily require the moving party to show that he was prejudiced by the misconduct.  Quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. at 246, the Court of Appeals stated:  "The Supreme Court, for example, has explained this provision of the Rule not so much in terms of whether the alleged misconduct prejudiced the opposing party but more in terms of whether the alleged misconduct 'harms' the integrity of the judicial process".  Alexander v. Robertson, supra at 424; see In re Intermagnetics Am., Inc., 882 F.2d at 916-917.

Reading Hazel-Atlas Glass in conjunction with Moore's definition of fraud upon the court, the Court of Appeals further observed that Robertson's assertion that Warren's misconduct had subverted the integrity of the judicial process seemed to fit with the proposition that relief may be granted pursuant to rule 60(b) of the Federal Rules of Civil Procedure for fraud upon the court where there is an extraordinary harm to the public.  See Alexander v. Robertson, supra at 424.

Nevertheless, the Court of Appeals sustained the District Court's denial of Robertson's motion to vacate the judgment on the grounds that:  (1) There was no showing that Warren's misconduct was designed to improperly influence the court in its

decision; (2) setting aside the judgment pursuant to rule 60(b) of the Federal Rules of Civil Procedure would be a "fruitless" gesture, inasmuch as Robertson could not prevail on his cross-claims against Fraser in any event; and (3) other remedies, such as disciplinary proceedings, were available to protect the judicial system from the harm arising from Warren's misconduct. See id. at 425; see also Chao v. Commissioner, 92 T.C. at 1144-1145 (where the Court declined to set aside a final judgment for alleged fraud on the Court where the taxpayers could not show that the Court's decision would be different).

The final case in the survey, Pumphrey v. K.W. Thompson Tool Co., 62 F.3d 1128 (9th Cir. 1995), held that in-house counsel for a defendant/gun manufacturer had committed fraud on the court in a products liability action by failing to disclose an incriminating videotape of a product test. Melvin Sparks (Sparks) had dropped a handgun manufactured by defendant K.W. Thompson Tool Co. (Thompson) and was killed when the gun discharged. In a wrongful death action by Sparks' heirs, Thompson introduced a videotape of drop tests of the handgun, and relied upon the testimony of its expert witness who had conducted the tests, to support its contention that the gun had never fired in a drop test. The jury held that the plaintiffs had suffered $100,000 in damages, but that Sparks was 80 percent contributorily negligent.

Following entry of judgment in the case, the plaintiffs learned that Thompson possessed a videotape, made the same day as

the videotape offered at trial, which showed that the handgun in question had in fact fired during a drop test.  On the basis of this evidence, the District Court granted the plaintiff's motion to set aside the verdict and ordered a new trial.

On appeal, the Court of Appeals affirmed the District Court's decision ordering a new trial.  The Court of Appeals first held that Thompson's general counsel was an officer of the court, even though he had not entered his appearance at trial, because he had significantly participated in the case by attending the trial, gathering information to respond to discovery requests, and participating in the videotaping of the drop tests.  See id. at 1130-1131.

The Court of Appeals further defined fraud on the court to include both attempts to subvert the integrity of the court and fraud by an officer of the court, involving an unconscionable plan or scheme designed to influence the court improperly in its decision.  See id. at 1131.  In concluding that Thompson's general counsel had engaged in a scheme to defraud the court, the Court of Appeals cited the general counsel's role in providing misleading and incomplete responses to discovery, as well as his participation in the presentation of fraudulent evidence and his failure to correct the false impression created by the testimony of Thompson's expert witness.  See id. at 1132.

The Court of Appeals went on to reject Thompson's contention that there was no fraud on the court because the videotape was not material to the issues in the trial.  Although questioning

Thompson's assertion that the videotape was not material, the Court of Appeals observed that "Rule 60(b) focuses not so much in terms of whether the alleged fraud prejudiced the opposing party but more in terms of whether the alleged fraud harms the integrity of the judicial process." Id. at 1133.

B.   Discussion

With the preceding review as background, we address whether the Government misconduct in these cases constitutes fraud on the Court.

By entering into secret settlements with the Thompsons and Cravenses, Messrs. McWade and Sims frustrated the Court's and the public's expectations that all litigants before the Court would be adversaries in the full sense of the word.  Such expectations were particularly heightened in these cases, which affect more than a thousand other taxpayers.

Notwithstanding the Government misconduct in these cases, we are convinced, for the reasons set forth below, that the Court's deficiency determinations in Dixon II should be reinstated over petitioners' claims of fraud on the Court.

The misconduct in these cases is not typical of the fraudulent acts committed in cases in which other courts have overturned decisions for fraud on the court.  In particular, although Messrs. Sims, McWade, and DeCastro misled the Court regarding the status of the Thompson and Cravens cases, there was no attempt to present fraudulent evidence to the Court that had any bearing on the substantive issues concerning the transactions

that the Court was called upon to review in the trial of the test cases.

We also observe that, upon discovery of Messrs. McWade's and Sims' misconduct, respondent promptly reported the matter to the Court. Respondent's actions upon discovery of the misconduct and respondent's overall conduct in these proceedings exhibit respondent's institutional good faith.

Further, we are not convinced that justice would be served if we were to adopt the extraordinary remedy, after the evidentiary hearing and our review of the record, of renouncing the Court's deficiency determinations in Dixon II. Consistent with the views stated earlier in this opinion, we are convinced that the test case petitioners were afforded a fair trial, despite the Government misconduct, and that the Government misconduct was not material to the outcome in Dixon II. We are firmly convinced that the outcome of the retrial of the test cases would be the same if we were to order a new trial. Moreover, more discriminating remedies are available both to punish the offenders and to deter similar conduct in the future, see Alexander v. Robertson, 882 F.2d at 425. Considering all the facts and circumstances, we will--with the exceptions discussed below--reinstate the decisions entered in the test cases remaining before the Court.

VI.  Mr. Izen's Allegations That Mr. DeCastro Was a "Mole"

Mr. Izen created the strong impression, in oral argument before the Court of Appeals for the Ninth Circuit in the DuFresne appeal, that Mr. DeCastro had acted as a "mole" or "plant" for the Internal Revenue Service before and during the trial of the test cases.  Mr. Izen returned to this subject in his opening brief following the evidentiary hearing, which argues:

> Any advantage gained by the Commissioner in utilizing DeCastro to "infiltrate" the test case Petitioners' camp is grounds for a new trial, standing alone.  This would be so, in the civil, as well as a criminal context.  Sims and McWade unlawfully paid DeCastro's attorney's fees in a successful effort to subvert the test cases.  They inserted DeCastro into the Petitioners' camp.  They converted what should have been a taxpayer's advocate into a government operative. All of the Petitioners' interests were harmed by this infiltration, since it prevented the cases from being "fairly" tried.  [Citations omitted.]

Although we agree that it was improper for the Government to use Mr. Thompson as a conduit to pay Mr. DeCastro's attorney's fees, there is no credible evidence in the record that Mr. DeCastro acted as a Government "mole" during the trial of the test cases or that Mr. DeCastro conveyed any of Mr. Izen's trial strategies or confidential information to the Government. Accordingly, we reject Mr. Izen's argument that Mr. DeCastro's misconduct, standing alone, or in conjunction with the misconduct of Messrs. McWade and Sims, warrants a new trial of the test cases, or a trial of any other cases in the Kersting project group on the issues that were tried on the test cases, for that matter.

VII. <u>Enforceability of Piggyback Agreements</u>

Petitioners contend that the piggyback agreements executed by nontest case petitioners should be set aside on the ground that Messrs. Sims and McWade fraudulently induced nontest case petitioners to execute piggyback agreements by misrepresenting the status of the Thompson and Cravens cases.[115]  In the alternative, petitioners contend that the piggyback agreements should be set aside on the ground that Messrs. Sims' and McWade's failure to disclose the Thompson and Cravens settlements before the trial of the test cases resulted in a breach of contract. Mr. Sticht contends that enforcement of the piggyback agreements would result in manifest injustice on the ground that Messrs. Sims and McWade used the piggyback agreements as a means to proceed to trial under what Mr. Sticht calls the "sporting theory of justice".

Mr. Sticht raised additional contract arguments in posttrial Motions for Release From Piggyback Agreement that he filed on behalf of nontest case petitioners Richard B. and Donna G. Rogers, Anthony E. and Carol A. Eggers, and John L. and Terry E.

---

[115]  Nontest case petitioners Ronald L. and Mattie L. Alverson executed their piggyback agreement in June 1985--well before Mr. McWade had negotiated the Thompson and Cravens settlements.  Nontest case petitioners Anthony E. and Carol A. Eggers, John L. and Terry E. Huber, Stanley C. and Sharon A. Titcomb, and Richard B. and Donna G. Rogers executed piggyback agreements in late November 1986--about the time that Mr. McWade began settlement discussions with Messrs. Thompson and Cravens. Nontest case petitioners Norman W. and Barbara L. Adair executed their piggyback agreement in March 1987--well after Mr. McWade had negotiated the Thompson and Cravens settlements.

Huber. Mr. Sticht contends that Mr. Seery's apparent conflict of interest, at a time when Mr. Seery represented nontest case petitioners Rogers, Eggers, and Huber, provides a basis for releasing nontest case petitioners from their piggyback agreements.

Respondent contends that Messrs. Sims' and McWade's failure to disclose the Thompson and Cravens settlements did not rise to the level of failure to perform a contractual duty owed to the nontest case petitioners. Respondent further contends that the piggyback agreements should be enforced on the ground that the nontest case petitioners were not prejudiced by Messrs. Sims' and McWade's misconduct.[116]

Respondent also filed objections to Mr. Sticht's Motions for Release From Piggyback Agreement. In short, respondent contends that the validity of the piggyback agreements is not adversely affected by either Mr. Seery's alleged conflict of interest or the events occurring during the trial of the test cases.

A. Principles of Contract Law

Although the piggyback agreements in dispute are titled "Stipulation of Settlement For Tax Shelter Adjustments", we have noted that such agreements do not reflect a settlement or

---

[116] Respondent did not address the enforceability of the piggyback agreements in respondent's opening brief in the belief that it was premature to address the question pending the Court's decision whether the Government misconduct in the trial of the test cases constituted a structural defect. By order dated Feb. 27, 1998, the Court directed respondent to address the question in respondent's reply brief, and respondent did so.

compromise of the taxpayer's case but merely prescribe the procedure for the adjudication of the case. See Adams v. Commissioner, 85 T.C. at 369. Nevertheless, we have relied upon general principles of contract law in construing piggyback agreements and settlement agreements alike. See Gridley v. Commissioner, T.C. Memo. 1997-210; see also Saigh v. Commissioner, 26 T.C. 171, 177 (1956); Fisher v. Commissioner, T.C. Memo. 1994-434; Applestein v. Commissioner, T.C. Memo. 1989-42.

Mr. Izen contends that the piggyback agreements constitute public contracts that are governed by the Federal common law of contracts. Neither respondent nor the other petitioners have addressed the question.[117] In any event, as in Fisher v. Commissioner, supra, we see no consequential choice of law problem in the cases at hand. We are satisfied that the general contract principles relied upon herein are consistent with the principles applied by State courts.

Petitioners argue that the piggyback agreements may be set aside because of Messrs. Sims' and McWade's failure to disclose the true status of the Thompson and Cravens cases at the time nontest case petitioners executed the agreements. Every contract

---

[117] For a detailed discussion whether Federal or State law governs the validity of a purported joint return that is impugned on the ground of duress, reviewing the matter under 1 Restatement, Contracts 2d (1981), and New Jersey common law, see Berger v. Commissioner, T.C. Memo. 1996-76. The Berger opinion concludes that the result would be same under the State law and the putative Federal common law.

imposes upon the parties thereto an implied duty of good faith and fair dealing. See <u>San Jose Prod. Credit Association v. Old Republic Life Ins. Co.</u>, 723 F.2d 700, 703 (9th Cir. 1984); <u>Smith v. Empire Sanitary Dist.</u>, 127 Cal. App. 2d 63, 71, 273 P.2d 37, 43 (1954); 3A Corbin on Contracts, sec. 654A, at 86 (1998 Supp.). A contract generally is voidable if one party's assent to the agreement is induced by a fraudulent or material misrepresentation by the other party to the contract. See <u>Dorchester Indus. Inc. v. Commissioner</u>, 108 T.C. 320, 335 (1997); 1 Restatement, <u>supra</u> sec. 164(1). A party's nondisclosure of a fact known to him is treated as an assertion that the fact does not exist where he knows that the disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party relies in making the contract. See 1 Restatement, <u>supra</u> sec. 161(b). The nondisclosure of a fact known to a party to a contract may be considered a fraudulent misrepresentation if the party intends the nondisclosure to mislead the other party. See <u>id.</u> sec. 162(1)(a). The Court has held that a settlement stipulation may be set aside for excusable, damaging reliance upon a false or untrue representation of the other party. See <u>Saigh v. Commissioner</u>, <u>supra</u> at 180; <u>Fisher v. Commissioner</u>, <u>supra</u>.

Although a contract may be voidable because of a fraudulent or material misrepresentation, the right to avoid the contract may lapse if the effect of the misrepresentation is cured or the substance of the performance promised has been delivered before

the affected party gives notice of his intent to avoid the contract. See Ice v. Benedict Nuclear Pharms., Inc., 797 P.2d 757, 759 (Colo. Ct. App. 1990); 1 Restatement, supra sec. 165.

Petitioners also contend that Messrs. Sims' and McWade's failure to disclose the Thompson and Cravens settlements before the trial of the test cases constitutes a breach of contract. The conditions and obligations underlying a contract may be implied from the terms or nature of the agreement, particularly where the matter is presumed to have been perfectly obvious to the parties. See Sacramento Navigation Co. v. Salz, 273 U.S. 326, 328-329 (1927) (contract for the transportation of barley on a barge (which lacked a power source) implied that the barge would be used with a steamer or tug); see also Hudson Canal Co. v. Pennsylvania Coal Co., 75 U.S. (8 Wall.) 276 (1868) (contract between coal producer and canal company for transportation of coal by way of canal, under which coal company constructed railroad from its mine to the canal and canal company enlarged its canal, did not imply that coal company would use the canal as sole means for transporting its coal).

A contract may be avoided or rescinded where a party fails to satisfy a material or essential term or condition of the agreement. See First Interstate Bank v. SBA, 868 F.2d 340, 343-344 (9th Cir. 1989), and cases cited therein. A material breach of contract is one that substantially defeats its purpose so that the injured party is justified in treating the matter as at an end. See 4 Corbin on Contracts, supra sec. 946, at 809. The

materiality of a breach generally is considered a question of fact to be decided on the basis of all the facts and circumstances. See Smith v. Empire Sanitary Dist., supra, and cases cited therein. In First Interstate Bank v. SBA, supra at 343-344, the Court of Appeals for the Ninth Circuit stated that the test of whether a breach of a Federal contract is material is an "all-the-circumstances-test" and that the Court of Appeals considers the five factors listed under 1 Restatement, supra sec. 241, as significant in applying the test.[118]

---

[118] 1 Restatement, Contracts 2d, sec. 241 (1981), states as follows:

In determining whether a failure to render or to offer performance is material, the following circumstances are significant:

(a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(b) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(d) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all of the circumstances including any reasonable assurances;

(e) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

B.    Discussion

1.    Benefit of the Bargain

The piggyback agreements executed in these cases reflect a bargained-for exchange:  Nontest case petitioners who executed piggyback agreements surrendered their rights to have their own cases tried on the merits of the Kersting adjustments in exchange for respondent's agreement that their deficiencies would be redetermined in accordance with the outcome of the trial on the merits of the test cases.  Both respondent and nontest case petitioners expected to benefit under the piggyback agreements by avoiding the expenses of a trial on the merits.

It is apparent that nontest case petitioners who signed piggyback agreements did so with the assumption, shared by the Court, that the trial of the test cases would not include cases that had been settled before the trial.  That the trial of the test cases would not include settled cases is a matter that we presume to have been perfectly obvious to the parties and an implied term of the piggyback agreements.

We now know that Messrs. Sims and McWade misled the Court, the remaining test case petitioners, and the nontest case petitioners who signed piggyback agreements by entering into--and not disclosing--settlements with Messrs. Thompson and Cravens. Under the circumstances, we are persuaded that nontest case petitioners who executed their piggyback agreements after the Thompson and Cravens settlements were negotiated, were partially induced to execute the piggyback agreements by Messrs. Sims' and

McWade's failures to disclose the true status of all the test cases. Moreover, we conclude that Messrs. Sims and McWade violated an implied term of the piggyback agreements by allowing the trial of the test cases to proceed without disclosing the Thompson and Cravens settlements.

Notwithstanding the foregoing, we are obliged to consider, under either of petitioners' theories for relief, whether petitioners' received the substance of the performance promised under the piggyback agreements; i.e., whether petitioners received the benefit of the bargain. See Ice v. Benedict Nuclear Pharms., Inc., supra; 1 Restatement, supra sec. 165. Stated differently, we must determine whether Messrs. Sims and McWade violated a material or essential term or condition of the piggyback agreements before we can declare the piggyback agreements invalid. See First Interstate Bank v. Small Bus. Admin., supra.

We begin with the observation that Messrs. Sims' and McWade's misconduct did not deprive petitioners of the benefit that they reasonably expected under the piggyback agreements. As previously discussed, petitioners expected that their cases would be decided in accordance with the Court's opinion following a trial of test cases that would be representative of the various Kersting programs in dispute in their cases. The piggyback agreements imply an understanding that the trial of the test cases would be an adversarial proceeding (and that the trial would not include test cases that had been settled). Although

the Thompson and Cravens settlements were contrary to petitioners' assumption or expectation that none of the test cases would be settled before the trial, the record shows that the trial of the cases of the six test case petitioners represented by Mr. Izen remained fully adversarial. Further, we have already observed that Mr. Izen was not prevented or inhibited from fully and fairly presenting his cases to the Court and that the testimony and evidence associated with the Thompson and Cravens cases did not affect the outcome in Dixon II. Considering that the cases of the six test case petitioners presented by Mr. Izen were representative of the various Kersting programs in dispute, see table setting forth test case array supra pp. 38-41, we conclude that petitioners were not deprived of the benefit that they reasonably expected under the piggyback agreements.

We balance the fact that petitioners were not deprived of the benefit of their bargain under the piggyback agreements against Messrs. Sims' and McWade's misconduct in failing to disclose the Thompson and Cravens settlements before the trial of the test cases, as well as the indirect damages that petitioners have suffered as a result of Messrs. Sims' and McWade's misconduct. As a consequence of Messrs. Sims' and McWade's violation of an implied term of the piggyback agreements, some petitioners undoubtedly have suffered consequential damages such as accrual of additional statutory interest under section 6601

and/or attorney's fees incurred for representation at the evidentiary hearing.[119]

We note that Messrs. Sims and McWade are not solely responsible for the accrual of additional statutory interest in these cases. Petitioners have always had the ability to stop the accrual of additional interest by remitting a payment in the nature of a cash bond. See sec. 6213(b)(4). However, Mr. Kersting advised program participants that they should not remit any amount to the Internal Revenue Service until their liability was determined in court, and many of the nontest case petitioners appear to have relied upon that advice. We further observe that Mr. Kersting's interference in the Chicoine and Hallett settlement negotiations, and his recommendation that program participants reject the 20-percent settlement offer, can be viewed as indirect causes of the accrual of additional interest in many of these cases that would have otherwise settled.

On balance, we conclude that Messrs. Sims' and McWade's misconduct in failing to disclose the Thompson and Cravens settlements to nontest case petitioners who signed piggyback agreements, and in violating an implied term of the piggyback agreements, does not rise to the level of materiality that would

---

[119] We observe that a number of petitioners, including the Thompsons and the Cravenses, paid their deficiencies and interest in late 1986 in order to stop the running of interest and to obtain the full benefit of deductions for interest that would have been subject to phaseout if paid in later years.

justify setting aside the piggyback agreements. Accordingly, we will decline to avoid or rescind the piggyback agreements.

Even if we were to conclude that Messrs. Sims' and McWade's failure to disclose the Thompson and Cravens settlements constituted a breach of the piggyback agreements that would justify their rescission or cancellation, petitioners would not be entitled to a new trial. In due course, petitioners would be ordered to show cause why their cases should not be decided consistently with Dixon II. See, e.g., Krause v. Commissioner, 99 T.C. 132 (1992); Acierno v. Commissioner, T.C. Memo. 1997-441; Karlsson v. Commissioner, T.C. Memo. 1997-432; Bokum v. Commissioner, T.C. Memo. 1990-21, affd. 992 F.2d 1136 (11th Cir. 1993). Considering the entire record in these cases, we are convinced that nontest case petitioners inevitably would be bound by the Court's opinion in Dixon II.

2. Mr. Seery's Purported Conflict of Interest

We likewise reject Mr. Sticht's contention that the piggyback agreements should be set aside on the ground that Mr. Seery had a conflict of interest when he executed the piggyback agreements. The short answer to Mr. Sticht's contention is that Judge Goffe did not find that Mr. Seery had a conflict of interest. Judge Goffe merely indicated that Mr. Seery's motion to change the place of trial, filed November 7, 1986, gave rise to the possible inference that Mr. Seery was engaged in dual representation of both Mr. Kersting and Kersting program participants. Similarly, Mr. Seery's motions to withdraw

as counsel stated that Mr. Seery felt obliged to withdraw because the Court had raised an issue of his possible conflict of interest.

The record in these cases does not reflect that Mr. Seery had a conflict of interest as the result of his possible dual representation of Mr. Kersting and Kersting program participants. Mr. Seery negotiated the modified 7-percent settlement offer with Mr. McWade and arranged to have it disseminated to Kersting program participants, notwithstanding Mr. Kersting's disapproval of the offer as inadequate. Equally important, because Mr. Seery revealed in his motions to withdraw as counsel that he felt obliged to withdraw because the Court had raised an issue of his possible conflict of interest, Mr. Sticht's clients had ample opportunity at that time to move to have their piggyback agreements set aside.

Finally, even assuming for the sake of argument that Mr. Seery had a conflict of interest, petitioners have failed to show that they were prejudiced by his actions. See Adams v. Commissioner, 85 T.C. at 375-376. Accordingly, we will deny Mr. Sticht's Motions for Release From Piggyback Agreement filed on behalf of nontest case petitioners Richard B. and Donna G. Rogers, Anthony E. and Carol A. Eggers, and John L. and Terry E. Huber.[120]

---

[120] Mr. Sticht included as an attachment to the Rogers motion a copy of a piggyback agreement executed by Mr. Seery (on the Rogerses' behalf) and by Mr. McWade. Mr. Sticht contends
(continued...)

3.    Rejection of Mr. Izen's Argument for Entry of Decision
         on the Basis of Thompson Decisions

Mr. Izen contends that, pursuant to the piggyback

agreements, petitioners are entitled to entry of decision

consistent with the decisions entered in the Thompson cases.  In

Gridley v. Commissioner, T.C. Memo. 1997-210, we rejected this

argument on the ground that nontest cases petitioners who signed

piggyback agreements agreed to be bound by the Court's opinion in

Dixon II as opposed to a specific decision entered in a

particular test case.  Consistent with our analysis in Gridley v.

Commissioner, supra, we reject Mr. Izen's argument.

VIII. Mary Carter Agreements

At common law, a plaintiff had only one cause of action

against joint tort-feasors; therefore a plaintiff's release of

one joint tort-feasor would release all the joint tort-feasors.[121]

---

[120](...continued)
that the Rogerses may rescind this piggyback agreement on the
ground that it was never filed with the Court.  We reject
Mr. Sticht's argument as contrary to this Court's recent holding
in Dorchester Indus., Inc. v. Commissioner, 108 T.C. 320 (1997)
(settlement agreement is binding even though it has not been
filed as a stipulation with the Court).  Moreover, we are
satisfied that the Rogerses are bound by a piggyback agreement
executed by Mr. Seery and Mr. McWade and filed with the Court in
Aaronson v. Commissioner, docket No. 17445-82, on Dec. 1, 1986,
at a time when the Rogerses were parties to that consolidated
docket.

[121]   See Note, "The Mary Carter Agreement--Solving the
Problems of Collusive Settlements in Joint Tort Actions", 47 S.
Cal. L. Rev. 1393, 1395-1396 (1974).  This note is referenced in
d'Hedouville v. Pioneer Hotel Co., 552 F.2d 886, 895 (9th Cir.
1977), one of the few cases in which the Court of Appeals for the
Ninth Circuit has addressed Mary Carter Agreements (MCA's),
thereby meriting special attention.

In order to avoid this result and encourage partial settlements of cases, a number of legal devices were developed to circumvent the common law rule.  One of these devices is known as the Mary Carter agreement (MCA),[122] taking its name from <u>Booth v. Mary Carter Paint Co.</u>, 202 So. 2d 8 (Fla. Dist. Ct. App. 1967), overruled by <u>Ward v. Ochoa</u>, 284 So. 2d 385 (Fla. 1973).

As in <u>Mary Carter Paint Co.</u>, MCA's typically consist of four elements:  (1) The plaintiff enters into an agreement with some but not all the defendants not to enforce the court's judgment against the settling defendants; (2) the settling defendants agree to pay the plaintiff a guaranteed minimum payment, thereby placing a limit on their liability to the plaintiff; (3) the settling defendants agree to remain parties to the action until a verdict has been rendered or until they have been released by the court or the plaintiff; and (4) the parties agree to keep the agreement secret from the court and the nonsettling defendants. Usually, the defendant's guaranteed minimum payment is reduced or extinguished if the plaintiff recovers against the nonsettling defendants in an amount greater than the guaranteed minimum payment (hereinafter the Sliding Scale Clause), thereby giving

---

[122]  But see Note, "It's a Mistake to Tolerate the Mary Carter Agreement", 87 Colum. L. Rev. 368, 379 (1987), arguing that MCA's actually encourage litigation, rather than promote settlement of disputes, because the agreement requires continued litigation against the nonsettling defendants.  The Supreme Courts of Texas and Florida, in declaring MCA's void as against public policy, have done so for a variety of reasons, one of them being that MCA's, rather than encouraging settlements, actually promote litigation.  See <u>Dosdurian v. Carsten</u>, 624 So. 2d 241 (Fla. 1993); <u>Elbaor v. Smith</u>, 845 S.W.2d 240 (Tex. 1992).

the settling defendant a direct financial stake in the outcome of the case that is adverse to that of the nonsettling defendants.

MCA's that include a Sliding Scale Clause generally are considered invalid or void because such agreements leave the finder of fact with the false impression that there is adversity between the plaintiff and all of the defendants while in reality there is adversity between the settling defendants and nonsettling defendants.  See Dosdourian v. Cartsen, 624 So. 2d 241 (Fla. 1993); Fullenkamp v. Newcomer, 508 N.E.2d 37 (Ind. Ct. App. 1987); General Motors Corp. v. Lahocki, 410 A.2d 1039 (Md. 1980); Lum v. Stinnett, 488 P.2d 347 (Nev. 1971); Cox v. Kelsey-Hayes Co., 594 P.2d 354 (Okla. 1978).[123]  However, some courts have declined to invalidate such agreements, depending upon the particular facts and circumstances of the case.  See Hoops v. Watermelon City Trucking, Inc., 846 F.2d 637 (10th Cir. 1988); d'Hedouville v. Pioneer Hotel Co., 552 F.2d 886 (9th Cir. 1977); Slusher v. Ospital, 777 P.2d 437 (Utah 1989).

---

[123]  See Note, "It's a Mistake to Tolerate the Mary Carter Agreement", 87 Colum. L. Rev. 368, 370 (1987); see also Cox v. Kelsey-Hayes Co., 594 P.2d 354, 359 (Okla. 1978), where the court stated:

> Courts and commentators, recognizing the substantial prejudice to the non-agreeing defendants, are nearly unanimous in their belief the agreements must be disclosed prior to trial and if the agreeing defendant's maximum liability will be reduced by increasing the liability of his codefendant, the jury must be informed of the contents of the agreement * * *.

Although the Thompson and Cravens settlement agreements
contain the basic elements of an MCA, the tax liabilities of the
Thompsons and the Cravenses were not tied to a Sliding Scale
Clause. Rather than having a direct financial stake in the
outcome of the case adverse to that of the remaining test case
petitioners, the Thompsons and Cravenses had their tax
liabilities capped, and those liabilities would have been further
reduced or eliminated if the test case petitioners had prevailed
at trial. Although the Thompsons' and Cravenses' adversarial
posture toward respondent had been diluted, they remained
adversaries of respondent in some residual sense.

Even more important, the Thompson and Cravens settlement
agreements did not realign their interests so as to justify the
conclusion that they had become adversaries of the remaining test
case petitioners. The record shows that Mr. Cravens appeared at
the trial of the test cases and testified in support of the test
case petitioners' position. Although Mr. Thompson did not have a
direct interest in a decision against the remaining test case
petitioners, the record indicates that Mr. Thompson may have
viewed the trial of the test cases as an opportunity to gain
some advantage against Mr. Kersting's threats to enforce Mr.
Thompson's promissory notes.[124] While it might be argued that the
Thompsons expected or received some benefit from the Court's

_____

[124] Of course, Judge Goffe was aware that Mr. Thompson
was hostile towards Mr. Kersting and was able to assess
Mr. Thompson's credibility from that standpoint.

holding in Dixon II that the disputed promissory notes did not create genuine indebtedness for tax purposes, it was not a direct financial benefit in the sense that Judge Goffe's opinion is not dispositive of the question whether Mr. Thompson's notes are enforceable against him for State law purposes.  Unlike MCA's with Sliding Scale Clauses that provide settling defendants with an immediate financial reward for large verdicts against nonsettling defendants, Mr. Thompson's reward was a moral victory at best.  Any financial stake the Thompsons did have in the outcome of the test cases is at least one long step removed from the distinct and immediate financial stake a settling defendant normally has under a Sliding Scale Clause in an MCA.

Considering all the facts and circumstances, we hold that the family resemblances between Mary Carter agreements and the Thompson and Cravens settlements do not bar the Court from reinstating its decisions in the test cases.

IX.  Mr. Sticht's Motion To Sever Case and for Entry of Decision or Alternatively To Sever Case and Set for Trial

On June 9, 1998, Mr. Sticht filed a Motion to Sever Case and for Entry of Decision; Or Alternatively to Sever Case and Set for Trial on behalf of Joe A. and JoAnne Rinaldi in docket No. 7205-94.  The Rinaldis' case at docket No. 7205-94 concerns the Rinaldis' tax liabilities for 1990 and 1991 and is based upon a notice of deficiency that was issued after the disclosure of the misconduct in the trial of the test cases.  Because the Rinaldis did not sign a piggyback agreement in docket No. 7205-94, Mr.

Sticht contends that the Court's opinion in Dixon II is not binding on the Rinaldis.[125]  Mr. Sticht relies upon the misconduct in the trial of the test cases to contend that the Court should either enter a decision in the Rinaldis' favor or sever the Rinaldis' case from the consolidated cases and set the case for trial.  Mr. Sticht contends that the Court's opinion in Dixon II has no effect in the Rinaldis' dockets in which they did not execute piggyback agreements.

Respondent contends that Mr. Sticht's motion should be denied on the grounds that:  (1) The record does not support entry of decision in the Rinaldis' favor; and (2) the Rinaldis' motion amounts to a premature attempt to avoid a "show cause" proceeding.  Respondent further contends that, if the Court's opinion in Dixon II should be reinstated, it provides an appropriate basis for resolving any deductions claimed by the Rinaldis with respect to Kersting programs in dispute in Dixon II.[126]

Consistent with our holdings that the Government misconduct did not cause a structural defect in the trial of the test cases

---

[125]  The Rinaldis have seven cases docketed with the Court assigned docket Nos. 31065-83, 21615-87, 6981-89, 11439-90, 27556-90, 14907-93, and 7205-94.  The Rinaldis executed piggyback agreements in each of the dockets listed above except docket Nos. 14907-93 and 7205-94.

[126]  Respondent states that the Rinaldis may have participated in Mr. Kersting's Bauspar program during some of the years for which they have filed petitions with the Court. Respondent acknowledges that, because the Bauspar program was not litigated in Dixon II, the Court's opinion would not dispose of Bauspar deductions claimed by the Rinaldis or others.

and that the misconduct resulted in harmless error, we see no basis or justification for entry of decision in favor of the Rinaldis. Nor will we sever the Rinaldis' case from the consolidated group and/or set the case for trial at this time. To the contrary, because we will reinstate our opinion in Dixon II and enter decisions in the remaining original test cases, we will abide the outcome of any appeal that follows the issuance of this opinion. If affirmed by the Court of Appeals, we will, upon respondent's motion, issue an Order to Show Cause in due course directing the Rinaldis to show cause why the resolution of the substantive tax issues in their case should not be controlled by our opinion in Dixon II. See Krause v. Commissioner, 99 T.C. 132 (1992); Acierno v. Commissioner, T.C. Memo. 1997-441; Karlsson v. Commissioner, T.C. Memo. 1997-432; Bokum v. Commissioner, T.C. Memo. 1990-21.

X.    Protective Orders

As previously discussed, the Court issued protective orders in these cases dated June 10 and 26, 1996, with respect to documents produced by Mr. Thompson. By order dated August 27, 1998, the Court directed the parties, particularly Messrs. Huestis and Sticht, to file reports with the Court stating in detail any objection to the lifting of the Court's protective orders. Mr. Huestis filed a report with the Court objecting to the lifting of the Court's protective orders on the ground that Mr. Kersting might use the records in question to harass the Thompsons. Mr. Sticht and respondent filed separate reports with

the Court indicating no objection to the lifting of the

protective orders.

Section 7458, which governs hearings before the Tax Court,

provides that such hearings shall be open to the public.  In

addition, section 7461, entitled "Publicity of Proceedings",

provides in pertinent part:

> SEC. 7461(a). General Rule.--Except as provided in subsection (b), all reports of the Tax Court and all evidence received by the Tax Court and its divisions, including a transcript of the stenographic report of the hearings, shall be public records open to the inspection of the public.

> (b) Exceptions.--

> (1) Trade Secrets or Other Confidential Information.--The Tax Court may make any provision which is necessary to prevent the disclosure of trade secrets or other confidential information, including a provision that any document or information be placed under seal to be opened only as directed by the court.

Rule 103 provides that upon motion by a party or other

affected person, and upon good cause shown, the Court may make

any order which justice requires to protect a party or other

person from annoyance, embarrassment, oppression, or undue burden

or expense.

Sections 7458 and 7461 reflect the well-established

principle that official proceedings and records of all courts,

including the Tax Court, generally shall be open and available to

the public.  See Nixon v. Warner Communications, Inc., 435 U.S.

589, 597 (1978); Willie Nelson Music Co. v. Commissioner, 85 T.C.

914, 917 (1985).  However, section 7461 and Rule 103 provide that

the Court has the discretionary authority to order all or part of

a record to be sealed where such action is necessary to protect trade secrets and confidential information or to avoid annoyance, embarrassment, oppression, or undue burden or expense. See Willie Nelson Music Co. v. Commissioner, supra at 918-919, and cases cited threat.

In resolving whether a permanent protective order sealing a portion of the evidentiary record is warranted in these cases, we must weigh the public's interest in free and open access to Tax Court proceedings against the individual interests advanced in these cases. See Nixon v. Warner Communications, Inc., supra at 602. The public's interest in open judicial proceedings is presumed to be paramount to the interests of an individual seeking to close the proceedings in that open proceedings allow the public an opportunity to understand the underlying dispute and its disposition, thereby enhancing public confidence in our system of taxation. See Willie Nelson Music Co. v. Commissioner, supra at 919.

The Court is of the view that its protective orders sealing the documents described above have served their purpose and that the public's interest in open proceedings outweighs any continuing individual interests at stake in these cases. Mr. Huestis has not persuaded us otherwise. We note that there is no indication that Mr. Kersting has initiated litigation against the Thompsons, nor any imminent threat of any such litigation. We do not believe that unsealing the documents in question would increase the likelihood of any such threat.

Moreover, the Court has disclosed the contents of a number of the disputed documents in this opinion. Considering all the facts and circumstances, we will lift the protective orders dated June 10 and 26, 1996.

XI. <u>Sanctions</u>

The Court has inherent power "to protect our own process from abuse, oppression, and injustice." <u>Griffith v. Commissioner</u>, T.C. Memo. 1988-123 (citing <u>Gumbel v. Pitkin</u>, 124 U.S. 131, 145-146 (1888), and <u>Eash v. Riggins Trucking Inc.</u>, 757 F.2d 557 (3d Cir. 1985) (en banc)).

Messrs. Sims' and McWade's misconduct in the trial of the test cases has caused a substantial delay in the resolution of Kersting project cases. Considering the unique circumstances of these cases, and the harm resulting from the Government misconduct in the trial of the test cases, we consider this is an appropriate occasion for the Court to impose limited sanctions against respondent under Rule 123(a). See <u>Vermouth v. Commissioner</u>, 88 T.C. 1488 (1987) (discussing and relying on <u>United States v. Sumitomo Marine & Fire Ins. Co.</u>, 617 F.2d 1365 (9th Cir. 1980)); see also <u>Betz v. Commissioner</u>, 90 T.C. 816, 823 (1988).

Respondent determined that Kersting program participants are liable for additions to tax for negligence under section 6653. For the taxable years 1981 through 1985, section 6653(a)(2) provides that the addition to tax for negligence includes a component equal to 50 percent of the interest due on the

deficiency. For the taxable years 1986 and 1987, the interest component of the addition to tax for negligence is codified under section 6653(a)(1)(B).

Respondent also determined that Kersting program participants are liable for interest computed at the increased rate prescribed under section 6621(c). Section 6621(c) provides that interest on a deficiency shall be computed at an increased rate with respect to any substantial underpayment attributable to a tax-motivated transaction.

The interest component of the addition to tax for negligence and interest computed at the increased rate prescribed under section 6621(c) are time-sensitive provisions whose impact will be amplified in these cases as a consequence of the delay occasioned in large part by the Government misconduct described herein. With a view to promoting basic fairness and justice in the Kersting project cases, and to discourage future acts of Government misconduct, we hold that Kersting program participants who either have not had decisions entered in their cases or whose decisions are not yet final are not liable for the interest component of the addition to tax for negligence under sections 6653(a)(2) and 6653(a)(1)(B) or interest computed at the increased rate prescribed in section 6621(c).[127]

---

[127] As previously mentioned, see supra pp. 44-47, there is an inconsistency between the 1985 piggyback agreements and the post-1985 piggyback agreements concerning additions to tax: the 1985 piggyback agreements are silent about additions to tax, while the post-1985 piggyback agreements provide that Kersting

(continued...)

## Conclusion

Consistent with all the foregoing, we will issue an order reinstating the Court's opinion in <u>Dixon v. Commissioner</u>, T.C. Memo. 1991-614, excepting the portions sustaining respondent's determinations that test case petitioners were liable for additions to tax for negligence under sections 6653(a)(2) and 6653(a)(1)(B) and increased interest under section 6621(c), and directing the parties, where appropriate, to file stipulated decisions with the Court.

> <u>An appropriate order will be issued</u>
> <u>and decisions will be entered in docket</u>
> <u>Nos. 9382-83, 4201-84, 15907-84, 40159-84,</u>
> <u>22783-85, 30010-85, 30979-85, and 29643-86</u>.
> <u>An appropriate order will be issued in</u>
> <u>docket Nos. 17646-83, 7323-84, 20119-84,</u>
> <u>35608-86, 19464-92, 621-94, 7205-94,</u>
> <u>9532-94, 17992-95, and 17993-95</u>.

---

[127](...continued)
program participants are not liable for additions to tax for negligence for taxable years before 1982. We have surmised that respondent limited this concession to taxable years before 1982 on the ground that the Court's May 1982 release of its opinion in <u>Pike v. Commissioner</u>, 78 T.C. 822 (1982), put prospective Kersting program participants on notice that the Kersting programs did not generate legitimate interest deductions. See <u>supra</u> note 26. The record does not disclose whether respondent intends to extend the same relief across the board to all participants in the Kersting programs whose cases have not been the subject of a final determination. We observe that extending such relief would promote the consistency in treatment among similarly situated taxpayers that piggyback agreements and the test case procedure are intended to promote.